# 25-3129 (L),
## 25-3132 (CON), 25-3135 (CON)

# United States Court of Appeals

*for the*

## Second Circuit

BRIAN PFAIL,

*Plaintiff-Appellee,*

– v. –

COUNTY OF NASSAU, POLICE OFFICER JONATHAN PANUTHOS, in his individual and official capacity, POLICE OFFICER KAREN C. O'BRIEN, in her individual and official capacity, JOHN DOES 1-10, in their individual and official capacities, NASSAU COUNTY POLICE DEPARTMENT, SERGEANT THOMAS IANNUCCI, in his individual and official capacity, POLICE OFFICER JOSEPH MASSARO, in his individual and official capacity,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## APPENDIX FOR DEFENDANTS-APPELLANTS
## VOLUME 6 OF 17 (PAGES A-1421 TO A-1700)

MATTHEW A. CUOMO
CUOMO LLC
*Attorneys for Defendant-Appellant
Thomas Iannucci*
200 Old Country Road, Suite 2 South
Mineola, New York 11501
(516) 741-3222

LEO DORFMAN
SOKOLOFF STERN LLP
*Attorneys for Defendant-Appellant
Joseph Massaro*
179 Westbury Avenue, Suite 201
Carle Place, New York 11514
(516) 334-4500

*(For Continuation of Appearances See Inside Cover)*

 COUNSEL PRESS   (800) 4-APPEAL • (392582)

HELEN M. BENZIE
THE LAW OFFICE OF
 VINCENT D. MCNAMARA
*Attorneys for Defendants-Appellants*
 *Police Officer Jonathan Panuthos, in*
 *his individual and official capacity.*
 *Police Officer Karen C. O'Brien, in*
 *her individual and official capacity,*
 *Nassau County Police Department*
1045 Oyster Bay Road, Suite 1
East Norwich, New York 11732
(516) 922-9100
hbenzie@vdm-law.com

i

# TABLE OF CONTENTS

**Page**

U.S. District Court Docket Entries ............................ A-1

Complaint, dated February 1, 2016 ........................... A-37

Answer, by Defendants, dated April 1, 2016 ............. A-64

Order of the Honorable Cheryl L. Pollak, dated
  January 2, 2023 ........................................ A-77

Order of the Honorable Cheryl L. Pollak, dated
  November 8, 2023 ................................... A-88

Proposed Pretrial Order, dated May 10, 2024 ............ A-93

Proposed Pretrial Order with Comments, dated
  January 3, 2025 ........................................ A-153

Proposed Pretrial Order, dated January 14, 2025 ...... A-195

Motions *In Limine*, by Plaintiff, dated
  March 21, 2025 ........................................ A-234

Motions *In Limine*, by Plaintiff, dated
  March 21, 2025 ........................................ A-243

Exhibit A to Motions In Limine -
(i) Certificate of Disposition Dismissal, in *The
People of the State of New York v. Pfail*, Nassau
County Court Case No. 00402B-2015, dated
December 21, 2018 ................................... A-252

(ii) Certificate of Disposition Acquittal, in *The
People of the State of New York v. Pfail*, Nassau
County Court Case No. 00402N-2015, dated
December 20, 2018 ................................... A-254

(iii) Certificate of Disposition Dismissal, in *The
People of the State of New York v. Pfail*, Nassau
County Court Case No. 00402A-2015, dated
December 21, 2018 ................................... A-255

**ii**

Page

(iv) Certificate of Disposition, in *The People of the State of New York v. Pfail*, Nassau District Court Docket No. CR-003681-17NA, dated December 21, 2018 ................................................. A-256

(v) Certificate of Disposition, in *The People of the State of New York v. Pfail*, Queens Criminal Court Docket No. CR-016669-17QN, dated November 19, 2018 ................................................. A-257

Request to Charge, by Plaintiff, dated March 21, 2025 ........................................................ A-258

Proposed Verdict Sheet, filed May 21, 2025.............. A-304

Motion *In Limine*, by Defendants, dated March 21, 2025 ........................................................ A-309

Notice of Motion I*n Limine*, by Defendant Police Officer Joseph Massaro, dated March 21, 2025 .... A-316

Declaration of Leo Dorfman, for Defendant Police Officer Joseph Massaro, in Support of Motion, dated March 21, 2025 ............................................. A-318

Exhibit A to Dorfman Declaration - Neuropsychological Evaluation of N.G. Berrill, Ph.D., dated May 19, 2020 .................................... A-320

Exhibit B to Dorfman Declaration - Dr. N.G. Berrill's Amended Expert Report Disclosure Pursuant to FRCP Rule 26(A)(2)(a), by Plaintiff, dated December 10, 2024 .................. A-338

Annexed to Disclosure - Updated Evaluation of N.G. Berrill, Ph.D., dated December 4, 2024 .................................... A-342

Exhibit C to Dorfman Declaration - Deposition Transcript of Dr. N.G. Berrill, dated December 20, 2024 ................................................ A-369

iii

**Page**

Exhibit D to Dorfman Declaration -
Deposition Transcript of Dr. Naftali Garcia
Berrill, dated February 4, 2025 .............................. A-503

Motion *In Limine*, by Defendants, for an Order to
Preclude Dr. Berrill's Testimony, dated
March 21, 2025 ....................................................... A-616

Letter from Frederick K. Brewington to the
Honorable Nina R. Morrison, dated
March 21, 2025 ....................................................... A-635

Memorandum of Law, by Defendants, in Opposition
to Plaintiff's Motion *In Limine*, dated
April 4, 2025 ........................................................... A-637

Opposition, by Plaintiff, to Defendants' Motions *In
Limine*, dated April 4, 2025 ................................... A-649

Opposition, by Plaintiff, to Defendants' Motions to
Preclude Dr. Berrill, dated April 4, 2025 ............... A-657

Letter from Leo Dorfman to the Honorable Nina R.
Morrison, dated April 14, 2025 .............................. A-669

Exhibit A to Letter -
Independent Neuropsychological Evaluation of
Dustin J. Gordon, Ph.D., dated June 22, 2023 ....... A-673

Exhibit B to Letter -
Neuropsychological Evaluation of Amanda L.
Sacks, Ph.D. and Wayne Gordon, Ph.D., dated
August 12, 2008 ...................................................... A-712

Exhibit C to Letter -
Patient Care Report of Nassau County Police
Emergency Ambulance Bureau, dated
July 16, 2013 ........................................................... A-721

Exhibit D to Letter -
Medical Records from Nassau University
Medical Center ........................................................ A-723

iv

**Page**

Exhibit E to Letter -
Medical Records from Nassau University
Medical Center...................................................... A-729

Exhibit F to Letter -
Initial Psychiatric Rehabilitation Assessment
Note of Danielle Dimeo, dated July 18, 2013 ....... A-738

Exhibit G to Letter -
Excerpts from Discharge Summary of John
Maloy, M.D., dated November 12, 2013 ............... A-740

Exhibit H to Letter -
Excerpt from Documents Review Report, dated
December 3, 2014 ................................................. A-743

Exhibit I to Letter -
Documents Review Report, dated
February 7, 2017 .................................................. A-745

Exhibit J to Letter -
Excerpt from Initial Psychiatric Rehabilitation
Assessment, dated February 24, 2017 ................... A-751

Exhibit K to Letter -
Excerpts from Discharge Summary of Augusto
Angulo, M.D., dated April 14, 2015 ...................... A-753

Exhibit L to Letter -
Excerpt from Discharge Summary of Patricia
Giarrusso, N.P., dated February 24, 2017 .............. A-756

Letter from Frederick K. Brewington to the
Honorable Nina R. Morrison, dated May 2, 2025 . A-758

Letter from John Carnevale to the Honorable Nina
R. Morrison, dated May 5, 2025 ........................... A-760

Transcript of Pretrial Conference held before the
Honorable Nina R. Morrison, dated May 6, 2025 . A-762

Letter from Matthew A. Cuomo to the Honorable
Nina R. Morrison, dated May 10, 2025 ................. A-810

v

**Page**

Letter from Matthew A. Cuomo to the Honorable
Nina R. Morrison, dated May 11, 2025 .................. A-812

Annexed to Letter -
(i) Transcript of Trial Proceedings held before the
Honorable Terence P. Murphy, in *The People of
the State of New York v. Pfail*, Nassau County
Supreme Court Indictment No. 402A-15, dated
February 27, 2018 .................................................... A-813

(ii) Excerpts from Transcript of Trial Proceedings
held before the Honorable Terence P. Murphy, in
*The People of the State of New York v. Pfail*,
Nassau County Supreme Court Indictment No.
402A-15, dated March 1, 2018 .............................. A-892

Excerpts from Transcript of Pretrial Conference
held before the Honorable Nina R. Morrison,
dated May 12, 2025 ................................................ A-945

Transcript of Trial Proceedings held before the
Honorable Nina R. Morrison, dated
May 13, 2025 .......................................................... A-966

Transcript of Trial Proceedings held before the
Honorable Nina R. Morrison, dated
May 14, 2025 .......................................................... A-1014

Letter from Frederick K. Brewington to the
Honorable Nina R. Morrison, dated
May 15, 2025 .......................................................... A-1245

Transcript of Trial Proceedings held before the
Honorable Nina R. Morrison, dated
May 15, 2025 .......................................................... A-1247

Transcript of Conference in Chambers held before
the Honorable Nina R. Morrison, dated
May 15, 2025 .......................................................... A-1489

vi

**Page**

Transcript of Trial Proceedings held before the
Honorable Nina R. Morrison, dated
May 16, 2025 .......................................................... A-1497

Letter from Frederick K. Brewington to the
Honorable Nina R. Morrison, dated
May 18, 2025 .......................................................... A-1714

Letter from Frederick K. Brewington to the
Honorable Nina R. Morrison, dated
May 19, 2025 .......................................................... A-1716

Letter from Leo Dorfman to the Honorable Nina R.
Morrison, dated May 19, 2025 .............................. A-1721

Exhibit A to Letter -
Letter from Tammi M. Mitchell to Maureen Grix,
Ph.D., dated April 29, 2019 .................................. A-1723

Exhibit B to Letter -
Email from Maureen Grix, Ph.D. to Frederick K.
Brewington, dated May 5, 2018, with Letters ....... A-1724

Exhibit C to Letter -
Combined First Set of Interrogatories and
Requests for Documents, by Defendants, dated
July 23, 2019.......................................................... A-1729

Exhibit D to Letter -
Letter from Jeremy J. Scileppi to Maureen Grix,
Ph.D., dated May 9, 2019 ..................................... A-1739

Letter from Leo Dorfman to the Honorable Nina R.
Morrison, dated May 20, 2025 .............................. A-1740

Exhibit A to Letter -
List of Items Being Filed, in *The People of the
State of New York v. Pfail*, Nassau County
Supreme Court Indictment No. 402N-15............... A-1748

**vii**

**Page**

Exhibit B to Letter -
Letter from Matthew Perry to the Honorable
Teresa Corrigan, dated January 19, 2018............... A-1752

Exhibit C to Letter -
Excerpts from Transcript of Trial Proceedings, in
*The People of the State of New York v. Pfail*,
Nassau County Supreme Court Indictment No.
402N-15, dated March 2, 2018 .............................. A-1753

Proposed Jury Charge, filed May 20, 2025................ A-1767

Transcript of Trial Proceedings held before the
Honorable Nina R. Morrison, dated
May 20, 2025 ........................................................ A-1800

Jury Charge, dated May 21, 2025 .............................. A-2071

Annexed to Jury Charge -
Proposed Verdict Sheet ......................................... A-2102

Letter from Frederick K. Brewington to the
Honorable Nina R. Morrison, dated
May 21, 2025 ........................................................ A-2105

Exhibit A to Letter -
Letter from Lavern Van Ommeren to Leo
Dorfman, dated January 12, 2023 .......................... A-2109

Exhibit B to Letter -
Order of the Honorable Cheryl L. Pollak, dated
January 2, 2023 ..................................................... A-2110

Exhibit C to Letter-
Letter from Lavern Van Ommeren to Ralph
Reissman, dated January 12, 2023......................... A-2121

Exhibit D to Letter -
Letter from Tammi M. Mitchell to Jeremy James
Scileppi, dated April 17, 2019 .............................. A-2122

viii

**Page**

Transcript of Trial Proceedings held before the
Honorable Nina R. Morrison, dated
May 21, 2025 ........................................................ A-2123

Letter from Matthew A. Cuomo to the Honorable
Nina R. Morrison, dated May 22, 2025 ................. A-2336

Transcript of Trial Proceedings held before the
Honorable Nina R. Morrison, dated
May 22, 2025 ........................................................ A-2339

Transcript of Trial Proceedings held before the
Honorable Nina R. Morrison, dated
May 23, 2025 ........................................................ A-2410

Verdict Sheet, dated May 23, 2025 ............................ A-2616

Letter from John Carnevale to the Honorable Nina
R. Morrison, dated May 26, 2025 .......................... A-2619

Proposed Jury Charge, filed May 27, 2025 ................ A-2621

Letter from Leo Dorfman to the Honorable Nina R.
Morrison, dated May 27, 2025 .............................. A-2628

Transcript of Trial Proceedings held before the
Honorable Nina R. Morrison, dated
May 27, 2025 ........................................................ A-2631

Letter from Frederick K. Brewington to the
Honorable Nina R. Morrison, dated
May 27, 2025 ........................................................ A-2889

Transcript of Trial Proceedings held before the
Honorable Nina R. Morrison, dated
May 28, 2025 ........................................................ A-2891

Jury Charge, dated May 28, 2025 .............................. A-3108

   Annexed to Jury Charge -
   Proposed Verdict Sheet (Damages)........................ A-3116

Supplemental Jury Charge, dated May 29, 2025 ....... A-3118

ix

**Page**

Transcript of Trial Proceedings held before the
Honorable Nina R. Morrison, dated
May 29, 2025 ........................................................ A-3120

Verdict Sheet (Damages), dated May 29, 2025 ......... A-3159

Defendants' Trial Exhibit C -
Redacted Indictment, in *The People of the State
of New York v. Pfail*, Nassau County Supreme
Court ................................................................... A-3161

Defendants' Trial Exhibit D -
DVD Containing Outside Video ............................. A-3169

Defendants' Trial Exhibit E -
DVD Containing Inside Video............................... A-3171

Defendants' Trial Exhibit F -
Redacted District Court – Felony Complaint, in
*The People of the State of New York v. Pfail*,
Nassau County District Court Docket No. 23996 . A-3173

Defendants' Trial Exhibit G -
District Court – Information, in *The People of the
State of New York v. Pfail*, Nassau County
District Court Docket No. 23996.......................... A-3182

Defendants' Trial Exhibit O -
Redacted Neuropsychological Evaluation of
Wayne A. Gordon, Ph.D., dated August 12, 2008 . A-3185

Defendants' Trial Exhibit P -
Redacted Emergency Department Nursing Care
Record from Nassau University Medical Center... A-3189

Defendants' Trial Exhibit Q -
Redacted Initial Psychiatric Rehabilitation
Assessment Note of Danielle Dimeo, dated July
18, 2013 ............................................................... A-3191

x

**Page**

Defendants' Trial Exhibit R -
Patient Results Report from Nassau University
Medical Center, dated November 4, 2014 ............. A-3193

Defendants' Trial Exhibit BBBBB -
Photograph of Plaintiff's Face ............................... A-3197

Defendants' Trial Exhibit CCCCC -
Photograph of Plaintiff's Face ............................... A-3199

Defendants' Trial Exhibit DDDDD -
Photograph of Plaintiff's Face ............................... A-3201

Defendants' Trial Exhibit FFFFF -
Aerial View of Incident Location .......................... A-3203

Defendants' Trial Exhibit IIIII -
Photograph of Plaintiff's Face ............................... A-3205

Defendants' Trial Exhibit JJJJJ -
Photograph of Plaintiff's Sweatshirt...................... A-3207

Defendants' Trial Exhibit ZZZZZ -
Redacted Nassau County Police Dept Physical
Condition Questionnaire of Brian J. Pfail, dated
November 4, 2014 ................................................. A-3209

Court Exhibit 2 -
Email from John Carnevale to Albert Huber and
Freddie Valderrama, dated May 22, 2025.............. A-3212

Court Exhibit 3 -
Email Thread between Freddie Valderrama, John
Carnevale, *et al.*, dated May 15-16, 2025.............. A-3213

Court Exhibit 4 -
Handwritten Abuse of Process Questions.............. A-3217

Trial Exhibit -
Medical Records from Maureen Grix, Ph.D.......... A-3218

Judgment in a Civil Action, dated May 30, 2025 ...... A-4205

Notice of Appeal, dated June 26, 2025 ...................... A-4206

xi

**Page**

Letter from Robert F. Van der Waag to the
Honorable Brenna B. Mahoney, dated
June 26, 2025 ......................................................... A-4208

Motion and Notice of Motion, by Plaintiff, for Costs
and Reasonable Attorneys' Fees, dated
July 22, 2025.......................................................... A-4209

Declaration of Frederick K. Brewington, for
Plaintiff, in Support of Motion, dated
July 22, 2025.......................................................... A-4212

Exhibit 1 to Brewington Declaration -
Pre-Bill Worksheet from the Law Offices of
Frederick K. Brewington, dated July 18, 2025 ...... A-4265

Exhibit 2 to Brewington Declaration -
Abbreviated *Curriculum Vitae* of Frederick K.
Brewington ............................................................. A-4347

Exhibit 3 to Brewington Declaration -
Declaration of Harry Ballan, in *Greenaway v.
County of Nassau*, U.S. District Court, EDNY
Case No. 11-cv-2024 (LDH) (AKT)
("Greenaway Action"), dated June 15, 2018 ......... A-4398

Exhibit 4 to Brewington Declaration -
Declaration of Patricia E. Salkin, for Plaintiff, in
Support of Motion, in Greenaway Action, dated
June 18, 2018 ......................................................... A-4401

Exhibit 5 to Brewington Declaration -
Declaration of Howard A. Glickstein, for
Plaintiff, in Support of Motion, in Greenaway
Action, dated June 11, 2018................................... A-4406

Exhibit 6 to Brewington Declaration -
Declaration of Randolph M. McLaughlin, for
Plaintiff, in Support of Motion, in Greenaway
Action, dated June 15, 2018 .................................. A-4410

xii

**Page**

Exhibit 7 to Brewington Declaration -
Declaration of Rick Ostrove, for Plaintiff, in
Support of Motion, in Greenaway Action, dated
June 15, 2018 .......................................................... A-4416

Exhibit 8 to Brewington Declaration -
Declaration of Jonathan C. Moore, for Plaintiff,
in Support of Motion, in *Besedin v. County of
Nassau*, U.S. District Court, EDNY Case No.
CV-18-819 (NRM) (ST) ("Besedin Action"),
dated November 14, 2024...................................... A-4421

Declaration of Scott A. Korenbaum, for Plaintiff, in
Support of Motion, dated July 21, 2025 ................ A-4433

Exhibit 1 to Korenbaum Declaration -
Declaration of Gabriel P. Harvis, for Plaintiff, in
Support of Motion, in Besedin Action, dated
November 13, 2024 ................................................ A-4450

Exhibit 2 to Korenbaum Declaration -
Declaration of Jonathan C. Moore, for Plaintiff,
in Support of Motion, in Besedin Action, dated
November 14, 2024 ................................................ A-4467

Exhibit 3 to Korenbaum Declaration -
May and June 2025 Time and Expense Entries
for SAK.................................................................. A-4478

Memorandum of Law, by Plaintiff, in Support of
Motion, dated July 22, 2025 ................................. A-4484

Declaration of John Carnevale, for Defendants, in
Support of Motion for Judgment and for a New
Trial or Remittitur Pursuant to Rules 50 and 59,
dated August 1, 2025 ............................................. A-4512

Combined Memorandum of Law, by Defendants, in
Support of Motion for Judgment and for a New
Trial or Remittitur Pursuant to Rules 50 and 59,
dated August 1, 2025 ............................................. A-4513

**xiii**

*Page*

Exhibit A to Carnevale Declaration -
Excerpts from Transcripts of Trial Proceedings
held before the Honorable Nina R. Morrison ........  A-4562

Exhibit B to Carnevale Declaration -
Excerpts from Transcript of Trial Proceedings
held before the Honorable Terence P. Murphy, in
*The People of the State of New York v. Pfail*,
Nassau County Supreme Court Indictment No.
402A-15, dated February 27, 2018 ........................  A-4615

Memorandum of Law, by Defendants, in Opposition
to Plaintiff's Motion for Attorneys' Fees and
Costs, dated September 4, 2025 .............................  A-4626

Memorandum of Law, by Plaintiff, in Opposition to
Defendants' Motion for Judgment and for a New
Trial or Remittitur Pursuant to Rules 50 and 59,
dated September 4, 2025 .......................................  A-4646

Reply Memorandum of Law, by Defendants, in
Further Support of Motion for Judgment and for
a New Trial or Remittitur Pursuant to Rules 50
and 59, dated September 17, 2025 .........................  A-4693

Memorandum and Order of the Honorable Nina R.
Morrison, dated November 13, 2025 .....................  A-4717

Memorandum and Order of the Honorable Nina R.
Morrison, dated December 3, 2025 .......................  A-4761

Notice of Appeal, by Defendants County of Nassau.
Nassau County Police Department, Police Officer
Jonathan Panuthos, Police Officer Karen C.
O'Brien and John Does 1-10, dated
December 11, 2025 ...............................................  A-4765

Notice of Appeal, by Defendant Sergeant Thomas
Iannucci, dated December 11, 2025 .......................  A-4767

Notice of Appeal, by Defendant Police Officer
Joseph Massaro, dated December 11, 2025 ...........  A-4769

Panuthos - Cross - Carnevale                454

CROSS-EXAMINATION

BY MR. CARNEVALE:

Q    Good afternoon, Detective Panuthos.  How are you?

A    Good afternoon.  Thank you.

Q    I know Mr. Brewington just asked you a lot of questions, but I want to run through everything with you again.

Does that sound all right?

A    Okay.

Q    How long have you been a member of the Nassau County Police Department?

A    21 years this summer.

Q    And what is your current position?

A    I'm a detective.

Q    And in November of 2014, were you also detective?

A    No.  I was a police officer.

Q    And what precinct were you working out of?

A    The 3rd Precinct.

Q    And who were you working with that night?

A    I was working with Sergeant Iannucci; at the time Police Officer Massaro, now Inspector Massaro.

Q    And the three of you were assigned to a plainclothes unit; is that right?

A    Correct.

Q    As a plainclothes officer, it's not your typical responsibility to be responding to 911 calls; is that right?

Linda A. Marino, Official Court Reporter

*Panuthos - Cross - Carnevale*                455

A    That's exactly right.

Q    But that evening, you responded to a call involving a Buffalo Wild Wings, right?

A    Correct.

Q    What was the call that you received?

A    The call was dispatched as probably a disturbance.  Male had broken glass and had left the scene, something to that effect.

Q    Around what time did that call come over the radio?

A    It was a little after 10 p.m.

Q    After you got that call, what did you do?

A    We were very close to that location, so we drove over there to see if we could help.

Q    And did you respond to the Buffalo Wild Wings?

A    Yes.

Q    What did you observe once you arrived at the Wild Wings?

A    So, when I got there, another sergeant from the 3rd Precinct was also there and he was talking to an individual, a female, who was on her phone.  She was distraught and she was talking into the phone -- she appeared to be distraught and she was talking into her phone saying --

            MR. BREWINGTON:  Objection.

            THE COURT:  Let me see counsel at sidebar really briefly.  Thank you.

            (Continued on the following page.)

*Linda A. Marino, Official Court Reporter*

A-1423

*Sidebar*                                                          456

(The following occurred at sidebar.)

THE COURT:  So, I called you all over because in my view, anything that the officers heard anyone say appears to be an exception to hearsay because it's not being offered for its truth, it's been being offered simply to go to what they knew and their state of mind and thereby the jury's assessment of the reasonableness of their actions.

Even though reasonableness is an objective standard, it does require the jury to look at facts and circumstances known to a reasonable officer at the time.  And I think even though typically something like this would be hearsay in a civil case where the question is whether the officers conducted themselves reasonably and in accordance with the law, anything they overheard someone saying is fine for that purpose.

I certainly could instruct the jurors or advise them at this time that they may hear testimony about things that they overheard.  That's to go only to the question of what was in the officer's mind at the time that they acted, not being offered for the truth of whatever was said, something along those lines, Mr. Brewington, but I'm happy to hear from counsel on that.

MR. BREWINGTON:  Of course, my objection was to preserve it for the record, but also that it was hearsay. Understanding what the Court has just explained, we would ask

*Linda A. Marino, Official Court Reporter*

A-1424

*Sidebar*                                                              457

for instruction to the jury to that effect.

THE COURT:  And that would also, Plaintiff's counsel, to the extent you want to, but I'm not saying you should, you would be free to inquire about how he did or didn't know the truth of any of that, whether he did or did not follow up with the witnesses.

MR. CUOMO:  Your Honor, you gave that charge yesterday as well.

THE COURT:  I did, but let me just do it again, since even learned counsel seemed to be confused why I was about to let it in.  So, I'll do it one more time.

Thank you.

(Continued on the following page.)

*Linda A. Marino, Official Court Reporter*

*Panuthos - Cross - Carnevale*                 458

(Sidebar ends; in open court.)

THE COURT:  So ladies and gentlemen, you may hear some testimony about things that this officer or other officers heard or were said to them.  That testimony about anything someone said or they may have heard someone saying is being offered for the limited purpose of assessing what the officer's state of mind was at the time, what information was available to them.  The fact that they've heard it doesn't necessarily mean it was true, doesn't mean it was not true, but it's just being offered to evaluate this officer and potentially the other officers' state of mind at the time.

With that in mind, you may proceed, Mr. Carnevale.

And the objection is overruled.

MR. CARNEVALE:  Is it possible to have my last question read back?

THE COURT:  That was a bit back.

Do you remember in your notes where you were?

I think it was addressed to someone who was on the phone.

BY MR. CARNEVALE:

Q    Detective, when you arrived at Wild Wings, what was going on?

A    Again, so, Sergeant Johnson, another sergeant in the precinct, seemed to be interacting with a female.  The female appeared to me to be upset.  She was talking into a phone, she

*Linda A. Marino, Official Court Reporter*

Panuthos - Cross - Carnevale                459

was talking very loudly, saying, "Come back.  Come back,"
something to that nature.

Q    And at that point, did you learn of the crime that had
been committed and why you were called there?

A    Yeah, so --

        MR. BREWINGTON:  Objection.

        THE COURT:  Sustained.

Q    At that point, did you get a description of the suspect
of the call?

A    Yes.  At that point, a description was also dispatched on
the radio, but I also got a more detailed description as we
were at the Buffalo Wild Wings.

Q    Did you observe a shattered glass door at the Buffalo
Wild Wings?

A    I don't think I specifically or I don't recall
specifically seeing it.  It was indicated to me that the door
was broken.

        MR. BREWINGTON:  Objection.

        THE COURT:  Just answer the question that he's
asked.  If he has a follow-up, he'll ask.

        So, the question is:  Did you observe a shattered
glass door?

        THE WITNESS:  I do not recall if I saw it myself or
not.

Q    Based on all the information you learned up until that

Linda A. Marino, Official Court Reporter

A-1427

*Panuthos - Cross - Carnevale* 460

point, what did you and your partners go do?

A    At that point, we went to look for the subject that was based upon the description.

MR. CARNEVALE:  At this time, I'm going to show you what's been admitted into evidence as Defendants' FFFFF.

I'll put it on the overhead?

THE COURT:  You may.

(Exhibit published to the jury.)

Q    All right, Detective, are you able to see that clearly on your screen?

A    Yes.

Q    What is this a picture of?

A    This is a satellite picture of the Buffalo Wild Wings being on the top right there, where I just put the X.  And you can see all the way to the Fairway Market, which is approximately over here somewhere.

Q    So you responded to the call at the Buffalo Wild Wings.

Is that in the top right of the picture; that's correct?

A    Yeah, I actually put the X approximately where we responded to in relationship to the building.

Q    So when you started canvassing, can you draw on that where -- the route you took?

A    Sure.  So initially, it was indicated to us that the subject had gone west from that location.  So, the first thing

*Linda A. Marino, Official Court Reporter*

*Panuthos - Cross - Carnevale*                    461

we did was check this back area.  We we didn't see anyone there immediately.  This is -- somewhere in this back area, Sergeant Iannucci got out of the car.

I'm just going to draw another line indicating approximately there's a chain link fence.  It's not a very accurate line, but approximately there, there was at that time a chain link fence there that we couldn't drive through to get to that other side.

So, Sergeant Iannucci went over that fence.  I don't know exactly where on this map, but somewhere in that general area.

Q    So, Sergeant Iannucci got out of the car and it was just you and Inspector Massaro in the car at that point?

A    Correct.

Q    Where did you and Inspector Massaro drive from there?

A    So from there, after checking this back area, at some point I exited this parking lot, went what would essentially be off the map, coming back on the map here, and then right down this road here is where the sheds were that Sergeant Iannucci was getting out of the car to check.

Q    And when you drove over there, did you pick up Sergeant Iannucci?

A    Yes, I did.

Q    And after you picked up Sergeant Iannucci, then where did you go?

*Panuthos - Cross - Carnevale*                    462

A    So then we proceeded to drive down this roadway and then kind of like somewhere very roughly where I've ended there, probably a little before that is where the video of the shopping carts on the exterior video starts, approximately.

Q    From the time you left in the car from the back fence area until you then picked Sergeant Iannucci up, how far of a drive is that, if you can recall?

A    It's probably, like, two-tenths of the mile or something. It's a very short distance.  It's probably only 1,000 or 1,500 feet as a direct path.  But having to drive around the streets, I've just given a rough estimate.

Q    And can you indicate on this map where you first observed Mr. Pfail?

A    It's pretty zoomed out, but if you kind of look where that arrow is at the entryway to the Fairway, you know, it's somewhere -- I don't want to point to it on the map and be inaccurate, but I'll make a big circle here.

The entryway is here.  The carts would have been somewhere over there on the right.  So, we were in that general area.

Q    And what did you observe when you first saw Mr. Pfail?

A    So, as I pull up into the parking lot there, when I observed Mr. Pfail, we got -- matching the description of the description we had just received, as I pulled up very close, in the street area there, I hear, "I'm not coming back."

*Linda A. Marino, Official Court Reporter*

*Panuthos - Cross - Carnevale*                    463

So, I have no way to know who he was talking to, but in my mind, my state of mind that day, this was a continuation of the conversation that I had just heard at Buffalo Wild Wings where someone was saying, "Come back."

So, I then heard, "I'm not coming back," on the phone a few minutes later.

THE COURT:  Should we put the lights up or are you still using the map?

MR. CARNEVALE:  Can I switch now to the computer?

THE COURT:  You can.

(Exhibit published to the jury.)

Q    The location you indicated on the map where you circled and put the arrow, is this a picture of where you first saw Mr. Pfail?

A    Approximately, yes.

Q    And that's where you heard him talking on the phone?

A    Yes.

Q    And in this -- the video is paused it's at zero second.

How many cars can you see in that parking lot?

A    Maybe three.

Q    And in that image I just had up, Defendants' quintuple F, that's a pretty big parking lot, right?

MR. BREWINGTON:  Objection.

THE COURT:  Sustained.

Q    And this -- withdrawn.

*Linda A. Marino, Official Court Reporter*

A-1431

Panuthos - Cross - Carnevale                    464

What time of night was it when you encountered Mr. Pfail?

A    So, you know, it was 10 something p.m.  I don't know exactly.  It was a few minutes after we left Buffalo Wild Wings.

Q    Was the parking lot busy?

A    No.

Q    Were there other people around?

A    Not many.

Q    I know we watched the video before, but I'm going to run through it here with you now.

(Video plays; video stops.)

Q    Here in the video, is that the car that you were driving?

A    Yes.

Q    Does that car have police lights on it?

A    They are discrete lights, they are hidden lights.

Q    At that point, did you turn on the police lights?

A    I did not.

Q    Why not?

A    I didn't turn on the police lights for two reasons.

One would be that it's just not used in the fashion of when you're stopping the vehicle right there.  It's used to get through traffic or to pull someone over on a car stop.

The second thing was that Mr. Pfail had just left the scene and it was my belief from the beginning that he was

Linda A. Marino, Official Court Reporter

*Panuthos - Cross - Carnevale* 465

going to run.  Turning on the police lights from a great distance would have indicated that here come the police and may have given him the opportunity to go further away from the original scene.

Q    And although your windows were up, were you still able to hear Mr. Pfail speaking?

A    Yes.

Q    Was he speaking loudly?

A    He was yelling.

MR. CARNEVALE:  I'm going to hit play again.

(Video plays; video stops.)

Q    At the moment you stepped out of the car, did you say anything?

A    I immediately said something to the effect of, "Police. We just want to talk to you."  Something like that.  That was the very first thing I said.  I don't know if that's my words verbatim, but it was something friendly like that.  I might have used the word "buddy."  I say that to almost everybody, just in a disarming way.

Q    And were you wearing a police uniform; no, right?

A    I was not.

Q    Did you have anything on you that identified you as a police officer?

A    Yes, I had my shield on a lanyard around my neck, like a necklace.

*Linda A. Marino, Official Court Reporter*

Panuthos - Cross - Carnevale                  466

Q    And after you identified yourself as an officer, what was Mr. Pfail's response to you?

A    He said, "I'm not talking to the fucking cops."

Q    And based on that response, would you say he understood that you were a law enforcement officer?

MR. BREWINGTON:  Objection.

THE COURT:  Sustained.

Q    What happened immediately after that exchange?

A    Once he said, "I'm not talking to the fucking cops," he was looking around.  I got the impression that he was going to run.  So, I started to run towards him.

As I started to run towards him, he said something to the effect of, "Come at me, motherfuckers."  That's the exact same time when you saw the hand come up -- it was about the same time he said something to the effect of, "Come at me, motherfuckers."

MR. CARNEVALE:  I'm going to run through the video now at half speed.

(Video plays; video stops.)

Q    In that short time there, from 9 seconds in the video to 12 seconds in the video, based on what you just saw and your recollection, can you tell us what happened?

A    So, that is exactly what kind of I just explained.  I got out of the car, said, "Police.  We just want to talk to you."

He said, "I'm not talking to fucking cops."

Linda A. Marino, Official Court Reporter

A-1434

*Panuthos - Cross - Carnevale*      467

I started to then realize this guy's gonna run, I start to close the distance.

Q    What made you think he was going to run?

A    One is he had just left the scene or -- left the scene originally at Buffalo Wild Wings.  He was a thousand feet away.

When I say "police" or whatever to that effect, he said, "I'm not talking to the cops."

And he was looking around.  His body movements to me indicated that he was looking for a place to go.  He wasn't just stopping and saying, "Hey, sorry.  I'll talk to you.  My bad," or put his hands up or anything.

I understood from his body language that he was going to run.

Q    So, you thought he was going to run, and, so, you picked up the pace and headed towards him.

MR. BREWINGTON:  Objection.

THE COURT:  Sustained.

Let's try to avoid the leading questions, please.

Q    So, you exited your car and started heading towards Mr. Pfail; is that right?

A    Correct.

Q    And after you thought he was going to run, then what did you do?

A    I ran towards him.

*Linda A. Marino, Official Court Reporter*

Panuthos - Cross - Carnevale                    468

Q     And did his demeanor change in any way at that point?

A     So, I don't want to say his demeanor changed, but as I got closer to him, which my intension was just to grab him, I saw his hand come back, his right hand.  When I realized that his hand was cocked back and I'm running at him, I then, you know, lift up my leg, turn my gun side away, lift up my leg, with my left leg -- I'm right legged, by the way -- I lift up my left leg, turn by my gun side away, and my foot doesn't make contact, just for the record, into his stomach, my foot comes up like this, it goes in front of him.

      I'm sure my body, my knee, and other parts of my body made contact with him, but it was not a jump kick to the stomach.

Q     We have the benefit of looking at this in hindsight and we're going to play the video again in a second --

      MR. BREWINGTON:  Object to the colloquy.

      THE COURT:  Sustained.

      Please proceed to your question.

Q     Do you recall Mr. Brewington asking you questions about which direction Mr. Pfail looked like he was going to run?

A     Yes.

Q     Do you recall him asking you if he ran to the right he would have had to go on top of the shopping carts?

A     Right.

Linda A. Marino, Official Court Reporter

A-1436

*Panuthos - Cross - Carnevale*                    469

Q    Do you remember him asking you did he advance towards you?

A    Right.

Q    And your answer to that was no, he didn't advance towards you, right?

A    Right.

Q    What was behind him?

A    The entrance to the store.

Q    So, he could have ran into the store, right?

          MR. BREWINGTON:  Objection.

          THE COURT:  Sustained.

          Mr. Carnevale, please.

          MR. CARNEVALE:  I'm going to play the video now.

          (Video plays; video stops.)

Q    What happened at this point in the video that's stopped at the 13 second mark?

A    I realized I was going to get punched and I twisted my body and lifted up my leg.

          (Continued on the following page.)

*Linda A. Marino, Official Court Reporter*

A-1437

Panuthos - cross - Carnevale          470

(Continuing)

BY MR. CARNEVALE:

Q    And are you a righty or a lefty?

A    I'm a righty.

Q    In this picture -- the still image, rather, this your off leg?

A    Yes, that's my weak foot.

THE COURT:  When you say this, you mean the one that's in the air at a right angle?

MR. CARNEVALE:  Yes.

Q    I'm going to advance.  What happened after you lifted your leg and lifted your arm?

A    So at this point in the video, I had already gotten struck in the head, and my sweatshirt had pulled up a little bit over my head, kind of like in a hockey fight when they pull the shirt up.  My head was a little bit covered by my sweatshirt.  But my foot is back down planted.  You can see it's back down on the ground right where it was.

Q    So, in fact, you didn't kick Mr. Pfail; right?

MR. BREWINGTON:  Objection.

THE COURT:  Sustained.

Q    Did you make contact with Mr. Pfail before he punched you?

A    No.

Q    In this moment in the video, what happened immediately

Panuthos - cross - Carnevale                471

after?

A    So, after my sweatshirt went up, you know, kind of half over my head, let's call it, I held on to Mr. Pfail and we went down to the ground.

It wasn't my intent to take him down to the ground. I never planned on taking him down to the ground when I was running at him.  Unfortunately, that is what happened.

I didn't put my foot behind him to trip him.

I didn't have in my mind when I got out of that car he was going to go to the ground.

When I ran at him, I got hit.  I held on.  And we went to the ground.

Q    Where is Mr. Pfail's arm in this still image?

A    I can't -- I don't know.  I can't really tell.  It looks like it's maybe across him.

MR. BREWINGTON:  Objection.

THE COURT:  He said he can't tell.

If you are going to ask about a still image, note a second marker for the record so that the record is clear.

MR. CARNEVALE:  For the record, this is at the 13-second mark.

THE COURT:  All right.  So you can move on to the next question.  Thanks.

Q    At this moment --

MR. CARNEVALE:  I'm going to play the video.

```
                    Panuthos - cross - Carnevale              472
```

Q    So from 13 seconds until 16 seconds, what happens after the 6-second mark?

A    So at this point, we went to the ground in the vestibule.

Q    And did a struggle ensue?

A    Yes.

Q    Did you or any of your partners issue any commands to Mr. Pfail at this point?

A    I think all of us at some point said numerous times put your hands behind your back, put your hands behind your back. And our objective at this point was to handcuff him.

            MR. BREWINGTON:  Objection.

A    My objective.

            THE COURT:  Okay.  Do you still wish me to address that, Mr. Brewington?

            MR. BREWINGTON:  No, Judge.

            THE COURT:  You may proceed.

            MR. BREWINGTON:  Thank you.

            MR. CARNEVALE:  One moment.  I'm going to pull up the video from inside the vestibule.  Going from 16 seconds of what's marked?

            MR. DORFMAN:  I'm sorry, counsel.

            MR. CARNEVALE:  Yes.  Just give me a second here to work with the computer.

            THE COURT:  Are we moving to a different exhibit, a different view?

Panuthos - cross - Carnevale                    473

MR. CARNEVALE:  Yes.

Q    So at the 16-second mark at the outside video, which was Defendant's Exhibit D, would you agree that's where then you all go inside the vestibule of the Fairway market?

A    Yes.

Q    So I'm going to show you now what's Defendant's Exhibit E, the video from inside.

I'm going to play the video.

(Video playing.)

Q    Now, at the moment you all went to the ground, was Mr. Pfail grabbing on to you?

MR. BREWINGTON:  Objection.

THE COURT:  Sustained.  Let me ask you again to please avoid leading.

You can ask him what happened or what was what happening at the moment you went to the ground.

Q    What happened at the moment you went to the ground?

A    We were all holding on to each other.

Q    And were you able to see what was going on at this point?

A    At this point I think my sweatshirt was still kind of like halfway up over my head.  Shortly after this, I kind of pulled it back down.

Q    How did your sweatshirt get half up over your head?

A    When me and Mr. Pfail made contact, he was holding on to my sweatshirt and kind of pulled it backwards.

A-1441

Panuthos - cross - Carnevale                474

Q    I'm going to run the video at half speed.  Can you maybe point out the moment when you pulled the sweatshirt back down?

(Video playing.)

A    There.  You can see my head pops out.

THE COURT:  For the record, we are at 21 seconds on the video, on Exhibit E.

Q    At the 21-second mark, was Mr. Pfail continuing to resist?

A    Yeah.

MR. BREWINGTON:  Objection.

THE COURT:  Sustained.

Q    What happened after you pulled your sweatshirt down?

A    We continued to struggle with Mr. Pfail to get handcuffs on him.

Q    And at any point did Mr. Pfail bite any of the officers?

MR. BREWINGTON:  Objection.

THE COURT:  Sustained.

Q    Can you describe then what happened in the struggle?

A    Sure.  During the struggle, we were trying to get Mr. Pfail's arm from underneath him.  I remember one arm, we had control of at kind of at his feet area, as you can see in the video.

At some point during the struggle, Inspector Massaro says he's biting me.  And then that's when I, you know, delivered the strikes that plaintiff's counsel asked me about

A-1442

Panuthos - cross - Carnevale                    475

to the back of his knee.  At some point after that, you know, other -- the security -- or at some point during the whole thing the security guard comes.  Officer O'Brien -- I think we know the basic walkthrough at that point.

Q    Who was that civilian that joined in?

A    I'm not sure.  I believe he was like a security guard or an employee of something over there.  I'm not sure.

Q    I'm going to play the video.  Can you let me know when to stop when you see the civilian come in?

A    Yes.

          (Video playing.)

A    Right there.

          (Video stopped.)

Q    Did you ask the civilian for help?

A    I did not.

Q    At any point during the struggle, did you have a flashlight in your hand?

A    I did not.

Q    You mentioned that you did strike Mr. Pfail; is that correct?

A    Yes.

Q    Can you describe -- and what was the word you used for that, perneal --

A    Common peroneal.

Q    What is the purpose of a strike like that?

A-1443

Panuthos - cross - Carnevale                476

A    The common peroneal nerve strike again is a strike that's taught at the police academy.  It's a strike that's used in law enforcement.  And, essentially, what it is a strike it's a strike to the back of your thigh, a little bit above your knee, and it's supposed to, you know, be painful, not hurtful or permanent, right, painful so that you stop doing whatever you're doing.

Q    Is that a technique you learned in your training to become a police officer?

A    Yes.

Q    At some point, did -- at some point, were you able to get Mr. Pfail in handcuffs?

A    Yes.

Q    Was that before or --  withdrawn.

Who was there when you put Mr. Pfail into handcuffs?

A    It was myself, Sergeant Iannucci, Inspector Massaro, Officer O'Brien, the security guard in the picture, or whatever employment he has.  And I think that was it.

I'm not sure if there were other officers outside at this point, but that's who was in the vestibule.

Q    Okay.  I'm going to skip ahead in the video to the point the handcuffs are on Mr. Pfail.

(Video playing.)

Q    Okay.  At this point in the video, you're the individual with the --

A-1444

Panuthos - cross - Carnevale                477

THE COURT:  Can you just say the timestamp, Mr. Carnevale.

MR. CARNEVALE:  Yes.  For the record, the video has stopped at the two-minute and 15-second mark.

Q    At this point in the video, Detective, you're the individual with the maroon-colored sweatshirt?

A    Correct.

Q    What were you doing at this point?

A    So I was kneeling on what would be his butt down to the back of his thighs.  He had started saying I'm sorry and indicated that he -- you know, I'm sorry, I'm not going to do anything.

So, just to be safe, I still maintained my body weight, you know, on the back of his butt and on the back of his legs.

Q    At that point, did you know that there was a camera right there filming this?

A    No.

Q    Even without knowing you were on camera, did you strike Mr. Pfail?

A    No.

Q    Once he was restrained, did you or any of your partners strike Mr. Pfail?

A    No.

Q    Did you continue to apply any force after he was

Panuthos - cross - Carnevale                478

compliant and handcuffed?

A    No.

Q    At what point did he begin to cry and apologize?

A    As soon as the second handcuff went on his arm, so his hands were behind his back, he had one cuff.

The second the second cuff went on, he immediately was compliant, upset and apologetic.

Q    Did other officers arrive to assist?

A    Yes.

Q    And this is all after you were punched in the face; correct?

A    Correct.

MR. BREWINGTON:  Objection.

THE COURT:  Sustained.

MR. BREWINGTON:  Move to strike, Judge.

THE COURT:  The jury will disregard that remark, meaning the question and the answer.

Q    Officer, during this whole encountered, was any of the force you used on Mr. Pfail retaliatory?

MR. BREWINGTON:  Objection.

THE COURT:  Overruled.  Withdrawn or do you want that noted for the record?

MR. BREWINGTON:  No.  I will take your ruling, Judge.  Thank you.

THE COURT:  Okay.

A-1446

Panuthos - cross - Carnevale                479

A    No, it was not.

Q    Were your actions consistent with your training and duty as a police officer?

A    Yes.

Q    Did you personally act with restraint even after you were punched?

MR. BREWINGTON:  Objection.

THE COURT:  Sustained.  This is all appropriate for your argument, Counsel, but not for questioning of the witness.

Q    After this moment in the video, the 2:15 mark, did you observe Mr. Pfail interacting with any other officers?

A    After this?

Q    Yes.

A    Yes.

Q    Did you witness him being taken to the ambulance?

A    Yes.

Q    What did you observe when he was being taken to the ambulance?

A    So I was, you know, offset to where he was.  I was not right next to him.  But at some point he started -- he yelled something to the effect of I'm gonna kick you, fucking bitch, something like that.

When I heard that, I looked over, and I saw him with his foot out behind him and Officer O'Brien, you know, like

Panuthos - cross - Carnevale                     480

hunched over a little bit.

Q    And did you get involved anyway after he kicked Officer O'Brien?

A    No.

            MR. BREWINGTON:  Objection.

            THE COURT:  Sustained.

            MR. BREWINGTON:  Move to strike and ask for an instruction.

            THE COURT:  Yes.

            The jury will disregard the question and answer. There has been no testimony from this witness that he saw the plaintiff kick or strike Officer O'Brien.  He testified merely to what he heard and then what he saw with Officer O'Brien.

Q    Okay.  Officer, what happened after Mr. Pfail was taken to the ambulance?

            MR. BREWINGTON:  Objection.

            Withdrawn.

            THE COURT:  Okay.  What happened after Mr. Pfail was taken to the ambulance?

A    Are we still talking about the walk to the ambulance or after he went into the ambulance?

Q    I want know what you did after he was taken to the ambulance.

A    After I went into the ambulance, I went back to the substation, which is kind of across the street diagonally.

Panuthos - cross - Carnevale                481

Q     And do you recall Mr. Brewington asking you questions about a witness that was taken to the substation?

A     Yes.

Q     And do you recall being asked about the videos on that person's phone?

A     Yes.

Q     What kind of phone did that person have?

A     They had an old, what we call a feature phone, which is like a flip phone, the old Nokia style, one of those ones that have the very small screen.

Q     But was it like a flip phone?

A     Yes.

Q     And what did you see on that person's phone?

A     So that person showed me essentially what they thought was a video.  I looked at it.  It was basically a few seconds of a dark screen.  You could say oh, was that a shopping cart off in the distance.  There was no police officers.  There was no interaction with Mr. Pfail.  There was no vehicles.  There was nothing in that video that made me believe that it needed to be secured.

Q     And why didn't you take down this person's information?

A     So it was my understanding that that individual had called 911.  It was my understanding that that person worked across the street.

            And I don't want to make it sound like pushing

Panuthos - cross - Carnevale                    482

responsibility on to anyone else, but I was -- I was going to the hospital, and I wasn't investigating the case in any further way.

So at that point, I left the person with the phone. It was my responsibility, as a tech person, to make sure if they had something that we needed to secure, I would do that.

I also want to mention to you that numerous times throughout this process, I did mention to people make sure they secure the video at Fairway. I had no idea what camera angles they had.

MR. BREWINGTON: Objection. Unresponsive.

THE COURT: Yes. Disregard the last portion.

Just answer the question about the 911 caller.

Is there anything further about why you didn't take the name or the information of the 911 caller?

THE WITNESS: Again, so I thought they had contacted 911. I left to go to the hospital.

I'm not saying that someone else investigating the case didn't do their job. But at that point I left, and I did not take their information.

Q    So, after the arrest that night, it wasn't your responsibility to investigate this case?

MR. BREWINGTON: Objection.

THE COURT: Sustained.

Q    You mentioned in your testimony with Dr. Brewington

A-1450

Panuthos - cross - Carnevale                483

[sic], do you recall mentioning someone named Detective Ramos?

A    Yes.

Q    Was that the person who was responsible for investigating the case?

A    I believe he was the carrying detective.

Q    And did you ever document your injuries you sustained that night?

A    The crime scene -- you know, the crime scene unit came to the precinct and I believe they took a picture of my face.

        MR. CARNEVALE:  I'd like to put the picture on the overhead, what has been admitted into evidence as Defendant's Exhibit BBBBB.

        THE COURT:  Quintuple B.

Q    Detective, is that the picture that was taken?

A    Yes.

Q    And do you recall being asked questions about whether you were punched in the eye or punched in the ear?

A    Yes.

Q    And can you see on that picture where you were punched?

A    I mean, I obviously see the redded area.  But it went between my eye and my ear exactly, I think as I described it before.

Q    Can you circle on that picture approximately where you were struck by Mr. Pfail?

A    I'd say somewhere (indicating).

Panuthos - cross - Carnevale                    484

Q     And where was this photo taken?

A     The precinct stationhouse.

         MR. CARNEVALE:  Okay, just give me one moment, Your

Honor.

         (Pause in the proceedings.)

Q     Okay.  Detective, I just have a couple of more questions.

         MR. CARNEVALE:  We can put the lights back on at

this point.

         THE COURT:  Thank you.

Q     You mentioned before you saw Officer O'Brien keeled over

in the parking lot.  Is that right?

A     Yes.

Q     What did you observe after you saw her keeled over in the

parking lot?

A     I observed other officers then, you know, assist her

withholding on to Mr. Pfail.

Q     Can you describe the nature of that interaction you

observed?

         MR. BREWINGTON:  Objection to form.

         THE COURT:  Overruled.

         You can answer.

A     So everyone ran to -- people ran over to assist her, is

how I would describe it after the -- after he had, you know,

kicked backwards.  Other officers came over and helped --

helped hold on to him again.

Panuthos - redirect - Brewington                485

Q    And what happened to Mr. Pfail after that?

A    He got very upset again.  He became irate again.

     At some point while he was upset, I left to go back to the substation, but he was still there.

Q    And at some point was he put into the ambulance?

A    Yes.

Q    Did you assist at all in putting him into the ambulance?

A    Not that I recall.

     MR. CARNEVALE:  Okay.  Thank you, I don't have any more questions.

     THE COURT:  Okay.  Mr. Brewington.

     MR. BREWINGTON:  Yes, Judge.

REDIRECT EXAMINATION

BY MR. BREWINGTON:

Q    Sir, during your examination from your attorney, you indicated that you didn't really tackle him to the ground; correct?

A    Oh, no, sir, I -- I conceded the word tackle.

Q    Okay.  You did?

A    Yes.

Q    And would you agree that you grabbed on to him and you tackled him to the ground?  Yes or no?

A    Counsel, you know exactly what I'm going to say.  We went down to the ground.  I tackled him, but it was not my intention.

```
                  Panuthos - redirect - Brewington              486
```

Q    Do you agree that your actions amounted to you tackling this man to the ground, yes or no?

A    No.

Q    And it was your forward -- I'm sorry?

A    I said no.  I don't agree to that exact statement.  I'm sorry.

Q    Okay.  Did you give this testimony in the criminal trial --

MR. BREWINGTON:  Your Honor, at page 548.

MR. CARNEVALE:  We're almost there.

Okay.  We have it up.

Q    Starting at line 6, did you give this testimony, sir -- and by the way, sir, you testified in the criminal trial; is that correct?

A    I did, sir.

Q    And when you testified there, you testified under oath; correct?

A    I did, sir.

Q    Understanding that questions were going to be asked of you and you want to give answers that would be relied on as being truthful; correct?

A    Yes, sir.

Q    And you intended people to rely on what you said; is that correct?

A    I did, sir.

```
             Panuthos - redirect - Brewington              487
```

Q    Because you understood what the oath meant; correct?

A    Correct.

Q    Did you give this testimony at page 140 -- excuse me -- 548, line 6?

          Question:  Didn't you actually tackle him to the ground, sir?

          Answer:  Sure.  We can use that term.

          Question:  So you do know how you came to the ground, don't you?

          Answer:  Yes.  I grabbed on to him, and my forward momentum -- and we fell, and I tackled him.  Sure.

          Is this your testimony, yes or no?

A    Counselor --

Q    Was that your testimony, sir?

A    You have to let me speak, sir.

          THE COURT:  Just answer the question.  Was that your testimony?

          And then he may have a follow-up or your attorney may ask you an additional question.

A    It was my testimony.

Q    Thank you.

          THE COURT:  Okay.

Q    And, sir, do you recall being asked questions about the video just a few minutes ago?

A    Yes.

Panuthos - redirect - Brewington                488

Q    Or the flip phone?

A    Yes.

Q    And, sir, you were instructed to download the video; right?

A    I was not -- Sergeant Iannucci asked me to see if a video existed on the device, sir.

Q    Sir --

A    And if it did, then to download it.

Q    Excuse me.

Did you give this testimony in the trial transcript at page 553, line 6?

Question:  Sir, you were instructed to download video, correct?

Answer:  Correct.

Question:  You viewed a camera or a phone that had some video on it, correct?

Answer:  Correct?

Question:  Anybody else view it along with you?

Answer:  I believe Sergeant Iannucci saw the video also.  He was there with me.

Question:  At that time, this person that was in the substation, it was never documented who he was; correct?

Answer:  It was not documented by me.

Did you give that testimony?

A    Yes, sir.

Panuthos - redirect - Brewington          489

Q    So your prior sworn testimony was that Sergeant Iannucci ordered you or instructed you to download the video; correct?

A    Correct.

Q    And you -- and you also agree that what he instructed you to download, he watched; correct?

A    Correct.

Q    So you chose not to download what a superior officer told to you do; correct?

A    Correct.


          (Continued on next page.)

A-1457

Panuthos - Redirect - Mr. Brewington                490

BY MR. BREWINGTON (continuing):

Q   And, sir, you were asked early on in your examination by your counsel that you claim that you heard a female -- your words -- saying "come back, come back," right?

A   Yes.

Q   Prior to today, you've testified how many times in this case?

A   So we did depositions in your office, I was in the criminal trial, grand jury.

Q   At least three?

A   Yes, sir.

Q   Ever said that before?

A   I don't recall, sir.

Q   Well --

A   I believe -- I believe I did.

Q   Well, sir, you reviewed your transcripts before coming here, sir, right?

A   I -- I did not read them verbatim.  I believe in the deposition in your office, I believe we did discuss that, but if I'm incorrect, I apologize.

Q   Well, I'm not asking you to apologize, sir.

        Isn't today the first time that you can recall ever saying you heard someone at the Buffalo Wild Wings saying, "come back, come back"?

A   Again, I thought that we went over it in deposition,

A-1458

Panuthos - Redirect - Mr. Brewington                491

but if I'm mistaken, then I --

Q    So you're prepared to be examined in this case, correct?

A    Correct.

Q    Part of your time was spent with your lawyer, right?

A    Yes.

Q    And part of your time was -- an assignment that you had was to review your transcripts, correct?

A    Correct.

Q    Which you have copies of, correct?

A    I do.

Q    Can you tell me if, in your transcripts, you claim that you heard a woman say, "come back, come back"?

          MR. CARNEVALE:  Objection.

          THE COURT:  If you know.

A    I don't recall.

Q    And, sir, you said turning on your lights would have allowed him possibly to run, your words, right?

A    Yes.

Q    Turning on your lights would also have allowed him to understand that you were the police, correct?

A    Correct.

Q    Because you didn't have uniforms on, correct?

A    Correct.

Q    And in your exiting the vehicle, you see yourself,

A-1459

correct?

A    Yes.

Q    In the bringing up of your leg -- and by the way, you said it's your bad leg, but you're pushing off your good leg, right?

A    Counsel, I wouldn't describe it as pushing off, but okay.

Q    Have you ever done a layup?

A    I'm not very good at basketball, sir.

Q    I'm not asking if you are good.  I am asking if you have ever done a layup?

A    Sir, I have no idea, I'm sorry.

Q    And, sir, would you just tell us, please, when you exited your vehicle, you're actually coming toward Mr. Pfail, correct?

A    Correct.

Q    Do you see in that video your shield?

A    I don't recall seeing it.

Q    And so you claim that Mr. Pfail said words to the effect:  Come at me motherfuckers?

A    Something like that.

Q    And what did you do, if you claim that's what he said, you kept coming, right?

A    Yes.

Q    You didn't say, hey, buddy, calm down; did you?  You

*Panuthos - Redirect - Mr. Brewington*                    493

said you used the word "buddy," right?

A    I said --

Q    Did you say that?

A    Calm down?

Q    Yeah.

A    I don't think I used those words, calm down.

Q    And, sir, would it be accurate to say that at the time you said that you didn't restrain Mr. Pfail any further after he was cuffed, correct?

A    Correct.

Q    You were kneeling on him for nearly a minute; isn't that correct?

A    Yes, I was.

Q    So that's restraint; isn't it?

A    Yes.

Q    And so you were asked questions about a witness that came back, the 911 caller?

A    Correct.

Q    With the camera?

A    Yes.

Q    With the video that you and Mr. Iannucci both looked at, right?

A    Correct.

Q    Accurate to say that that individual who was before you could easily have been identified by you?

Panuthos - Redirect - Mr. Brewington                494

A    Sure.

Q    And you said that you didn't want to say that anybody else didn't do their job, right?

A    Correct, yeah.

Q    But you didn't do your job; did you?

A    I don't -- wouldn't characterize it like that, sir.

Q    I'm not asking you to characterize it.

A    So I'm not going to say to you that, yes, I didn't do my job.  I didn't take his information.  It wouldn't have been typical for me to do that.  I was on my way to the hospital.  But -- but I did not take his information.

Q    Sure.  Sir, you were an officer that night, right?

A    Correct.

Q    You had a memo book responsibility, correct?

A    Plain clothes actually doesn't, sir, just --

Q    But, sir, you did fill out a memo book that night?

A    Yes, I did, yup.

Q    You didn't put any place in your memo book -- which is supposed to talk about your actions that evening, correct?

A    Correct.

Q    You didn't put any place in your memo book that you even spoke to anybody like a witness; did you?

A    That's not what we would use the memo book for.

Q    Sir, are you telling me that when you take a 32(b) of a witness at a place you don't put that in your memo book; is

A-1462

that what you are saying?

A    Counselor, when you take a 32(b) --

Q    If you can answer my question.

A    -- it does not go in your memo book.

Q    Can you answer my question?

A    I can.  And it does not go in your memo book.

Q    So when you interview a witness, you don't put that in your memo book; is that your testimony?

A    Yes, that is my testimony.

Q    Mm-hm.

        MR. CUOMO:  Your Honor, can we just ask Mr. Brewington not to give the "mm-hm" at the end of the question.

        MR. BREWINGTON:  Judge, I won't do that and I apologize.

        THE COURT:  Okay.  I hadn't heard it, but it is reflecting in that one instance in the real-time.

        MR. BREWINGTON:  Inadvertent.

        THE COURT:  That's fine.  It's noted.

Q    And sir, would it be accurate to say that with regard to Mr. Pfail's injuries, you actually didn't see his injuries in the vestibule; did you?

A    I don't recall when I -- when I saw it.  I believe I -- I know I saw the blood.  I don't know if, when he was walking through the ambulance that I saw it or if it was

A-1463

*Panuthos - Redirect - Mr. Brewington*                    496

later or I saw pictures of it.  I don't recall exactly when
I saw his injuries, sir.

Q    Would it be accurate to say that you gave testimony --
did you give this testimony in the criminal trial, page 559,
starting at line 20:

Question:  Would it be accurate to say that with
regard to Mr. Pfail's injuries, to this day, you claim never
to have seen an actual injuries to his head, right?

Answer:  Correct.

Your second answer, correct.

You gave that testimony, correct?

A    It certainly sounds correct, sir.

Q    And so would it be accurate to say that in order for
you to claim -- oh, by the way, you didn't go right to the
hospital, right?

A    No.  I went back to the substation, as we spoke about.

Q    You didn't get into an ambulance, correct?

A    Correct.

Q    And you --

A    I believe actually we did go from the substation to an
ambulance, but I could be mistaken about that.

Q    You don't recall; do you?

A    No.

Q    So when you went back to the substation, you spoke with
your sergeant, correct?

*Panuthos - Redirect - Mr. Brewington*                                    497

A    Correct.

Q    And he was there with you, right?

A    Yes.

Q    And Officer Massaro was there with you, right?

A    Yes.

Q    So in order for all three of y'all to substantiate any charge of assault against Mr. Pfail, you all had to go to the hospital and get some type of documentation that you either had a red face or a scrape -- or some type of scrape, correct?

A    You're implication is that that's why we went to the hospital.  It's not.

Q    It's not my implication.

        MR. BREWINGTON:  And please, Judge, move to strike as unresponsive.

        THE COURT:  That's granted.

        The jury will disregard the last portion of the witness's answer.

A    We went to the hospital for the injuries, sir.

Q    And so you went to the hospital because you needed to have documentation; isn't that correct?

A    No.

Q    Did you go to the hospital and you got documentation?

A    Yes.

Q    And didn't you use the documentation to support your

allegations?

A    I -- I assume so, but I don't know that to be true.

Q    You were shown a photograph of quintuple B.

Do you recall that?

A    Just remind me what it was.

Q    A photograph of you?

A    Yes.

Q    And that was taken by whom?

A    Crime Scene.

Q    And that was of your face, correct?

A    Correct.

Q    Of your left side of your face; is that correct?

A    Correct.

Q    And it showed some reddening, correct?

A    Correct.

Q    And, sir, right now, do you know if your cheeks are red?

A    Probably are, sir.

Q    In other words, they're flushed, correct?

A    Correct.

MR. BREWINGTON:  Can we put the picture up?

That being quintuple B, Your Honor.

(Exhibit published.)

Q    Sir, that's you there, correct?

A    Yes, it is.

*Panuthos - Redirect - Mr. Brewington*                    499

Q    And there, not only the area up by your cheekbone is flushed, but -- withdrawn -- is reddish, but going down -- down by your jawline is reddish, correct?

A    Okay, sure.

Q    Kind of the way it looks right now; do you know that?

A    I believe you, sir.

Q    Did anybody take a picture of the other side of your face to see if they matched?

A    Not that I recall.

Q    And, sir, when you went to the hospital, would it be accurate to say --

     And by the way, sir, do you remember when you testified, when I asked you questions and you made a statement that it was up by your eye?

A    Yes, sir.

Q    Is there any portion of this where you're claiming that this was near your eye, that being in quintuple B?

A    Counselor, this entire section that has the even darker red, between my left eye and my ear, I consider this part my orbital, which is part of my eye, so yes, I would.

Q    And, sir, in your felony complaint, you allowed a felony complaint to go forward, sworn to, that you have a swollen eye, correct?

     MR. CARNEVALE:  Objection.

     THE COURT:  Overruled.

Jamie Ann Stanton, RMR, CRR, RPR
Official Court Reporter

*Panuthos - Redirect - Mr. Brewington*                    500

Q    Correct?

A    Correct.

Q    You don't have a swollen eye in this picture; do you? Yes or no?

A    Counselor, I can't possibly tell from this picture.

Q    Well, sir, you were telling us just a second ago --

        MR. BREWINGTON:  Withdrawn.

Q    Just a second ago, you said that that was the area that was affected, correct, and you were able to circle it, correct?

A    Correct.

Q    Do you see, as you just looked at the photo, a swollen eye; yes or no?

A    Again, sir, I can't tell from this picture which part's swollen or not swollen.

Q    Sir, didn't you --

A    I circled for you the dark -- the darker part of the screen showing you where I believe the, you know, impact had been.  I don't know to what extent this swelling went down to my jaw or up to my head.  It was swollen.  It was swollen near my orbital.  My orbital is considered my eye.  My face inside of my cheek were swollen.

        That's the best of my recollection and the best way I can describe it to you.

        MR. BREWINGTON:  Just one second, please.

Jamie Ann Stanton, RMR, CRR, RPR
Official Court Reporter

A-1468

(Pause in proceedings.)

MR. BREWINGTON:  Judge, we can put the lights back up, please.

BY MR. BREWINGTON:

Q    Sir, when you went to the hospital, did you get any treatment for your eye?

A    They gave me, you know, Tylenol or Ibuprofen or something like that and an ice pack.

Q    They gave you Motrin and an ice pack for your cheek, correct?

A    Again, sir, you are getting into semantics --

Q    Can you answer my question; yes or no?

A    No.

THE COURT:  That's not what they gave you?

THE WITNESS:  Yes, that's what they gave me, but he added the word cheek on the end.  The fact is that it was the side of my face and I considered that to include, you know, underneath my eye, which is my orbital.

You know, we're getting into like very detailed semantics of where the swelling was and I'm telling you that to the best of my recollection, the left side of my face was swollen, it included the part under my eye here.

Q    Sir, you never saw Mr. Pfail kick anybody; did you?

A    I saw him with his leg back and Officer --

Q    Sir, can you answer my question?

A-1469

*Panuthos - Redirect - Mr. Brewington*     502

Q    Did you see Mr. Pfail kick anybody; yes or no?

A    Yes.

Q    And, sir, during your examination from your counsel, do you recall him asking you what you saw and didn't see?

A    Yes.

Q    So now you're saying you saw Mr. Pfail kick somebody, right?

A    Well, I saw her hunched over with his foot in her stomach.

Q    That's not my question, sir.

A    Okay.

Q    Did you see Mr. Pfail actually kick somebody; yes or no?

A    I saw the end of the kick.

Q    You actually saw contact?

A    Yeah.  When I saw -- when I -- when I saw -- when I looked over, his -- his foot was, you know, in her, you know, stomach area.

Q    And, sir, during the criminal case, did you testify to that?

A    I don't recall.

Q    During your deposition, did you testify to that?

A    I don't recall, sir.

Q    During the grand jury, did you testify to that?

A    I don't recall.

A-1470

*Panuthos - Redirect - Mr. Brewington*                    503

Q    During the hearing -- did you testify at the hearing?

A    I don't think so.

Q    During any other -- at your deposition, did you testify

to that?

A    I don't recall specifically.

Q    So you reviewed your transcript, correct?

A    Again, I didn't read any portions that had to do with

that, so I don't recall specifically.  I don't -- I don't

know if I -- if it was asked of me, if I mentioned it, I

don't know.

Q    Sir, do you have a recollection of ever testifying

before today of having seen Mr. Pfail kick Officer O'Brien;

yes or no?

A    I don't recall.

              (Continued on the following page.)

Panuthos - Redirect - Brewington                504

(Continuing)

Q    So with regard to your actual treatment at the hospital, did they take any tests?

A    No, no tests, sir.

Q    Sir, do you recall being treated in the ambulance or being taken in an ambulance?

A    I don't recall.

Q    Do you recall what they say they were treating in your medical records?

A    I don't even know if I ever saw it, sir.

Q    Excuse me?

A    I'm not sure that I ever saw my medical records from the treatment.

Q    Okay.  And sir, seeing them would refresh your recollection of what they treated you for, right?

A    I'm happy to look at them, sir, but I don't have recollection of getting those medical records, seeing them, or reviewing them in any other form.

Q    You didn't review them in preparation for this trial?

A    I did not.

Q    And how about at the hospital, did you ever see those medical records?

A    No, sir.

Q    Do you know what they diagnosed you with?

A    I do not, sir.

Linda A. Marino, Official Court Reporter

A-1472

```
                Panuthos - Redirect - Brewington              505
```

Q    Do you know if they said anything about an eye injury?

A    I don't recall.

Q    You said you don't recall?

A    I don't recall what their diagnosis was.  I don't have a copy of the medical records.  Me and my attorney did not review them in any way, so I certainly don't recall at this point what they say.

MR. BREWINGTON:  Judge, no further questions for this witness at this time.

THE COURT:  Mr. Carnevale, anything further or are we done?

MR. CARNEVALE:  Yes, your Honor.

THE COURT:  Let's see if we can do this briefly.

(Continued on the following page.)

Linda A. Marino, Official Court Reporter

Panuthos - Recross - Carnevale                    506

RECROSS-EXAMINATION

BY MR. CARNEVALE:

Q    Detective, I just want to briefly go over some of the things Mr. Brewington just mentioned to you.

You recall testifying at the criminal trial in this case, right?

A    Correct.

Q    And Mr. Brewington just asked you about your testimony regarding arriving to the Buffalo Wild Wings and hearing the person on the phone; do you recall that?

A    Yes.

Q    And he read from Page 29 -- withdrawn.

You also recall testifying at deposition in this case, right?

A    Yes.

Q    And Mr. Brewington just read to you from Page 29 of that deposition the following, Lines -- about 20.

MR. BREWINGTON:  One second, please.

THE COURT:  Which page?

MR. CARNEVALE:  It's 29.

THE COURT:  Okay.

Q    And Mr. Brewington said you never mentioned before today that you heard a female at the scene.

Do you recall being asked that just now?

A    Yes.

Linda A. Marino, Official Court Reporter

*Panuthos - Recross - Carnevale*                    507

THE COURT:  I think that may mischaracterize Mr. Brewington's question.

MR. CARNEVALE:  Let me correct it.

Q    Mr. Brewington asked you if you've ever testified before today if you heard the woman at the scene of the Buffalo Wild Wings; is that correct?

A    That's correct.

THE COURT:  I don't think that's correct.

My recollection is that he asked if he had ever testified before today if he heard the woman say, "come back. Come back."

MR. CARNEVALE:  Okay.

Q    Did you ever testify before today that you heard that?

A    Again, I thought that I did in depositions, but I could be mistaken.

Q    And I'm going to read for you Page 29 of your deposition in this case Line 4.

Do you know Sergeant Johnson's first name?

Answer, Glen.

Question, When you say interviewing a female, what did you actually see Sergeant Johnson doing?

Answer, There was a distraught female outside.  She was on her cell phone.  She was screaming or yelling into the phone to come back.  He was having a conversation with her at the same time she was on the phone, so it was kind of like a

*Linda A. Marino, Official Court Reporter*

```
                Panuthos - Recross - Carnevale              508
```

back and forth.

Do you recall giving that testimony?

A   Well, I'm glad you read it, counselor.  Thank you.

THE COURT:  The question was do you recall giving that testimony?

THE WITNESS:  I do recall giving it now, yes.

Q   Plaintiff's counsel also read from the transcript and asked you if you were asked these questions and gave these answers on Page 548 of the criminal trial.

Question, Did you actually tackle him to the ground, sir?

Answer, Sure, we can use that term.

Do you remember being asked just now about that testimony you gave?

A   Yes, I do, and I was hoping you were going --

THE COURT:  Sir, could you please refrain from commentary on the questions asked?  It's up to the lawyers, so just answer the questions and we'll move along more quickly.

THE WITNESS:  I apologize.

THE COURT:  That's okay.

Q   At that same proceeding, on the same page were you also asked these questions and gave the following answers?

At Line 16.

Question, You agree you tackled him?

Answer, I think it is difficult because we are

Linda A. Marino, Official Court Reporter

Panuthos - Recross - Carnevale                    509

probably have slightly different definitions of the word, but I would certainly agree with you that I used weight and momentum and that we went to the ground. My sweatshirt was up over my head. I couldn't see anything at that point. I didn't -- my intention wasn't for him necessarily to fall, I was just holding on.

And then this continues to Page 549, the answer.

If by holding on to him brought him to the ground, then yes, I tackled him.

Do you recall giving that testimony in the criminal trial of this case?

A    Yes.

Q    Okay. And lastly, you were asked about observing the head injuries of Mr. Pfail.

Do you recall being asked those questions?

A    Yes.

Q    And Mr. Brewington read for you from Page 559 of the criminal transcript and -- hold on just one second.

(Pause in proceedings.)

THE COURT:  Mr. Carnevale, we are going to finish promptly at five. I'm not going to cut you off, but if you're not able to finish by then we will have to recall this witness.

MR. CARNEVALE:  I will. I apologize.

THE COURT:  We can continue in the morning. If you

Linda A. Marino, Official Court Reporter

*Panuthos - Recross - Carnevale*                510

would like to end it now, we can do that.

Q    I'm referring now to Page 559 of the criminal transcript, Line 20.  Mr. Brewington read for you Line 20.

The question was:  Would it be accurate to say with regard to Mr. Pfail's injuries to this day you claim never to have seen any actual injuries on his head, right?

Answer, Correct.

At that same proceeding, on the same page, were you also asked these questions?

This is line 3.

Question, Sir, you saw injuries on Mr. Pfail's head, didn't you?

Answer, I saw.

And the question cuts off and now it's Line 7.

Question, While you were in the vestibule, at any time while you were in the vestibule, did you see injuries to Mr. Pfail's head?

Answer, Not in the vestibule.

Question, Did you see injury to Mr. Pfail's head in the parking lot?

Answer, No.

Question, When was the first time you saw Mr. Pfail's injury?

Answer, I don't know what the time was, but when I went back to the 3rd Precinct after getting out of the

A-1478

Panuthos - Redirect - Brewington                511

hospital, I saw Mr. Pfail in the hallway of the 3rd Precinct with other officers and he had gauze around his head.

Do you recall giving that testimony?

A    Yes.

MR. CARNEVALE:  Thank you.  I don't have any more questions.

THE COURT:  Thank you.

MR. BREWINGTON:  One question.

REDIRECT EXAMINATION

BY MR. BREWINGTON:

Q    You saw gauze around his head.  You didn't see the injuries, did you?

THE WITNESS:  Correct.

MR. BREWINGTON:  No further questions.

THE COURT:  All right.

You are excused, sir.  You can leave the witness stand.  You're relieved of your obligation not to speak with your attorneys or anyone about your testimony at this point.

Jurors, we'll excuse you for the day.  Let me just remind you a little bit about some scheduling issues.

Tomorrow is Friday.  We do not have court on the weekends, of course, so you will not be here over the weekend. In addition, tomorrow there is an event honoring a colleague of mine at the courthouse that I need to attend, so we're going to end a little bit early, at four o'clock tomorrow.

*Linda A. Marino, Official Court Reporter*

Proceedings                                              512

So, we will let you go for the weekend a bit early.

On Monday, due to another scheduling matter, we do not have trial, but we'll be back Tuesday through Friday of next week. There may be a partial half-day in there that I immediate to take off for another matter, but we're seeing what we can do about that. In general we're going start at ten and end at five Tuesday through Friday of next week.

Thank you all very much again for your attention and for your patience with us today, and we'll see you tomorrow morning by 10 o'clock. Thank you.

(Jury exits.)

THE COURT: Have a seat, everyone.

I don't mind putting this on the record, Judge Bloom's retirement party is tomorrow starting at four. So, if any of you have had the pleasure of appearing before her or working with her or knowing her, you're all welcome to attend. It's open to the community. It's in the ceremonial courtroom.

Before we adjourn today, I think you all wanted to raise with me this question of Dr. Berrill's trial testimony. Again, I'm going to reserve on that until I hear Plaintiff's direct. So, I think probably the most efficient thing to do is just have you file a letter on the docket indicating the pages or send Freddie an e-mail to get to me the pages you'd like me to look at that you propose come in in light of what you anticipate Mr. Pfail's testimony may be following his

Linda A. Marino, Official Court Reporter

Proceedings                                             513

counsel's opening statement.

MR. CUOMO:  I'll get an e-mail out this weekend.

THE COURT:  Thank you.  An e-mail is fine, whatever is easier.  I won't make you pronounce something on your letterhead.  You have plenty else to do.  Whatever you prefer is fine.

I have one other matter for you all.

Is there anything else you have for me?

MR. BREWINGTON:  Judge, there was an issue that we raised actually last time we had a conference before the trial about the payment of Dr. Berrill.

THE COURT:  Yes.

Has that not happened yet?

MR. BREWINGTON:  No.

THE COURT:  What's going on here?

I thought that was going to get taken care of in 48 hours.

MR. CARNEVALE:  I forwarded that to the people who handle the billing at the county.

THE COURT:  Tell your supervisor they're at risk of something more serious coming from me if they don't get him paid for his deposition, including some issues with the damages portion of the trial if we get to that.  So, they really need to get him paid ASAP.

And if they are not going to get him paid by Monday,

Linda A. Marino, Official Court Reporter

A-1481

Proceedings                    514

I need to know why and I may need to have someone come in to address that.

MR. CARNEVALE:  Okay.

THE COURT:  Thank you.

Anything else?

MR. BREWINGTON:  Nothing from us.

MR. DORFMAN:  Your Honor, we did upload the two files that you requested; the 911 call, which is an unmarked exhibit at this point, and we also uploaded the video of the breaking of the window.

I'm just letting you know.  I don't expect a ruling this afternoon.

THE COURT:  Thank you.  Yes, I will take it a look at it this evening or tomorrow or over the weekend, but I will have looked at it prior to the time when Mr. Pfail testifies so I can evaluate your application.

I wanted to speak briefly with the lawyers without their clients here, so let me do this.  I know it may not be a good idea to have everyone together in the hallway.

Let me have the Defendants head out first.  You can go downstairs and meet your lawyers there.

And then Mr. Pfail, you can meet in the hallway once they have exited the area.

This won't take too long, I just want to check in with the lawyers about one thing.

Linda A. Marino, Official Court Reporter

A-1482

*Proceedings* 515

(Defendants exit the courtroom; Plaintiff exits the courtroom.)

THE COURT: The record will reflect that the Plaintiff and individuals defendants have left the courtroom.

I asked them to leave because I wanted to ask you all whether you've had any further discussions about possible settlement now that the trial has begun and before we have the jury deliberate on liability.

MR. DORFMAN: As far as I know, there have not been any further discussions, Judge.

THE COURT: Mr. Brewington, as far as you know?

MR. BREWINGTON: I believe that we did ask the county at some point to have discussions. I don't think we ever heard anything back.

MR. CARNEVALE: That's correct.

MR. BREWINGTON: We haven't heard anything back.

THE COURT: Let me just say this from my vantage point. I obviously don't know what's to come, but if I can be of assistance in facilitating that, obviously please let me know. I'm certainly happy to continue to preside over this case through deliberations and potentially through the damages phase, if it comes to that.

I will say hearing the testimony so far, no one knows what the jury will do, but I think, given some of the testimony that's been introduced, seeing videos, seeing the

*Linda A. Marino, Official Court Reporter*

*Proceedings* 516

testimony related to both the videos, the photograph, some of the contrast that Plaintiff has attempted to highlight between the felony complaint and what's in the photographs and videos, as well as the issues of what happened to the 911 caller's phone, what happened to Mr. Pfail's phone, what happened to or why the 911 caller's name and contact information was not taken by the officers, as well as the destruction of the sweatshirt and what happened with the sweatshirt photo, I think it may be in the individual Defendant's interests to have this case resolved with a settlement rather than proceeding to liability and potentially getting a judgment.

I think there may also be a concern about the Plaintiff on your end, meaning Defendants' end, laying the groundwork for the jury to award substantial punitive damages. Obviously, if it came to that, there would probably be some litigation over it, over the amount, whatever it is. But I think certainly in terms of laying a factual basis for the jury to make that finding, it seems as though the Plaintiff is certainly presenting some evidence that could theoretically support such an award.

So, I wanted to put that out there. I'm not in any way suggesting that I've taken a view, I certainly don't know what the jury will do, and, of course, all of that discussion on damages is before we even get to the question of whether there would be, if there were a liability verdict in

*Linda A. Marino, Official Court Reporter*

*Proceedings*                                                    517

Plaintiff's favor, a separate trial at a later point this year on *Monell* liability regarding failure to train, failure to supervise, failure to discipline, as well as the other *Monell* claims the Plaintiff may have brought, which I don't recall off the top of my head at this point.

So, this may be a juncture, especially because we have a three-day weekend coming up from trial, which it may be fruitful for the county and those who actually make the decisions on the county's part, to understand some of what's been going on so far and think about whether it's in the individuals' interests as well as county's interest.

Similarly, on Mr. Pfail's part, he has not yet testified. I do not know how his testimony will go, how it will be received. We have not yet gotten to the damages portion of the trial. If we get to that, there may be some reason why it would be in his interest to the consider a reasonable offer by the county at this juncture.

So, let me say just that. And, again, if I can be of any assistance, let me know. You all have the transcripts and you've been here so you don't need me to say any more.

(Continued on the following page.)

Linda A. Marino, Official Court Reporter

A-1485

Proceedings                                          518

(Continuing)

MR. DORFMAN: Judge, I'm sorry, as Mr. Brewington was talking, he refreshed my recollection about the course of discussions.

I don't want to give the Court the impression that we heard something from Mr. Brewington and there was just no communication back. We heard from Mr. Brewington. There was some communication back. It's not as though we are not talking or incapable of talking. It's just that so far here we are.

THE COURT: All right. You're actually not under any obligation to discuss anything at this point. I'm not a judge who forces people to engage in settlement discussions if you don't think it would be fruitful. But now that the trial has begun, I thought there may be another juncture to revisit that.

I also will say my understanding or my recollection is that Nassau County believe there may be an issue with settlements over a certain amount that need to get approved by the legislature. To the extent I have, as you all may know, conditionally approved settlements and suspended pending trial dates, even they day before trial, but I don't see any reason why I would treat it differently if the parties were in agreement. Even if the settlement isn't final and the stipulation isn't so ordered, it can be conditionally noted

Proceedings                                              519

and the trial suspended or adjourned while the County seeks the necessary approval from the legislature. I don't want that to stop you. It would require discharging the jury. So it would have to be a settlement that everyone is confident would be approved, to the extent it can be. Everyone understands the risks. I would advise the parties, but I don't want that to be a barrier either.

MR. BREWINGTON: Judge, just so you now, I have had experienced with the County of Nassau where we have signed a settlement agreement and then -- not in this case. But where after signing the settlement agreement and all of the parties going forward, the County legislature has just said no, we are not going to settle the case. And now that matter is before Judge Brown for an inquest after a finding of liability on summary judgment from the plaintiff.

THE COURT: Okay.

MR. BREWINGTON: So --

THE COURT: I understand. You may not have confidence even if you were to reach a settlement in principle.

MR. BREWINGTON: Unless I got it signed in blood from him.

THE COURT: Let the record reflect Mr. Cuomo is the designated sacrificial lamb here.

MR. CUOMO: I always am.

Proceedings                520

THE COURT:  Understood.  And given that your expert hasn't been paid for his deposition, that may further reduce your confidence.

Be that as it may, certainly my door is open if I can be of assistance.  Sometimes is the case that if we do go to deliberations on liability and there is a plaintiff's verdict before we commence the damages portion or the jury deliberates on damages, that may be another opportunity to revisit discussions.  So let's see where we are.

If not, I will see you here tomorrow morning.

MR. BREWINGTON:  Thank you.

MR. DORFMAN:  Thank you.

THE COURT:  Thank you all.

MR. CUOMO:  Thank you, Your Honor.

(Matter adjourned to May 16, 2025 at 9:30 a.m.)


ooo0ooo

A-1488

521

<u>I N D E X</u>

<u>WITNESS</u>                                                 <u>PAGE</u>

**JOSEPH MASSARO**

    VOIR DIRE EXAMINATION BY MR. BREWINGTON        321

    VOIR DIRE EXAMINATION BY MR. DORFMAN           345

    FURTHER VOIR DIRE BY MR. BREWINGTON            346

    FURTHER VOIR DIRE BY MR. DORFMAN               347

    FURTHER VOIR DIRE BY MR. BREWINGTON            355

    REDIRECT EXAMINATION BY MR. BREWINGTON         361

    RECROSS-EXAMINATION BY MR. DORFMAN             381

    REDIRECT EXAMINATION BY MR. BREWINGTON         392

**JONATHAN PANUTHOS**

    DIRECT EXAMINATION BY MR. BREWINGTON:          395

    CROSS-EXAMINATION BY MR. CARNEVALE             454

    REDIRECT EXAMINATION BY MR. BREWINGTON         485

    RECROSS-EXAMINATION BY MR. CARNEVALE           506

    REDIRECT EXAMINATION BY MR. BREWINGTON:        511

<u>E X H I B I T S</u>

Defense Exhibit JJJJJ                                    383

*Jamie Ann Stanton, RMR, CRR, RPR*
*Official Court Reporter*

A-1489

*Conference in Chambers*                                          1

(The following took place in Chambers; Juror No. 7 present.)

THE COURT:  We are here for a brief conference in Chambers with Juror No. 7, who is Mr. Vega, correct?

JUROR NO. 7:  Correct.

THE COURT:  I am Judge Morrison as you know. Sometimes during trial an issue comes up.  My job is to make sure everybody is a fair and impartial juror, to address it as informally as I can, while still doing whatever I need to do to make sure the trial proceeds fairly and in accordance with the law.  So we are doing it in here to make it an environment where you can speak freely.

So it's come to my attention that you may have perhaps in an offhand way expressed an opinion or a concern about your impressions of Mr. Massaro, the police officer who was testifying yesterday to another juror.  We're all human beings.  We all form impressions from time to time.  I just want to know if you recall what it was that you said to anyone and who was present and what happened.

JUROR NO. 7:  Man.  That's a good question.  I wish that I did have sincere recollection of it.  I don't immediately off the top of my head, yeah, I don't know, if you have information, I would be happy to discuss it.

(Continued on the following page.)

Jamie Ann Stanton, RMR, CRR, RPR
Official Court Reporter

A-1490

*Conference in Chambers* 2

(Continuing.)

THE COURT: Sure. So, again, it came to me through a game of telephone so I don't know if this is correct, but essentially that someone said that you made a comment that Inspector Massaro, after he testified, something along the lines of, "It must be hard to be a Nazi," or he appeared to be a Nazi, something like that.

JUROR NO. 7: Oh, no, no. No, I definitely did not use the word "Nazi."

THE COURT: Okay.

JUROR NO. 7: I would certainly remember that. I didn't say anything about that.

THE COURT: Okay.

JUROR NO. 7: Now, I really wish I had, like, perfect recollection. No, I may have mentioned offhand that it's, like hard to be in the hot seat, I think I may have said something like that.

THE COURT: Oh, in the hot seat. Okay.

JUROR NO. 7: I can see maybe how saying it out loud sounds similar.

THE COURT: Okay.

JUROR NO. 7: Geez.

THE COURT: Do you remember who you said it to or who was present?

JUROR NO. 7: We were all, like, sitting around the

*Linda A. Marino, Official Court Reporter*

A-1491

*Conference in Chambers* 3

table, so I don't remember.  I definitely didn't, like, pull anybody aside, not having one-on-one conversations.

THE COURT:  All right.  Thanks.  That sounds good.

So, let me just say this:  Is there anything else that you remember about anybody's reaction or your interactions or anything like that?

JUROR NO. 7:  I wish I did.  As it comes up now, I just -- it didn't even dawn on me as something that was, like, awkward because I didn't notice anybody reacting anyway and it just was an offhanded remark.

THE COURT:  I appreciate it.

JUROR NO. 7:  Yeah.  Jesus Christ, I'm so sorry that this has happened.

THE COURT:  That's okay.

JUROR NO. 7:  I promise that I didn't say anything --

THE COURT:  This is why we call you one-on-one, because I wanted to talk to you directly and see if we can get to the bottom of it.  And I really appreciate your candor.

JUROR NO. 7:  Absolutely.

THE COURT:  Thank you.  I don't think I have any further questions for you.

I'm going to just tell everybody when we go back into court to just remember not to comment on the evidence at all or even the impressions.  For a human, being a juror is

*Linda A. Marino, Official Court Reporter*

A-1492

*Conference in Chambers* 4

very, very different than being an ordinary person in the world where you're free to say or not say what's on your mind. Once we get to the end of the case, you're all feel free to discuss your opinions and impressions.

And you also shouldn't feel any kind of way towards the person who brought it to my attention, whoever that may be, because if they misheard you, I understand why they would want to raise that.

JUROR NO. 7: Certainly. I understand that as well.

THE COURT: Great. We do actually have some other legal issues we're dealing with and some testimony issues I need to discuss with the lawyers as well. So, we are going to give you guys until 11:30 so I can deal with those all at the same time.

Thank you, Mr. Vega, for coming in. You're welcome to step out of the building and enjoy your break and we'll see you back here at 11:30.

JUROR NO. 7: Thank you. I'm sorry for the misunderstanding.

THE COURT: No, that's all right. Thank you.

(Conference in chambers with Juror No. 7 ends.)

*Linda A. Marino, Official Court Reporter*

A-1493

*Conference in Chambers* 5

(The following occurred in chambers.  Juror No. 6. present.)

THE COURT:  Have a seat.  We're going to speak with you.  I know everything in this building can be intimidating. We're going to try to speak with you in as least intimidating a form as possible.

So, first of all, I want to thank you very much for making the phone call to Freddie.  Whether it turns out to be anything of significance or not, it's always important we have the information so we can decide what to do with it.  So, the lawyers and I really appreciate it.

I did speak with Mr. Vega this morning, did not tell him you had made the phone call.  We kind of sent everybody out to stagger it so there wouldn't be an issue.

I just told him that it had come to my attention he may have made a comment about his impressions of Mr. Massaro, the witness who was on the stand yesterday, and asked him what he recalled.

I can tell you that he was at first confused, wasn't sure what I was talking about, and asked if I could tell him what I thought the issue was.  So, I explained to him that someone may have overheard him saying something along of lines of, "It must be hard to be a Nazi."

And then he looked very surprised and said, essentially, "Oh, no, I didn't say anything like that."

*Linda A. Marino, Official Court Reporter*

A-1494

*Conference in Chambers* 6

What he recalls, and he kind of immediately said it, was that, "It must be hard to be in the hot seat."

So, that was how he recalled it. But let me ask you.

Having said that, he really insisted it was a misunderstanding. Let me ask you if you interpreted it differently or how clear your recollection is.

JUROR NO. 6: I asked him to repeat it and he said "Nazi." That's what I heard. Maybe he did say "hot seat" and I misheard it again. That's all I can say.

THE COURT: All right. So, let me ask you, now that you've heard that explanation, given what you heard, what you're hearing now, separately or in combination, do you think in your mind it affected your own ability to be fair and impartial and continue to serve on this jury?

JUROR NO. 6: No, not at all. In fact, the opposite. I really believe in the process.

THE COURT: All right. I want to make sure you're still comfortable serving. We would like to keep everyone because you've all been listening very closely and paying attention and everyone's service is important. So, I just want to make sure it's not uncomfortable or awkward with you.

JUROR NO. 6: Well, he's going to know it was me because he'll probably remember that I said...

THE COURT: If at any point it does become awkward

*Linda A. Marino, Official Court Reporter*

*Conference in Chambers*         7

or you're concerned that you can't serve with him for any reason -- I trust that it's not going to be issue, especially because you're not starting deliberations for some period of time, but if it does in any way, you can let Freddie know you want to speak with me again and we can proceed from there.

But for all we know, he may think that it was someone else in the room who heard it.

I did want to ask you, do you recall at this point who else was there when it was heard or said?

JUROR NO. 6:  I think most of the people, I think.

THE COURT:  Did anyone else react in any way or follow up about it or was there any discussion?

JUROR NO. 6:  No, no.  I mean if other people, I didn't notice.  And then I got up and went to the bathroom.

THE COURT:  Do you remember how close you two were when he said it?

JUROR NO. 6:  I was at the end where I was sitting, which is like the corner where the paper is, and he was at his seat at the opposite end.  The same side of the table but the opposite end.

THE COURT:  Got it.  So, you weren't looking across at each other, but you were --

JUROR NO. 6:  But I was, at that moment, I think, that he said it, I was getting up to go to the bathroom.  So, I was just, like, starting to walk around.

*Linda A. Marino, Official Court Reporter*

A-1496

*Conference in Chambers* 8

THE COURT:  Got it, got it.  That makes good sense.

Thank you very much.  I really appreciate it.  We'll see you back at 11:30.  We do have to talk about a witness issue on another matter, so that's mostly why we're taking this hour but I wanted to address this at the same time in as unobtrusive a way as possible.  I really appreciate it and I'm glad you want to continue to serve --

JUROR NO. 6:  Yes.

THE COURT:  -- and look forward to continuing the trial.

JUROR NO. 6:  Yes.

THE COURT:  Thanks so much.  Freddie will show you out.

(Conference in chambers with Juror No. 6 ends.)

*Linda A. Marino, Official Court Reporter*

A-1497

522

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - X
BRIAN PFAIL,                    : 16CV518(NRM)
                                :
          Plaintiff,            :
                                :
      -against-                 : United States Courthouse
                                : Brooklyn, New York
COUNTY OF NASSAU, ET AL.        :
                                :
          Defendant.            : Friday, May 16, 2025
                                : 9:30 a.m.
- - - - - - - - - - - - - X
          TRANSCRIPT OF CIVIL CAUSE FOR A JURY TRIAL
          BEFORE THE HONORABLE NINA R. MORRISON
               UNITED STATES DISTRICT JUDGE

               A P P E A R A N C E S:

For the Plaintiff:    OFFICES OF FREDERICK K. BREWINGTON
                          556 Peninsula Boulevard
                          Hempstead, New York 11550
                      BY: FREDERICK K. BREWINGTON, ESQ.
                          COBIA MALIK POWELL, ESQ.

For Defendants County
of Nassau, Panuthos,
O'Brien:              OFFICE OF THE NASSAU COUNTY ATTORNEY
                          One West Street
                          Mineola, New York 11501
                      BY: JOHN CARNEVALE, ESQ.

For Defendant Massaro:    SOKOLOFF STERN, LLP
                          179 Westbury Avenue
                          Carle Place, New York 11514
                      BY: LEO DORFMAN, ESQ.

For Defendant         CUOMO LLC
Iannucci:                 9 East 38th Street
                          New York, New York 10016
                      BY: MATTHEW A. CUOMO, ESQ.


Court Reporter:   **SOPHIE NOLAN**
                     225 Cadman Plaza East/Brooklyn, NY 11201
                     NolanEDNY@aol.com
*Proceedings recorded by mechanical stenography, transcript
produced by Computer-Aided Transcription*

SN      OCR      RPR

A-1498

Proceedings                                    523

(In open court.)

(The Hon. NINA R. MORRISON, presiding.)

THE COURTROOM DEPUTY:  Civil cause for a jury trial, Docket No. 16-CV-518, Pfail v. County of Nassau, et al.

Counsel, please state your appearance for the record, starting with Plaintiff.

MR. BREWINGTON:  Appearing for Mr. Pfail, Law Offices of Frederick K. Brewington, by Frederick K. Brewington.

Along with me this morning, your Honor...

MR. POWELL:  Cobia M. Powell.

MR. BREWINGTON:  Also at the table is Christina Portier and our client is also at the table, your Honor.

THE COURT:  Good morning, everyone.

MR. CARNEVALE:  For Defendants Panuthos, O'Brien, and the County of Nassau, Deputy County Attorney John Carnevale.  Good morning.

THE COURT:  Good morning.

MR. DORFMAN:  Good morning, Judge.  For Joseph Massaro, Leo Dorfman, Sokoloff Stern LLP.

MR. CUOMO:  Good morning, your Honor.  Happy Friday Matthew Cuomo, Cuomo LLC, for Sergeant Thomas Iannucci.

THE COURT:  Good morning, everyone.

All right.  I gather Mr. Brewington had one brief item to take up before we brought in the jury.

*Linda A. Marino, Official Court Reporter*

A-1499

Proceedings                                    524

MR. BREWINGTON:  One brief item and another short item, Judge.

The brief item is that we wanted to put tabs in your book so it might be easier to find things in your book and we wanted permission to be able to do that.  Ms. Portier would put the tabs in and return it back to --

THE COURT:  It would be helpful.  That would include the prior testimony that you've been be using for impeachment?

MR. BREWINGTON:  That's correct.

THE COURT:  That would be delightful.  I will happily hand it up to Ms. Portier.  Thank you.

MR. BREWINGTON:  The other item was, Judge, that we did submit a letter last night on one of the issues raised by Defendants and just wanted to make the Court aware that that was submitted.

THE COURT:  It has not been flagged for me personally, but I let me take a look at a break.  And if anything comes up that you need to discuss related to that at sidebar in the meantime, just let me know.

MR. BREWINGTON:  Very good.

MR. DORFMAN:  Good morning, Judge.

THE COURT:  Good morning.

MR. DORFMAN:  We also just had a couple of brief items, or which I think ought to be brief.

If your Honor hasn't reviewed the letter yet, then

*Linda A. Marino, Official Court Reporter*

A-1500

Proceedings                                    525

we'll just wait on that and address that issue at the appropriate time when your Honor wants to hear further argument on that, if your Honor does.

In reviewing the transcript -- item two is in reviewing the transcript of yesterday's trial, I came upon a portion of my client's testimony that was just ever so slightly mistranscribed but it's a meaningful difference.

THE COURT:  Okay.

MR. DORFMAN:  And I raised it with Mr. Brewington this morning and he graciously agreed to a physical alteration of the transcript.

THE COURT:  Okay.

This is one from this trial?

MR. DORFMAN:  From this trial, from yesterday's proceeding.

THE COURT:  Got it.

MR. DORFMAN:  On Page 375 of the transcript, on Line 20, it reads:

Answer, The sweatshirt was in evidence.

It should read:  The sweatshirt wasn't evidence.

As in was not.

THE COURT:  Wasn't evidence.  But not wasn't in evidence, it should just say W-A-S-N-'-T evidence.

MR. DORFMAN:  Correct.

THE COURT:  That's fine.  We will ask the court

Linda A. Marino, Official Court Reporter

A-1501

Proceedings 526

reporter to make that correction and we will proceed from there.

MR. BREWINGTON: Consent.

THE COURT: I did the receive Mr. Cuomo's note directing me to the pages of Dr. Berrill's testimony that you wanted me to consider. So, as I said, I'm going to reserve on that until I hear Mr. Pfail's direct testimony, but I will take another look at the specific pages, from Page 605, that he referenced.

MR. DORFMAN: Thank you, Judge.

The last item is we did receive yesterday a transcript of your Honor's questioning of the jurors about that issue. We had a chance after the proceedings to review that transcript.

Having done that, we'd like to renew our motion both for a mistrial or, in the alternative, to dismiss Juror No. 7.

THE COURT: Thank you.

I reviewed the transcript independently as well. I don't think it changes my recollection of what we spoke about; if anything, I think clarified the basis for my earlier ruling.

You may have leave to review them now that you've reviewed it, but the motions are denied and your exception is noted for the record.

MR. DORFMAN: Thank you, your Honor.

*Linda A. Marino, Official Court Reporter*

A-1502

Proceedings                                    527

THE COURT:  Okay.  Let's go ahead and bring in the jurors.

(Jury enters.)

THE COURT:  Please be seated.  Good morning, jurors. Welcome back.  We're about to begin with the testimony of Plaintiff's next witness.

Please call your next witness, Mr. Brewington.

MR. POWELL:  Your Honor, at this time we call Karen O'Brien to the stand.

THE COURT:  All right.

(Witness sworn.)

THE COURTROOM DEPUTY:  Can you please state and spell your name for the record Karen C. O'Brien, K-A-R-E-N, middle initial C, O-'-B-R-I-E-N.

THE COURT:  Ms. O'Brien, pull the mic a little closer to you there.  Twist it around.  Perfect.

Mr. Powell, you may proceed when you're ready.

MR. POWELL:  May I inquire, your Honor?

THE COURT:  You may.

(Continued on the following page.)

Linda A. Marino, Official Court Reporter

*O'Brien - Direct - Powell*                    528

**KAREN O'BRIEN**,

        called by the Plaintiff, having been

        first duly sworn, was examined and testified

        as follows:

DIRECT EXAMINATION

BY MR. POWELL:

Q    Hello.  My name is Cobia Powell I'm one of the attorneys representing Mr. Pfail, along with Mr. Brewington.  Good morning.

A    Good morning.

Q    Is it accurate you're currently retired from the Nassau County Police Department?

A    Yes, sir.

Q    Would you like for me to refer to you as Ms. O'Brien or Officer O'Brien or something else?

A    Either.  It doesn't matter.

Q    Ms. O'Brien, how long did you work for the Nassau County Police Department?

A    I was employed for 16 years.

Q    What was your highest rank at the Nassau County Police Department?

A    I was a police officer.

Q    And as a Nassau County police officer --

        THE COURT:  Give us just one second.

        (Pause in proceedings.)

*Linda A. Marino, Official Court Reporter*

A-1504

O'Brien - Direct - Powell                    529

THE COURT:  Go ahead.

Q    And as a Nassau County police officer, you went through training, correct?

A    Yes, sir.

Q    And you completed the police academy training, correct?

A    Yes, sir.

Q    And one of the trainings you completed as a Nassau County police officer was use of force training, correct?

A    Yes, sir.

Q    And you were taught the difference between reasonable use of force and force that was not reasonable?

A    Yes, sir.

Q    And could you describe to the jury, what's the difference between reasonable force and force that's not reasonable?

A    We're trained in the police academy force met with force when they're training us.  So, their training includes where if you're placing somebody under arrest, when they're resisting, how you counteract when someone resists with you, as well as use of deadly force.

Q    So, it would be accurate that you know the difference between reasonable force and unreasonable force?

A    Yes, sir.

Q    And if you were to observe an officer use unreasonable use of force, would you have a responsibility to report it?

A    Absolutely.

Linda A. Marino, Official Court Reporter

A-1505

O'Brien - Direct - Powell                    530

Q    And who would you report it to?

A    My superior officer.

Q    And that would be your obligation, correct?

A    Yes, sir.

Q    And can you turn your attention to November 3, 2014?

A    Yes, sir.

Q    And what was your position that day with the Nassau County Police Department?

A    I was assigned to the 3rd Precinct, my post is 320, and the hours that I work is from 1900 to 0500.

Q    And would it be accurate that your rank at that time was a police officer?

A    Yes, sir.

Q    And did there come a time around 10:20 p.m. when you received a call or radio run about an incident at Buffalo Wild Wings?

A    Yes, sir.

Q    And at first, you started to respond to that location, meaning Buffalo Wild Wings, correct?

A    I was assigned to start responding to Buffalo Wild Wings.

Q    You never actually went to Buffalo Wild Wings, did you?

A    No, sir.

Q    At some point, you received a call or a radio from Sergeant Iannucci?

A    Sergeant Iannucci went over the air.

A-1506

O'Brien - Direct - Powell                    531

Q    And when you say "went over the air," what does that mean?

A    It was dispatched through the radio, Sergeant Iannucci, for individuals to start canvassing over by Home Depot.

Q    So, you heard Sergeant Iannucci radio over that to canvass to the Home Depot area, correct?

A    Yes, sir.

Q    And did you proceed to go to the Home Depot area to canvass?

A    Yes, sir.  I was actually pulling up in front of -- passing the Home Depot parking lot, which is why I entered it right away.

Q    And would Sergeant Iannucci be a superior officer to you on that day?

A    He was my sergeant, yes, sir.

Q    And as a sergeant, he would be your superior officer, correct?

A    Yes, sir.

Q    And once you arrived to the Home Depot area, you did not see anyone that matched the description that went over the radio run, correct?

A    When I first arrived, I went through the back of the Home Depot so I didn't see anybody at that time.

Q    So, would it be accurate that after going to the Home Depot, you went to the Fairway Market?

Linda A. Marino, Official Court Reporter

A-1507

O'Brien - Direct - Powell                    532

A    Yes, sir, I started to pass the Home Depot going towards Fairway supermarket.

Q    And once you got to the Fairway supermarket, did you see a Jeep?

A    Yes, sir.

Q    And also when you got to Fairway Market, did you see an individual waving you down?

A    Yes, sir.

Q    And which one did you see first, meaning did you see the Jeep first or did you see the individual waving you down first?

A    Actually, when I was pulling away from the Home Depot, I was driving westbound in the parking lot, I noticed the Jeep in an angle with a door open in front of the Fairway supermarket.  That's what drew my attention to go over there.

Q    And I'm going to take you through that step-by-step.

        Once you saw the Jeep, how was it positioned?

A    It was positioned in an angle.  So, it was partially in -- in the roadway, there are lines marking the east and westbound lane of travel.  So, the vehicle was partially in the westbound and the front end of the Jeep was facing in the eastbound direction.

Q    And was the front portion of the Jeep facing the entrance of Fairway Market?

A    Yes.

Linda A. Marino, Official Court Reporter

A-1508

O'Brien - Direct - Powell                    533

Q    And you stated that a door was open, correct?

A    Yes, sir, the driver's side door was open.

Q    And did you recognize that particular Jeep?

A    Yes, sir.

Q    And how did you recognize that particular Jeep?

A    That's the unmarked Jeep that's at the substation.

Q    And did Sergeant Iannucci ever use that Jeep?

A    Yes, sir.

Q    Did you observe the windows of the Jeep?

A    No, sir, I just observed the door being open of the Jeep.

Q    And did you observe -- withdrawn.

Would you agree that the Jeep wasn't in a parking spot?

A    Yes, sir.

Q    And you said the driver's side door was open.

Were any other doors open?

A    No, sir, that was the only door that was open.

Q    Now, going back to the individual that was waving you down --

You saw an individual waving you down, correct?

MR. CARNEVALE:  Objection.

THE COURT:  Overruled.

A    There were actually several individuals outside.  One had his hand pointing in the direction of, waving towards, the entrance Fairway.

Linda A. Marino, Official Court Reporter

A-1509

O'Brien - Direct - Powell                                   534

Q    And would you agree with me that that individual was waving you down?

A    Yes, sir, waving towards my direction to come towards them, yes.

Q    And would you describe that individual as frantic?

A    No.

Q    Would you describe that individual as breathing heavy?

A    Not that I recall.  I wasn't that close to see how he was breathing.

Q    Was you close enough to see if the individual was on the phone?

A    I saw a cell phone in his hand up to his ear, yes.

Q    And at that time, do you know who he was on the phone with?

A    No, sir.

Q    Did you ever come to learn who that individual was on the phone with?

A    Yes, sir, at a later date.

Q    And who did you learn that individual was on the phone with?

A    I learned one of the individuals that were outside the Fairway was on the phone with 911.

Q    Was that the individual that was waving you down?

A    I believe it was.

Q    And Ms. O'Brien, could you please tell the jury the

Linda A. Marino, Official Court Reporter

A-1510

O'Brien - Direct - Powell                    535

number of the marked police car that you drove into the Fairway Market?

A    I was in Unit 320.

Q    And when you say "Unit 320," would that be the number that would be in the license plate's position of the vehicle?

A    Yes, sir, it's on the license plate as well as on the side of the RMP as well as on the top of the vehicle.

Q    At the time that you saw the individual that was waving you down, did you say "what's up" to the individual?

A    I don't recall saying it.

Q    And you heard the 911 call that was played in open court on Wednesday, correct?

A    Yes, sir.

Q    And prior to Wednesday, you heard that 911 call multiple times, haven't you?

A    Yes, sir.

Q    Did you hear a woman's voice on the 911 call?

A    Yes, sir.

Q    And was that your voice?

A    It sounds like me, yes.

        MR. POWELL:  Your Honor, if I could play Plaintiff's Exhibit 85 that's already in evidence.

        THE COURT:  Yes, you may.

        Mr. Brewington is not going to be your tech guy? Doesn't work that way?

Linda A. Marino, Official Court Reporter

A-1511

O'Brien - Direct - Powell          536

MR. BREWINGTON:  I was demoted, Judge.

(Exhibit published to the jury.)

MR. POWELL:  Your Honor, starting Plaintiff's Exhibit 85.

THE COURT:  Okay.

(Audio plays; audio stops.)

MR. POWELL:  Stopping the audio at 49 seconds.

Q    Now, ma'am, did you hear a female on the 911 call say "what's up"?

A    Yes, sir.

Q    And that was your voice, correct?

A    Yes, sir.

Q    You also heard the caller say, "A woman.  License plate 320," correct?

A    Yes, sir.

Q    And that would have been your vehicle?

A    Yes, sir.

Q    So, that caller would have been talking about you, correct?

A    Yes, sir.

Q    And ma'am, were you the only woman officer on scene at that time?

A    Yes, sir.

MR. POWELL:  Starting the audio from 49 seconds of Plaintiff's Exhibit 85.

Linda A. Marino, Official Court Reporter

A-1512

O'Brien - Direct - Powell                537

(Audio plays; audio stops.)

MR. POWELL: Stopping the audio at 54 seconds.

Q    Now, ma'am, you just heard the audio from 49 seconds to 54 seconds?

A    Yes, sir.

Q    Did you hear the individual on the call say, "This guy's head is bloody"?

A    I heard him as you played the recording, yes.

Q    Now, on November 3, 2014, based on your recollection, do you recall anyone's head being bloody?

A    Yes, sir.

Q    Was your head bloody?

A    No, sir.

Q    Was Sergeant Iannucci's head bloody?

A    No, sir.

Q    Was Officer Panuthos' head bloody?

A    No.

Q    Was Officer Massaro's head bloody?

A    Yes.

Q    And when you say that his head was bloody, do you mean his nose?

A    Yes, sir. His face.

Q    His face or his nose?

A    His face, which is his nose, going down his face, down his lip. The blood was dripping down.

Linda A. Marino, Official Court Reporter

O'Brien - Direct - Powell                538

Q    You said from his nose going down was bloody?

A    Yes, sir.

Q    Was above the nose bloody?

A    Not that I recall.

Q    Was the crown of his head bloody?

A    Not that I recall.

Q    Was the back of his head bloody?

A    Not that I recall.

Q    On that date, meaning November 3, 2014, in the vestibule of Fairway Market was Mr. Pfail's head bloody?

A    Yes, sir.

Q    And at the time you arrived to the -- withdrawn.

        MR. POWELL:  Taking off Plaintiff's Exhibit 85.

Q    And at the time you arrived at the vestibule on that date, meaning November 3, 2014, was Mr. Pfail's head already bloody?

A    Can you say that question again?

Q    Yes.  At the time you arrived to the vestibule, you noticed Mr. Pfail being bloody, didn't you?

A    No, sir.

Q    Now, ma'am, you previously testified about this matter, correct?

A    Yes, sir.

Q    And when you testified at the criminal trial, you were under oath?

Linda A. Marino, Official Court Reporter

A-1514

O'Brien - Direct - Powell                    539

A     Yes, sir.

Q     And you were under oath today as well, correct?

A     Yes, sir.

Q     And then and now you know to give truthful answers, correct?

A     Yes, sir.

Q     And you have sworn to give truthful testimony, correct?

A     Yes, sir.

Q     Did you give this testimony on Page 461 of the February 26, 2018, trial transcript?

          MR. DORFMAN:  Hold on a second, please.

          What line?

          MR. POWELL:  Starting Line 16.

Q     Question, Officer, at the time that you came, was Mr. Pfail already bloodied?

          Answer, I noticed blood on him when I first arrived, yes.

          Did you give that testimony?

A     Yes.

Q     And was that testimony accurate?

A     Yes.

Q     Now when you arrive to the vestibule, Mr. Pfail was already bloody, correct?

A     I didn't notice the blood.  You're asking me when I first arrived into the vestibule.  That's not the first thing I

Linda A. Marino, Official Court Reporter

O'Brien - Direct - Powell                    540

noticed, no.

Q    I'm not asking what's the first thing you noticed, I'm asking when you first arrived did you notice in Mr. Pfail was bleeding?

A    Not when I first arrived.

Q    Now, once again, Officer, did you give this testimony on February 26, 2018, Page 461, Line 16?

Question, Officer, at the time that you came, was Mr. Pfail already bloodied?

Answer, I noticed blood on him when I first arrived, yes.

MR. CARNEVALE:  Objection.

THE COURT:  It was asked and answered, but I'll allow her to answer.

Did you give that testimony at that trial?

THE WITNESS:  Yes.

THE COURT:  I just wanted to make sure the record was clear because I was not clear myself.  Thank you.

Q    And prior to your arrival, you don't know if any officer punched Mr. Pfail, do you?

A    No, sir.

Q    And prior to your arrival, you don't know if any officer kicked Mr. Pfail?

A    No, sir.

Q    And just to be clear, Officer Panuthos, Officer Massaro,

Linda A. Marino, Official Court Reporter

A-1516

O'Brien - Direct - Powell                541

and Sergeant Iannucci was there on the scene before you, correct?

A    Yes, sir.

Q    And prior to your arrival, you don't know if any of the officers or Sergeant Iannucci hit Mr. Pfail with a flashlight, do you?

A    No, sir.

Q    And prior to your arrival -- withdrawn.

You can't say whether that happened or not, could you?

A    No, sir.

Q    Because you weren't there, right?

A    Yes, sir.

Q    Now, focusing on the time when you did arrive, while in the vestibule you did not observe Mr. Pfail punch any officer, did you?

A    No, sir.

Q    And while in the vestibule, you didn't observe Mr. Pfail kick any officer, did you?

A    No, sir.

Q    You never saw Mr. Pfail elbow any officer while he was on the ground, did you?

A    No, sir.

Q    You never saw Mr. Pfail headbutt any individual while he was on the ground, did you?

A-1517

O'Brien - Direct - Powell                    542

A    No, sir.

Q    And once you arrived to the vestibule, you began to engage Mr. Pfail as your -- withdrawn.

Once you arrived to the vestibule, you began to engage Mr. Pfail as your fellow officers correct?

A    Yes, sir.

Q    And you made physical contact with Mr. Pfail?

A    Yes, sir.

Q    And while Mr. Pfail was on the ground, you physically touched his body, correct?

A    Yes, sir.

Q    And you joined the officers in subduing Mr. Pfail, correct?

A    That's correct.

Q    Now, once you arrived and noticed Mr. Pfail was bleeding, you never asked Mr. Pfail how he came to be bleeding, did you?

A    No, sir.

Q    You never asked Sergeant Iannucci?

A    When I first arrived?

Q    Yes, did you ask him?

A    No, sir.

Q    Did you ever ask Sergeant Iannucci how Mr. Pfail came to be bleeding?

A    No, sir.

Q    You never asked Officer Panuthos, did you?

Linda A. Marino, Official Court Reporter

```
                O'Brien - Direct - Powell                543
```

A      No, sir.

Q      You never asked Officer Massaro?

A      No, sir.

Q      From November 3, 2014, until today, you never asked anyone how Mr. Pfail came to be bloody on that night, did you?

A      We did discuss what happened that night, what transpired of them going down onto the ground.

Q      Did you ever ask anyone between November 3, 2014, up until today how it came to be that Mr. Pfail was bloodied, yes or no?

          MR. CARNEVALE:  Objection.

          THE COURT:  Overruled.

A      I would say yes because we did have a discussion of what transpired.

Q      And when you say you had a discussion about what transpired, did you have a discussion about how Mr. Pfail started bleeding on that night, yes or no?

A      I don't recall.

Q      And as a Nassau County police officer at that time, wouldn't that fact that Mr. Pfail was bleeding be important?

A      Yes, sir.

Q      But you never asked why this man, Mr. Pfail, was bloody on the ground at the Fairway Market, did you?

          MR. CARNEVALE:  Objection.

          THE COURT:  Overruled.

```
              O'Brien - Direct - Powell                544
```

A    I knew they all had fallen on to the ground and he went down with his body.  So, I assumed some of the injury to Mr. Pfail was due to them falling on to the ground.

Q    And thank you for that, Officer.  We don't want you to assume.

My question is you never asked anyone how Mr. Pfail came to be bloody while he was on the ground in the vestibule, did you?

MR. CARNEVALE:  Objection.

THE COURT:  Overruled.

The question is just did you ask.

Do you have any recollection of specifically asking any of your fellow officers how did he come to be bloodied?

THE WITNESS:  I don't recall.

Q    And is it accurate that no one from Nassau County Police Department ever asked you how Mr. Pfail came to be bloodied?

A    Not that I recall.

Q    And no one -- withdrawn.

And no one from Internal Affairs asked you how Mr. Pfail came to be bloodied?

A    No, sir.

Q    And you had conversations with Detective Ramos about this matter, correct?

A    Yes, sir.

Q    And Detective Ramos never asked you how Mr. Pfail came to

```
         Linda A. Marino, Official Court Reporter
```

A-1520

```
                 O'Brien - Direct - Powell                    545
```

be bloody, did he?

A    Not that I recall specifically that question.

Q    So, would that be no?

A    Not that I recall that specific question.

Q    And you agree with me that you made physical contact with Mr. Pfail, correct?

A    Yes, sir.

Q    And while making the physical contact with Mr. Pfail, did you ever say, "Break his fucking legs"?

A    Absolutely not.

Q    You never said that, did you?

A    No, sir.

Q    Did you respond with the force necessary to get Mr. Pfail under control?

A    Yes, sir.

Q    And that force was reasonable?

A    Yes, sir.

Q    And you never saw any officer use unreasonable force in your presence, did you?

A    No, sir.

Q    At some point, Mr. Pfail was placed in handcuffs, wasn't he?

A    Yes, sir.

Q    And that occurred when Mr. Pfail was facedown?

A    Yes, sir.

A-1521

O'Brien - Direct - Powell                    546

Q    And then he was turned faceup, correct?

A    After he was placed in handcuffs.

Q    So, let me ask this:  After Mr. Pfail was placed in handcuffs, was he turned from facedown to faceup?

A    Yes; not immediately, but, yes, he was.

Q    And from your recollection, do you recall there being a blood stain on the vestibule floor of the Fairway Market?

A    I remember blood on the floor, yes.

Q    And you watched the video in this matter, correct?

A    Yes, sir.

Q    And how many times have you watched it?

A    I've watched it a few times.

Q    And in those few times that you watched the video, did you see a pool of blood in the middle of the floor of the vestibule?

A    I see blood on the floor, yes.

Q    And how would you describe the blood you saw on the floor?

A    Blood on the floor.

        MR. POWELL:  I'm going to withdraw that.

Q    At some point you put on rubber gloves, correct?

A    Yes, sir.

Q    And please tell the jury, what is the reason you put the rubber gloves on your hands on that night?

A    On that night I put it on because there was blood on the

Linda A. Marino, Official Court Reporter

```
                O'Brien - Direct - Powell                547
```

defendant as well as the other officers.

Q    And when you say "defendant," you mean Mr. Pfail?

A    Yes, sir.

Q    And now you said that you put the rubber gloves on because there was blood on the defendant, meaning Mr. Pfail, as well as the other officers, correct?

A    Yes, sir.

Q    Did you put the gloves on because of Mr. Pfail was bleeding or because of the other officers?

A    I put the gloves on because I was touching the defendant as well as him having blood on him.

Q    And when you say as well as him having blood on him you mean Mr. Pfail?

A    Yes, sir.

         MR. POWELL:  And Judge, I'm going to play Exhibit 74C, which is already in evidence.

         May I publish that to the jury.

         THE COURT:  You may.

         (Exhibit published to the jury.)

Q    Now, ma'am, do you have Plaintiff's Exhibit 74C in front of you?

A    Yes, sir.

Q    At this time on the video, meaning at 0000, could you observe the middle of the vestibule floor?

A    Yes, sir.

A-1523

O'Brien - Direct - Powell                        548

Q    Do you see any stain on the vestibule floor?

A    No.

          THE COURT:  Just checking, you're asking just looking at the video now, not where she was at the moment the video began recording in realtime?

          MR. POWELL:  Yes.

          THE COURT:  Just right now can you see any stain, okay, got it.

Q    And you said you can't see any stain, correct?

A    Correct.

Q    Now skipping to 3 minutes and 24 seconds of Exhibit 74C, stopping at 3 minutes and 24 seconds, I will now play the video at 3 minutes and 24 seconds.

          (Video plays; video stops.)

          MR. BREWINGTON:  Pausing at 3 minutes and 27 seconds.

Q    Ma'am, in the video, do you see yourself in the video?

A    Yes, sir.

Q    And where are you positioned in the video?

A    I am to the right of the video, or the officer standing to the right.

          MR. POWELL:  Starting the video again at 3 minutes and 27 seconds of Exhibit 74C.

          (Pause in proceedings.)

          MR. POWELL:  Technical difficulty.

Linda A. Marino, Official Court Reporter

*O'Brien - Direct - Powell*                           549

THE COURT:  I'll send reinforcements from my side.

Go ahead, Freddie.  You can go help.  Thanks.

(Pause in proceedings.)

MR. POWELL:  Placing 74C back on the screen at 3 minutes and 27 seconds, playing the exhibit.

(Video plays; video stops.)

MR. POWELL:  Stopping the exhibit.

Q    At some point in time, ma'am, you placed rubber gloves on your hands, correct?

A    Yes, sir.

MR. POWELL:  And placing 74C back on the screen at 3 minutes and 39 seconds.

Q    At this still shot, do you see a stain on the middle of the vestibule floor?

A    Yes, sir.

Q    And after Mr. Pfail was turned from facedown to faceup, at some point you, along with Officer Colon, helped him up, correct?

A    Yes, sir.

Q    And you walked Mr. Pfail out of the vestibule, right?

A    Yes, sir.

Q    And you were on his side, meaning at the side of Mr. Pfail?

A    Yes, sir.

Q    And you claim that at some point Mr. Pfail kicked you,

*Linda A. Marino, Official Court Reporter*

O'Brien - Direct - Powell                    550

correct?

A    Yes, sir, he did.

Q    In fact, you claim he bent over and kicked you three times, didn't you?

A    Yes, sir.

Q    And you were never behind Mr. Pfail, were you?

A    No, sir, I was to the side of him.

Q    And you said he kicked back and hit you in the stomach?

A    He did a donkey kick.  He brought his knee forward, and, as he brought his knee forward, his foot came back into my abdomen.  And once his foot was in my stomach, he continued to keep kicking where it was three times total; the initial kick, and then the two because his foot was already there.

Q    And now ma'am, you testified about this matter at the criminal trial, correct?

A    Yes, sir.

Q    And you testified about this matter at the criminal hearing, correct?

A    Yes, sir.

Q    And you testified about this matter at the grand jury indictment?

A    Yes, sir.

Q    And in any of those prior testimonies, did you ever say Mr. Pfail did a donkey kick?

A    I said that he brought his knee forward and then kicked

Linda A. Marino, Official Court Reporter

A-1526

O'Brien - Direct - Powell                551

back with his foot.  And the best way to describe it to you is to say it's a donkey kick.  The knee went up and it came back.

He didn't do a Rockette kick, where his foot went straight out and came back.  The knee went up and the foot came back.

Q    My question, ma'am, is at any point in time prior to today did you say that Mr. Pfail did a donkey kick, yes or no?

A    I don't recall if I used those exact words describing it.

Q    And Officer O'Brien, Mr. Pfail didn't have the ability to kick you, did he?

A    Yes, he did.

Q    Mr. Pfail never kicked you at all, did he?

A    He did.  Three times, sir.

Q    And you say he kicked you three times, correct?

A    Yes, sir.

Q    You never documented on any criminal paperwork that Mr. Pfail kicked you three times, did you?

A    Yes, I did.

Q    Which document?

A    I believe the statement that I wrote with either Detective Ramos or with my boss that night.  And I signed it.

Q    Do you recall which statement at this time that you wrote?

A    I don't, sir.

Q    Was there any pictures or bruising -- withdrawn.

Linda A. Marino, Official Court Reporter

A-1527

O'Brien - Direct - Powell                552

Was there any pictures of bruising to your abdomen?

A    No, sir.  I didn't have bruising on may abdomen.

Q    Ma'am, you went on to charge Mr. Pfail with resisting arrest, correct?

A    Excuse me?

Q    You went on to charge Mr. Pfail with resisting arrest, correct?

A    Yes, sir.

Q    You also charged him with felony assault, correct?

A    Yes, sir.

Q    And that would be you charged him with assault on an officer?

A    Yes, sir, that was the charges.

Q    And in fact, you were the signator on all of the felony complaints against Mr. Pfail, weren't you?

A    Yes, sir.

Q    You signed them all, correct?

A    Yes, sir.

Q    And you participated in the prosecution of Mr. Pfail, didn't you?

A    Yes, sir.

Q    You had conversations was Detective Ramos regarding the matter?

A    Yes, sir.

Q    You had conversations with the district attorney

A-1528

O'Brien - Direct - Powell                    553

regarding the matter?

A    Yes, sir.

Q    You participated as a witness for the prosecution of Mr. Pfail?

A    Yes, sir.

Q    You testified at the grand jury -- and I know I asked you this before.

     You testified at the grand jury, at the criminal hearings, and at the criminal trial in furtherance of his prosecution, correct?

A    Yes, sir.

Q    Your intent was to have Mr. Pfail convicted of felony assault and resisting arrest, wasn't it?

A    Yes, sir.

Q    Ultimately, Mr. Pfail was found not guilty on the felony assault and resisting arrest, wasn't he?

A    Yes, sir.

Q    And during the criminal process, did you ever speak with the other Defendants about what information would go into the felony complaint again Mr. Pfail?

A    I believe I spoke to the detective.

Q    And my question, ma'am, is during the criminal process, did you speak with the other Defendants, meaning Sergeant Iannucci, Officer Panuthos, and Officer Massaro, about what information would go into the felony complaint?

Linda A. Marino, Official Court Reporter

A-1529

O'Brien - Direct - Powell                              554

A    Not that I recall.

Q    Some of the information in the felony complaint --

You signed, you ultimately signed it, correct?

A    Yes, sir.

Q    Some of the information in the felony complaint occurred before you arrived; isn't that true?

A    Yes, sir.

Q    So, would it be accurate to say that based on your personal observations you doesn't know if that information ever occurred, do you?

A    From my observations of the injuries that I saw on the officers and from what I was told from the incident, yes, I do believe that it occurred.

Q    My question is not if you believe it occurred.

My question is based on your personal observations, did you see all of the information in the felony complaint occur; meaning, did you observe it?

A    Yes, sir.

Q    You observed everything that occurred on that night?

A    I observed their injuries which were part of the complaint, yes.  I didn't observe the initial because I wasn't there the first minute and a half.

Q    And you wasn't there for the first minute and a half, correct?

A    Yes, sir.

Linda A. Marino, Official Court Reporter

A-1530

                    O'Brien - Direct - Powell                    555

Q   So, those things in the first minute and a half, meaning from the video, correct?

A   Yes, sir.

Q   So, things from 0000 to a minute and 30 seconds you weren't there to witness, correct?

A   That's correct, sir.

Q   And those things were in the felony complaint, correct?

A   Yes, sir.

Q   And you don't know what happened, do you?

A   What I was told from the officers and from what I saw on their injuries, I believe the information to be true.

Q   And when you say you believe the information was true, you didn't personally observe what happened during that time, as you said, from zero seconds to a minute and 30 seconds, did you?

        MR. CARNEVALE:  Objection.

        THE COURT:  I'm going to sustain it just because we've gone over this a couple times, so I think you've established when she arrived and what she saw and didn't see.

        So, you can move on to the next area, Mr. Powell. Thanks.

        MR. POWELL:  Thank you, Judge.

Q   At no point in time did you amend the felony complaint, did you?

A   I did not.

*Linda A. Marino, Official Court Reporter*

A-1531

O'Brien - Direct - Powell                556

Q    And going back to November 3, 2014, Sergeant Iannucci was the superior officer on scene that night, correct?

A    He was the sergeant at scene at the Fairway, yes.

Q    And being the sergeant at scene at the Fairway, was he a superior officer to you?

A    Yes, sir.

Q    And did you ever report to him that any officer used unreasonable force on Mr. Pfail that night?

A    No, sir.

Q    You claim that the force used on Mr. Pfail was necessary, correct?

A    Yes, sir.

Q    And you can't explain any physical injury Mr. Pfail suffered on November 3, 2014, can you?

A    No, sir.

        MR. POWELL:  Give me one second, Judge.

        (Pause in proceedings.)

Q    When you reviewed the felony complaint and ultimately signed it, you believed it was accurate, correct?

A    Yes, sir.

Q    In the felony complaint, you didn't put Mr. Pfail kicked you three times, did you?

A    I would have to review it, if you have a copy of it.

Q    I do?

        MR. POWELL:  Your Honor, may I approach the witness.

Linda A. Marino, Official Court Reporter

A-1532

O'Brien - Direct - Powell                    557

THE COURT:  Sure.

Is this exhibit in evidence or is this just to refresh her recollection?

MR. POWELL:  This is to refresh the...

THE COURT:  It may have been preadmitted as well.

MR. POWELL:  Yes, this is a preadmitted exhibit, Plaintiff Exhibit 6.

THE COURT:  Let's just note that.  Whether you publish it or not, let's just note for the record what she's looking at so it's clear.

MR. POWELL:  Handing the witness Plaintiff's Exhibit 6.

THE COURT:  Yes, you may.

MR. BREWINGTON:  Judge, we don't believe that 6 is actually in evidence.  It's been used to refresh and/or address --

THE COURT:  I don't know if it's been used -- admitted yet, but I think it was one of the ones we preadmitted because there was no objection; is that correct?

No?  Okay.  Six for ID, just to refresh.

MR. POWELL:  So passing the witness Plaintiff's Exhibit 6 for ID?

THE COURT:  Yes.

I may have just made that more complicated than it needed to be, but you can proceed.

Linda A. Marino, Official Court Reporter

A-1533

O'Brien - Direct - Powell                558

Ms. O'Brien, you can take your time and read whatever portions you need to read.

(Pause in proceedings.)

Q   You reviewed Plaintiffs' Exhibit 6 for ID, correct?

A   Yes, sir.

Q   Does that refresh your recollection as to whether you placed that Mr. Pfail kicked you three times in the felony complaint?

A   It states the initial kick that he did.

Q   Does it state that you kicked -- withdrawn.

Does it state that Mr. Pfail kicked you three times in the felony complaint, yes or no?

A   It does not.

MR. POWELL:  No further questions, your Honor.

THE COURT:  Thank you.

Do you want to take that back?  Thanks.

Mr. Carnevale, whenever you're ready.

MR. DORFMAN:  Judge, if we could just have moment for tech setup.

THE COURT:  Sure.

(Pause in proceedings.)

(Continued on the following page.)

Linda A. Marino, Official Court Reporter

A-1534

O'Brien - Cross - Carnevale                    559

CROSS-EXAMINATION

BY MR. CARNEVALE:

Q    Officer, I know you just answered a lot of questions from Mr. Powell.  I'm going to ask you a few more questions to clarify a few things.

Could you explain for us what happened immediately after you arrived at the Fairway Market on November 3 of 2014?

MR. POWELL:  Objection.

THE COURT:  Overruled.

A    When I saw the unmarked vehicle with the door open and none of the officers there, I immediately jumped out of my vehicle, out of the RMP, and ran over to the entrance to the Fairway supermarket.

Q    What did you see at the entrance of the Fairway Market?

A    At that time, Inspector Massaro looked up at me and I noticed blood pouring from his nose, going straight down on him.

Sergeant Iannucci at that time had said to me, "We need your help."

And then I immediately went in between Officer Panuthos and Sergeant Iannucci to assist with placing the Defendant under arrest.

(Continued on the following page.)

Linda A. Marino, Official Court Reporter

A-1535

O'Bried - cross - Carnevale                    560

BY MR. CARNEVALE: (Continuing.)

Q    And how would you describe the demeanor of your fellow officers at that point?

A    They all -- when I got down by -- onto the ground, I saw the side of Officer Panuthos' face already swollen.  All three look3e like they just got their asses kicked.  That was my first impression.  I knew these guys for a long time.  And Sergeant Ianucci --

        MR. POWELL:  Objection.

        THE COURT:  Sustained as to the last portion.

        The jury will disregard that comment.

        Just answer the question about what you observed at that time.

        THE WITNESS:  Yes, Your Honor.

BY MR. CARNEVALE:

Q    What did you observe about their demeanor as they were interacting with Mr. Pfail?

A    The officers were yelling at Mr. Pfail to stop resisting, to give us your hand.  They had one cuff on the defendant's hand which was being held so the cuff would not swing at the rest of us while they were attempting to pull out his other arm and to place the handcuffs and restrain him.

Q    And at some point was that one handcuff able to be placed around Mr. Pfail's other wrist?

A    Yes, I was able to do that.

Sophie Nolan, RPR, NYRCR - Official Court Reporter

A-1536

O'Bried - cross - Carnevale                561

Q    What happened after Mr. Pfail was handcuffed?

A    His demeanor completely switched.  It was like a flip that went off.  He started crying and apologizing immediately once the cuffs got on him and we retreated back he just kept apologizing for his behavior.

Q    And at some point did you assist Mr. Pfail in standing up to his feet?

A    Yes, myself and Officer Colon.

MR. CARNEVALE:  Okay, I would like to direct your attention now to what's been marked as Defendant's Exhibit D, The outside video.

(Video played.)

Q    Officer, you've seen this video; correct?

A    Yes.

Q    I'm going to skip ahead until the five-minute and 30, second mark.

(Video played; video paused.)

MR. CARNEVALE:  I can't see it, what does that marker say there?

THE COURT:  It looks like 6:17.

MR. DORFMAN:  5:31.

MR. CARNEVALE:  I'm going to hit play from here. I'm going to back up to the five minute and 18-second mark.

(Video played; video paused.)

Q    Officer, at this point in the video do you see yourself

Sophie Nolan, RPR, NYRCR - Official Court Reporter

O'Bried - cross - Carnevale                562

walking with Mr. Pfail?

A    Yes.

Q    And where were you walking with him?

A    I was walking to the right side of him.

Q    And were you holding on to him at all?

A    Yes.

Q    Where were you holding on to him?

A    On his arm.

Q    Okay.  I'm going to hit play again.

        (Video played; video paused.)

Q    What happened just now in the video?

A    We had fallen to the ground.

Q    What caused you to fall to the ground?

A    So, as we walking towards the ambulance, we had to turn the defendant around to take him to a second ambulance because there were officers being treated in that one.

        As we turned around, the defendant switched -- it's like a flip went off in him again.  He turned around and said fuck them or fuck that motherfucker.  So, I figured that one of the defendants were in his sight because he went from crying, apologizing, to fuck him.

        So at first I looked to see who he was talking about and then he turned around and he looked at me and said, fuck you, you fucking bitch and they he proceeded to say -- his exact words, I'm going to kick you and I froze at that moment

Sophie Nolan, RPR, NYRCR - Official Court Reporter

O'Bried - cross - Carnevale                    563

when he said that to me.

Q    At that point were you the only female officer at the scene?

A    I was the only female officer at the scene.

Q    Can you describe the way in which Mr. Pfail kicked you?

A    He brought his knee up in front of him and then brought his foot back to make contact with -- his foot made contact in my lower abdomen where my gun belt rests.

Q    And how did you react to that kick?

A    When he kicked, I got scared and I pushed him forward because his foot kept hitting me.  So on that evening, I had realized that I was over 24 hours past my period and my partner and I were attempting to get pregnant.

        MR. POWELL:  Objection.  Can that be stricken, Your Honor?

        THE COURT:  Sustained.

        The jury will disregard that.  It's been stricken from the record.  To the extent you can, it is as if the testimony was not given.

BY MR. CARNEVALE:

Q    Do you recall being asked just now by Mr. Powell about your testimony in the criminal trial of this case?

A    Yes.

Q    And Mr. Powell was asking if you ever mentioned in the criminal trial if you were kicked three times as you just say

A-1539

O'Bried - cross - Carnevale                564

now.  Do you remember being asked that?

A    Yes.

Q    And in your testimony in the criminal trial on page 434 which Mr. Powell read, do you recall giving this testimony? I'm going to start from line six:

"Question:  After you paused for a second, what did the defendant do?

"Answer:  The defendant did lean his body forward as bending over, in a bending over motion he brought his right leg up, more of a knee up, and kicked his right leg back toward me as in a donkey kick; bring the knee up to a backwards swing where his foot did hit my stomach and lower pelvic region."

Now this is line 14:

"Question:  How many times did the defendant kick you at that point?

"Answer:  The defendant did bring his leg back, his foot back, onto my stomach making contact three times around in the same area.

"Question:  How did your stomach feel after all three of those kicks?

"Answer:  It was intense pain immediately when he had kicked my stomach."

Do you recall giving that testimony?

A    Yes.

Sophie Nolan, RPR, NYRCR - Official Court Reporter

O'Bried - cross - Carnevale                565

Q    And, so, in fact you did mention before that Mr. Pfail kicked you three times?

A    Yes.

Q    After you were kicked three times, what happened?

A    We fell toward forward onto the RMP that was there.  I pushed the defendant forward so his foot would stop making contact with me.  We fell forward and slid off the RMP onto the ground where other individuals then started to assist to gain control of him again.

Q    Okay.  I'm going to hit play on the video again now.

         THE COURT:  Officer O'Brien, can you just try to remember to refer to Mr. Pfail as "Mr. Pfail" or "the plaintiff," not "the defendant"?

         THE WITNESS:  I'm sorry.

         THE COURT:  That is okay.

         Go ahead, Mr. Carnavale.

         (Video played; video paused.)

Q    6:40.  So I'm stopping the video at the six minute and 40-second mark.

         What do you see in the video at this point?

A    The EMT did bring the gurney out to place Mr. Pfail onto the gurney as well as myself and other officers almost -- to the left of the screen in a pile up starting to get back up again.

Q    And can you describe for the jury Mr. Pfail's demeanor at

A-1541

O'Bried - cross - Carnevale                566

this point?

A    He's screaming and cursing and yelling at us again.

Q    At some point was he placed onto the gurney?

A    Yes, sir.

Q    Okay.  I'm going to hit play on the video again.

        (Video played; video paused.)

Q    Officer O'Brien, can you describe for us the way Mr. Pfail was placed onto the gurney?

        MR. POWELL:  Objection.

        THE COURT:  The witness cannot describe based on the video.  She can describe what she recalls or she can narrate her recollection in accordance with what's shown there.  But having looked at the video you can now ask her to testify to what she recalls.

BY MR. CARNEVALE:

Q    Officer O'Brien, do you recall the manner in which Mr. Pfail was placed onto the gurney?

A    He was placed onto the gurney as well as a strap for the upper body and a strap for the lower body so he doesn't fall off.

Q    Okay.  I'm going to hit play again.

        (Video played; video paused.)

Q    Let the record reflect that I'm stopping the video at the 10:33 mark.

        Officer O'Brien, do you recognize yourself anywhere

Sophie Nolan, RPR, NYRCR - Official Court Reporter

A-1542

```
              O'Bried - cross - Carnevale              567
```

in the video at the 10:33 mark?

A    Yes.

Q    Where are you in the video?  Can you indicate?

A    I'm to the right.  I am by my patrol vehicle.

Q    And what were you doing at this point?

A    At that point, I had my hand on my abdomen.  I was getting into my vehicle to move the vehicle out of the way.

Q    Okay.  I'm going to play the rest of the video now.

(Video played; video paused.)

Q    Okay, Officer, at some point did you take Mr. Pfail to the hospital?

A    Yes.

Q    And were you driving the ambulance?

A    Yes.

Q    How far away was the hospital from the Fairway Market?

A    Maybe three miles.

Q    What do you recall about the drive to the hospital?

A    I was driving the ambulance.  There was another police officer in the back of the bus, as well as the paramedic.

THE COURT:  Just be careful not to testify, and I'm not sure you were going to, as to what anybody said, just what happened in the ambulance.

BY MR. CARNEVALE:

Q    What happened when you arrived at the hospital?

A    Mr. Pfail was removed from the back of the ambulance from

A-1543

O'Bried - cross - Carnevale                    568

on the gurney.

Q    Did you assist in removing him from the back of the ambulance?

A    No, the other officer took him out and I was walking to the side of the gurney.  Mr. Pfail at that time was screaming and yelling and at that time Mr. Pfail spit on me where his spit landed into my mouth.

Q    A and what else did you notice about Mr. Pfail at that point in time when you were on the side of the gurney?

A    He was screaming and yelling.

Q    Do you recall anything specifically that Mr. Pfail was screaming and yelling?

A    Since he was loaded into the back of the ambulance from when I was driving until I got there, the EMT had placed a spit mask on Mr. Pfail.

            MR. POWELL:  Objection.

            THE COURT:  Overruled.

BY MR. CARNEVALE:

Q    And after Mr. Pfail was exiting the ambulance and you were there, did he say anything to you at that point?

A    I believe he was saying fuck you, continuously calling me a bitch.

Q    Did he say anything to you before he spit on you?

A    I don't recall what was said.

Q    And where exactly on your body did he spit on you?

Sophie Nolan, RPR, NYRCR - Official Court Reporter

A-1544

O'Bried - redirect - Powell                 569

A    His spit landed in my mouth.

Q    And what happened after that?

A    We brought him into the ER and another officer was with him and then at that time I was seen by the ER doctor for the spit in my mouth as well as the kick.

Q    And so you were admitted on the ER as well?

A    Yes, sir.

        MR. POWELL:  Objection.

        THE COURT:  What do you mean by "admitted"?

BY MR. CARNEVALE:

Q    Did you also go into the emergency room?

A    Yes, sir.

Q    And were you also seen as a patient?

A    Yes, I was.

        MR. CARNEVALE:  I don't have any further questions.

        THE COURT:  Do you have any redirect?

        MR. POWELL:  Yes, Your Honor.

        THE COURT:  Okay.

REDIRECT EXAMINATION

BY MR. POWELL:

Q    Officer, when Mr. Carnevale was asking you questions, you said that they were getting their ass kicked.  Did you say that?

A    They looked like they were getting -- they looked like they were getting their ass kicked.

Sophie Nolan, RPR, NYRCR - Official Court Reporter

O'Bried - redirect - Powell                570

Q    When you said they looked like they had their ass kicked, who were you talking about?

A    I was talking about Massaro, Panuthos and Ianucci.

Q    Did Mr. Pfail look like he got his ass kicked?

A    No.  It looked like he was doing it.

Q    So, is it your testimony that Mr. Pfail was doing the ass kicking?

A    No.  That's what it looked like.

Q    So, it's your testimony that it looked like Mr. Pfail was doing the ass kicking?

A    It looked like he did it before I arrived.

Q    And when you arrived, you said that Mr. Pfail's -- one of Mr. Pfail's hands were already in one cuff?

A    Yes, sir.

Q    And that hand was being held; correct?

A    Yes, sir.

Q    Who was that hand being held by?

A    I believe it was either Sergeant Ianucci with the assistance of the security guard from Fairway.

Q    Do you know who that hand was being held by?

A    I believe it was Sergeant Ianucci.  I'm not positive, but I think it was Sergeant Ianucci.

Q    So you're not sure who that hand was being held by; correct?

A    At this time, I don't recall.

Sophie Nolan, RPR, NYRCR - Official Court Reporter

```
                  O'Bried - redirect - Powell                 571
```

Q    And you said once you arrived you placed Mr. Pfail under arrest; meaning you put his other hand in the cuff; correct?

A    It took me about 35 seconds to get his right arm out and put the cuff on it, yes.

Q    So ultimately you placed the other hand of Mr. Pfail in the cuff; correct?

A    I believe so.

Q    You said you believe so.  Did you or did you not?

A    Yes, from what I recall.

Q    And I believe you testified just now that Mr. Pfail's foot made contact with your lower abdomen; is that what you said?

A    Yes, sir.

Q    And you said after that you pushed him forward, meaning Mr. Pfail; correct?

A    Yes, sir, we fell forward.

Q    Did you fall forward or did you push him forward?

A    I pushed him forward, but I was still holding on to him and we all fell forward.

Q    He was in handcuffs?

A    He was in handcuffs, yes.

Q    Did your push of Mr. Pfail cause Mr. Pfail to fall to the ground?

A    Not initially.  We fell onto where the RMP was and we slid from the RMP onto the floor.

A-1547

O'Bried - redirect - Powell                572

Q    So, it's your testimony that the push of Mr. Pfail caused him to fall on the RMP and everybody fell down?

A    Yes, sir.

Q    And ultimately a gurney was brought for someone; correct?

A    Yes, sir.

Q    And the gurney was brought for who?

A    At the time that Mr. Carnevale showed, it was for Mr. Pfail.

Q    There was another gurney brought for someone else?

A    No.  At the time when it came out it was for Mr. Pfail.

Q    And at the time the gurney was brought for Mr. Pfail, his head was bloody; correct?

A    Yes, sir.

Q    At some point in the vestibule did Mr. Pfail ever lose consciousness?

A    No, sir.

Q    Did he ever lose consciousness after you pushed him on the ground?

A    No, sir.

Q    And you know that for sure?

A    Yes, sir.  He was yelling and cursing the entire time, or crying and apologizing.

Q    And you said that not only Mr. Pfail was placed on the gurney, he was strapped to the gurney; correct?

A    There were two safety straps that everybody who is placed

Sophie Nolan, RPR, NYRCR - Official Court Reporter

A-1548

O'Bried - redirect - Powell                573

on the gurney gets the two straps.

Q    And my question is was Mr. Pfail strapped on the gurney?

A    He had the two buckles.

Q    So would that be yes?

A    Yes.

Q    And after you pushed Mr. Pfail, did he collapse to the ground?

A    No, we fell forward onto the RMP and from the RMP we slid down.  It was a forward motion and going down from the RMP onto the ground.

Q    And after you went from the -- withdrawn.

You first pushed Mr. Pfail; correct?

A    I pushed him away for his foot to stop making contact with my abdomen.

Q    And then once you pushed Mr. Pfail, everyone fell on the RMP?

A    I don't know with everyone.  I know myself and Officer Colon we went forward because I pushed him to get him away from me.  We went down and everybody -- at that point whoever was around, either with him -- it's almost like the resisting mode where he was screaming and yelling and his feet were coming up and we call just went forward.

Q    And my question is when Mr. Pfail was pushed forward you went onto the RMP; correct, just you?

A    No.

Sophie Nolan, RPR, NYRCR - Official Court Reporter

A-1549

O'Bried - redirect - Powell                          574

Q    Just asking about you, did you go onto the RMP?

A    Part of me, yes.

Q    Did Officer Colon also go onto the RMP?

A    I don't know if he struck the RMP.  I, myself, and Mr. Pfail were closer to the RMP.

THE COURT:  Can I pause for a second?

Just in case the jury has forgotten or is unfamiliar with the term, can you clarify what you mean by "RMP"?

MR. POWELL:  Yes.

BY MR. POWELL:

Q    Officer O'Brien, what is the RMP?

A    It's the Radio Mode of Patrol.  It's our patrol cars.

Q    Would it also be known as a police vehicle?

A    Yes.

Q    And so once you and Mr. Pfail went to the RMP, after that you slid down; correct?  Is that your testimony?

A    Yes, sir, we went down.

Q    And was Mr. Pfail on the ground again?

A    Yes, sir.

Q    And were you on top of Mr. Pfail?

A    Yes, sir.

Q    Was somebody else on top of Mr. Pfail?

A    Yes, sir.

Q    How many officers were on top of Mr. Pfail?

A    I don't know.

Sophie Nolan, RPR, NYRCR - Official Court Reporter

A-1550

```
                 O'Bried - redirect - Powell                575
```

Q    And you claim that after Mr. Pfail kicked you, that you had pain; correct?

A    Yes, sir.

Q    But you were able to move your RMP; correct?

A    Yes.

Q    And you were able to drive Mr. Pfail to the hospital; correct?

A    Even with pain I can drive, yes, sir.

Q    And you did that; right?

A    Yes, sir.

Q    And you claim that once at the hospital, Mr. Pfail spit on you; correct?

A    Yes, sir.

Q    Would it be accurate to say that at the hospital Mr. Pfail had on not one but two spit masks?

A    At the time that's what I thought he had on was two spit masks.

Q    Is it correct that Mr. Pfail had on two spit masks at the hospital?

A    No.

Q    So he had on one spit mask?

A    Yes, sir.

Q    And you say that Mr. Pfail had on one spit mask?

A    Yes, sir.

Q    Was he also on the gurney?

A-1551

```
                  O'Bried - redirect - Powell                  576
```

A    Yes, sir.

Q    Was he strapped to the gurney?

A    He had the two ties on, yes.

Q    And the two ties were the two ties that he had on at the scene --

A    Yes.

Q    -- at Fairway?

A    Yes, sir.

Q    So he was strapped to the gurney and also handcuffed, wasn't he?

A    Yes, sir.

Q    So, is it your testimony that with being strapped to the gurney and handcuffed, that Mr. Pfail pulled himself forward and spit in your mouth not once, but twice?

A    Yes, sir.

Q    And he was able to do that?

A    Yes, sir.

Q    And you're not making that up, are you?

A    No, sir.

Q    And you said the spit landed in your mouth?

A    Yes, sir.

        MR. POWELL:  One second, Judge.

        (Pause in proceedings.)

BY MR. POWELL:

Q    And once you arrived at the hospital, meaning after

A-1552

O'Bried - redirect - Powell                577

driving Mr. Pfail to the hospital, you didn't ask for any treatment, did you?

A    Can you say that again?  I'm sorry.

Q    Once you arrived at the hospital, meaning after you drove Mr. Pfail to the hospital, did you immediately ask for medical treatment at that time?

A    Yes, I did.

Q    And what medical treatment did you ask for?

A    I saw the ER doctors with regards to the spit in my mouth and the kick to my abdomen.

Q    Prior to the alleged spit in your mouth, when you first arrived to the hospital, did you ask for medical treatment, yes or no?

A    I'm not sure if you're asking as soon as I walked into the --

Q    Yes.  As soon as you walked into the hospital, prior to the alleged spitting, did you ask for medical treatment?

A    When I walked in I said I needed to be seen, yes.

Q    As soon as you walked in?

A    When I walked, yes.  As soon as you walk in, there's a desk right there and I said I need to be seen for the spit and the EMT --

Q    You stated that Mr. Pfail spit on you in the hospital; correct?

A    No.

A-1553

```
                  O'Bried - redirect - Powell              578
```

Q    Mr. Pfail didn't spit on you in the hospital?

A    Not inside the hospital, no.

Q    Where did he spit on you, allegedly?

A    When we removed him out of the ambulance and we were walking in.  So he's maybe about 15 feet from the time you come out of the ambulance to the bay doors where you wheel the patients in.

Q    So, did Mr. Pfail spit on you once you were in the hospital or before you got to the hospital?

A    Before we entered the bay doors, he spit on me.

Q    And you previously testified that Mr. Pfail spit on you twice; correct?

A    I believe it was only one time.

Q    And prior to today did you ever say that Mr. Pfail spit on you twice?  Do you know?

A    I don't recall.  I do know that it only one time landed in my mouth, not two times.  So I recall the one time it landing in my mouth.  I don't recall if he spit twice.  I just know that only one time it landed on me.

Q    And Mr. Carnavale asked you questions about questions that I asked you regarding you being kicked; correct?

A    Yes, sir.

Q    And you previously testified that you were kicked three times correct?

A    Yes, sir.

A-1554

```
                O'Bried - redirect - Powell              579
```

Q    And today you testified you were kicked three times; correct?

A    Yes, sir.

Q    In the felony complaint it doesn't say that you were kicked three times; is that correct?

A    That may have said that I was kicked the one time.

Q    So, is it correct that in the felony complaint you only stated that you were kicked once?

A    Yes, sir.

          MR. CARNEVALE:  Objection.

          THE COURT:  I'll allow it, but I think that it's been covered.

BY MR. POWELL:

Q    And you previously stated that Mr. Pfail spit on you while you were walking in before you hit the bay doors of the hospital; correct?

A    Yes.

Q    And you previously testified in this matter; correct?

A    Yes.

Q    And you testified at a criminal hearing prior to today?

A    Yes.

Q    And you knew you were under oath?

A    Yes, sir.

Q    And you are today; correct?

A    Yes, sir.

O'Bried - redirect - Powell                580

Q    Did you give this testimony at page 228 of the criminal trial hearing on October 19, 2016 starting at line five --

MR. CARNEVALE:  Could you give us a second, please? 22 --

MR. POWELL:  8, line five.

MR. CARNEVALE:  Objection.

THE COURT:  Overruled.

BY MR. POWELL:

Q    Starting at line five of 228 of the criminal hearing:

"Question:  So, as you were wheeling Mr. Pfail into the hospital, you claim that he turned to you with a spit mask on and cursed at you; correct?

"Answer:  Yes.

"Question:  And spit in your mouth; right?

"Answer:  Not while we were walking in.  It was once we were in the hospital and the gurney was stopped up against the wall.

"Question:  And you were stationary?

"Answer:  Yes, sir.  We just walked in and stopped. There were other people in the way."

Did you give that testimony?

A    Yes.

Q    Was that testimony accurate?

A    Yes.

Q    So Mr. Pfail never spit on you outside?

O'Bried - redirect - Powell 581

A    From what I recall that's what I thought it was.  So --

Q    And my question is --

THE COURT:  Let her finish her answer.

Go ahead.

A    From what I recall that's what it was.  I didn't have those notes to refresh my memory.

Q    So, was the testimony that you previously give accurate or was the testimony at the criminal trial hearing accurate? Which one was it?

A    I remember him spitting on me.  The exact spot where he -- if I said before it happened in the hall, that's more accurate.  It's been so long and I haven't reviewed that.

Q    But I asked you where he spit on you at; correct?

A    Yes.  And from my memory now that's when I recall when he spit on me.

Q    Ma'am, could you describe what a spit mask is to the jury?

A    It's a mask that goes over an individual to prevent fluids from easily being accessible to anybody else.  It has wire -- it looks like wire mesh in the front of it.

Q    And when you say it's a mesh, it's like a net; correct?

A    Yes.

Q    And you previously stated that he had one of those on; correct?

A    I originally thought he had two on but there was just one

O'Bried - redirect - Powell                582

on the individual.

Q    Did you give this testimony at page 229 of the criminal trial hearing -- I'll start at line 7 for completeness.

            MR. CARNEVALE:  Objection, Your Honor.

            THE COURT:  I am going to sustain that one, only because I think she already acknowledged the fact for which you're seeking to elicit here.

BY MR. POWELL:

Q    Now, prior to today, ma'am, you had the ability to review your previous transcripts; correct?

A    Not all of them.

Q    You had the ability to review them; correct?

A    No.

Q    You didn't have the ability to review your previous testimonies?

A    No.

Q    Is it your testimony that in preparation for this trial, you didn't have the ability to review your grand jury testimony, your criminal trial testimony, nor your criminal hearing testimony; is that true?

A    That's true.

            MR. POWELL:  I have no further questions, Your Honor.

            THE COURT:  Okay.  We may have some brief reexamination and then we'll take our break.

Sophie Nolan, RPR, NYRCR - Official Court Reporter

```
                O'Bried - recross - Carnevale              583
```

RECROSS-EXAMINATION

BY MR. CARNEVALE:

Q    Officer O'Brien, do you recall being asked just a little while about the criminal complaint in this case?

A    Yes, sir.

MR. POWELL:  Objection, the felony complaint.

THE COURT:  Felony complaint/criminal complaint. Understood.

MR. POWELL:  Outside of the scope.

THE COURT:  Of the reexamination?

Is this something that came up on redirect?

MR. CARNEVALE:  At this point I want to admit the felony complaint which was discussed into evidence.

THE COURT:  Right, but I don't think you can do that through this witness unless something came up on the reexamination, which I don't think it did.

MR. CARNEVALE:  Okay.  Then I don't have any more questions.

THE COURT:  All right.  Officer O'Brien, you're excused from the witness stand.

And, ladies and gentlemen, we'll take --

Yes?

MR. DORFMAN:  Your Honor, can I have just a moment?

THE COURT:  Can we do it when the jury is out, please?  You want it before we excuse her?

A-1559

O'Bried - recross - Carnevale          584

MR. DORFMAN:  Yes, please, Your Honor.

THE COURT:  Okay.  Let's do it very briefly.

(Sidebar held outside of the hearing of the jury.)

(Continued on next page.)

Sophie Nolan, RPR, NYRCR - Official Court Reporter

A-1560

Sidebar                                                            585

(The following sidebar took place outside the hearing of the jury.)

MR. DORFMAN:  On recross it was brought up the felony complaints.  The question was how many times in the felony complaints does it say they were kicked.

THE COURT:  Understood.

MR. DORFMAN:  It did come up.  So I wonder if we could --

THE COURT:  They have heard more than three times that she didn't say three times in the felony complaint and she said it in her testimony.  So I don't think it is necessary to do it now.  We can have it admitted.

The jury will have a chance, in your case or in plaintiff's case, once you all agree on the redactions, because I haven't that back from you all yet, about whether that is coming in.  So this is not the witness to do it through, but you will have an opportunity to put it through another witness or in --

MR. DORFMAN:  Thank you, Your Honor.

THE COURT:  Okay.  No problem.  Thank you.  That will get charged.

(End of sidebar conference.)

(Continued on next page.)

```
                    Proceedings                    586
```

(In open court.)

THE COURT:  Okay.  Okay, ladies and gentlemen, we have resolved that issue.

So, Ms.  O'Brien, you are excused from the stand. We are going to take our morning break.

(Witness steps down.)

THE COURT:  So we will see you back here a little under 15 minutes, at ten minutes to noon.  Have a good break.

Don't discuss the case.  We will see you back shortly.  Thank you.

(Jury exits the courtroom.)

THE COURT:  Okay.  Everyone, very briefly, I have one question to take up with the lawyers about Ms. O'Brien's testimony.  So let me have the parties leave the room for just a minute.  We can have the defendants head out.  And, Mr. Pfail, you can wait just another moment.

MR. BREWINGTON:  Do you want Mr. Pfail out as well?

THE COURT:  Actually, I think just because it's Ms. O'Brien.  My apologies.  The rest of you can stay if you need to.  Just Ms. O'Brien in case something comes up about this. The other defendants can stay.  Mr. Pfail can stay if you would like.  That's fine.

Mr. Carnevale, in what universe did you think it was okay to elicit testimony about how she thought she might be pregnant when Mr. Pfail allegedly kicked her?  How did that

A-1562

Proceedings                                587

happen?

MR. CARNEVALE:  Your Honor, it was not my intention to elicit that specific testimony, but I think that goes to her state of mind when Mr. Pfail was cursing at her.

THE COURT:  Why is her state of mind, when Mr. Pfail is cursing at her, relevant?

She said that she backed up after he had already committed this alleged kick because she thought she could possibly be pregnant.  How does that go to any of the liability claims and how is it not incredibly prejudicial, designed only to elicit sympathy in the jury's mind about him allegedly kicking a possibly pregnant woman?

MR. CARNEVALE:  I think that explains, Your Honor, that there was questions posed to her about whether she was standing in front, to the side, whether she pushed him and --

THE COURT:  Yes, there were lots of those questions, legitimate questions.  But why is what is in her mind about why she might or might not be pregnant have anything at all to do with the credibility of her account that he kicked her or Mr. Pfail's contrary account that he did not?

MR. CARNEVALE:  That's why she reacted in the way that she did.  That was in her mind.

THE COURT:  Why she reacted?  Like she wouldn't reacted the same way if she weren't pregnant, that she would have stood there and let him kick her allegedly?

```
                      Proceedings                    588
```

MR. CARNEVALE:  Yes.

THE COURT:  Let me ask you this:  Did you know she was going to testify?  Did you discuss this in the prep with her?

MR. CARNEVALE:  I did not.

THE COURT:  You did not.  That is your representation to me, that you have no idea, this just came out spontaneously and she did not discuss this with you before?

MR. CARNEVALE:  And it was certainly not my intention --

THE COURT:  That's not my question.

Had you discussed this with her before?  Did you know that she allegedly thought that she could be pregnant because she had missed her period 24 hours earlier?

MR. CARNEVALE:  Yes, she did mention that to me in our preparation.

THE COURT:  Okay.  And you did not in any way discuss or tell her that that was a fact that you intended to elicit?  She just spontaneously burst out with it; is that your representation?

MR. CARNEVALE:  That is accurate, Your Honor.

THE COURT:  Mr. Brewington, do you have anything to say, or Mr. Powell?

MR. BREWINGTON:  Judge, with Mr. Powell's

Proceedings                              589

permission, this was not only highly prejudicial but I believe was intended to try to get it in.  This is a witness who kept speaking past the questions that were asked.  And even when Mr. Powell tried to control her, she continued to try and speak.

This was, from our standpoint, a clear intent to try to elicit from the jury sympathy but also to prejudice Mr. Pfail and his case in this situation.  We are going to be asking for, and we will suggest, a curative instruction that be given to the jury, if the Court will allow that.  But in this situation, I believe that it would not only -- I think the Court appropriately struck it.  But in this situation we believe a curative instruction to that type of testimony would be appropriate.

It was never ever raised in discovery or in the criminal matter.  The first time it happened -- and for counsel to know that was being discussed, he should have advised her not to make that comment.  And I didn't hear counsel indicate that instruction was given.

I'm concerned, because I believe in this situation the defendants, in a number of ways -- this is the second time, I believe, tried to create a situation where there is a mistrial, and I think it is prejudicial.

THE COURT:  I take it, Mr. Brewington, you're not asking for a mistrial at this point.

```
                    Proceedings                    590
```

MR. BREWINGTON:  I am not.

THE COURT:  Hold on.  Mr. Cuomo, have a seat for a moment.

MR. CUOMO:  Okay.

THE COURT:  Let me say this:  The testimony was clearly and unquestionably improper.

Mr. Carnevale, I recognize you have less trial experience than some others in this room.  I still don't think there is any way you could have believe that this was remotely proper.  It has absolutely nothing to do with the factual disputes the jury is asked to resolved.

And even if you could make some arguable case for relevance, it is so far in the other line of the 403 balance as to barely merit discussion by me.

That said, I certainly didn't want to compound it by highlighting it any further to the jury than has already been.  It's been stricken.

If the plaintiff wishes to have me give a curative instruction that they don't believe compound the error further or the prejudice further, I'm happy to consider it.  And I will hear defendant's out after plaintiff has prepared one.

I can give it immediately after the break or I can give it at the end of the day, but why don't you all take a look.

Mr. Carnevale, do you have anything to add further

```
                    Proceedings                    591
```

on that?

MR. CARNEVALE:  No, Your Honor.

THE COURT:  Let's take our break.  Thank you.

(Recess taken.)

THE COURTROOM DEPUTY:  All rise.

THE COURT:  Have a seat, everyone.  Welcome back.

Are we ready to bring in the jury?  Who is plaintiff's next witness?

MR. BREWINGTON:  Mr. Iannucci.

THE COURT:  Okay.  I'm sorry, before we bring them in.  My apologies.  Did you give further thought to the question of the curative instruction or admonishment?

MR. BREWINGTON:  We are working on it right now.

THE COURT:  That's fine.  We don't have to give it now.  We can talk about it at the close of the lunch break.

MR. BREWINGTON:  Yes.

THE COURT:  Thanks.

THE COURTROOM DEPUTY:  All rise.

(Jury enters.)

THE COURT:  Have a seat, everyone.

Welcome back, jurors.  We are ready to proceed with plaintiff's next witness prior to our lunch break.

Who is plaintiff calling next?

MR. BREWINGTON:  Thomas Iannucci.

THE COURT:  Mr. Iannucci, please come up and take

A-1567

Iannucci - direct - Brewington                592

the stand.

THE COURTROOM DEPUTY:  Please raise your right hand.

(Witness sworn.)

THE COURTROOM DEPUTY:  Please state and spell your name for the record.

THE WITNESS:  Thomas Iannucci.  T-H-O-M-A-S.  Last name I-A-N-N-U-C-C-I.

THE COURT:  Have a seat, sir.  And there is water for you if you need it.

MR. BREWINGTON:  May I inquire, Your Honor?  May I inquire, Your Honor?

THE COURT:  Yes.  I'm so sorry.  My apologies.  I was sending a note to my staff.  Yes.  You absolutely may.

MR. BREWINGTON:  Not a problem.

**THOMAS IANNUCCI**,

    called as a witness, having been first duly

    sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. BREWINGTON:

Q    Sir, that microphone does move, so you can move it as close to you as you need to.

A    Thank you.  How's that?

Q    Now, sir, can you tell us please are you currently employed?

A    Yes, I am.

A-1568

Iannucci - direct - Brewington                    593

Q    By whom are you employed, please?

A    Nassau County Police Department.

Q    And in what capacity are you employed with the Nassau County Police Department?

A    I'm a sergeant.

Q    And how long have you been a sergeant, sir?

A    Since January 2004.  So 21 years and a few months.

Q    And, sir, prior to becoming a sergeant, you held the position of police officer; correct?

A    That is correct.

Q    And the position of police officer came as a result of taking a civil service examination, passing it and being canvassed off a list; correct?

A    Correct.

Q    And at that time that you were canvassed off a list, you became a cadet once you were called off the list; right?

A    Correct.

Q    You went through a background investigation; correct?

A    That is correct.

Q    A while back; right?

A    Quite a whiles back.

Q    Right.  And went through a process where you went to the academy?

A    Yes, sir.

Q    And in the academy you took the regular course of study

A-1569

```
                Iannucci - direct - Brewington              594
```

there; is that correct?

A    Yes, sir.

Q    And after that, before actually starting work, you worked in field training, is that right?

A    I'm sorry?

Q    Did you do field training before your first real assignment?

A    Before we graduate, we did field training, yes.

Q    Where did you do your field training, sir?

A    I did my field training in the 4th Precinct and in the 8th Precinct.

Q    And where are you signed currently?

A    I'm currently assigned to the 3rd Precinct.

Q    And after your field training, would it be accurate to say that you were assigned to a precinct, at least at that point, as your permanent assignment?

A    That is correct.

Q    Where were you assigned at that point, after your field training?

A    The 1st Precinct.

Q    So the 1st Precinct covering Baldwin, Roosevelt, Uniondale, a little bit part of Merrick.  Is that approximately what you covered?

A    Belmar.  I think I got it all.

        East Meadow.

Iannucci - direct - Brewington                595

Q    A little bit of East Meadow?

A    Correct.

Q    As a result of that, sir, you patrolled the streets in a radio motor parole car; is that correct?

A    That is correct.

Q    Did you have any special assignments while you were working in the 1st Precinct?

A    In later years I did, yes.

Q    What units were you assigned to in the 1st Precinct as part of a special assignment?

A    I was assigned to the plainclothes unit.  It was called different things at different times depending on who was the commanding officer.

        And I was also a school resource officer for a short period of time.  I wore many hats.

Q    Sir, as a school resource officer -- or SRO; is that correct?

A    That's what they call them now, yes.

Q    What district did you serve as a school resource officer?

A    Uniondale, primarily.

Q    So there came a time --  withdrawn.

        In or about November of 2014, you were assigned to the 3rd Precinct; correct?

A    Yes, sir.

Q    And in November of 2014, what was your detail, please?

A-1571

Iannucci - direct - Brewington 596

A    I was the sergeant in charge of the 3rd Precinct detail, which is what's most often called, but it would have been like the anti-crime or plainclothes detail operated out of the 3rd Precinct.

Q    And just please tell the jury the Third Precinct covers what geographic areas.

A    It's a lot of area.  So, if you are familiar with the map of Long Island, roughly stating, it is from the Queens line, in the center of the island up to the Wantagh Parkway, north of Hempstead Turnpike, south of the Parkway, the LIE.

There's a lot of towns.

Part of East Meadow, again.  Westbury, New Castle.

Q    Carle Place?

A    Carle Place.  Some of Bellerose.

Forgive me if I am missing some.

Williston Park, Mineola.

Q    They go right up to the 4th right there on that side?

A    The 4th?

Q    You go right up to the 4th Precinct?

A    No, the 4th is on the South Shore.

Q    Okay.

A    The 1st and like Hempstead and maybe the 5th, depending, that's all on the South Shore.  We are kind of in the center the 3rd.

Q    I'm sorry, sir.  The Williston Park community is in what

A-1572

Iannucci - direct - Brewington                    597

district?

A    The 3rd Precinct.  It is right next to Mineola, next to East Williston.

Q    Sir, on November 3, 2014, do you recall on that day what tour of duty you were working?

A    Yes.

Q    What tour of duty were you working on that day, sir?

A    12:00 in the afternoon to 10:00 at night.

Q    At that time, sir, would it be accurate to say that at the end of your tower normally would you sign out or clock out?

A    Normally, yes.

Q    And when you are not --  withdrawn.

     When you go past your regular tour of duty, you get paid overtime?

A    That's correct.

Q    What rate, please?

A    Time-and-a-half.

Q    And that would be time-and-a-half for every hour that you work overtime; correct?

A    Yes.

Q    Now, sir, on November 3, 2014, at or about 10:15 or 10:18 in the evening, would it be accurate to say that you got a call of disturbance at the Buffalo Wild Wings?

A    Yes, sir.

A-1573

Iannucci - direct - Brewington    598

Q    And at that time, you hadn't signed off duty yet; is that correct?

A    That is correct.

Q    So at that time, even before getting that call, you had shifted into overtime; correct?

A    That is correct.

Q    The decision to do that --  withdrawn.

You weren't on a specific call before the Buffalo Wild Wings radio call, were you?

A    No, sir.

Q    Actually, you guys were just checking cars in the parking lot; right?

A    Yes, sir.

Q    So you had decided that you were going to do some overtime by the time you got the call; correct?

A    I decided to authorize overtime for me and my men, yes.

Q    For you and your men, that being the two that were in the car with you?

A    Correct.

Q    So there was no emergency going on at the time that you decided to do overtime, was there?

A    No, sir.

Q    There wasn't anything that any lieutenant, captain, or anybody above that had told you to take overtime; correct?

A    At the scene or that night, no?

Iannucci - direct - Brewington                599

Q    That night?

A    No.

Q    And there was nothing -- you didn't actually -- you weren't pursuing someone at that particular point when you authorized overtime, were you?

A    No, sir.

Q    So at that point, the only thing that you were doing when you went into overtime was checking cars to see if there were any cars broken into or suspicious people; correct?

A    At that moment, yes.

Q    And then you got a call while 15 or more minutes into overtime; correct?

A    Correct.

Q    And you decided to answer the call; correct?

A    That is correct.

Q    And accurate to say that that call had come in as a 911 call?

A    That is correct.

Q    And that was dispatched as a 911 call; correct?

A    Correct.

Q    And there are sector cars that are assigned to handle 911 calls; correct?

A    Yes, there are.

Q    That wasn't your normal assignment, was it?

A    I'm sorry.  Rephrase the question.

Iannucci - direct - Brewington                600

Q    It wasn't your normal assignment to handle 911 calls, was it?

A    It's not my assignment, but there is sector cars that answer the specific 911 calls, correct.

Q    And at that point you decided to respond to that call; right?

A    Yes.

Q    And you were nearby; right?

A    Correct.

Q    And that then gave you have the opportunity to extend your overtime; right?

A    That is correct.

Q    And you knew that was going to happen; right?

A    It wasn't -- that wasn't absolute.

Q    Sir, let me just ask you, once you decided to leave watching cars and looking for suspicious people and turned to go answer a 911 call, you knew that you were adding more time to your overtime, didn't you?

        Yes or no?

A    It's not a yes-or-no answer because we would've stayed looking at cars on overtime.

Q    I'm sorry, sir.  As long as you were working --

A    Yes.

Q    -- 911 calls, looking at the cars, looking for suspicious people, you were getting overtime; right?

A-1576

```
                Iannucci - direct - Brewington              601
```

A    That is correct.

Q    And you knew that; right?

A    Yes.

Q    And you knew that for the other two people in the car?

A    That is correct.

Q    So, yourself, as a sergeant, and two other officers who were in the car were going to get overtime and you were continuing to get overtime; right?

A    That is correct.

Q    And, sir, would it be accurate to say that at the time you went to the 911 call, to respond to that, you went to the Buffalo Wild Wings in Westbury?

A    Yes.

Q    And at the time that you went to the Buffalo Wild Wings, did you yourself actually speak to anyone?

A    I'm not 100 percent certain.  I may have spoke to the sergeant at scene.

Q    Well, let me just ask you --  before I ask you who you spoke to, first, my question was did you speak to anybody? Yes or no?

A    I may have.  I don't recall.

Q    But you had heard the radio run; correct?

A    Correct.

Q    And by radio run, I'm talking about what came over the radio channel that covers the 3rd Precinct; right?

A-1577

Iannucci - direct - Brewington                    602

A    Yes, sir.

Q    It wasn't on the detective band, was it?

A    No.

Q    Can you just explain that to the jury, that there are different bands that you may listen to as you're working?

A    Well, I've never been a detective, so I don't know what the detective band would be used for except point to point. It's not really used to communicate, but bands on the radio, they are broken up by precincts.  There are eight precincts. So there's four bands.

        Our's is the 3rd and 6th Precinct.  So everyone shares a band.  The 1st is the 1st and 7th Precinct.  2nd is 2nd and 8th.

        4th is 4th and 5th.

        That is the different frequencies for patrol.

Q    And then --

A    And there are other emergency frequencies, like highway or something like that.

Q    That's how units, such as yours, or sector units can be communicated to by dispatchers or headquarters; correct?

A    Correct.

Q    And there came a time after you left the Buffalo Wild Wings that you began to do a search; is that right?

A    That is correct.

Q    And you were doing a search or a canvass for someone that

A-1578

Iannucci - direct - Brewington                    603

had been identified to you as having broken a window; correct?

A    That is correct.

Q    And, sir, with regard to your search, you had gotten a direction that a the person may have gone in; correct?

A    Correct.

Q    And that would have been west from the location of the Buffalo Wild Wings; right?

A    Yes, sir.

Q    And then you got out of the car that you were in; right?

A    Yes, sir.

Q    And by the way, that car was a Jeep Cherokee, Grand Cherokee; right?

A    I believe so, yes.

Q    A good size SUV?

A    Mid-size.

Q    Okay.  Unmarked?

A    Yes, sir.

Q    By unmarked, I mean no decals on it on the outside?

A    That's what I took you to mean.  Yes, sir.

Q    Okay.  And no popcorn thing on the top?

A    No obvious lights.

Q    Okay.  Would it be accurate to say that you emerged out of that vehicle and then traversed to a place where you would basically climb over a fence?

A    I was driven up to the fence line, but, yes, I exited the

Iannucci - direct - Brewington                    604

vehicle, and then I climbed over the fence.  I didn't know if it mattered.

Q    In the olden days, we would say you hopped over the fence; right?

A    No hopping these days.

Q    Okay.  And at the time you hopped over the fence you had in your hand --  withdrawn.

Would it be accurate to say at the time you went over the fence you had some police equipment with you or on you?

A    Yes.

Q    So you would have had on you your firearm; correct?

A    That is correct.

Q    And at the time were you guys carrying Glocks?

A    I believe we were still carrying Sigs back then.

THE COURT:  What was that?

THE WITNESS:  Sig, S-I-G.

MR. BREWINGTON:  Sig Sauer.

THE COURT:  I'm sorry.  Just one at a time.  Can you say what the weapon was.

THE WITNESS:  I said Sigs, S-I-G-S.

Mr. Brewington said it is a Sig Sauer sidearm.

THE COURT:  Thank you.

Q    And you also would have had on you handcuffs; correct?

A    That is correct.

A-1580

Iannucci - direct - Brewington                    605

Q    Did you keep pepper spray on your belt at that time?

A    Not on my belt.  In my pocket.

Q    In a leather canister in your pocket?

A    No, probably just in my jacket pocket.

Q    And did you have on you at that particular point any other form of weapons?

A    Weapons?

Q    Yes.  Like did you have an asp or a TASER?

A    No.  We weren't issued TASERs at that point.

Q    Okay.  Any other equipment that you had on you at that time?

A    Probably had a pocketknife, because I usually do, and I had a flashlight.

Q    Let's talk about the flashlight, sir.

        The flashlight was a flashlight commonly referred to as a MAG flashlight.

A    That is the manufacturer, yes.

Q    It was approximately 16 inches long?

A    It's maybe a little bit shorter.  Yes, you would refer to it a 4D cell would be a good way to imagine it, if you can imagine a D battery, that would be a fair representation.

Q    Just so we can get an identification in terms of its size, it is usually a black flashlight with a graded handle?

A    Graded?

Q    It's got a rough handle?  It is not smooth?

A-1581

Iannucci - direct - Brewington                606

A    You know what, I've never really paid attention.  It might be -- it may be roughed up, yeah.

Q    Okay.  And I estimated 16 inches.  Would you agree with that?

A    I don't have a problem with that.

Q    Okay.  It has in it -- this one that you had had a rechargeable battery in it; correct?

A    That's correct.

Q    And at that point they had gone from using the old D Evereadies, and it had a power pack in it that could be recharged; right?

A    Yes.  And upgraded little bulbs from incandescent to halogen to eventually LEDs.

Q    Right.  So, would it be accurate to say at that particular point when you emerged with that flashlight, the flashlight had some weight to it, didn't it?

A    Yes.  Everything has weight, yes.

Q    Well, let me perhaps be more specific with my question.

A    Okay.

Q    It wasn't one of those cheap 5 and 10 flashlights, was it?

A    I don't know -- I mean, I have only had a MAG light. They are well-made.  They are made of aircraft aluminum and then we have the battery within.

Q    And would it be accurate to say that at the time that you

A-1582

Iannucci - direct - Brewington                607

emerged from the vehicle at the Fairway, you knew you had the flashlight in your hand?

A    When -- I'm sorry, repeat the question.

Q    Withdrawn.  Would it be accurate to say that at the time you emerged from the vehicle to hop the fence that you had the flashlight in your hand?

A    Yes, I consciously took it to hop the fence.

Q    Right.  Because you were going to do a search of structures in that parking lot?

A    Correct.

Q    There were displays out there in the form of sheds and things of that nature; is that right?

A    That is right.

Q    And, sir, then at some point the car that you were in, which was this Jeep, met you on that side of the fence, didn't it?

A    On the other side of the fence.

Q    Right.  On the side of the fence that you had hopped over?

A    Correct.

Q    And when it met you, you got back in the car; correct?

A    Yes, I did.

Q    Now, was there anything on the floor which prevented you from putting the light down?

A    No.

A-1583

Iannucci - direct - Brewington                608

Q    Was there anything -- did you have any type of holster or anything to put the light on your hip?

A    I ride with a flashlight on my lap at night.

Q    Okay.  So you placed the flashlight on your lap; correct?

A    Yes, sir.

Q    And then you and your partners, the two partners that you had, drove through the Home Depot lot toward the Fairway supermarket; correct?

A    That is correct.

Q    And when you were in the Fairway supermarket, someone or all of you made a potential ID of the person you were looking for; is that right?

A    Correct.

Q    Who was it that spotted this individual first?  Do you recall?

A    I -- I know when I recognized -- I saw the possible subject.  I assumed it was all at the same time, but I couldn't tell when they saw him.

Q    So you don't know.  It wasn't like it was discussed at that point; right?

A    No, it wasn't.

Q    Okay.  So at some point -- you were in the passenger seat -- excuse me.  At that point you were in the passenger seat; correct?

A    Front passenger seat.

A-1584

Iannucci - direct - Brewington                609

Q    Front passenger seat?

       Officer Panuthos was driving; correct?

A    That is correct.

Q    Who was seated behind you?

A    Now Inspector Massaro.

Q    Okay.  And when this individual spotted your car, it was what, approximately 50, 60 feet away?

A    To the best of my recollection.

Q    And then the car actually drove up in a fashion where it angled the front of the car toward the supermarket door; correct?

A    Yes, sir.

Q    And you got out of the vehicle; correct?

A    Yes, I did, sir.

Q    The parking lot is fairly well-lit, isn't it?

A    The entire parking lot?

Q    The parking lot where you pulled up.

A    Yes, sir.  It's lit where we are.

Q    And you were able to actually make your -- what you believed -- identification with the light that was in the parking lot at that time; correct?

A    That is correct.

Q    And when you got out, you got out and opened the door of the back passenger side so that Officer Massaro could exit as well; correct?

A-1585

Iannucci - direct - Brewington                610

A    Yes, I did.

Q    And you did that because at that point those doors were not openable from the inside?

A    That is correct.

Q    And you got out with your flashlight too, didn't you?

A    Yes, I did.

Q    And when you got out with your flashlight, sir -- and by the way, your window was up?

A    My window?

Q    Yes.

A    My window was down.

Q    And how about the window behind you?

A    I don't know.

Q    How about the window by the driver's side?

A    That window was up.

Q    And how about the window in the back of the driver's side?

A    Are you talking about my recollection or what I know now?

Q    Your recollection.

A    My recollection.  I don't have any recollection of it.

Q    Okay.

A    Okay.

Q    Okay.  Now, sir, when you got out of the vehicle, the person that you saw turned out to be Brian Pfail; correct?

A    That is correct.

A-1586

Iannucci - direct - Brewington                611

Q     And at that particular time, Brian Pfail, when you first got out of the vehicle, was on the telephone; right?

A     Yes, sir.

Q     And when he was on the telephone, at that point, you didn't know exactly who he was speaking with; is that correct?

A     That is correct.

Q     And did you ever come to find out by records who he was speaking with?

A     I haven't viewed any records.  I've heard.

Q     Not what you heard.

A     And I wasn't going to say what I have heard.  I've heard different things.  I never saw a definitive answer.

Q     Okay.  Now, sir, at the time, Brian Pfail, from your standpoint, was a person of interest or this man was a person of interest at that point for a broken window; correct?

A     That is correct.

Q     Would it be accurate to say, sir, that at the time Brian Pfail was on the -- when you saw him, he was on the sidewalk?

A     Yes, sir.

Q     By the shopping cart area of Fairway; is that right?

A     That's correct.

Q     And if his back was to the Fairway building, the shopping carts would be to his right; is that right?

A     Yes.

Q     And to his left would be a display and then the doors

A-1587

Iannucci - direct - Brewington                612

going into Fairway?

A    I believe there is a display to the left.  I'd have to look at the video or picture, but....

Q    I just want to be clear at this point.  You don't have a clear memory if there was a display there?

A    No, I do not.

Q    Okay.  Now, sir, at the time that you saw Brian Pfail on the phone in that place, what happened to his phone?

A    I don't know.

Q    Did he ever take the phone out of his hand, drop it, or do anything else that you are aware of?

A    That I am aware of, no.

Q    And the phone was in his right hand; correct?

A    Yes, sir.

Q    There came a time when Mr. Pfail, from your observation, appeared to at least see you coming at you; correct?

A    Yes.

Q    And at that time he made a step to the left; correct?

A    Correct.

Q    And then came back to the right, kind of centered himself in front of Officer Panuthos; is that fair?

A    That's fair.

Q    And Officer Panuthos exited the vehicle from the driver's side door; is that correct?

A    That's right.

Iannucci - direct - Brewington                    613

Q    And left his door wide open; correct?

A    Yes, sir.

Q    So he didn't take time to close his door, did he?

A    He didn't close the door.

Q    Well, in this situation, he left it open, and then at some point you made an observation of Officer Panuthos running at Mr. Pfail, donut?

A    I'm sorry.  Repeat the --

Q    At some point you made an observation of Officer Panuthos running at Mr. Pfail, didn't you?

A    Yes, sir.

Q    Mr. Pfail never ran, did he?

A    He never ran.

Q    He never advanced towards you, did he?

A    No, sir.

Q    Never advanced toward Officer Panuthos, did he?

A    No, sir.

Q    Never advanced toward Officer Massaro or -- excuse me -- Inspector Massaro?

A    Not that I saw, no.

Q    And at that point, it was for a broken window still; right?

A    Yes, sir.

Q    Isn't it accurate that Mr. Pfail never advanced to try to attack anybody that night, yes or no?

A-1589

```
                Iannucci - direct - Brewington                614
```

A    Advanced to attack?

Q    Yes.

A    No, he never advanced.

Q    And isn't it true that you and your partners advanced toward Mr. Pfail, at least one of them, but perhaps all three of you, running towards him?

A    Yes, sir.

Q    Sir, do you know the term fight or flight?

A    Yes, sir.

Q    What do you understand that term to mean?

A    Well, when faced with a stressful stimulus that is possibly alarming, a person, obviously, has two choices, and I think it is obvious that instinctively you will either run or fight.

Q    As a self preservation; correct?

A    Yes, sir.

Q    It's natural for a person no matter who you understand them to be from your understanding; correct?

A    That's correct.

Q    You have been on the job awhile; right?

A    A little too long.

Q    You worked Roosevelt for a period of time; right?

A    Yes.

Q    Do you remember us?  Do you remember me?

A    I remember you.

A-1590

Iannucci - direct - Brewington                    615

Q    I just want to be clear, people have run at you before?

A    Yes, sir.

Q    What have you done when they've run at you?

A    As a police officer?

Q    As a police officer.  I won't talk about the other stuff. As a police officer, what do you do when someone runs at you sir?

A    As a police officer, I have a duty to stay, you know, and fight.

Q    And do what?

A    As a police officer doing my job.  Oh.  Protect yourself that --

Q    Yeah.

A    Okay.

Q    You would put up a hand, do something try to do the work that you need to do.  You've been trained to do that; right?

A    Yes, sir.

Q    And you know it is not unnatural for someone who is attacked or appearing to be attacked to want to defend themselves, is it, based on your experience?

A    No, I agree.

Q    And, sir, you saw Mr. Pfail as you were running towards him; correct?

A    I saw Mr. Pfail, yes, sir.

Q    And as you ran towards him, would you agree that at least

Iannucci - direct - Brewington                616

with his left hand, he put a hand up --  withdrawn.

Do you have a memory of that?

A    Yes, sir.

Q    Okay.  He did that, didn't he?

A    He did what, sir?

Q    Put up a left hand?

A    Put up a left hand.

Q    Put up a left hand to guard himself?

A    I wouldn't describe it as that, no, sir.

Q    Okay.  Did you observe Officer Panuthos as he approached Mr. Pfail?

A    Yes, sir.

Q    And would you agree that as he approached Mr. Pfail he put a leg up toward Mr. Pfail?

A    Yes, sir.

Q    And that's while he was closing the space between himself and Mr. Pfail; correct?

A    That's correct.

Q    And when someone closes the space between one person and the other and the other person is stationery, who is the aggressor?

MR. DORFMAN:  Objection.

THE COURT:  Sustained.

(Continued on next page.)

```
                  Iannucci - Direct - Brewington              617
```

BY MR. BREWINGTON (Continuing):

Q    In this situation, as Mr. Pfail was stationary, Officer Panuthos, yourself, and Officer Massaro were entering his space at a rapid rate, correct?

MR. CUOMO:  Objection.

THE COURT:  Overruled.

Q    Correct?

A    Yes, sir.

Q    And sir, at the time when Officer Panuthos is coming towards Mr. Pfail, you agree that Officer Panuthos came in contact with Mr. Pfail, correct?

A    I agree.

Q    And actually, Officer Panuthos' body collided with Mr. Pfail.

Would you agree with that?

A    I would agree with that.

Q    And that included his leg contacting Mr. Pfail.

A    At which point?

At some point, yes.

Q    Well, as he collided with him.

A    I don't believe it's the first thing that makes contact with Mr. Pfail.

Q    I'm not asking if it was the first thing.

A    Okay.  At some point, yes, his leg is going to be in contact with Mr. Pfail.

Iannucci - Direct - Brewington                618

Q   And I'm talking about the leg that was up.

The left leg that was up, that made contact with Mr. Pfail, didn't it?

A   While it was up?

Q   Well --

A   You're asking if the leg makes contact?  It does.  His whole body makes contact.

If you're asking the leg at that point in time and in which position, you'd have to be more specific.

Q   Well, sir, you're the one that witnessed it, correct?

A   Yes, sir.

Q   Now, sir, after Officer Panuthos collided with Mr. Pfail, would it be accurate to say that you and your partners dragged Mr. Pfail to the ground or tackled him?

A   I think those are fair descriptions.

Q   And would it be accurate to say, sir, that you claimed injuries after Officer Panuthos collided with Mr. Pfail.

A   Yes, sir.

Q   And your injuries, you claim, were to an abrasion on your left hand; is that correct?

A   No, sir.  I believe the abrasion was on my forehead.

MR. BREWINGTON:  One second, Judge.

THE COURT:  Sure.

(Pause in proceedings.)

Q   I'm sorry, abrasion on your forehead and a scratch to

Linda A. Marino, Official Court Reporter

A-1594

Iannucci - Direct - Brewington                    619

your left hand, correct?

A    A scratch?  My injury to my hand was more than a scratch.

Q    Tell us what your injury to your hand was.

A    There was substantial pain to my hand.

Q    I didn't ask what you felt, I asked what the injury was.

A    I'm sorry, I was led to believe that pain is an injury.

Q    Isn't pain the alleged result of an injury?

A    It's that too, but if we're talking about the charges --

Q    Withdrawn.

Tell us physically what you claim happened to your hand.

A    Physically?

Q    Yes.

A    You want me to go through the whole incident?

Q    No.  Withdrawn.

Tell us, sir, what type of damage you claim happened to your hand.

A    According to the ER doctor --

Q    I'm talking about you.  Explain it in your terms.

A    My terms is I hurt my left hand.

Q    And, so, with regard to your claim of hurting your left hand, that had been a hand that you had injured before, correct?

A    Yes, sir.

Q    At least one fracture.

Linda A. Marino, Official Court Reporter

A-1595

Iannucci - Direct - Brewington                620

A    At least.

Q    And some other injuries to that hand as well other than the fractures, correct?

A    I don't recall but I wouldn't be surprised.

Q    Well, sir, it's your hand.

A    I know.

Q    Do you know how many injuries you had to that left hand before this night?

A    At least that one fracture.

Q    At least that one?

A    Yes.

Q    And how many others?

A    I don't recall.

Q    Give us a ballpark.

A    Maybe one more.

     My entire life?

Q    No, we're talking about --

A    I'm sorry, just the one I could recall for the fracture prior to that that comes to mind for work-related.

Q    And the fracture was in 2012, wasn't it?

A    I believe so.

Q    And actually, when the doctors looked at you, they identified that you had a...

     MR. BREWINGTON:  One second, Judge.

     (Pause in proceedings.)

A-1596

Iannucci - Direct - Brewington                621

Q    Strain of your finger, correct?

MR. CUOMO:  Objection, your Honor.  If we could just have clarification, are we discussing 2012 or --

MR. BREWINGTON:  Thank you, sir.  We're talking about the evening of November 3, 2014.

THE COURT:  I think counsel wanted clarification about whether you're asking did he already have that preexisting sprain before his encounter with Mr. Pfail or after.

Is that correct?

MR. CUOMO:  No, Mr. Brewington got it right.

THE COURT:  Oh, because of 2012.  Understood.

So back in 2012, two years before your encounter with Mr. Pfail is the question I think we're asking.

MR. BREWINGTON:  Judge, I'll clarify and try to clean it up.

THE COURT:  And I'll get out of the way.

Q    November 3, 2014, the diagnosis with your finger was a sprained finger, right?

A    I don't recall what the diagnosis was.

MR. BREWINGTON:  Let me ask you if this will help refresh your recollection.

Showing the witness a copy of AA, Defendants' AA for identification.  And Judge, I'm showing him...

(Pause in proceedings.)

*Linda A. Marino, Official Court Reporter*

A-1597

Iannucci - Direct - Brewington                622

MR. BREWINGTON:  Showing him AA, your Honor, and I'm going to provide to him the page number that has Bates stamp on it of 227, which I'll point to it.

A    Thank you.

Q    Are you able to read what's written there?

A    No, not really.  I'm sorry.

Q    Okay.

A    I'm sorry.

Q    Is it you can't see it or you can't make it out?

A    Well, it's a little of both.  I can squint and I can see it but I can't read the doctor's handwriting.

You're referring to the handwritten stuff?

Q    Yes, sir.

A    I can't.  I'm sorry.

MR. BREWINGTON:  I'm taking the document back.

Q    Sir, do you recall being diagnosed with a sprained finger?

A    I don't recall.

Q    Do you recall the diagnosis of -- that there were no deformities on your hand?

A    I don't recall.

Q    Do you recall a finding that there were no fractures of your hand?

A    I recall that.

Q    And you recall that...

Linda A. Marino, Official Court Reporter

A-1598

```
                Iannucci - Direct - Brewington              623
```

MR. BREWINGTON: Just one second, Judge.

(Pause in proceedings.)

Q   Sir, other than the sprained finger, were you treated at the hospital -- withdrawn.

Other than the injury that you claim to your hand, were you treated at the hospital for any other condition?

A   I don't recall.

Q   And the sprained finger -- withdrawn.

The condition to your finger, whatever that was, happened when your hand struck the ground, according to you, correct?

A   Yes.

Q   And that was when you were tackling Mr. Pfail, right?

A   When I was tackling?

Q   When you were along with your partners tackling Mr. Pfail, yes.

A   It happened during us apprehending him.

Q   So, when you say "apprehending" him, he hadn't run, right?

A   Correct.

Q   So, it wasn't as though you were chasing him down, correct?

A   That's correct.

Q   You tackled this man, didn't you?

A   I tackled him?

*Linda A. Marino, Official Court Reporter*

Iannucci - Direct - Brewington                 624

Q    You and your partners.  Withdrawn.

     You and your subordinates.

A    I don't believe I had a hand in actually tackling him.  I believe my contact came with him once he was on the ground.

Q    Sir, did you give this testimony...

     MR. CUOMO:  Page and line?

     MR. BREWINGTON:  I'll give it to you in a second.

Q    Sir, your partners tackled him to the ground, right?

A    I believe the part you would describe as a tackle would be involving more of Detective Panuthos and Inspector Massaro, yes.

Q    And your injury to the hand --

     And this was your left hand, correct?

A    That's correct, sir.

Q    -- happened after falling to the ground; is that right?

A    Yes, sir.

Q    And it wasn't as a result of you getting hit by Mr. Pfail, was it?

A    No, sir.

Q    The ground caused your hand to suffer the injury, right?

A    No, sir.

Q    Sir, wasn't it -- I just want to be clear.

     Did you give this testimony -- withdrawn.

     Do you recall writing -- do you know what an incident/accident report is?

Linda A. Marino, Official Court Reporter

A-1600

Iannucci - Direct - Brewington                    625

A    PDCN206?

Q    Yes, sir.

A    Yes, sir.

Q    And do you recall writing in that, quote, "I injured my left hand after falling to the ground"?

A    I didn't write it but I remember that being in the report, yes.

Q    That was a report that you adopted, correct?

A    That is true, sir.

Q    It was accurate then, correct?

A    Yes, sir.

Q    And would it be accurate to say that the only place you indicated you had any pain was your hand?

A    To the best of my recollection, yes.

Q    Sir, would it be also accurate to say that there were a series of tests done on your hand, correct?

A    Yes, sir.

Q    And you know what your medical records say concerning that, don't you?

A    I believe so.

Q    And they say that you had a -- withdrawn.

     A possible sprain to your finger, right?

A    That's not what I believe was the diagnosis.

     From who?  Can you be more specific, sir?

Q    You went to Nassau University Medical Center, right, sir?

Linda A. Marino, Official Court Reporter

Iannucci - Direct - Brewington                    626

A    Yes.

Q    And they diagnosed you that night, didn't they?

A    Yes.

Q    Do you recall what the diagnosis was that night?

A    I do not.  My recollection was the doctor saying I possibly bruised a bone.

Q    Sir, you've had a chance to look at your medical records in preparation for today, haven't you?

A    No, sir.  I've actually never seen my medical records, even when I left the hospital.  I just handed them over to the department and filed them.

Q    Sir, in your preparation for this trial, you didn't look at AA?

          MR. BREWINGTON:  And Judge, I want to show it to the witness so I can give him an opportunity.

          Showing the witness AA.

Q    Sir, I'm just going to ask you a question after you get a chance to thumb through those.

          Do you have those sir?  Do you have those records?

A    Yes, sir.

Q    Take a look at them.

A    Okay.

          (Pause in proceedings.)

A    Okay.

Q    From November 3, 2014, to today, is it your testimony

Linda A. Marino, Official Court Reporter

*Iannucci - Direct - Brewington*                    627

that you've never seen or been shown your medical records from that night?

A    I was handed these that night, I'm sure, or parts of these, and I handed them to the administrative offices at the precinct and it would have been filed at my medical administration office.

        I don't keep a copy personally.  That's just my habit.  And I didn't review this before trial, hearing, proceeding; this one or prior.

Q    Now I'll go back to my question.

A    Yes, sir.

Q    Is it your testimony that from November 3 of 2014 to now, that nobody else has shown you a copy of your medical records or allowed you the opportunity to review it knowing you would be cross-examined?

        MR. CUOMO:  Objection, your Honor.

        THE COURT:  Overruled.

A    Not that I recall.

        MR. BREWINGTON:  Judge, I want to take AA back.

        THE COURT:  Okay.

        MR. BREWINGTON:  Thank you, sir.

        THE WITNESS:  You're welcome.

Q    Now, sir, would it be accurate to say you never saw Mr. Pfail take a drink, right?

A    That is accurate.

*Linda A. Marino, Official Court Reporter*

A-1603

Iannucci - Direct - Brewington                    628

Q    You never smelled alcohol on Mr. Pfail, did you?

A    Not that I recall, no.

Q    And would it be accurate to say, sir, that Mr. Pfail got injured while he was in contact with yourself and your partners?

A    Yes, sir.

Q    And you were the ranking officer on scene at that time, correct?

A    Yes, sir.

Q    And at that particular point, did you make a determination on how Mr. Pfail received injuries?

A    I'm sorry, you want me to speculate on how I thought he got injured?

Q    No, I don't want you to speculate.

A    Okay.

Q    Did you make a determination?

A    As you said, as a result of the contact with us.  Other than that would be speculation, more specific than that would be speculation on may part.

Q    I don't want you to speculate.

A    Okay.

Q    Do you know what the actual instrumentality was?

A    No, I do not.

Q    Sir, at the time that Mr. Pfail was being handcuffed on the ground --

Linda A. Marino, Official Court Reporter

A-1604

Iannucci - Direct - Brewington                    629

And he was handcuffed while he was on the ground, correct?

A    That's correct.

Q    That was in the vestibule of the Fairway, right?

A    Yes, sir.

Q    And yourself, Officer O'Brien, right --

A    At which point?  At the end?

Q    As part of the process?

A    Yes.

Q    Officer Panuthos, right?

A    Yes, sir.

Q    And now current Inspector Massaro, right?

A    And one other person.

Q    I'm going to get there.

A    Yes, sir.

Q    I'm talking about people on the force.

A    Oh, sorry.  Yes, sir.

Q    Nassau County people, right?

A    Yes.

Q    Nassau County employees, right?

A    Yes, police officers.

Q    People that were police officers that were using their police authority against Mr. Pfail?

        MR. CUOMO:  Objection, your Honor.

        THE COURT:  Overruled.

Linda A. Marino, Official Court Reporter

Iannucci - Direct - Brewington                    630

Q    That's what I'm talking about.

You understand that?

A    I understand.

Q    And then another person, a civilian, put hands on Mr. Pfail, correct?

A    Correct.

Q    And you were there when that happened, correct?

A    Yes, sir.  I asked for help.

Q    Did you know that person from a can of paint, sir?

A    No, I did not.

Q    Sir, would it be accurate to say at some point Officer Panuthos kneeled on Mr. Pfail's back and legs after he was handcuffed?

A    His back?  Not his back.

His legs and his butt, for lack of a more graceful term.

Q    And how long -- withdrawn.

At the time that Mr. Pfail was being kneeled on in that fashion, he was facedown, correct?

A    Yes, sir.

Q    When, if at all, did you, as the ranking officer, check Mr. Pfail to see if he was unconscious?

A    I didn't have to check if he was unconscious because he was obviously conscious.

Q    Sir, when you say he was obviously conscious, when

Linda A. Marino, Official Court Reporter

A-1606

Iannucci - Direct - Brewington                    631

Officer Panuthos was kneeling on his -- as you said, his buttocks or his butt or his legs, Mr. Pfail was facedown, right?

A    Yes, sir.

Q    Is it your testimony he was talking at that time?

A    Yes, sir.

Q    And sir, did you see Mr. Pfail get rolled over?

A    I don't remember if I was there when he was rolled over, but I have seen since then on video.

Q    And you've seen when he gets rolled over, do you see that Officer Colon has to lower his head down to the ground after he rolls him over, cradle his head?

     Did you see that?

A    I don't recall that, but...

Q    Did you see his feet basically be limp?

A    I don't recall.

Q    And when he was rolled over, sir, do you have a recollection of what was under the space where he had been previously facedown?

A    I'm sorry, repeat that?

Q    Sure.  When he got rolled over, do you recall what was under his face after he got rolled over.

A    Yes, sir.

Q    What was that?

A    It was blood.

Linda A. Marino, Official Court Reporter

Iannucci - Direct - Brewington                632

Q    Sir, there came a time when you left the scene; is that correct?

A    Yes, sir.

Q    And when you left the scene, did you go right to the hospital?

A    No, sir.

Q    As a matter of fact, before you left the scene you spoke to a person who told you that he was a witness, correct?

A    He told me he was the one who called 911, yes.

Q    At that point, you hadn't heard the 911 call, correct?

A    No, I had not.

Q    And, so, he identified himself as a person that not only called 911 but that he had witnessed certain actions, right?

A    He represented himself as that, yes.

Q    And he also said that he had a phone that he had recorded something on, correct?

A    Correct.

Q    And sir, would it be accurate to say that at the time he told you that, you understood him to be the cart wrangler; is that correct?

A    For lack of a better term, yes.

            MR. BREWINGTON:  Judge, is this a good time?

            THE COURT:  Yes.  Let's take our lunch break.

            It's a little before one.  We'll endeavor to start promptly at 2 o'clock.  You're welcome to leave the building,

Linda A. Marino, Official Court Reporter

A-1608

*Iannucci - Direct - Brewington* 633

get your devices, get some fresh air -- I hear it's free from the rain today at last -- and we'll see you back here at 2 o'clock.  Thank you very much.

(Jury exits.)

THE COURT:  Sergeant Iannucci, you're free to leave the stand.  Just remember, you're still on the stand so you can't speak with your lawyer or anybody else about the subject of your testimony.  We'll see you back here a little before two.

THE WITNESS:  Thank you, your Honor.

THE COURT:  I did have a couple of quick things I wanted to take up with you all at the lunch break, but let's do it at the end of the break rather than now?

So, why don't we aim to be back here at 1:45 and I'll come in as soon as I can after that.  And if you all can confer with a proposed admonition or a curative instruction the Plaintiff would like me to give, that would be helpful, and we can discuss when if I agree to give it.

Yes?

MR. DORFMAN:  There's actually a severe thunderstorm happening.

THE COURT:  Oh, my goodness.  Well, the jurors are going to lose all faith in this Court.

This is what happens.  That's why there's circumstantial evidence and we use the rain example, right?

*Linda A. Marino, Official Court Reporter*

A-1609

*Iannucci - Direct - Brewington*                          634

There's no direct evidence.

Thank you all.  Have a good lunch.

MR. CUOMO:  Your Honor, are we breaking at 4 o'clock today?

THE COURT:  Yes, which is part of why I wanted to talk about some of those other things now, before the weekend.

I'll see you back around 1:45.  Thanks.

(Luncheon recess taken.)

Proceedings                                        635

AFTERNOON SESSION

1:45 p.m.

(In open court; jury not present.)

THE COURT:  I do want to bring in the jury at two, so we may need to take some of this up at the close of the day.

With respect to the parties' proposed curative instructions on the aspect of Officer O'Brien's testimony that I struck, I took a look at both of your proposed suggestions, I have modified them somewhat.  So, here is what I plan to give them.

I'll hear you all out on anything else and I thought I would wait until Sergeant Iannucci's testimony is over and do it at a break between the witnesses.

Ladies and gentlemen of the jury, you heard the testimony of Defendant Karen O'Brien regarding a concern about possible pregnancy.  I struck that testimony because it was improper and told you that you are not to consider it.  I want to remind you again that you may not and cannot consider it for any purpose.  Since it has been stricken from the record, it should play no roll in your assessment of the case nor in your deliberations.

And I will leave it at that.

Any concerns or objections to that?

MR. BREWINGTON:  We thank the Court for refashioning

Linda A. Marino, Official Court Reporter

A-1611

*Proceedings* 636

that.  It will be fine with Plaintiff.

Judge, I do hesitate, but I think I have to, at least for the record, make an application for a mistrial.

THE COURT:  Okay.  Let me hear you out on that.

MR. BREWINGTON:  I believe that the prejudice in this situation did create a concern for Mr. Pfail and for the case; however, I understand that we are well into the case, and at this particular point I believe I have an obligation to at least make that application for the preservation of the record.

THE COURT:  Mr. Carnevale, let me hear you in response.

MR. CARNEVALE:  Your Honor, we oppose the application for a mistrial.  We feel there is no reason for mistrial to be issued.

THE COURT:  Okay.  Do you have anything you want to say at all about the potential prejudice to the Plaintiff or lack thereof?

MR. CARNEVALE:  For the instruction, we object to there being an instruction.  We feel that that would -- raising it again would compound any prejudice that was already alleged to be suffered.

THE COURT:  That's really the Plaintiff's argument to make, though.  I want to hear about your objection to the instruction from your client's perspective.

*Linda A. Marino, Official Court Reporter*

A-1612

*Proceedings* 637

MR. CARNEVALE:  So, my objection to the instruction would only be that the sentence you have that uses the word "improper."

THE COURT:  Okay.  Both parties' positions are noted for the record.

I'm going to deny the motion for a mistrial.  I do not think it rises to the level that warrants a mistrial at this stage.

I will say that had this been a criminal trial, Mr. Carnevale, I think it would have been serious grounds for a mistrial had an officer in a criminal trial testified about such things.  There are a lot of judges in this courthouse who would not have been as accepting of your explanation as I have been.  Please do not let anything like that happen again here or anywhere else.

The testimony was, indeed, improper.  I did tone down some of the Plaintiff's proposed language and took out "thoroughly" from their proposed language of "thoroughly improper."  But I think telling the jurors that it was improper is not unfairly prejudicial to the Defendants, so I'll keep the proposed instruction that I have.

All right.  We have just a couple minutes left.  Let me save the other issues about the 911 call from Buffalo Wild Wings and some of the other things for either a break or at the end of the day so we don't keep the jurors waiting.

*Linda A. Marino, Official Court Reporter*

Proceedings                                    638

Does anyone have anything quick to do in the next two minutes before we bring them in?

MR. BREWINGTON:  No.

THE COURT:  Okay.  Let's bring in the jurors.

MR. CUOMO:  Your Honor, do you want Sergeant Iannucci?

THE COURT:  Yes, please have him come up.

(Witness resumes the stand; jury enters.)

THE COURT:  Please be seated, everyone.  Welcome back.

Sorry, I couldn't control the weather better than I predicted.  The lawyers, who have been outside more recently than I have, apparently, advised me about the rain.  I hope you haven't lost confidence in my ability to preside over the trial as a result.

With that Mr. Brewington, you can proceed with your examination of Sergeant Iannucci.

MR. BREWINGTON:  Thank you so much, your Honor.

(Continued on the following page.)

Linda A. Marino, Official Court Reporter

*Iannucci - Direct - Brewington*          639

THOMAS IANNUCCI,

    called as a witness, having been previously duly

    sworn, resumed and testified further as follows:

DIRECT EXAMINATION

BY MR. BREWINGTON (Continuing):

Q    Before we broke, we were talking about this person that we otherwise identified as the cart wrangler.

    Is that a good way of identifying him, as best as you know?

A    Yes, sir.

Q    And this would also be a person that you recognize as the 911 caller, correct?

A    As he identified himself to me, yes.

Q    Okay, sir.  And he came up to you at the scene; is that right?

A    That is correct.

Q    And then at some point, he came back to the substation; is that accurate?

A    Yes, sir.

Q    How was it that he came to come to the substation?

    Did you invite him or something else?

A    I asked him to meet us at the substation.

Q    And at the substation, you spoke to him and he told you some things, didn't he?

A    At the substation?

*Linda A. Marino, Official Court Reporter*

A-1615

Iannucci - Direct - Brewington                640

Q    Yes.

A    Yes.

Q    And did you write down any of that?

A    No, sir.

Q    And you didn't memorialize it in any way by speaking into a recorder of any kind, did you?

A    No, sir.

Q    And there was no audio recording of it from any device that might be in the room that you were in; is that right?

A    You are correct, sir.

Q    But at that time, there were opportunities for you to be able to record statements from potential witnesses; isn't that right?

A    I'm sorry, repeat the question?

Q    Withdrawn.

There were mechanisms within the Nassau County Police Department which would allow you to record statements of prospective witnesses; isn't that correct, sir?

A    Yes, sir.

Q    And could you just tell us from your own knowledge what those might be?

A    Like the actual how to record a witness statement?

Q    Yes.

A    Pen and paper, most simply.  As you had mentioned in another direct, the 32B, the supporting deposition.

Linda A. Marino, Official Court Reporter

A-1616

Iannucci - Direct - Brewington                641

Q    And that wasn't done, right?

A    No, sir.

Q    And sir, you didn't write down this person's name, did you?

A    No, sir.

Q    Did you ask the person for a business card so you could contact him later if you needed to?

A    No, I did not.

Q    And sir, you were at that time still the ranking officer dealing with this matter, at least at that particular point; is that correct?

A    That is correct.

Q    And even Detective Ramos didn't outrank you at that point, did he?

A    No, he did not.

Q    Right.  Because he's a detective and you're sergeant, right?

A    Yes, sir.

Q    He then did show you something that he had in his possession, correct?

A    Correct.

Q    And it was a video on his cell phone, right?

A    Yes, sir.

Q    And you ordered Detective -- withdrawn.

        You ordered Officer Panuthos to get a copy of the

Linda A. Marino, Official Court Reporter

Iannucci - Direct - Brewington                642

recording or download it, didn't you?

A    Yes, sir.

Q    And you made a determination at that point that that should occur, right?

A    I asked him to take a look; if there's a video, to download it, yes.

Q    Did he download it?

A    No, sir.

Q    And, so, whatever was on that phone, would you agree with me, whatever it was, was not preserved?

A    Correct.

Q    In a criminal matter, correct?

A    Correct.

Q    At that time.

A    Yes, sir.

Q    And it's not available today; is that right?

A    No, sir.

Q    Whatever is on there, right?

A    Correct.

Q    Did you ever ask the witness who came to speak with you to preserve it for later review by anybody else?

A    No, sir.

Q    And, so, you told -- withdrawn.

This person who told you that he was the 911 caller, you heard the 911 call at the time that he came to the

Linda A. Marino, Official Court Reporter

A-1618

Iannucci - Direct - Brewington                643

substation, did you?

A    No, sir.

Q    And sir, at that time that he came to the substation, you understood that there would be criminal charges against Mr. Pfail; is that right?

A    That is correct.

Q    And you understood that Mr. Pfail had, from your own training, certain rights, correct?

A    Yes, sir.

Q    And one of those is the ability to have evidence that may or may not be exculpatory, correct?

        MR. CUOMO:  Objection, your Honor.

        THE COURT:  Sustained as to form.

Q    One of his rights at the time that this witness came to you was that Mr. Pfail would have had a right to have access to potential evidence that existed in the case, correct?

        MR. CUOMO:  Objection your Honor.

        THE COURT:  Overruled.

A    Can you define "potential," what you mean by potential evidence?

Q    Sure.  Whether or not something may be admissible is a different issue as opposed to whether or not something might be discoverable.

A    I'm sorry, just repeat the whole question again.

Q    Sure.  And I'll rephrase it and try to do it better.

Linda A. Marino, Official Court Reporter

Iannucci - Direct - Brewington                644

A    Okay.

Q    Would it be accurate to say at the time that this witness was speaking to you and showing you the phone, that you understood that Mr. Pfail had rights with regard to items that might be evidence?

A    Yes, sir.

Q    And when you looked at the phone, even though you did indicate that it should be downloaded, you made a determination that the phone didn't catch anything that you evaluated to be important; is that right?

A    That is correct.

Q    And, so, would you agree with me that right now you had a chance to view the video, right?

A    Yes, sir.

Q    But not Mr. Pfail or his attorney at the time, correct?

A    Correct.

Q    And not the district attorney, correct?

A    Correct.

Q    And not the carrying detective, correct?

A    That is correct.

Q    And with regard to this witness and this telephone, you didn't tell anybody else that was a ranking officer, did you?

A    Meaning a higher rank than me?

Q    Yes, sir.

A    Not that I recall.

A-1620

*Iannucci - Direct - Brewington* 645

Q    And do you know where that video is today?

A    No, sir.

Q    Have you made -- did you make any effort from the time that he was in the substation 'til today to try and find him?

A    No, sir.

Q    Or to try and get the video?

A    No, sir.

Q    Did anybody ask you to make an effort to do so?

A    No, sir.

Q    Anybody from the DA's office?

A    No, sir.

Q    Have you been asked to make an effort to try and backtrack to get the name of this person by anyone from the County of Nassau?

A    No, sir.

(Continued on the following page.)

*Linda A. Marino, Official Court Reporter*

Iannucci - direct - Brewington 646

BY MR. BREWINGTON: (Continued.)

Q    And, so, it would be accurate to say that with regard to this person, you believe that he worked at Fairway?

A    That was my understanding at the time, yes, sir.

Q    And you continued to work in that general area doing the parking lot evaluation and possible break-ins, didn't you, after the 3rd of November?

A    I did some work in the area, yeah, in that capacity and others.

Q    And you had the ability to just stop into the store to find out the name of that person, didn't you?

A    Yes, sir.

Q    And you had already met the security guard that jumped in or came in when he Mr. Pfail was on the ground; correct?

A    Can you -- what do you mean by already?  Prior to the incident?

Q    No.  After November 3rd?

A    I met the security guard after November 3rd again?

Q    Withdrawn.

After November 3rd, would it be accurate to say that you had met the security guard on November 3rd?

A    Yes.

Q    And on the days after, you knew that he was the security guard working in or about Fairway; correct?

A    Yes, sir.

A-1622

```
              Iannucci - direct - Brewington              647
```

Q    And did you make any effort to ask him who the cart wrangler was?

A    No, sir.

Q    And, sir, once you made the determination that there was nothing of value on that video, would you agree with me that you deprived Mr. Pfail of access to that item?

A    I deprived him?

Q    Yes.

A    I guess by not -- not taking the video.  He didn't have access to it.

Q    And, sir, and the time that you declined to take the video, would it be accurate to say that you were aware that Mr. Pfail had injuries?

A    Yes, sir.

Q    Would it be accurate to say that Mr. Pfail was going to be or had been taken to the hospital?

A    Yes, sir.

Q    And at the time that you declined to take the video, would it be accurate to say that Mr. Pfail had been bleeding from his head?

A    Yes, sir.

Q    And you observed that; correct?

A    Correct, sir.

Q    So when you viewed this video would it be fair to say you viewed it with Officer Panuthos?

A-1623

Iannucci - direct - Brewington                    648

A    Yes, I believe we both viewed it at the same time.

Q    And who was the decisionmaker in deciding not to download whatever you saw?

A    I have a multipart answer for that. I watched it. I decided that there was nothing of value and I asked Officer Panuthos or Detective Panuthos Panuthos now to make sure that there's nothing that he thought -- and he agreed but the ultimate authority is mine. I gave him that direction and he did what I asked him.

Q    And, so -- but didn't you ask him to record it or download it?

A    Yes, before we watched it.

Q    So it's your testimony that you didn't take this person's name or any contact information because he wasn't a witness to anything?

A    I believe that was my prior testimony, yes.

Q    Well, not only your prior testimony, that's what you determined; correct?

A    Correct.

Q    And, sir, you heard the 9-1-1 call here; correct?

A    Yes, I did.

Q    And you heard the depiction of what this witness observed; correct?

A    I did.

Q    And at the time that you -- that he walked out of the

Sophie Nolan, RPR, NYRCR - Official Court Reporter

A-1624

Iannucci - direct - Brewington                649

substation, had you heard the 9-1-1 call?

A    No, sir.

Q    You let this person walk out without taking his information because he didn't witness anything that was going to be valuable to you; correct?

A    To the investigation, correct.

Q    Well, when you say "to the investigation," to you and your partners; isn't that true?

A    Well, to the investigation -- me and my partners personally?  It wasn't going to be valuable for our prosecution of Mr. Pfail.

Q    Did you give this testimony in --

MR. BREWINGTON:  Judge, let me just make sure I have the right proceeding.

(Pause in proceedings.)

BY MR. BREWINGTON:

Q    -- in the criminal trial proceedings at page 355?

MR. CUOMO:  Line?

Q    Line 20.  I believe -- withdrawn, withdrawn, withdrawn.

Line 20.  Did you give this testimony, sir -- and, by the way, in those proceedings when you were asked questions you understood that you were under oath; right?

A    Correct.

Q    And you gave responses intending for them to be depended on; correct?

Sophie Nolan, RPR, NYRCR - Official Court Reporter

A-1625

Iannucci - direct - Brewington                650

A    Yes, sir.

Q    Line 20:

"Question:  And why didn't you take the person's contact information?

"Answer:  Again, because he didn't witness anything that was valuable to us."

Did you give that testimony?

A    Yes, I did.

Q    And the "us" didn't include Mr. Pfail, did it?

A    No.  The "us" was meaning the police as a whole, the department.

Q    And so this person, based on listening to the 9-1-1 call, was a witness, wasn't he?

A    He believed he was a witness, yes.

Q    Well, listening to the 9-1-1 call and also the proximity that he had to officer O'Brien, whose voice was identified today, he was at the scene, wasn't he, based on what you now know?

A    Yes, sir.

Q    And as a witness on the scene, is it your testimony that when you spoke to him that your evaluation was that he had nothing to add?

A    Correct.

Q    And, sir, when individuals such as this witness come to you and say, I saw what happened, is it your job -- withdrawn.

Iannucci - direct - Brewington          651

Was it your job to make a determination what was valuable or not valuable in the entire scope of the criminal proceeding?

A    At the scene when he approaches me and he identifies himself as a 9-1-1 caller and says he has a video, it is my determination at that time whether or not to take the evidence.  So, I am deciding on behalf of the police department and the investigation at that point.

Q    I understand at that point.  I'm asking do you believe that that was your job to make a determination that a person that comes with potential evidence --

A    Yes.

Q    -- gets dismissed?

A    It's my determination, yes.

Q    How many times have you done that in cases?

A    How many times?

Q    Yeah.  How many times has someone come to you and said, I saw this, please take a statement from me; or, I saw this please take a piece of evidence and you told them I'm not taking it, go away?

A    I would never -- it's never I'm not going to take it, go away.  You hear what they have to say and you --

Q    Let me ask you -- I'm sorry.

Let me ask you this:  Didn't this person come to you and say, I witnessed something?  You spoke with him; right?

Sophie Nolan, RPR, NYRCR - Official Court Reporter

A-1627

Iannucci - direct - Brewington                    652

A    He said that he was the 9-1-1 caller and that he had a video.

Q    And the 9-1-1 call was based on the fact that he witnessed certain things; right?

A    Yes.

Q    And based on that, him coming to you, you dismissed him; is that right?

A    Dismissed?

Q    You told him, thanks for the stuff, but we're not even going to take your name, just leave?

A    After we viewed what he thought he had a video of that didn't exist that was the end of, yes, our contact with him and I did not take his name.

Q    When you say it didn't exist, there was something on that phone; correct?

A    Correct.

Q    And you made a determination that it had no value, correct, right?

A    Yes.

Q    And the determination that you had saying that there's no value was something that after you made that determination you gave no one else the opportunity to even make an evaluation of their own; right?

A    Correct.

Q    Including Mr. Pfail?

A-1628

Iannucci - direct - Brewington     653

A    Correct.

Q    Including his attorney?

A    Yes, sir.

Q    And, sir, based on the evidence that you've heard, this 9-1-1 caller was a witness, wasn't he?

A    He witnessed something, but he didn't witness what happened in the vestibule.

Q    Okay.  Let me just ask a question and I heard you say that.

He witnessed something; is that right?

A    Yes.  In his opinion, he witnessed something.

Q    In his opinion?

A    Yes.

Q    Like we all have opinions, Knicks, Celtics, right; we all have opinions?

A    Yes, sir.

Q    His opinion was not yours to dismiss, was it?

A    It was mine to evaluate if it was --

Q    Are you saying that when evidence comes into your hands, it is your job just to evaluate whether or not it's evidence or not?

A    Yeah, initially when it comes in if I'm the one receiving it, I have to make a determination if it's evidence.

Q    Sir, you made a determination that this person who was the 9-1-1 caller was not an eyewitness; is that correct?

A-1629

                    Iannucci - direct - Brewington              654

A    That's correct.

Q    And you made a determination that after he -- after he volunteered to give information that he thought was relevant; correct?

A    Correct.

Q    And after speaking with him, having heard the 9-1-1 tape, looking at what he had on his phone, you still say he's not a witness; right?

A    To the incident?

Q    Yeah.

A    I'm sorry, at which point because he sees us come out of the car.

Q    I'm not suggesting any point.

A    Okay.

Q    I'm suggesting whatever he may have witnessed. Just like you're witnessing me raise a pen now, but it's down now; you can't see it, right?

A    He did not witness any of the crimes we were charging him with.

Q    Yeah, but he did witness the actions of the persons that ran out of that car and that he said were beating this one guy, didn't he?

A    Correct.

Q    And you made a determination to basically hide that, didn't you?

A-1630

```
               Iannucci - direct - Brewington              655
```

A    No, sir.

Q    Didn't you make a determination to suppress that evidence to make sure that nobody else had it?

A    No, sir.

Q    But that's what you did, isn't it?

A    I didn't hide or suppress anything.

Q    Okay.  You made sure -- withdrawn.

You made a determination that no one had access to it, didn't you?

A    That no one had access to it?

Q    Yeah.

A    Who had access to the witness, is that what we're talking about?

Q    The witness that came before you, that you took no name of?

A    Yes.

Q    That you took no address of?

A    Correct.

Q    That you took no pedigree information of?

A    Correct.

Q    That you didn't take a telephone number?

A    I didn't have to take a telephone number, sir.

Q    But you didn't take a telephone number?

A    No, I did not.  I agree to that.

Q    And you didn't find out what town he came from?

Iannucci - direct - Brewington                656

A    No, sir.

Q    You didn't take a picture of him --

A    No, sir.

Q    Or anything.

So let's just assume that one of those areas for purposes of this question, one of those areas fails to allow access to that witness, like a telephone number, let's just assume because you said you didn't need to take a telephone number because you said there's the telephone number on the 9-1-1 call; correct?

A    Correct.

Q    Let's assume that that telephone number is either wrong or no longer exists?

A    Okay.

Q    What did you do to preserve the fact that that person claimed that he was a witness?

A    I didn't take his name, look, as you said I didn't do anything else other than what we just talked about.

Q    And, so, you conferred with Detective Panuthos in leading to you making that decision; correct?

A    That is correct.

Q    Sir, would it be accurate to say that one of the things you said about the video was it was too short in length?

A    That is one of my prior testimonies, yes.

Q    And did you make a determination that it was too far

A-1632

Iannucci - direct - Brewington                657

away?

A    That is another way I described the video that was on his phone.

Q    And then you ended up indicating that he wasn't a witness; correct?

A    That is correct.

Q    Now, sir, video that's too far away, you know what video enhancement is?

A    Yes, I do.

Q    Did you know that on November 3rd of 2014?

A    Yes, I also knew that that couldn't be enhanced.

Q    Sir, I didn't ask you that?

MR. BREWINGTON:  And I move to strike the last portion of the answer.

THE COURT:  Sustained.  The jury will disregard the last portion of the answer by.

MR. BREWINGTON:

Q    There was stuff on this man's phone that did exist, correct, it wasn't like it was blank is that correct?

A    That's correct.

Q    And would it be accurate to say that on that day you were aware that there were things that could be done electronically, digitally or whatever to capture something that might not be otherwise visible; right?

A    In some circumstances, yes, that exists.

Sophie Nolan, RPR, NYRCR - Official Court Reporter

A-1633

Iannucci - direct - Brewington                    658

Q    So are you -- do you have a certification in technology?

A    I do not.

Q    Sir, with regard to Mr. Pfail, you got a chance to see him after coming in contact with yourself and your partners?

A    At the scene, yes.

Q    At the scene.  And let me show you, please, Exhibit Number 80 six.  And judge we'll put that on the screen, please?

        (Exhibit published.)

Q    On the screen is Exhibit Number 80 six a two-page document.  And you've seen this before; correct?

A    Yes, sir.

Q    And this is a photograph of Mr. Miller taken after he was taken into custody; correct?

A    That is correct.

Q    Does he look like he got his ass kicked?

A    Can you be more specific.  He looks like he has injuries.

Q    And it looks like he, himself suffered injuries to the top of his head; correct?

A    Correct.

Q    Side of his face; correct?

A    Correct.

Q    Go?

        MR. BREWINGTON:  Go to the next page, please.

Q    To his check; correct?

A-1634

Iannucci - direct - Brewington                659

A    Correct.

Q    And, sir, prior to Mr. Pfail taking these pictures, who had he come in contact with physically?

A    Myself, the officers --

Q    Just name them, please?

A    Sorry, myself, Massaro, Panuthos, O'Brien and I'm sorry I don't remember the name of the security guard.

Q    And who caused these injuries -- withdrawn.

What type of force was used to create these type of injuries.

MR. CUOMO:  Objection, Your Honor.

MR. BREWINGTON:  Withdrawn.  We can take that down, please

BY MR. BREWINGTON:

Q    And, sir, Mr. Pfail at the time that you were looking for him -- withdrawn, Judge.  Just one second, please.

Is it accurate to say that with regard to the prosecution of Mr. Pfail that you cooperated with that process?

A    Yes, sir.

Q    And sought to bring about a conviction on four counts of assault; right?

A    Yes, sir.

Q    And resisting arrest; correct?

A    Yes, sir.

Sophie Nolan, RPR, NYRCR - Official Court Reporter

A-1635

Iannucci - direct - Brewington                660

Q    And would you agree with me, sir, that in that cooperation that you did it several ways including testifying at the grand jury?

A    Yes.

Q    Testifying in hearings?

A    I don't believe I testified in hearings.

Q    Did you provide support to your officers who were going to testify in the hearings?

A    I -- I don't recall.

Q    Do you recall conferring with the district attorney during the proceedings that let to trial?

MR. CUOMO:  Objection, Your Honor could we have clarification as to what point.

THE COURT:  At any point do you recall conferring with the district attorney?

THE WITNESS:  Yes, for pretrial meeting, yes.

Q    And do you have a recollection of actually appearing at the trial?

A    I have a recollection.

Q    Do you have a recollection of testifying in a fashion which you intended to lead to a conviction; correct?

A    Yes, sir.

Q    And that would be a conviction on your interaction with Mr. Pfail; is that right?  That being when you saw him at the Fairway?

Sophie Nolan, RPR, NYRCR - Official Court Reporter

```
                Iannucci - direct - Brewington            661
```

A    Yes, sir.

Q    Sir, would it be accurate to say that with regard to Mr. Pfail's charges against him, that the charges of assault included your claim of injury to your finger?

A    My left hand.

Q    Your left hand?

A    Yes, sir.

Q    And it included the claim that you had some pain to your face; is that right, or an abrasion to your fails?

A    An abrasion to my forehead, yes.

Q    Forehead.  None of which you claim that Mr. Pfail did physically to you; correct?

A    Correct.

Q    And, so, would you agree with me that the injuries that Mr. Pfail suffered happened at the hands of you and your partners?

        MR. CUOMO:  Objection.

        THE COURT:  Let him finish the question.

Q    Including officer O'Brien?

        MR. CUOMO:  Objection.

        THE COURT:  Overruled.

A    I'm sorry.  We can have it read back.

Q    Judge, I have it?

        THE COURT:  Okay, that's fine.

BY MR. BREWINGTON:

A-1637

Iannucci - direct - Brewington                    662

Q    Would you agree with me that the injuries that Mr. Pfail suffered happened at the hands of you, your partners and Officer O'Brien?

A    At the hands?  It happened due to our interaction with him.

Q

         MR. BREWINGTON:  Please if I may confer with counsel one second.  We may be done.

         THE COURT:  Sure.

         (Pause in proceedings.)

         MR. BREWINGTON:  Nothing further, thank you, Your Honor.

         THE COURT:  Mr. Cuomo, you may inquire.

         While you're getting set up, let me deal with the matter we discussed at the break.

         Ladies and gentlemen of jury, I wanted to address one issue that arose before lunch.  You earlier heard the testimony of defendant Karen O'Brien regarding her concern about possible pregnancy on the night of the interaction with Mr. Pfail.  I struck that testimony because it was improper and told you not to consider it.

         I want to remind you that you may not and cannot consider it for any purpose.  Since it's been stricken from the record, it should play no role in your assessment of the case nor in your jury deliberations.

A-1638

Iannucci - cross - Cuomo                    663

Okay, Mr. Cuomo, whenever you are ready.

MR. CUOMO:  May I inquire, Your Honor?

THE COURT:  You may.

CROSS-EXAMINATION

BY MR. CUOMO:

Q    Good afternoon, Sergeant.

A    Good afternoon.

Q    How are you today?

A    I'm okay.

Q    Keep your voice up.  I'm going to come back to some pedigree and talk to you about yourself in a second but I want to write you back to some testimony that you gave in the criminal trial.  Do you recall when the criminal trial was?

A    Sometime in 2018.

Q    Okay.  Close enough.  Sometime in 2018.  That was just about over three years when the incident occurred on November 3rd of 2014?

A    Yeah, I believe it was February or March of 2018, yeah.

Q    Okay.  Let me ask you at the time, from your recollection of the criminal trial, was the 911 tape available for Mr. Pfail's counsel?

A    I believe so.

Q    And were you questioned at the criminal trial about this alleged witness, the cart wrangler?

A    Yes, sir.

Iannucci - cross - Cuomo                                     664

Q    And did Mr. Brewington just read to you a couple of sentences or one sentence from that testimony during your direct a few moments ago?

A    I believe so, yes.

Q    I'm just going to go back, sergeant.  Do you recall Mr. Brewington reading this to you from the criminal trial. It's page 355, starting at line 20:  Question and why didn't you take this --

        MR. BREWINGTON:  One second, please.

        MR. CUOMO:  I'm sorry.

        MR. BREWINGTON:  Yes, sir.

Q    Question, and why didn't you take this person's contact information?

        "Answer:  Again, because he didn't witness anything that was valuable to us.

        Do you remember that a few moments ago?

A    Yes.

Q    And you gave that testimony back at the criminal trial seven or so years ago?

A    I believe so, yes.

Q    Okay.  Did you testify additionally about that witness in the criminal trial?  Was there other testimony from you about the other witness in the criminal trial?

A    I believe so.

Q    Do you recall back at the criminal trial being asked

```
            Iannucci - cross - Cuomo                665
```

these questions and giving these answers. - on?

THE COURT: Which page.

MR. CUOMO: Page three 53, Your Honor.

THE COURT: What line?

MR. CUOMO: Starting at line five. Okay to move forward Your Honor?

THE COURT: Let me hear from plaintiff. Any objection?

MR. BREWINGTON: No.

THE COURT: Okay.

MR. CUOMO: Your Honor I'm going to read up to where Mr. Brewington questioned.

THE COURT: The whole next three pages?

MR. CUOMO: Yes, it's about two pages Your Honor.

THE COURT: I thought you were just reading that one page. Let me just read the rest then.

MR. BREWINGTON: I'm going to read the rest.

THE COURT: I'm not sure that reading this entire portion is appropriate rehabilitation for the purpose for which I understand you to be offering it as opposed to just eliciting the facts from this witness because it doesn't seem to be for the purpose for which that's typically done.

MR. CUOMO: Your Honor, may we approach at sidebar?

THE COURT: You may, yes

(Sidebar held outside of the hearing of the jury.)

A-1641

(Continued on next page.)

Sophie Nolan, RPR, NYRCR - Official Court Reporter

A-1642

Sidebar                                                    667

(The following sidebar took place outside the hearing of the jury.)

THE COURT:  Okay, so let me explain why I was stopping you there.  The initial purpose on the page to which you've directed me seemed to be addressed to rehabilitation on the point that Mr. Brewington had impeached the witness on from his trial testimony; namely whether this was anything valuable to us, meaning the police on the video, because he had given a slightly different answer.  And then Mr. Brewington sought to impeach him on what the meaning of value was and the like.  I didn't have an issue.  I didn't quite see the connection with rehabilitating him with the portion on 353 about nothing of value.

I don't see the reason to read two pages of prior testimony into the record when nothing in those remaining two pages appears to be inconsistent with the testimony he gave when Mr. Brewington was examining him about what he saw in the video.  I don't think it's proper rehabilitation because he wasn't impeached on the question of how long the video was, was there anything on it, was he a witness, what type of a phone it was.

I don't know why we're reading all of this prior testimony into the record when you can just ask him these questions.

MR. CUOMO:  It is context and it is completeness and

Sophie Nolan, RPR, NYRCR - Official Court Reporter

A-1643

Sidebar                    668

it was testimony that was given seven years which the whole tenor of the direct is that this is something kind of new. He never really said it so the jury needs to understand the context and the completeness that he did testify in this fashion years ago and that there's nothing new here.

THE COURT: What is the plaintiff's position on this?

MR. BREWINGTON: I'm not sure. I think it's an inappropriate rehabilitation, but more so if the intent is to try to get the information out, the witness is here; he can ask that question. He doesn't have to read testimony just putting the transcript in.

THE COURT: All right. So, I'm going to allow you to rehabilitate him with the portion on 353 that goes to the determination -- so from line five down to line 17. The rest is not --

MR. CUOMO: Can I just take a peek.

THE COURT: Sure. Lines five to 17. The rest is not proper rehabilitation. You can certainly elicit anything that you think is appropriate that Mr. Brewington didn't bring out, but he was not impeached by anything in here. So it's not proper rehabilitation. Let's go back.

(Sidebar ends.)

(Continued on next page.)

Sophie Nolan, RPR, NYRCR - Official Court Reporter

Iannucci - cross - Cuomo                    669

(Continuing.)

MR. CUOMO:  May I inquire, Your Honor?

THE COURT:  Yes, of course.

MR. CUOMO:  You know what I'm going to withdraw that and move on.

BY MR. CUOMO:

Q    Let's go back to you for a second, sir.  Sergeant, how long have you been a Nassau County police officer?

A    I just completed 31 years in April.

Q    All right.  What's your highest level of education?

A    I have a Bachelor's degree in accounting.

Q    Did you work as an accountant before you were a police officer?

A    Yes, sir.  I managed a CPA firm.

Q    And where was that?

A    When I left accounting, it was out by Northport.

Q    Why did you leave accounting?

A    I didn't enjoy it.

Q    Did you seek to go to the police department from accounting?

A    Yes, I had taken tests years prior because my father made me just as an option and when they called me years later, I said why not.

Q    Now, do you have any children?

A    Yes, sir.

A-1645

Iannucci - cross - Cuomo                    670

Q    How many?

A    I have three children.

Q    What are their ages?

A    My daughter is 28 and then I have two other children from a second marriage.  They're now 14 and ten.

Q    Are you married?

A    I'm widowed.

Q    I'm sorry.

Now, November 3, 2014, there was some discussion before about you got a call and my question is did you get a call on that evening or did a call come over the radio or something else?  How can you describe that for the jury.

A    I think the apartment description is called the dispatch over radio.

Q    Okay.  So you mentioned before that you were part of an anticrime detail.  What does that mean?

A    So, back then the anti crime detail, I was the supervisor in charge of it and I had a small group of members that we opted out of that substation, that estate precinct and through various meetings with my inspector who would be the commanding officer of the precinct, also with meetings with local leaders whether it be a council woman or sometimes clergy and we would gather up what the main concerns of the precinct.  Obviously the commanding officer would -- would be looking at stats, what are we having a problem with and that would be a priority

A-1646

Iannucci - cross - Cuomo                 671

and obviously the community members not so much stat related but-

THE COURT:  I am going to curtail this right now.  I know you're asking the question but let's keep it to the incident at hand and necessary context.

MR. CUOMO:  Your Honor, I believe this is context.

THE COURT:  All right.  Let's go to sidebar then.

(Sidebar held outside of the hearing of the jury.)

(Continued on next page.)

Sophie Nolan, RPR, NYRCR - Official Court Reporter

A-1647

Sidebar                                                672

(The following sidebar took place outside the hearing of the jury.)

THE COURT:  First of all, after what we saw with O'Brien, the fact that you would elicit testimony from him about the children and the fact that he's a widower --

MR. CUOMO:  This is really important.

THE COURT:  Sir, sir.  I am the judge.  You need to stop interrupting.  Just hold on.

There is zero relevance to him being a widower and the reasonableness of his actions towards this plaintiff or at any other time.  This is not at all relevant to this case and if you have a theory as to why that is relevant I would love to hear that from you in just a minute.  That's the first thing.

I didn't stop you.  I didn't tell the jury to disregard it.  I let it go.  I also let it go that he has three kids which is also not relevant whatsoever to the issues in this trial and whether he followed his Constitutional obligations on the night in question.

Now to go into his community meetings and anticrime unit and his role in the community -- I understand you are trying to get general context for how it is he came to be at the scene that night and the jury's assessment of the reasonableness of his actions.  That's why I very gently cut the witness off.  I let him complete his answer.

A-1648

```
                        Sidebar                        673
```

I don't mind additional context, but you are walking a very thin line here. Please address the is of the widower and the children. Why is that relevant?

MR. CUOMO: Mr. Brewington opened on the fact that Mr. Pfail is a member of the Catholic church in his community and is very engaged in his community.

So, are we to hear that the plaintiff is allowed to give some context about who he is, but the defendants are not? That is just unfair. It goes both ways.

I'm done. I have moved on from it. That's who he is. That's context in terms of terms whether a witness is credible, whether you like the witness or whether you want to understand or empathize with the witness.

THE COURT: Whether you like the witness?

MR. CUOMO: Yes. Jurors are doing it; do I like this witness, do I think he's credible. If we don't think jurors are determining whether they like a witness or not in terms of how they're evaluating that witness's testimony or whether that witness is truthful or not truthful, that's exactly what they do.

We've moved through it. With respect to the anticrime, it does to the reason why they're out there that night and his role in the precinct on that night.

THE COURT: I do not think there's any factual dispute whatsoever about the reason why they were there that

Sophie Nolan, RPR, NYRCR - Official Court Reporter

A-1649

```
                      Sidebar                          674
```

night.  He got into it extensively on Mr. Brewington's examination.  I will allow you to continue, but don't let me bring you over here again.

Mr. Brewington, is there anything you want to say about that for the record?

MR. BREWINGTON:  Judge, I was not happy about the children and the widower, but out of counsel, to whom I respect, I did not object, but if it does any further, I will object.

THE COURT:  All right.  Let's go back, please.

(Sidebar ends.)

(Continued on next page.)

Sophie Nolan, RPR, NYRCR - Official Court Reporter

A-1650

Iannucci - cross - Cuomo                 675

(Continuing)

THE COURT:  Okay.

MR. CUOMO:  You may continue.

DIRECT EXAMINATION

BY MR. CUOMO:

Q    Sergeant, so, without going into much greater detail about how anti-crime works, what was the particular detail that you were working that evening on November 3, 2014?

A    At that particular time, I had a concern of -- because of the recent break-ins -- of checking the cars in the parking lot in the retail corridor, restaurants, shops, and making sure no one was lurking around them, making sure nothing was already broken into that hadn't been discovered by the ownership.  And that was about it.

I had made the determination to hold myself and my officers over to continue until we finished the lot.

Q    And you mentioned the retail corridor.  What is that?

A    Well, in addition, my responsibilities are I have to be responsible for everything that occurs at the Roosevelt Field Mall.  That is the primary.  And then the liaisoning with the shop owners, the mall management, and security there and all the larger stores and commercial area up and down Old Country Road, whether it be Target, Walmart, et cetera.

Q    We've heard a lot about a substation.  Is that like a substation of the 3rd Precinct?

Iannucci - cross - Cuomo                    676

A    Yes, sir.

Q    And where is that located?

A    Three Transverse Drive in Westbury.

Q    And is that -- this incident that we are talking about here today that occurred at the Fairway, about how far from the Fairway was the substation?

A    It's literally across the street.  There is the parking lot and then it will it be maybe a block away to the north, northwest.

Q    Okay.  Now, there was some discussion before when you were being questioned by Mr. Brewington about why you responded to that call.  I think you mentioned or you agreed with Mr. Brewington that as a plainclothes anti-crime detail that you normally wouldn't respond to a 911 call.  Is that correct?

A    That is correct.

Q    Is there a particular reason that you responded to this 911 call?

A    Yes.

Q    What is it?

A    Well, it was twofold:  One, because we were literally in the parking lot next door and that's just commonsense.  But the reason we're there and we involve ourselves, which I think is the more important thing, is because the subject fled.

Q    So, when you say the subject fled, what do you mean by

A-1652

Iannucci - cross - Cuomo                          677

that?

A    Well, as everyone heard the call was for criminal mischief and broken window, that was it.  But the person that was accused of doing it had left the scene --

Q    Why?

A    -- And wasn't available.

Q    Why was that important to you?

A    Because there would have to be a search for him and, you know, to apprehend him if the complainant/victim, the owner of the window or the person responsible for the window wanted an arrest.

Q    And as the sergeant in that unmarked car, was it your determination we are going to go to see if we can give a hand at this place?

A    Yes, sir.

Q    And can you tell me how you got from where you were when you heard this call over the radio to the Buffalo Wild Wings?

A    Yes, Officer Panuthos drove from the one parking lot to the next.

Q    So we've seen the Jeep Grand Cherokee that you were in that night; right?

A    Yes.

Q    Can we just go back over -- I think you just mentioned Officer Panuthos was the driver?

A    Yes, I'm sorry.  Detective Panuthos.

```
                    Iannucci - cross - Cuomo                 678
```

Q    Now detective.

Where were you seated in that car at that time when the call came over the radio?

A    I believe in the front passenger seat.

Q    Is that also known as the recorder seat?

A    Yes, it is.

Q    What does that mean?

A    Generally, in an RMP or police vehicle, if there's two people in the vehicle -- the driver is called the operator and the front seat passenger is called the recorder.  He would be the one transmitting on the radio anything that was going on, what they were doing or what they were requesting.

Q    I think we've heard that you had a third that night because you didn't have an even number at roll call?

A    That is correct.

Q    And was that now Inspector Massaro?

A    Yes, it was.

Q    And he was seated in the back?

A    Yes, directly behind me.

Q    Okay.  When the call comes over the radio, do you actually say to Detective Panuthos let's head over there?

A    I don't recall.

Q    Okay.  Would it have been your call, though, to head over there?

A    Yes.

A-1654

Iannucci - cross - Cuomo                    679

Q    Did you eventually get to the Buffalo Wild Wings?

A    Yes, sir.

Q    Now, we've heard some talk about the windows tonight. Whether you got the call over the radio or when you heard the call over the radio, were there any windows in your car, or in the vehicle and you were in the recorder seat, were any of the windows open?

A    My window was open.

Q    Why do you remember that?

A    Well, I generally drive around with the window open when we're listening and looking for anyone that might be sneaking around.

Q    Okay.  And prior to getting the 911 call over the air, were you driving around looking for people who might be sneaking around?

A    Yes, sir.

Q    Okay.  Did you eventually get to the Buffalo Wild Wings?

A    Yes, sir.

Q    About how long did it take you to get there?

A    Under a minute, 25 seconds, 30 seconds.

Q    Okay.  And were you able to drive up right near the scene?

A    Yes, sir.

Q    Okay.  And what happened when the car came to a stop near the scene?

```
                    Iannucci - cross - Cuomo              680
```

        Describe to me what you did next?

A    I exited the vehicle.

Q    Okay.  Any particular reason you exited the vehicle?

A    Yes.  I wanted to see what the details were of this incident.

Q    Were there Nassau County police personnel there already?

A    Yes.

Q    And do you recall who or how many people were there from Nassau County Police Department at that time?

A    To the best of my recollection, there was at least two uniformed members of the department.

Q    Okay.  And do you recall who they were?

A    I recall who the uniformed sergeant was.

Q    And who was that?

A    That was Sergeant Glenn Johnson.

Q    And then I think you said there was another uniformed officer there?

A    Yes, sir.

Q    Do you recall who that person was?

A    I do not recall.

Q    Okay.  Were there other people standing with them?

A    Yes, sir.

Q    Were you able to identify any of those other people in any way?

A    I'm sorry, identify them as?

A-1656

```
                    Iannucci - cross - Cuomo                  681
```

Q    Who they were or what their role was in this situation.

A    Yes.  Some of them appeared to be Buffalo Wild Wings employees.

Q    How did you determine that?

A    They were wearing the Buffalo Wild Wings shirt.

Q    And did you talk with anybody while you were there?

A    I don't recall if I spoke to Sergeant Johnson or not or if he spoke to me.  I didn't speak to anyone else.

Q    And why didn't you speak to the Buffalo Wild Wings folks?

A    They were being interviewed by the officer.

Q    Okay.  Was there -- so was it -- you said the Buffalo Wild Wings folks was there.  Was there one, two, three?  How many, do you recall?

A    I believe there was three.

Q    Was there anybody else in that group of people?

A    Yes, there was.

Q    And did you know that person?

A    I didn't know the person.

Q    Can you describe that person for the jury?

A    Other than being a female Caucasian, she was on the phone and crying.

Q    That's what you observed?

A    Yes.

Q    Did you hear what she was saying?

A    The only thing I recall is come back and please.

A-1657

Iannucci - cross - Cuomo                              682

Q    Did you have any communication yourself with her or did you just listen to her?

A    I just listened.

Q    Did you observe the door that was broken?

A    I don't recall.

Q    Okay.  But were you aware of at the time that it was claimed that a door had been broken?

A    The glass on the door, yes.

Q    And to your understanding, was that the reason the police were there when you got there?

          MR. BREWINGTON:  Objection.

          THE COURT:  Sustained.

Q    What was your understanding as to why Nassau County police were there when you -- already there when you got there?

A    Because the management or employees of Buffalo Wild Wings had called after a patron had broken the glass on the door.

Q    Now, did you hear anything about this patron who had broken this glass on the door when you were in that group of people?

A    Yes, sir.

Q    And what did you hear?

          MR. BREWINGTON:  Objection.

          THE COURT:  Overruled.

A    I --

Iannucci - cross - Cuomo                    683

THE COURT:  Just what you were personally told or heard that night while you were there.

THE WITNESS:  Yes, Judge.  At that scene I had heard that he was accused of being intoxicated and he was cut off from being served, that he got angry, and as a result of that, he -- as he left, he broke the glass on the door.

Q    Now --

A    I'm sorry.

Q    -- you didn't see any of that; correct?

A    No, sir.

Q    Now, why was it important for you as a sergeant at that time that you heard that information?

A    Well, my purpose aluminum knowing that a call had come out that there was someone who broke a window and fled, I -- before you start to look for someone, one, you needed to know who you're looking for; two, you have to know there is actually a crime or reasonably believe that there was a crime committed; and three, that the person who would be considered the victim wants an arrest, otherwise there's no sense looking for the person if they don't want them arrested, if they just want a report.

Q    Based on what you heard, did you reasonably believe in your mind that there was a need to go out and look for this person?

MR. BREWINGTON:  Objection.

A-1659

```
                   Iannucci - cross - Cuomo                    684
```

THE COURT:  Sustained.

Q    What did you believe -- what did you think in your mind having heard that?  How did that determine your next course of action?

A    Well, while there, I believed that a crime was committed and I was convinced that the people wanted the person responsible arrested, and we obtained enough of a description to begin looking.

Q    And how did you get that description?

A    I had overheard while they were being interviewed by the police that were taking the report.

Q    And what was the description?

A    I --

MR. BREWINGTON:  Objection.

THE COURT:  Okay.  Is this something that you recall specifically in your memory from the time?

THE WITNESS:  It's going to be an easy one because I really don't recall.

THE COURT:  So, let's move on.  Just so you know, I know you have reviewed a lot of documents in the case.  He is asking you questions about what you knew and were aware at the time.

THE WITNESS:  Yes, Your Honor.

Q    Did you get back in your car?

A    Yes.

A-1660

```
                    Iannucci - cross - Cuomo                    685
```

Q    Did you get back in the recorder seat?

A    Yes, sir.

Q    Did you put a call out over the radio after that?

A    I believe I put out a description.

Q    Okay.  So, at some point you heard a description, you just don't recall it today?

A    Yes.

Q    That evening, having heard a description at the scene, you put that description out over the radio?

A    Yes, sir.

Q    What was the purpose of putting it out over the radio?

A    To allow the other available units in the area who would be and should be looking for the subject would have the description.

Q    And I think before we heard the term was sector cars?

A    Yes, sir.

Q    So those are the marked cars?

A    Yes, sir.

Q    Okay.  So by -- what did you believe would happen when they put this description out over the radio?

A    That the cars in the area, or that responded to the area for this would look for that person in the description.

Q    Okay.  Did you decide that you and now Detective Panuthos and now Inspector Massaro would also engage in that search?

A    Yes, sir.

Iannucci - cross - Cuomo                    686

Q    Okay.  So after making that decision and putting out that description over the radio, what did you tell Detective Panuthos to do?

A    I told him to go in the direction that he was last seen, which would have been west, to the back of the parking lot.

Q    When we say to go in the direction he was last seen, who is he?

A    The person who broke the window.

Q    Do we now know that to be Mr. Pfail?

A    Yes, sir.

Q    Let's just be clear, Mr. Pfail was convicted of that; correct?

A    Yes, sir.

Q    And how is it that you came to know or that you came to believe that Mr. Pfail had gone west?

A    That was the statements given by the witnesses or witness that I overheard.

Q    So you overheard that at the Buffalo Wild Wings?

A    With the description, correct.

Q    Okay.

THE COURT:  Mr. Cuomo, we are going to take a short afternoon break since we are ending at 4:00 today.  Let me know if this is a good.

MR. CUOMO:  Perfect time.

THE COURT:  So let's take a break.  We will try to

A-1662

Iannucci - cross - Cuomo                 687

keep it to a little more than five minutes to keep things
moving.  So we will see you all back here at approximately
3:15.

Thank you all.

(Jury exits the courtroom.)

MR. CUOMO:  Perfect.

THE COURT:  Okay, you are all welcome to step out
for a minute.  I will see you in five.

MR. BREWINGTON:  Thank you.

THE WITNESS:  Your Honor, may I?

THE COURT:  Absolutely.

(Recess taken.)

THE COURT:  Can we have the witness back.  Let's
have the jury.

You can all be seated.

THE COURTROOM DEPUTY:  All rise.

(Jury enters.)

THE COURT:  Have a seat, everyone.  All right.  Mr.
Cuomo, you may proceed.

MR. CUOMO:  Your Honor, if I may have the last
question read back, it will just refresh me to where I was.

THE COURT:  Sure.

(Record read.)

Q    Before we go any further there, Sergeant, I just want to
go back to this overtime issue for a second.

A-1663

Iannucci - cross - Cuomo                    688

Is there anything particular about that time of year, November 3, 2014, regarding the activities you were doing and as an anti-crime unit in the commercial corridor there?

A    Well.

MR. BREWINGTON:  Objection.  Form.

THE COURT:  I will allow it.  Overruled.

A    Well, we gear up in the retail areas, at least for the police department's response, right after Halloween up to until black Friday, which is pretty busy, Roosevelt Field, in that area, generally up to January 1st, we have to prep, so models, plans, how we are going to deal with the shoppers.

Q    When you made a determination that night to authorize overtime for yourself and for Officers Panuthos and Massaro, was that a unilateral decision that you made or did you have some authority from someone else to make that type of determination?

MR. BREWINGTON:  Objection.

THE COURT:  Sustained as to form.

Q    You were the ranking officer in that car?

A    Yes, sir.

Q    In your precinct, were there people who were higher than you?

A    Yes, sir.

Q    Okay.  Did they give you direction?

A-1664

Iannucci - cross - Cuomo                    689

A    I answer answered directly to the commanding officer. And, yes, I have direction from him.

Q    So when you say you authorized overtime that night, was that -- was your authorization of overtime previously authorized by a commanding officer?

A    Yes, I have the authority given to me by the commanding officer.

Q    And what was the purpose that the commanding officer was giving you that authority?  Why was he giving you that authority?

A    He was giving me that authority so I could complete my tasks that I felt were necessary.

Q    Were you in the process of those tasks as an anti-crime unit when that call came over the radio about Buffalo Wild Wings?

A    Yes, sir.

Q    Okay.  After you put the call out over the radio, what happened next?  Where did you go next?

A    I had -- we had driven to the west end of the parking lot of Buffalo Wild Wings up to the fence line that would separate it from the next shopping center that starts with the Home Depot.  And I had informed officer -- Detective Panuthos and Inspector Massaro that I would be getting out of the vehicle and my intention was to go on foot, over the fence and into the Home Depot parking lot to check the sheds.

A-1665

Iannucci - cross - Cuomo                    690

MR. CUOMO:  Your Honor, can we have Exhibit Quintuple F in evidence put up, please.

Quintuple F, the overhead of the area.

THE COURT:  While he is looking for that, do you want to do any preliminary questions, anything along those lines?

MR. CUOMO:  Yes.  No problem, Your Honor.

Q    Buffalo Wild Wings, what road is that located on?

A    The address is Merrick Avenue.

Q    And I think you mentioned or somebody mentioned before while we were going through this, is Merrick Avenue the kind of the eastern end of that commercial corridor?

A    Yes, sir.

Q    And just generally describe for the jury where the Buffalo Wild Wings parking lot is in relation to the building of Buffalo Wild Wings?

A    I'm sorry.  Repeat the question.

Q    So the building is on Merrick Avenue?

A    Correct.

Q    And the parking lot for Buffalo Wild Wings, is it located on either side, around the back, some other way that you can describe it?

A    Yes, I understand.  The parking lot would be to the west, to the rear of Buffalo Wild Wings.

Q    So was it your intention to go west in the parking lot?

A-1666

Iannucci - cross - Cuomo                    691

A    Yes.

Q    While going west in the parking lot, were you guys looking for Mr. Pfail?

A    When we got to the fence line, yes.

Q    Did you look for him before you got to the fence line?

A    I believe we just drove to the end of the parking lot to the fence line.  There's a little bit of bushes a little bit over here.  And then I made the determination to climb the fence and keep going west.

Q    Why did you make the determination to climb the fence?

A    Well, my experience, I -- if someone is fleeing on foot, it's usually beneficial to also go the same way because you're going to encounter the same hazards which would possibly change your decision that maybe I have to go this way because there's an obstacle here, I would foreseeably take the same route and run into the same obstacles.  That's why I made the decision to jump the fence.

          MR. DORFMAN:  Counsel, I think I do have it now.

          MR. CUOMO:  If we can put up quintuple F.

Q    Do you have that in front of you, Sergeant?

A    Yes.

Q    Are you able to identify where the Buffalo Wild Wings is in that exhibit?

A    Yes, sir.

Q    Just if you can tell the jury generally where you see it,

A-1667

Iannucci - cross - Cuomo                    692

until it stops moving?

MR. DORFMAN:  There we go.  Sorry about that.

A    Yes, sir.  It's actually marked Buffalo Wild Wings with a little like fork and knife in the upper right-hand portion of that photograph.

Q    And the parking lot that seems to be behind it, would you agree with me that's a parking lot behind it?

A    To the left of the building, yes.

Q    And from the building -- moving to the left on the photograph, what compass direction is that?

A    That is primarily west.

Q    Okay.  And you heard when you were listening to the witnesses talk about he went in that direction.  Did they point to the fence or did you observe something like that?

A    I don't recall.

Q    But at some point that evening you determined to go in that direction?

A    Yes, sir.

Q    Okay.  Do you have any recollection -- or do you have any understanding now why you determined to go in that direction?

A    Yes, it was because of what we had overheard at the scene.

Q    All right.  Did you walk down to that end of the parking lot?  Did you drive or something else?

A    No, I went in the car to that end.

A-1668

Iannucci - cross - Cuomo 693

Q    And you were here when Detective Panuthos testified?

A    Yes, sir.

Q    And do you remember how he drew the lines on the map here?

MR. BREWINGTON:  Objection.

THE COURT:  I think just for context only.  It is overruled.

That said, you can conduct your examination.  I think we've had a lot of testimony about some undisputed facts about the map and got the lay of the land.  So when you are ready to move to another area --

MR. CUOMO:  I'm going to fill it in and move on.

Q    So at the back of the parking lot or to the west end of the parking lot, I think you mentioned that there was a fence line?

A    Yes, sir.

Q    And you had to hop that fence?

A    Yes.

Q    Were you successfully able to hop that fence?

A    Yes, I was.

Q    Now, when you got out of the car, what did you have?

A    I had my sidearm.

Q    Okay.

A    I had my flashlight.  I had my handcuffs, and I believe I had possibly pepper spray in my pocket.

A-1669

Iannucci - cross - Cuomo                      694

Q    Okay.  And what was the purpose of hopping the fence there?

A    It was to, one, experience the same thing had the -- Mr. Pfail gone that way, so I can encounter the same environment. And the ultimate goal was to start to search those sheds just on the other side of the thoroughfare, which is just on the other side of the fence line.

Q    And those sheds that we're talking about, are they related to some business or something that you know of?

A    Yes.  They're the Home Depot models of sheds they sell.

Q    Okay.  Why did you think to go there?

A    Well, because I know those sheds are open and accessible. Someone might consider them a good place to hide or be out of view.

Q    What time of night was this?

A    This is sometime after 10:00 p.m. or after the call, minutes, maybe 10:20, 25.

Q    And how is it that you were familiar with the fact that these sheds were there?  What was it about the part of this Home Depot parking lot -- why did you know sheds were there?

A    I work in close proximity to the area.  Home Depot, not necessarily that late at night, there's not a lot of cars parked there.  But we had had problems with the shed.  We've had problems with the sheds with homeless people sleeping in them or other people doing drugs inside them.  So I was aware

A-1670

```
                    Iannucci - cross - Cuomo                    695
```

of the sheds through prior experience and exposure.

Q    Did you ultimately go and search those sheds?

A    Yes, sir.

Q    Did you find Mr. Pfail in any of the sheds?

A    No, I did not.

Q    Did you finish searching the sheds?

A    Yes, sir.

Q    What happened then?

A    So when I jumped the fence, I came out on the northern section of the sheds.

         If I touch this, does it draw anything?

         THE COURT:  I'm not the one to ask about that.  It might.

         THE WITNESS:  No, I don't think.  It didn't do anything.

         THE COURT:  See if you can do it without touching and go from there.

A    If you are following where I climb over, you might see like little orange squares or roofs kind of going north to south or from the top to the bottom.  Those are primarily where the sheds are.  I'm on the north end when I come across them, and I work my way south or down towards the front of Home Depot.  There's only like seven or eight sheds.  As I got to -- as I finished that up, then officer -- a sector car, a marked unit, a uniformed officer pulled up and asked me what

```

Iannucci - cross - Cuomo                              696

he should be doing.

Q    Do you remember the name of that officer?

A    I believe it was Officer Russell.

Q    Okay.  What did you tell Officer Russell to do?

A    I told him to -- I indicated to him to go around the back of the Home Depot from where we were standing and I pointed to my left, because I'm in the -- I'm in the top right corner of the Home Depot, if you see a large Home Depot building.  So I indicate down along the side, which would be the east side of Home Depot and instruct him to go check the back.  So, all those buildings.

Q    And did you observe Officer Russell drive the RMP in that direction?

A    Yes.

Q    What did you do next?

A    I started to walk along that thoroughfare in front of the Home Depot westbound.

Q    What happened next?

A    Detective Panuthos pulled up and picked me up.

Q    What seat did you get in?

A    The front passenger seat.

Q    Was the window still open in that front passenger seat?

A    Yes, sir.

Q    Okay.  Now, just back in the sheds for a minute, can you describe the utility of your flashlight while you were out

A-1672

Iannucci - cross - Cuomo                    697

looking in the shed?

A    By utility, you mean what?

Q    What did you use it for?  Why do you need a flashlight?

A    I need it to see into places that are dark.

Q    When you get back in the car, where do you put the flashlight?

A    It's my hand on my lap.

Q    Why?

A    That's generally where I carry it at night.

Q    And can you describe -- why is that where you carry it at night?

          Why isn't it someplace that you just have it that you can put it?

A    If you put it down somewhere, if you put it between the seat, if can get stuck or falls between the seat.  If you put it on the floor, it rolls under the seat.  When you need, you might not have it.  Over the years, habit, I've kept it in my hand.

Q    It's kind of a habit for you?

          MR. BREWINGTON:  Objection.

          THE COURT:  Sustained.

Q    When you got in the car, did Detective Panuthos start driving the car again?

          THE COURT:  Can we bring the lights up or should we keep them down?

A-1673

```
            Iannucci - cross - Cuomo                    698
```

MR. CUOMO: We can bring them up. We can take it down.

Q    After you got in the car, what happened?

A    Detective Panuthos continued down the thoroughfare in front of the stores westbound.

Q    Okay. At some point did you come -- did you observe Mr. Pfail?

A    Yes, sir.

Q    And when you observed him, about how far from him were you?

A    When I first observed him?

Q    Yes.

A    I believe 50, 65 feet approximately.

Q    Do you have a recollection of who was the first person in the car to flag Mr. Pfail as the possible subject that you were looking for?

A    I know I said there he is, but I don't know if anyone else. I don't recall if anyone else said anything or they had already seen him. I don't know.

Q    There he is. That's a pretty definitive statement. Why did you think it was him?

A    Because he matched the description that we were provided.

Q    Anything else?

A    As we got closer, he seemed agitated.

Q    And when you first observed him 50 to 65 feet away,

A-1674

Iannucci - cross - Cuomo                    699

approximately how quickly was the car moving?

A    To the best of my recollection, I would put us at maybe
10 to 15 miles per hour.

Q    When you say he was agitated, describe for the jury why
you believe he was agitated.

A    The manner in which he was walking.  He was pacing and he
was turning abruptly and he was obviously on the phone, from
what I could see, and he was yelling.

Q    As you were driving up to him, you were able to hear the
yelling?

A    Yes.

Q    Did you hear what he was saying?

A    I heard cursing.  Words to the effect of I'm not coming
back.

Q    What happened next?

A    We exited the vehicle.

Q    And just describe how that happened.

A    I exited my side, the passenger side of the vehicle, and
I opened Inspector Massaro's door, because he was seated right
behind me, and he couldn't open it himself.  I believe I
closed my door.  And we proceeded walking around the back of
the vehicle.

Q    Okay.  Did you get out with your flashlight?

A    Yes, sir.

Q    Why?

A-1675

Iannucci - cross - Cuomo                700

A    Because it's nighttime and it's habit for me.

Q    Okay.  But I think you told Mr. Brewington, though, that it was well-lighted in the area?

A    It was well lit where we were getting out.

Q    Did you need the flashlight to view anything right at that moment as you got out of the car?

A    No, sir.

Q    So apart from habit, was there any particular concern that you had as to why you would carry the flashlight with you?

A    Yes, sir.  We are looking for a subject who fled the scene of a crime.  It is in my experience very likely that when he comes upon the police or when the police comes upon him, he is going to flee again.

Q    Is that based upon at that time your 20-some-odd-years of experience?

A    21 years' experience, I believe it is 21.

Q    Had you ever had an experience before where someone who fled the scene when you located them that they fled again?

        MR. BREWINGTON:  Objection.

        THE COURT:  Overruled.  But let's move on.

A    Yes.

Q    Did you take the flashlight with you for any other reason?

A    No, sir.

A-1676

Iannucci - cross - Cuomo                    701

Q    If it was lighted there, though -- I want to drill in a little bit more on this.  If it was lighted, what were you concerned about needing the flashlight?  What was around that area?

MR. BREWINGTON:  Objection.

THE COURT:  Asked and answered.  Let's move on.

MR. CUOMO:  Your Honor, may we have a quick sidebar.

THE COURT:  Okay.

(Sidebar held outside of the hearing of the jury.)

(Continued on next page.)

A-1677

```
                    Sidebar                     702
```

(The following sidebar took place outside the hearing of the jury.)

THE COURT: Yes.

MR. CUOMO: I expect at some point Mr. Pfail is going to testify, based upon his deposition, that he was struck with this flashlight. And I suspect at some point Mr. Brewington is going to contend that Sergeant Iannucci got out of the car with the flashlight because he wanted a weapon. So the jury has to be given context as to why he might carry a flashlight into a lighted area.

THE COURT: I don't disagree with you at all. I just think you have gone there a few times and have already established it.

MR. CUOMO: But I don't think I have established it yet.

THE COURT: I think he was looking for someone who had already fled. He might be in the shed.

I think I have heard you say a few times and I, frankly, think you are losing the jury a little bit on this, because they are ready for you to get to the incident, which is, just as a pure trial management issue, why I sustained that objection.

They've heard all about the reasons he carries the flashlight. They've heard about Mr. Pfail fled. They've heard about how they haven't see him, how they were looking in

A-1678

Sidebar 703

the are, how he could be hiding in the sheds or hiding in other places.

So I think anyone paying attention knows why he took the flashlight out of the car, which is why I sustained the objection, and I think your record is clear, okay.

MR. CUOMO:  All right, Your Honor.

THE COURT:  Thank you.

(End of sidebar conference.)

(Continued on next page.)

Iannucci - cross - Cuomo                    704

(In open court.)

THE COURT:  Okay, you can proceed.

Q    Now, Sergeant, who was closest to Mr. Pfail when the three of you got out of that car, that SUV?

A    Detective Panuthos.

Q    As you got out of the car, did you hear Detective Panuthos say anything?

A    Yes.

Q    What did you hear him say?

A    I heard him say words to the effect of hey, buddy, police, can we talk to you.

Q    At that time, how long had you been working with Detective Panuthos?

A    For about a year.

Q    Okay.  Had you had the occasion to arrest other people or talk with other people about potential issues while working as police?

A    Yes.

Q    Was that something that you commonly heard Detective Panuthos say in terms of addressing people?

MR. BREWINGTON:  Objection.

THE COURT:  Sustained.

Q    When you got out of the car -- or let me ask you this, how do you identify yourself in terms of your dress when you're in plainclothes?  What is it that identifies you as a

A-1680

Iannucci - cross - Cuomo     705

police officer?

A    The shield that hangs around our neck.

Q    And how does that hang around your neck?

A    Either from a lanyard of some sort or a metal chain at about right here, where your rib cage meets, kind of that general area it will hang.

Q    And were you displaying your badge in -- your shield in that manner that evening?

A    Yes, sir.

Q    Okay.  Do you recall if Detective Panuthos was displaying his badge in that manner that evening?

A    Yes.

Q    How about Inspector Massaro?

A    Yes, he was.

Q    Other than Detective Panuthos saying hey, buddy, we are police, can we talk with you, did either you or Inspector Massaro say anything while you were walking?

A    I don't recall.

Q    What was the order?  Who was closest and who was furthest as you were getting out of the car?

A    It was Detective Panuthos, Inspector Massaro, and then myself.

Q    Now, at some point -- or how did Mr. Pfail respond to the identification by Detective Panuthos that you were police and wanted to talk to him?

A-1681

Iannucci - cross - Cuomo                 706

A    His response is I'm not talking to the police.  And --
I'm sorry -- and then taking that step to the left, like that
sudden step to the left.

Q    When he made that step to the left, what was the thing
that you did in response?

A    I started to run towards him.

Q    And why?

A    Because I believed he was going to flee again.

Q    Okay.  And he had already fled the scene of the crime he
committed?

        MR. BREWINGTON:  Objection.

        THE COURT:  Sustained.

Q    If you could, why did you believe that he was going to
flee, just because of that step?

        MR. BREWINGTON:  Objection.

        THE COURT:  Sustained.

Q    But did he flee?

A    Did he flee from --

Q    From the Fairway?

A    No, he did not.

Q    What did he do then?

A    He took that one sudden step and then immediately turned
back and with his left hand jabbed at the air and said come at
me, motherfuckers.

Q    Now, was it possible that he was putting his hand up to

Iannucci - cross - Cuomo                    707

say stop?

A    No.

Q    Why do you say that?

A    Because I have been in several altercations.  At that time, I was a 46-year-old man.  I've had a lot of experience in my personal life and outside -- in my professional.

Q    Not in your personal life, sir?

A    Okay.  In my professional life and I could -- I was closer to him than the video camera that captures it and I was at eye level with him and I know what a jab at the air is.

Q    And what did he do next?

A    He -- to me, he appeared he braced himself, cocked back his right arm.  He put up his jab arm, his -- it would be my weak arm -- in a fighter stance, and he threw a punch at Detective Panuthos.

Q    But you mentioned before he didn't run at you or Inspector Massaro or Detective Panuthos; correct?

A    He did not.

Q    He actually -- I think in the video --

          THE COURT:  Let me just ask you to avoid the leading, please.

Q    So based upon what he did, what did you do next?

A    Well, as I previously mentioned, when he took that quick step to the left, which I interpreted he was going to flee, we or I began running at him.

A-1683

```
                    Iannucci - cross - Cuomo                    708
```

Q    Did you observe what officers Massaro and Panuthos did at that time?

A    They also began running.

Q    And were they still in front of you at that point?

A    Yes, sir.

Q    And who got to -- who came in closest proximity to Mr. Pfail first?

A    Detective Panuthos.

Q    And then who was next?

A    Inspector Massaro.

Q    Okay.  And did their momentum coming at him bring everybody to the ground?

A    That is what I observed to be, yes.

Q    What did you do after you went to the ground?

A    I positioned myself in between Detective Panuthos and Inspector Massaro and began assisting and trying to pin him down, Mr. Pfail down and attempting to grab one of his arms.

Q    Why were you doing that?

A    In order to put handcuffs on him and keep him at the scene.

Q    Just tell the jury why is it that you were going to handcuff this person.

A    Well, because he had, at first -- well, first of all, he had fled the scene of the criminal mischief, the broken window, and his first action was -- caused us to believe he

A-1684

Iannucci - cross - Cuomo                    709

was going to run, and then his second action was to openly challenge us in his actions and his words.

Q   Do you believe that you and your men that evening appropriately identified yourselves as police to Mr. Pfail?

A   Yes, sir.

Q   How did you do that again?

A   Well, other than our shields around our neck, Detective Panuthos indicated that we were the police and that we wanted to talk to him.

Q   During the course of trying to get control of Mr. Pfail, did you sustain an injury of any sort?

MR. BREWINGTON:  Objection.

THE COURT:  Sustained as to form.

Q   While apprehending Mr. Pfail, did you sustain an injury?

A   Yes.

Q   Where did you sustain that injury?

A   My left hand.

Q   Do you know exactly how you injured yourself that day?

A   Yes -- well, yes, I believe -- I believe there were multiple things that hurt my hand.

Q   What were those multiple things?

A   Initially, in the initial rolling around, my hand had struck the ground while trying to gain control of Mr. Pfail. And while my hand was hurt, it further hurt, whether it be aggravating the initial hurt or re-injuring that same hand, it

A-1685

Iannucci - cross - Cuomo                710

got caught in the open cuff at one point when he was cuffed on his one hand.

So I had -- everyone knows what the handcuffs look like when they're closed.

So one is cuffed around his left wrist and the other one on the end of the chain is his -- it's closed.  It's not like open, and my thumb is in it.  I had to let go with my right hand of the handcuffs.  And during the struggle, he was able to pull that hand back and under him.  So this hand felt like it was overextended and caused pain.  And then it went under him with that metal cuff in my hand and under his body and that struggle between the ground, and it hurt more.  So, between those three things -- I'm not trying to give more weight to one or the other, it caused the pain to my hand.

Q    And that evening you sought medical treatment?

A    Yes.

Q    Did you undergo medical treatment after that?

A    Yes.

Q    What types of medical treatment did you undergo for that injury?

A    I have a hand doctor.  I had a previous injury.  I injured my other hand.  So I go see this doctor who is a hand specialist.  And he treated me in the next day or so.  I don't recall if I went the next day or a couple days after.

Q    Did that hand, that left hand that you injured that

A-1686

```
                  Iannucci - cross - Cuomo                 711
```

evening, November 3, 2014, how long -- did it give you any problem or any difficulty over the next several months?

A    My hand --

MR. BREWINGTON:  Objection.

THE WITNESS:  Sorry.

THE COURT:  Yes, Mr. Brewington.

MR. BREWINGTON:  Just objecting to the testimony about the next several months.

THE COURT:  Sustained.

Q    Was there any period of time after that evening --

THE COURT:  Sustained.  This is not an appropriate area of inquiry for this trial.

Q    Now, you were here when Inspector Massaro testified; right?

A    Yes, sir.

Q    You heard a lot about him being bitten by Mr. Pfail?

A    Yes, sir.

Q    What did you do when you heard that Mr. Pfail was biting Inspector Massaro?

MR. BREWINGTON:  Objection.

Assumes a fact.

MR. CUOMO:  It's been testified to.

MR. BREWINGTON:  Not through this witness. Objection.

THE COURT:  Sustained.  Let me have you briefly lay

Iannucci - cross - Cuomo                    712

a foundation.

Q    While this struggle to subdue Mr. Pfail was ongoing, did you hear at any time Inspector Massaro exclaim anything about what was happening to him?

A    Yes, sir.

Q    What did you hear?

A    He yelled he's biting me, he's biting me.

Q    In response to that, what did you do?

A    Okay.  Well, at that point, as I previously mentioned, we had just gotten the one handcuff on his left arm, and I was holding, as I said, the open cuff and pulling it so that his arm was in back of him, his lower back, to give him the least amount of leverage.  And my weight was on top of him.  My other hand was holding the cuff that was on his wrist.  And I was using a pain compliance technique, where the one that is locked on the wrist, you kind of press it against the bone. It causes like a pain that generally has people cooperate with you, you know, or are more compliant.

When he started yelling -- that's what position I was in when I heard him say he's biting me, he's biting me. My weight was forced down on him to keep him from getting back up.

When he said that, I pivoted on to my left side.  I removed my right hand from what I was doing helping to hold that arm, and I began to cock back my hand to try and throw a

Iannucci - cross - Cuomo                    713

punch.

Q    What was the purpose of throwing that punch?

A    To get Mr. Pfail to stop biting Inspector Massaro.

Q    To your understanding or to your knowledge, did any punch you throw have that effect?  Did it stop the biting?

A    I personally didn't see if it had any positive effect. He stopped saying he was biting.  Because I was thrown off balance when I tried to throw this punch.  I didn't have the distance that the punch being thrown should have had.  I was farther away.  I was overextended.  And because I was thrown off balance, I tried to throw myself down.  So I come down like this.

My recollection is I hit him in the right shoulder because he's trying now to rotate over.  He was almost all the way on his stomach.  He's rotating back.

As I said, my hand is in that cuff and that's what's going under him, I'm just trying now not to lose what leverage we had on him to put my body back down.  So my fist comes off his right shoulder --

MR. BREWINGTON:  Objection to the narrative at this time, Judge.

THE WITNESS:  Sorry.

THE COURT:  Have you finished with your answer?

A    It comes off his right shoulder and I believe it comes across his cheek or head.

A-1689

Iannucci - cross - Cuomo                714

Q    Where was the flashlight at that time?

A    My recollection of that moment, I have no idea where the flashlight is.

Q    Did you drop the flashlight on one or more occasions during the course of this?

MR. BREWINGTON:  Objection.

THE COURT:  Sustained.

Q    When you first went to the ground to help officers Panuthos and Massaro, did you still have the flashlight with you?

A    Yes, sir.

Q    What happened -- during the course of trying to subdue Mr. Pfail and place him under arrest, what happened with the flashlight?

A    Well, the flashlight was in my hand some of the times and some of the times it was on top of Mr. Pfail between our bodies.  Any time I felt like it was getting away, I tried to grab it back and keep it close to me.

Q    Why are you trying to keep it close to you at that point?

A    Because I needed both my hands and now I had one of them occupied with the flashlight that I feared that if it -- if I lost control of the flashlight that he might grab the flashlight and now be on me.

MR. BREWINGTON:  Objection, Judge.

THE COURT:  Overruled.

Iannucci - cross - Cuomo                    715

Q    Simple question:  Did you ever hit Mr. Pfail with that flashlight?

A    No, sir.

MR. CUOMO:  Your Honor, I'm about to get into the video.

THE COURT:  Okay.  Why don't we then break a little bit early before we get into the videos.

Ladies and gentlemen, we are going to adjourn.  As you know, it is a three-day weekend because we are not having court on Monday due to a scheduling issue.

You can leave your notepads in the jury room for the weekend.  We will see you back on Monday before 10:00 a.m.  I hope you have a safe and happy weekend.

If any emergencies arise, you can contact Freddie, otherwise we will see you back here as schedules.  And remember, please don't discuss the case with anyone in your lives.  You can simply say trial is continuing next week.  You don't know when it will end, except that we anticipate it will be on schedule.

Thank you for your patience and have a good weekend.

(Jury exits the courtroom.)

THE COURT:  Okay.  Everyone can have a seat.  You are welcome to leave the witness stand.

THE WITNESS:  Thank you.

THE COURT:  Just remember you are on the stand

```
                         Proceedings                    716
```

technically, so don't discuss your testimony with anyone, including your lawyer until it is concluded on Tuesday.

THE WITNESS:  Okay.

THE COURT:  Obviously you can tell your employer or anybody else that you are still testifying.  But other than the schedule, please don't discuss your testimony.

THE WITNESS:  Yes, Your Honor.

(Witness steps down.)

THE COURT:  Let me now, in the time we have, turn to the list I have for you all.

First, let me ask you all, as I look at the pending motions on some of the evidentiary issues, this question of Mr. Pfail's intoxication -- and I think I'm fine to discuss this with the parties present, but if at any point anyone thinks I should excuse them --  and also let me just say to the individuals, you are all welcome to leave.  I'm just going to talk about some legal issues with the lawyers.  So you can try to beat the traffic now or you can stick around or whatever you prefer.

On this question of Mr. Pfail's potential intoxication or lack thereof, we've heard some testimony about what was told to the officers.  I heard in Mr. Brewington's opening that Mr. Pfail is denying he was intoxicated.

I guess what I'm wondering is why does it matter to the disputed issues in the case?  That is, we know the

A-1692

Proceedings                                              717

officers had some limited information, a report from Buffalo

Wild Wings that they had every reason to credit that he had

been intoxicated and had been cut off.  But why does the fact

whether he was or wasn't matter since, as I heard it, none of

the officers thus far testified to smelling alcohol on his

breath.  They had only been there to witness his actions

before the arrest began.  And no one -- none of the officers

seems to be justify they were relying on the intoxication as

justification for the reasonableness of their actions and

plaintiff isn't relying on it as any kind of defense.

           I see Mr. Dorfman is standing and volunteering to

tell me why it matters.

           MR. DORFMAN:  It matters for two reasons, Judge.

First, it matters because it goes to his ability to perceive

and make memories on the day and to accurately relay those

memories to the jury.

           THE COURT:  Okay.

           MR. DORFMAN:  And second, because Mr. Brewington

made it an issue in the opening.  So, I think initially, you

know, we didn't include the audio from the 911 call because we

didn't think there would be a great deal of back and forth

about this, and we were happy to rely on what was relayed to

the officers at the time.  But now -- where maybe it wasn't in

dispute, now it seems to be squarely in dispute and an issue

for the jury to decide.  If that's the case, then we ought to

A-1693

Proceedings                                    718

be able to put in all of the evidence we have on that issue.

THE COURT:  All right.  I think I understand your position.  So I think the defendants have established the relevancy of that issue.  They simply, on the first part of your representation, which is the ability to perceive and recall, I didn't know, because I haven't heard Mr. Pfail's testimony or your cross, I know there is a significant factual dispute between the parties about what happened.  My understanding was the questions were whether Mr. Pfail was being truthful or not, not whether there was a question about his ability to persevere and recall.  But that's certainly part of credibility, so I think it is a fair area of inquiry.

That being said, having listened to the 911 call from the individual at Buffalo Wild Wings, I am going to stand by my original ruling to exclude that from evidence for a few reasons.  First and foremost, I think it is cumulative the evidence that's already in.  Mr. Massaro and Mr. Iannucci have both testified, Mr. Iannucci at even greater length today, that they heard the police dispatch report that he was intoxicated.  Mr. Iannucci testified today at greater length that he heard Mr. Pfail had been cut off, that he had left the scene and the like, and that he was intoxicated.  So that call is largely a mirror of what Mr. Iannucci says he was told.  And the plaintiff has not challenged Mr. Iannucci's testimony in that he was told as much.  So the call is cumulative

A-1694

Proceedings                                             719

evidence, and I think it's unfairly prejudicial and it might be taken for its truth, because I think it is a close question whether it is a presence-sense impression or not.  He is describing it after the fact, more in the nature of a report of a crime rather than any excited utterance or presence-sense impression.

That said, even with that issue, I think it's 403(b) evidence, it is purely cumulative and more prejudicial than probative.

(Continued on next page.)

A-1695

```
                    Proceedings                    720
```

(Continuing.)  (Continuing.)

THE COURT:  And also none of the officers of course heard the call.  They can testify to what they did here, which was the reports from the others.  Okay.  So that takes care of that one.

Let me just say with respect to the video clip of Mr. Pfail breaking the glass on the door, I've gone back and looked at it again.  I think that it is still, as far as I understand it -- let me just say this, it is in my view, I want to pull up the relevant part of Mr. Brewington's opening, so give me just a minute.

Okay.  Mr. Brewington according to the transcript in his opening said that Mr. Pfail he got embarrassed, he left and as he left you'll learned that he pushed the door and hit it hard and the door broke, glass on the door broke, a broken window.  I think that there is nothing in the video that Mr. Brewington's testimony is inconsistent with -- hold on.

There may be some details and again Mr. Brewington's opening is not evidence.  I don't think he has, to use a bad pun, opened the door to revisiting my ruling.  That said, I'm going to reserve decision as I said until I hear Mr. Pfail's testimony.  Certainly if Mr. Pfail testifies in a way that is materially inconsistent with the video, the video could be, upon an application by the defendants at that time, fair grounds for cross-examination.

A-1696

Proceedings                    721

My ruling at this point is that only Mr. Brewington's opening does not in and of itself warrant the independent admission of the video.  It will depend on Mr. Pfail testifies.  Most importantly, there's no dispute that the officers did not see the video so I think it is of limited probative value towards their own state of mind.  They were only told about the broken glass.  I did allow in the photograph, even though it's unclear whether they even saw the door, and I think there may have been some testimony in that regard but there's no dispute that they didn't see the video.

So, at this time I don't see a need to revisit that ruling.  But I am certainly open to revisiting my ruling yet again if Mr. Pfail's testimony is inconsistent.

Anything to add?

MR. DORFMAN:  Yes, Judge, and I appreciate the chance.  On the issue of the video, all I wanted to add, Judge, was if the plaintiff does testify consistently with how Mr. Brewington opened on it, I think there is a significant difference between the video and what was said or what Mr. Pfail would say.  I hear the Court that the Court has viewed the video and does not think that that's a significant difference, but we view it as very significant and I think that the decider of that ought to be the jury and that they should have the opportunity.

So, if we're not convincing in our argument to the

Sophie Nolan, RPR, NYRCR - Official Court Reporter

Proceedings                                                    722

jury that there's a significant difference, that's fine, but if Mr. Pfail says what Mr. Brewington said on the stand, then we've got to be able to show them that video because that is not a push, and that is not a punch or a hit.  What that is is a body check.  It's a slam.  It's -- I don't know anymore sports metaphors.  Mr. Brewington is better with those.

THE COURT:  You don't need to talk in abstraction. Let me be clear.  The only purpose for which I understand you're representing that you seek to offer it is simply to impeach Mr. Pfail's credibility on his own actions.

So, if he testifies about what he did with respect to the door, which you deposed him on it; you have some anticipation of what he's going to say.  If he testifies in a way that is materially inconsistent such that showing the video would impeach his credibility as a witness in the eyes of the jury, that is the only basis on which it could be admitted.  Is that your theory?

MR. DORFMAN:  Yes.

THE COURT:  So, I will evaluate it with that in mind.  I still need to do a even if it's potential impeachment I still need to do a separate 403 analysis since your clients, the reasonableness of whose actions is actually the issue in this case, did not view that video and didn't see him commit this act.

That said, I certainly understand Mr. Pfail's

Sophie Nolan, RPR, NYRCR - Official Court Reporter

A-1698

Proceedings                                    723

credibility is essential to his own case.  There are a number credibility disputes between the parties so I will certainly evaluate it with that frame of mind.

MR. DORFMAN:  Thank you, Judge.  There's another way in which I think it's relevant.  My brain just --

THE COURT:  Tell you what, you can make that application when I see you next week if you're not clear on it today.

All right.  Let me turn now to the question of the defendants' application, again in light of Mr. Brewington's opening, to have some portion of Dr. Burell's criminal trial testimony read in.  So, the portion having looked back at Mr. Brewington's opening that seems to go to the issue the defendants wanted to highlight to me is the portion that reads as follows:  Mr. Brewington describing Mr. Pfail when he went to the Buffalo Wild Wings and then he proceeds he ordered a drink and you're going to learn that on that day his hands tremored.  His speech was not complete yet but he was working towards that.  In terms of especially when he got frustrated or scared, you're going to learn that Brian Pfail spilled some of his drink and then immediately the wait staff cut him off, said you're drink and he couldn't articulate what was going on and then it continues.

So it seems to me, I just want to confirm, that what the defendants are claiming Dr. Burell's evaluation of

A-1699

Proceedings                                                    724

Mr. Pfail rebuts is the, in very broad strokes, roadmaps given by Mr. Brewington that his hands tremored on that day and that on that day and at that point his return to speech returning from his prior TPI was not complete yet.  It goes to the motor skills and the speech difficulties.

MR. CUOMO:  Yes, and Dr. Burell's testimony --

THE COURT:  I know what it is.  And Mr. Cuomo, go ahead and give me an account of what you think.  I have the testimony in front of me though.

MR. DORFMAN:  Judge, I was just going to say there's a second purpose in which Mr. Brewington connected the 2007 incident to the manner in which the plaintiff reacted to seeing the police on that night.  And as an explanatory -- as a -- as an explanatory factor.  Like, you're going to hear about 2007 and then you'll find out that when he -- when the police pulled out -- pulled up that night, why he did what he did.

And, so, that's something that Dr. Burell also talks about --

THE COURT:  I didn't hear or read his opening in that way.  That is, "you'll hear why he did what he did" didn't seem to me to be connected to the 2007 and -- I will go back and look at that.  I don't need to look at that now.  It seemed to me to be in such broad strokes and Mr. Pfail is

Sophie Nolan, RPR, NYRCR - Official Court Reporter

A-1700

Proceedings                                    725

going to testify about why he did what he did and I trust to the extent we're getting into the prior TBI it is a going to be limited only to explain his own actions.

So, let me just say this: Let me stick with the point where I was first on what happened at Buffalo Wild Wings and the potential hand tremors and like. Again, big picture, I'm going to reserve on this until I hear Mr. Pfail's testimony, but I wanted to flag this issue because I want the parties to think about if I were to allow something in in response to defendants' application, which portion, how far it would go and how -- what format it would take.

So, the defendants have pointed me to a section of Dr. Burell's testimony that I believe is at page 605, which reads -- there's a question and answer at the criminal trial:

"Question: Doctor, the problems that were reported in the records, were they just motor behavior and speech problems?

"Answer: No not at all. In fact there was less commentary on motor behavior, really hardly any, or speech language difficulties. They really focused principally on things like executive function, the ability to monitor one 's behavior adequately and control behavior adequately. As I said impulse control anger management depression anxiety."

Am I can correct that that's the key portion that the defendants are relying upon?

Sophie Nolan, RPR, NYRCR - Official Court Reporter