# 25-3129 (L),
## 25-3132 (CON), 25-3135 (CON)

# United States Court of Appeals

*for the*

## Second Circuit

BRIAN PFAIL,

*Plaintiff-Appellee,*

– v. –

COUNTY OF NASSAU, POLICE OFFICER JONATHAN PANUTHOS, in his individual and official capacity, POLICE OFFICER KAREN C. O'BRIEN, in her individual and official capacity, JOHN DOES 1-10, in their individual and official capacities, NASSAU COUNTY POLICE DEPARTMENT, SERGEANT THOMAS IANNUCCI, in his individual and official capacity, POLICE OFFICER JOSEPH MASSARO, in his individual and official capacity,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

### APPENDIX FOR DEFENDANTS-APPELLANTS
### VOLUME 17 OF 17 (PAGES A-4549 TO A-4769)

MATTHEW A. CUOMO
CUOMO LLC
*Attorneys for Defendant-Appellant*
  *Thomas Iannucci*
200 Old Country Road, Suite 2 South
Mineola, New York 11501
(516) 741-3222

LEO DORFMAN
SOKOLOFF STERN LLP
*Attorneys for Defendant-Appellant*
  *Joseph Massaro*
179 Westbury Avenue, Suite 201
Carle Place, New York 11514
(516) 334-4500

*(For Continuation of Appearances See Inside Cover)*

 COUNSEL PRESS   (800) 4-APPEAL • (392582)

HELEN M. BENZIE
THE LAW OFFICE OF
   VINCENT D. MCNAMARA
*Attorneys for Defendants-Appellants*
   *Police Officer Jonathan Panuthos, in*
   *his individual and official capacity.*
   *Police Officer Karen C. O'Brien, in*
   *her individual and official capacity,*
   *Nassau County Police Department*
1045 Oyster Bay Road, Suite 1
East Norwich, New York 11732
(516) 922-9100
hbenzie@vdm-law.com

i

# TABLE OF CONTENTS

**Page**

U.S. District Court Docket Entries ............................ A-1

Complaint, dated February 1, 2016 ........................... A-37

Answer, by Defendants, dated April 1, 2016 ............. A-64

Order of the Honorable Cheryl L. Pollak, dated
    January 2, 2023 ....................................................... A-77

Order of the Honorable Cheryl L. Pollak, dated
    November 8, 2023 ................................................. A-88

Proposed Pretrial Order, dated May 10, 2024............ A-93

Proposed Pretrial Order with Comments, dated
    January 3, 2025....................................................... A-153

Proposed Pretrial Order, dated January 14, 2025 ...... A-195

Motions *In Limine*, by Plaintiff, dated
    March 21, 2025 ...................................................... A-234

Motions *In Limine*, by Plaintiff, dated
    March 21, 2025 ...................................................... A-243

Exhibit A to Motions In Limine -
(i) Certificate of Disposition Dismissal, in *The
People of the State of New York v. Pfail*, Nassau
County Court Case No. 00402B-2015, dated
December 21, 2018................................................ A-252

(ii) Certificate of Disposition Acquittal, in *The
People of the State of New York v. Pfail*, Nassau
County Court Case No. 00402N-2015, dated
December 20, 2018................................................ A-254

(iii) Certificate of Disposition Dismissal, in *The
People of the State of New York v. Pfail*, Nassau
County Court Case No. 00402A-2015, dated
December 21, 2018................................................ A-255

**ii**

|  | Page |
|---|---|

(iv) Certificate of Disposition, in *The People of the State of New York v. Pfail*, Nassau District Court Docket No. CR-003681-17NA, dated December 21, 2018 ................................................ A-256

(v) Certificate of Disposition, in *The People of the State of New York v. Pfail*, Queens Criminal Court Docket No. CR-016669-17QN, dated November 19, 2018 ................................................ A-257

Request to Charge, by Plaintiff, dated March 21, 2025 ...................................................... A-258

Proposed Verdict Sheet, filed May 21, 2025.............. A-304

Motion *In Limine*, by Defendants, dated March 21, 2025 ...................................................... A-309

Notice of Motion I*n Limine*, by Defendant Police Officer Joseph Massaro, dated March 21, 2025 .... A-316

Declaration of Leo Dorfman, for Defendant Police Officer Joseph Massaro, in Support of Motion, dated March 21, 2025 ............................................ A-318

Exhibit A to Dorfman Declaration - Neuropsychological Evaluation of N.G. Berrill, Ph.D., dated May 19, 2020 ................................... A-320

Exhibit B to Dorfman Declaration - Dr. N.G. Berrill's Amended Expert Report Disclosure Pursuant to FRCP Rule 26(A)(2)(a), by Plaintiff, dated December 10, 2024 .................. A-338

Annexed to Disclosure - Updated Evaluation of N.G. Berrill, Ph.D., dated December 4, 2024 ................................... A-342

Exhibit C to Dorfman Declaration - Deposition Transcript of Dr. N.G. Berrill, dated December 20, 2024................................................ A-369

**iii**

|  | Page |
|---|---|
| Exhibit D to Dorfman Declaration - Deposition Transcript of Dr. Naftali Garcia Berrill, dated February 4, 2025 | A-503 |
| Motion *In Limine*, by Defendants, for an Order to Preclude Dr. Berrill's Testimony, dated March 21, 2025 | A-616 |
| Letter from Frederick K. Brewington to the Honorable Nina R. Morrison, dated March 21, 2025 | A-635 |
| Memorandum of Law, by Defendants, in Opposition to Plaintiff's Motion *In Limine*, dated April 4, 2025 | A-637 |
| Opposition, by Plaintiff, to Defendants' Motions *In Limine*, dated April 4, 2025 | A-649 |
| Opposition, by Plaintiff, to Defendants' Motions to Preclude Dr. Berrill, dated April 4, 2025 | A-657 |
| Letter from Leo Dorfman to the Honorable Nina R. Morrison, dated April 14, 2025 | A-669 |
| Exhibit A to Letter - Independent Neuropsychological Evaluation of Dustin J. Gordon, Ph.D., dated June 22, 2023 | A-673 |
| Exhibit B to Letter - Neuropsychological Evaluation of Amanda L. Sacks, Ph.D. and Wayne Gordon, Ph.D., dated August 12, 2008 | A-712 |
| Exhibit C to Letter - Patient Care Report of Nassau County Police Emergency Ambulance Bureau, dated July 16, 2013 | A-721 |
| Exhibit D to Letter - Medical Records from Nassau University Medical Center | A-723 |

iv

**Page**

Exhibit E to Letter -
Medical Records from Nassau University
Medical Center....................................................... A-729

Exhibit F to Letter -
Initial Psychiatric Rehabilitation Assessment
Note of Danielle Dimeo, dated July 18, 2013 ....... A-738

Exhibit G to Letter -
Excerpts from Discharge Summary of John
Maloy, M.D., dated November 12, 2013 ............... A-740

Exhibit H to Letter -
Excerpt from Documents Review Report, dated
December 3, 2014 ................................................. A-743

Exhibit I to Letter -
Documents Review Report, dated
February 7, 2017 .................................................. A-745

Exhibit J to Letter -
Excerpt from Initial Psychiatric Rehabilitation
Assessment, dated February 24, 2017 ................... A-751

Exhibit K to Letter -
Excerpts from Discharge Summary of Augusto
Angulo, M.D., dated April 14, 2015 ...................... A-753

Exhibit L to Letter -
Excerpt from Discharge Summary of Patricia
Giarrusso, N.P., dated February 24, 2017 .............. A-756

Letter from Frederick K. Brewington to the
Honorable Nina R. Morrison, dated May 2, 2025 . A-758

Letter from John Carnevale to the Honorable Nina
R. Morrison, dated May 5, 2025 ........................... A-760

Transcript of Pretrial Conference held before the
Honorable Nina R. Morrison, dated May 6, 2025 . A-762

Letter from Matthew A. Cuomo to the Honorable
Nina R. Morrison, dated May 10, 2025 ................. A-810

v

**Page**

Letter from Matthew A. Cuomo to the Honorable
Nina R. Morrison, dated May 11, 2025 .................. A-812

Annexed to Letter -
(i) Transcript of Trial Proceedings held before the
Honorable Terence P. Murphy, in *The People of
the State of New York v. Pfail*, Nassau County
Supreme Court Indictment No. 402A-15, dated
February 27, 2018 .................................................. A-813

(ii) Excerpts from Transcript of Trial Proceedings
held before the Honorable Terence P. Murphy, in
*The People of the State of New York v. Pfail*,
Nassau County Supreme Court Indictment No.
402A-15, dated March 1, 2018 .............................. A-892

Excerpts from Transcript of Pretrial Conference
held before the Honorable Nina R. Morrison,
dated May 12, 2025 ............................................... A-945

Transcript of Trial Proceedings held before the
Honorable Nina R. Morrison, dated
May 13, 2025 ........................................................ A-966

Transcript of Trial Proceedings held before the
Honorable Nina R. Morrison, dated
May 14, 2025 ........................................................ A-1014

Letter from Frederick K. Brewington to the
Honorable Nina R. Morrison, dated
May 15, 2025 ........................................................ A-1245

Transcript of Trial Proceedings held before the
Honorable Nina R. Morrison, dated
May 15, 2025 ........................................................ A-1247

Transcript of Conference in Chambers held before
the Honorable Nina R. Morrison, dated
May 15, 2025 ........................................................ A-1489

vi

**Page**

Transcript of Trial Proceedings held before the
Honorable Nina R. Morrison, dated
May 16, 2025 .......................................................... A-1497

Letter from Frederick K. Brewington to the
Honorable Nina R. Morrison, dated
May 18, 2025 .......................................................... A-1714

Letter from Frederick K. Brewington to the
Honorable Nina R. Morrison, dated
May 19, 2025 .......................................................... A-1716

Letter from Leo Dorfman to the Honorable Nina R.
Morrison, dated May 19, 2025 .............................. A-1721

Exhibit A to Letter -
Letter from Tammi M. Mitchell to Maureen Grix,
Ph.D., dated April 29, 2019 ................................... A-1723

Exhibit B to Letter -
Email from Maureen Grix, Ph.D. to Frederick K.
Brewington, dated May 5, 2018, with Letters ....... A-1724

Exhibit C to Letter -
Combined First Set of Interrogatories and
Requests for Documents, by Defendants, dated
July 23, 2019.......................................................... A-1729

Exhibit D to Letter -
Letter from Jeremy J. Scileppi to Maureen Grix,
Ph.D., dated May 9, 2019 ..................................... A-1739

Letter from Leo Dorfman to the Honorable Nina R.
Morrison, dated May 20, 2025 .............................. A-1740

Exhibit A to Letter -
List of Items Being Filed, in *The People of the
State of New York v. Pfail*, Nassau County
Supreme Court Indictment No. 402N-15............... A-1748

vii

**Page**

Exhibit B to Letter -
Letter from Matthew Perry to the Honorable
Teresa Corrigan, dated January 19, 2018............... A-1752

Exhibit C to Letter -
Excerpts from Transcript of Trial Proceedings, in
*The People of the State of New York v. Pfail*,
Nassau County Supreme Court Indictment No.
402N-15, dated March 2, 2018 .............................. A-1753

Proposed Jury Charge, filed May 20, 2025................ A-1767

Transcript of Trial Proceedings held before the
Honorable Nina R. Morrison, dated
May 20, 2025 ......................................................... A-1800

Jury Charge, dated May 21, 2025 .............................. A-2071

Annexed to Jury Charge -
Proposed Verdict Sheet ......................................... A-2102

Letter from Frederick K. Brewington to the
Honorable Nina R. Morrison, dated
May 21, 2025 ......................................................... A-2105

Exhibit A to Letter -
Letter from Lavern Van Ommeren to Leo
Dorfman, dated January 12, 2023 .......................... A-2109

Exhibit B to Letter -
Order of the Honorable Cheryl L. Pollak, dated
January 2, 2023 ...................................................... A-2110

Exhibit C to Letter-
Letter from Lavern Van Ommeren to Ralph
Reissman, dated January 12, 2023......................... A-2121

Exhibit D to Letter -
Letter from Tammi M. Mitchell to Jeremy James
Scileppi, dated April 17, 2019 ............................... A-2122

viii

**Page**

Transcript of Trial Proceedings held before the Honorable Nina R. Morrison, dated May 21, 2025 ........................................................ A-2123

Letter from Matthew A. Cuomo to the Honorable Nina R. Morrison, dated May 22, 2025 .................. A-2336

Transcript of Trial Proceedings held before the Honorable Nina R. Morrison, dated May 22, 2025 ........................................................ A-2339

Transcript of Trial Proceedings held before the Honorable Nina R. Morrison, dated May 23, 2025 ........................................................ A-2410

Verdict Sheet, dated May 23, 2025 ............................ A-2616

Letter from John Carnevale to the Honorable Nina R. Morrison, dated May 26, 2025 .......................... A-2619

Proposed Jury Charge, filed May 27, 2025................ A-2621

Letter from Leo Dorfman to the Honorable Nina R. Morrison, dated May 27, 2025 .............................. A-2628

Transcript of Trial Proceedings held before the Honorable Nina R. Morrison, dated May 27, 2025 ........................................................ A-2631

Letter from Frederick K. Brewington to the Honorable Nina R. Morrison, dated May 27, 2025 ........................................................ A-2889

Transcript of Trial Proceedings held before the Honorable Nina R. Morrison, dated May 28, 2025 ........................................................ A-2891

Jury Charge, dated May 28, 2025 .............................. A-3108

Annexed to Jury Charge - Proposed Verdict Sheet (Damages)........................ A-3116

Supplemental Jury Charge, dated May 29, 2025 ....... A-3118

ix

**Page**

Transcript of Trial Proceedings held before the
Honorable Nina R. Morrison, dated
May 29, 2025 ......................................................... A-3120

Verdict Sheet (Damages), dated May 29, 2025 ......... A-3159

Defendants' Trial Exhibit C -
Redacted Indictment, in *The People of the State
of New York v. Pfail*, Nassau County Supreme
Court ..................................................................... A-3161

Defendants' Trial Exhibit D -
DVD Containing Outside Video ............................. A-3169

Defendants' Trial Exhibit E -
DVD Containing Inside Video ............................... A-3171

Defendants' Trial Exhibit F -
Redacted District Court – Felony Complaint, in
*The People of the State of New York v. Pfail*,
Nassau County District Court Docket No. 23996 . A-3173

Defendants' Trial Exhibit G -
District Court – Information, in *The People of the
State of New York v. Pfail*, Nassau County
District Court Docket No. 23996 ........................... A-3182

Defendants' Trial Exhibit O -
Redacted Neuropsychological Evaluation of
Wayne A. Gordon, Ph.D., dated August 12, 2008 . A-3185

Defendants' Trial Exhibit P -
Redacted Emergency Department Nursing Care
Record from Nassau University Medical Center ... A-3189

Defendants' Trial Exhibit Q -
Redacted Initial Psychiatric Rehabilitation
Assessment Note of Danielle Dimeo, dated July
18, 2013 ................................................................ A-3191

x

**Page**

Defendants' Trial Exhibit R -
Patient Results Report from Nassau University
Medical Center, dated November 4, 2014 ............. A-3193

Defendants' Trial Exhibit BBBBB -
Photograph of Plaintiff's Face ............................... A-3197

Defendants' Trial Exhibit CCCCC -
Photograph of Plaintiff's Face ............................... A-3199

Defendants' Trial Exhibit DDDDD -
Photograph of Plaintiff's Face ............................... A-3201

Defendants' Trial Exhibit FFFFF -
Aerial View of Incident Location .......................... A-3203

Defendants' Trial Exhibit IIIII -
Photograph of Plaintiff's Face ............................... A-3205

Defendants' Trial Exhibit JJJJJ -
Photograph of Plaintiff's Sweatshirt....................... A-3207

Defendants' Trial Exhibit ZZZZZ -
Redacted Nassau County Police Dept Physical
Condition Questionnaire of Brian J. Pfail, dated
November 4, 2014 ................................................ A-3209

Court Exhibit 2 -
Email from John Carnevale to Albert Huber and
Freddie Valderrama, dated May 22, 2025............... A-3212

Court Exhibit 3 -
Email Thread between Freddie Valderrama, John
Carnevale, *et al.*, dated May 15-16, 2025.............. A-3213

Court Exhibit 4 -
Handwritten Abuse of Process Questions............... A-3217

Trial Exhibit -
Medical Records from Maureen Grix, Ph.D.......... A-3218

Judgment in a Civil Action, dated May 30, 2025 ...... A-4205

Notice of Appeal, dated June 26, 2025 ..................... A-4206

xi

**Page**

Letter from Robert F. Van der Waag to the
Honorable Brenna B. Mahoney, dated
June 26, 2025 ......................................................... A-4208

Motion and Notice of Motion, by Plaintiff, for Costs
and Reasonable Attorneys' Fees, dated
July 22, 2025.......................................................... A-4209

Declaration of Frederick K. Brewington, for
Plaintiff, in Support of Motion, dated
July 22, 2025.......................................................... A-4212

Exhibit 1 to Brewington Declaration -
Pre-Bill Worksheet from the Law Offices of
Frederick K. Brewington, dated July 18, 2025 ...... A-4265

Exhibit 2 to Brewington Declaration -
Abbreviated *Curriculum Vitae* of Frederick K.
Brewington .............................................................. A-4347

Exhibit 3 to Brewington Declaration -
Declaration of Harry Ballan, in *Greenaway v.
County of Nassau*, U.S. District Court, EDNY
Case No. 11-cv-2024 (LDH) (AKT)
("Greenaway Action"), dated June 15, 2018 ......... A-4398

Exhibit 4 to Brewington Declaration -
Declaration of Patricia E. Salkin, for Plaintiff, in
Support of Motion, in Greenaway Action, dated
June 18, 2018 ......................................................... A-4401

Exhibit 5 to Brewington Declaration -
Declaration of Howard A. Glickstein, for
Plaintiff, in Support of Motion, in Greenaway
Action, dated June 11, 2018.................................. A-4406

Exhibit 6 to Brewington Declaration -
Declaration of Randolph M. McLaughlin, for
Plaintiff, in Support of Motion, in Greenaway
Action, dated June 15, 2018 .................................. A-4410

xii

Page

Exhibit 7 to Brewington Declaration - Declaration of Rick Ostrove, for Plaintiff, in Support of Motion, in Greenaway Action, dated June 15, 2018 ........................................... A-4416

Exhibit 8 to Brewington Declaration - Declaration of Jonathan C. Moore, for Plaintiff, in Support of Motion, in *Besedin v. County of Nassau*, U.S. District Court, EDNY Case No. CV-18-819 (NRM) (ST) ("Besedin Action"), dated November 14, 2024 ...................................... A-4421

Declaration of Scott A. Korenbaum, for Plaintiff, in Support of Motion, dated July 21, 2025 ................ A-4433

Exhibit 1 to Korenbaum Declaration - Declaration of Gabriel P. Harvis, for Plaintiff, in Support of Motion, in Besedin Action, dated November 13, 2024 ................................................ A-4450

Exhibit 2 to Korenbaum Declaration - Declaration of Jonathan C. Moore, for Plaintiff, in Support of Motion, in Besedin Action, dated November 14, 2024 ................................................ A-4467

Exhibit 3 to Korenbaum Declaration - May and June 2025 Time and Expense Entries for SAK ................................................................... A-4478

Memorandum of Law, by Plaintiff, in Support of Motion, dated July 22, 2025 .................................. A-4484

Declaration of John Carnevale, for Defendants, in Support of Motion for Judgment and for a New Trial or Remittitur Pursuant to Rules 50 and 59, dated August 1, 2025 ............................................. A-4512

Combined Memorandum of Law, by Defendants, in Support of Motion for Judgment and for a New Trial or Remittitur Pursuant to Rules 50 and 59, dated August 1, 2025 ............................................. A-4513

**xiii**

                                                                  **Page**

Exhibit A to Carnevale Declaration -
Excerpts from Transcripts of Trial Proceedings
held before the Honorable Nina R. Morrison ........ A-4562

Exhibit B to Carnevale Declaration -
Excerpts from Transcript of Trial Proceedings
held before the Honorable Terence P. Murphy, in
*The People of the State of New York v. Pfail*,
Nassau County Supreme Court Indictment No.
402A-15, dated February 27, 2018 ........................ A-4615

Memorandum of Law, by Defendants, in Opposition
to Plaintiff's Motion for Attorneys' Fees and
Costs, dated September 4, 2025 ............................. A-4626

Memorandum of Law, by Plaintiff, in Opposition to
Defendants' Motion for Judgment and for a New
Trial or Remittitur Pursuant to Rules 50 and 59,
dated September 4, 2025 ........................................ A-4646

Reply Memorandum of Law, by Defendants, in
Further Support of Motion for Judgment and for
a New Trial or Remittitur Pursuant to Rules 50
and 59, dated September 17, 2025 ......................... A-4693

Memorandum and Order of the Honorable Nina R.
Morrison, dated November 13, 2025 ..................... A-4717

Memorandum and Order of the Honorable Nina R.
Morrison, dated December 3, 2025 ....................... A-4761

Notice of Appeal, by Defendants County of Nassau.
Nassau County Police Department, Police Officer
Jonathan Panuthos, Police Officer Karen C.
O'Brien and John Does 1-10, dated
December 11, 2025 ............................................... A-4765

Notice of Appeal, by Defendant Sergeant Thomas
Iannucci, dated December 11, 2025 ....................... A-4767

Notice of Appeal, by Defendant Police Officer
Joseph Massaro, dated December 11, 2025 ........... A-4769

Police officers are entitled to qualified immunity "if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (citing *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991). Moreover, "arguable probable cause to charge exists when 'even with distance and new information, it was not manifestly unreasonable ... to charge.'" *Richardson v. McMahon,* 2023 WL 3102910, at *2 (2d Cir. Apr. 27, 2023) (quoting *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 572 (2d Cir. 1996)).

Here, Defendants are entitled to qualified immunity because there is nothing in the record reasonably suggesting that officers would uniformly agree that Plaintiff did *not* resist arrest or commit an assault as defined above.

### D. Grand Jury Indictment Created Unrebutted Presumption of Probable Cause

Plaintiff was indicted by a grand jury for three charges: assault, resisting arrest, and criminal mischief. Although he was ultimately acquitted of the assault and resisting arrest charges, he was convicted of criminal mischief. As the Second Circuit has explained, "The indictment by a grand jury creates a presumption of probable cause." *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003). That presumption "may only be rebutted by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Rothstein v. Carriere*, 373 F.3d 275, 284 (2d Cir. 2004). Here, there was no evidence the grand jury ever heard fraudulent or perjurious testimony, nor that it was influenced by the suppression of evidence or other police conduct undertaken in bad faith. Therefore, the presumption must hold and the claim must be dismissed.

A-4550

### III.   DEFENDANTS SHOULD BE GRANTED JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S DUE PROCESS CLAIMS, OR THEY SHOULD BE SET ASIDE

Plaintiff's abuse of process claim is unsupported by evidence in the record and should be dismissed as a matter of law or in the alternative, set aside.  In order to demonstrate abuse of process pursuant to 42 USC § 1983, a plaintiff "must establish the claim's elements under state law." *See Cook v. Sheldon,* 41 F.3d 73, 80 (2d Cir.1994). A plaintiff may assert a malicious abuse of process claim in New York where a defendant: "(1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Savino v. City of N.Y.,* 331 F.3d 63, 76 (2d Cir.2003) (quoting *Cook,* 41 F.3d at 80).

Plaintiffs' abuse of process claim must fail for the same reason the malicious prosecution claim must fail – because probable cause existed for Plaintiff's prosecution. Under New York law, a showing of probable cause at the time process issued can suffice to establish excuse or justification for the purposes of a defense to abuse of process. *See Berman v. Silver, Forrester & Schisano*, 549 N.Y.S.2d 125, 127 (2d Dept. 1989).  Where plaintiff's only argument to support such elements is a purported lack of probable cause, such claims must fail if probable cause is found to exist. *Mangino v. Inc. Vill. of Patchogue*, 814 F. 3d. 951 (2d Cir. 2015).

For the reasons discussed above, Defendants had probable cause, or at the very least, arguable probable cause to arrest and charge Plaintiff.  Thus, his abuse of process claim fails.  *See Pinter v. City of New York*, 976 F. Supp. 2d 539, 570 (S.D.N.Y. 2013) ("the Second Circuit's conclusion that the individual defendants had arguable probable cause forecloses [the] abuse of process claims against them") (citing *Ketchuck v. Boyer*, No. 10-cv-870 (TJM), 2011 WL

31

5080404, at *8 (N.D.N.Y. Oct. 25, 2011)) ("arguable probable cause provides an objectively reasonable justification for issuing process").

Moreover, the evidence presented at trial failed to demonstrate that Defendants sought to obtain a collateral objective outside the legitimate ends of the process. The "collateral objective" is interpreted as being the primary motivation behind the use of process. Per the Second Circuit:

> because the tort arises out of the accomplishment of a result that could not be achieved by the proper and successful use of process, the gravamen of the action for abuse of process is the use of 'a legal process . . . against *primarily* to accomplish a purpose for which it is not designed . . . Comment b to § 682 explains that the addition of "primarily" is meant to exclude liability "when the process is used for the purpose for which it is intended, but there is an incidental motive of spite or an ulterior purpose of benefit to the defendant."

*Doctor's Associates, Inc. v. Weible*, 92 F.3d 108 (2d Cir. 1996) (emphasis in original) (quoting Rest. 2d Torts § 682 (1977).

To discern whether a collateral objective was the improper purpose driving a prosecution, "it might be more pertinent to inquire whether the use of process was sufficiently pretextual as to constitute abuse." *See Pinter v. City of New York*, 976 F. Supp. 2d 539, fn. 132 (S.D.N.Y. 2013) (collecting cases); *Chrysler Corp. v. Fedders Corp.,* 540 F. Supp. 706, 727 (S.D.N.Y. 1982) ("plaintiff must . . . be able to show a pretextual use of seemingly proper process"); *see also Curiano v. Suozzi*, 63 N.Y. 2d 113 (1984) (holding no abuse of process where defendant initiated libel action with [secondary] purpose of punishing free speech and electoral participation and inflicting expense and burden).

There was no evidence of any collateral objective for Plaintiff's prosecution, much less evidence of a *primary* nefarious purpose.

32

A-4552

Finally, the Defendant Officers are entitled to qualified immunity on this claim. As set forth above, the Defendants had probable cause to arrest and charge Plaintiff. *See Smith v. Cnty. of Nassau*, 2024 WL 4407007, at \*5 (E.D.N.Y. Sept. 10, 2024) *(*"the 'very existence' of confusion regarding whether probable cause constitutes a complete defense to an abuse of process claim establishes that a defendant officer is entitled to qualified immunity when their use of process is supported by probable cause" (quoting *Mangino,* 808 F.3d at 959). Accordingly, Plaintiff's abuse of process claim should be dismissed as a matter of law or set aside.

## IV. DEFENDANTS SHOULD BE GRANTED JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S EXCESSIVE FORCE CLAIMS, ASSAULT, AND BATTERY CLAIMS, OR THEY SHOULD BE SET ASIDE FOR QUALIFIED IMMUNITY

Government officials exercising discretionary functions are entitled to qualified immunity shielding them from damages in a § 1983 suit "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982), or insofar as it was objectively reasonable for them to believe that their conduct did not violate such rights. *See Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987).

New York law, similarly, grants "government officials qualified immunity on state-law claims except where the officials' actions are undertaken in bad faith or without a reasonable basis." *Jones v. Parmley*, 465 F.3d 46, 63 (2d Cir. 2006).

While there need not be "a case directly on point" for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017). An officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Kisela v. Hughes*, 138

33

A-4553

S. Ct. 1148, 1153 (2018) (cleaned up). Thus, qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law," *Malley v. Briggs*, 475 U.S. 335, 341 (1986), and summary judgment should be granted on the basis of a qualified immunity defense unless all reasonably competent officers would agree that the conduct at issue violates the Constitution, *id*.

"Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Kisela*, 138 S. Ct. at 1153 (cleaned up). "Qualified immunity protects actions in the hazy border between excessive and acceptable force." *Mullenix v. Luna*, 577 U.S. 7, 18 (2015) (cleaned up). Unless the use of excessive force is obvious, to show a violation of clearly established law, a plaintiff "must identify a case that put [the officer] on notice that his specific conduct was unlawful." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021).

It is clearly established that gratuitously using force against a compliant individual is impermissible, *see Jones v. Treubig*, 963 F.3d 214, 226 (2d Cir. 2020); *Tracy*, 623 F.3d at 98, but the same is not true if the individual is resisting arrest, refusing to be handcuffed, or attacking the officers, *see Jones*, 963 F.3d at 228; *Penree by Penree v. City of Utica*, 694 F. App'x 30, 33 (2d Cir. 2017) (summary order); *MacLeod v. Town of Brattleboro*, 548 F. App'x 6, 8 (2d Cir. 2013) (summary order).

Here, no clearly established law prohibited the officers' actions in their efforts to apprehend Plaintiff, who had just violently smashed a store window and fled the scene. They identified themselves, approached to speak to him, and the videos show the rest: the officers moved to pursue him when it seemed he made a move to run. Then, they took him down to the ground and worked

34

A-4554

to place him in handcuffs. It took the efforts of three, then four, then five people, over the course of several minutes, to get Plaintiff into handcuffs. Why did it take so long to get Plaintiff into handcuffs? Massaro explained: "We couldn't do it any quicker. We tried. It was the struggle of my career…. It took two minutes and myself, my partners and the security guard because it was that difficult to control him, to restrain him, to get him to have his hands behind his back. It was a lot of movement, a lot of flailing, …." Ex. A., p. 250. And once Plaintiff was restrained, they applied no further force. Ex. A., p. 477-78.

In the process, the officers used nothing more than their hands, and their legs for leverage. Courts have held much more force than that to be reasonable under similar circumstances. *See, e.g., Felix v. City of N.Y.*, 408 F. Supp. 3d 304, 311 (S.D.N.Y. 2019) ("a reasonable officer could have concluded that even an intentional head slam and chokehold were reasonable"); *McKenzie v. City of N.Y.*, No. 18-CV-6913, 2021 WL 3375613, at *6 (S.D.N.Y.) ("a reasonable jury could not find . . . Cross' use of force was excessive" where Cross placed the suspect in chokehold and punched him while the suspect continued to resist arrest), *report and recommendation adopted*, 2021 WL 2894164 (S.D.N.Y. July 2, 2021).

No law put the Defendants on notice that their actions were unreasonable, so they are all entitled to qualified immunity on Plaintiffs' excessive force, assault, and battery claims.

## V. THE JURY'S AWARD OF COMPENSATORY DAMAGES IS EXCESSIVE, UNSUPPORTED BY EVIDENCE, AND SHOULD BE SET ASIDE OR, ALTERNATIVELY, REDUCED

The compensatory damages awarded to Plaintiff should be set aside or substantially reduced because the record fails to support an award of this magnitude. The jury's award is premised on a falsity: that Plaintiff's traumatic brain injury (TBI), and his resulting psychological symptoms, were proximately caused by the November 2014 incident involving Nassau County. In

35

reality, Plaintiff's damages stem in large part from a separate and unconnected incident that occurred over a year earlier.

In July of 2013, Plaintiff was tackled by Garden City police officers, struck in the head, and sustained an exacerbation of a preexisting traumatic brain injury. In July 2016, Plaintiff—through the same counsel who represents him here—filed a federal lawsuit against the Village of Garden City and its officers in connection with that event under EDNY Docket 2:16-cv-3832. That lawsuit made nearly identical claims of constitutional and psychological injury as those presented in this matter. Critically, the complaint in the instant action makes no reference whatsoever to the prior incident, and Plaintiff's expert neuropsychologist, Dr. Berrill, confirmed at trial that he was not told about the Garden City incident. (Tr. 1800)

This omission is significant. Plaintiff's entire theory of damages rests on the claim that the 2014 incident triggered or worsened a chronic and ongoing neuropsychological decline. Yet Plaintiff suffered an exacerbation of a TBI only 16 months earlier in a separate incident that resulted in a confidential settlement. It is undisputed that Plaintiff did not disclose that prior case to Dr. Berrill. As a result, Dr. Berrill's opinions—including his conclusion that the 2014 incident played a substantial role in Plaintiff's long-term cognitive and emotional deterioration—are not only speculative but incomplete. Because Dr. Berrill was not made aware of the 2013 incident, he could not and did not differentiate between injuries arising from that event and those allegedly caused by the later incident with Nassau County officers.

Concealing the prior Garden City case is especially troubling given that Plaintiff seeks to recover twice for the same core injury: an alleged exacerbation of a prior TBI with subsequent psychological sequelae. The Garden City and Nassau County complaints, both drafted by the same attorney, allege nearly identical emotional and cognitive damages, including memory loss,

36

confusion, headaches, emotional distress, and impaired executive functioning. Neither complaint acknowledges the existence of the other, thereby creating the appearance of separate, distinct injuries when in fact both are linked to the same underlying condition. Permitting Plaintiff to collect full compensatory damages here—on top of a prior confidential settlement for the same injuries—would amount to a duplicative and unjust windfall.

That lawsuit, filed by the same counsel in July 2016, described the Garden City incident using strikingly similar language to the complaint in the present case. Paragraph 31 of the Garden City complaint alleges that officers "initiated contact with Mr. Pfail and violently throwing him to the ground…Defendant Officers engaged in what was a clear gang assault." Paragraph 32 of the Nassau complaint alleges that officers "initiated contact with him by tackling him and violently throwing Plaintiff to the ground…Defendant Officers engaged in what was clearly a gang assault". Furthermore, both complaints assert that the respective incidents caused "further traumatic brain injury" severe emotional and neurological consequences and refer to the same original 2007 TBI as having been exacerbated. (p. 25 and 23). Yet neither complaint references the other incident, *despite being filed within five months of each other by the same attorney on behalf of the same plaintiff.*

Where, as here, a jury's award of compensatory damages rests upon speculative expert testimony and fails to account for alternate and more probable causes of a Plaintiff's condition, remittitur is warranted. *See Gibeau v. Nellis*, 18 F.3d 107, 110 (2d Cir. 1994) (damages must be proximately caused by the constitutional violation); *Anderson Group, LLC v. City of Saratoga Springs*, 805 F.3d 34, 51 (2d Cir. 2015) (damages must not be speculative or uncertain).

In sum, Plaintiff's failure to disclose the 2013 Garden City incident to his own expert fatally undermines both the credibility of the expert's opinion as well the veracity of his damages claim.

A-4557

The record contains no basis to conclude that the 2014 incident caused, or even meaningfully contributed to, Plaintiff's psychological decline—particularly in light of evidence that he suffered from significant cognitive issues before the encounter, stemming from both the 2013 incident and a longstanding history of TBI. The jury's award of compensatory damages is therefore unsupported by the evidence and should be vacated or reduced accordingly.

## VI. THE JURY'S AWARD OF PUNITIVE DAMAGES IS EXCESSIVE AND SHOULD BE VACATED OR, ALTERNATIVELY, SUBSTANTIALLY REDUCED

The jury's punitive damages award in this case was excessive, constitutionally infirm, and unsupported by the record. The jury awarded Plaintiff $293,580 each in punitive damages against Officers Panuthos, Massaro, and Iannucci, and $143,550 against Officer O'Brien—for a total of $1,024,290 in punitive damages. These sums are wholly disproportionate to the evidence presented at trial, which failed to show any individual malice or egregious conduct by any defendant warranting such a substantial sanction.

Punitive damages may only be awarded where a defendant's conduct was "motivated by evil motive or intent," or when it involved "reckless or callous indifference" to the plaintiff's federally protected rights. *Smith v. Wade*, 461 U.S. 30, 56 (1983). But the record here contains no such proof. Plaintiff was arrested, charged, and prosecuted for the events which occurred on November 3, 2014—but the jury heard no evidence that any officer used racial slurs, brandished a weapon, or sought to humiliate or target Plaintiff based on personal animus. The incident, though serious, was not prolonged, was not repeated, and did not involve any element of sadism or cruelty.

Moreover, there was no showing that any of the individual officers played a singular or, let alone, a culpable role. The jury imposed nearly identical six-figure amounts across four defendants, without distinguishing among them. Such uniformity suggests that the awards were

38

A-4558

levied reflexively, without careful consideration of each officer's state of mind or level of culpability. This contradicts the individualized assessment that due process requires. *See State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003) (emphasizing "the degree of reprehensibility of the defendant's conduct" as the most important factor).

The ratio of punitive to compensatory damages is also problematic. With $1.86 million awarded in compensatory damages, the additional $1 million in punitive damages yields a cumulative figure that is plainly disproportionate to the underlying facts. This is particularly troubling in light of the duplicative nature of Plaintiff's damages claims, as discussed above. Where the compensatory award is already excessive and likely overstated, any attempt to calibrate punitive damages to that award becomes equally flawed.

Furthermore, there are no civil or criminal penalties that remotely approach the size of the punitive damages assessed here. No officer was internally disciplined, nor was any referred for criminal prosecution. The absence of such parallel sanctions highlights the unreasonableness of the jury's verdict. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574–75 (1996) (relying on comparative sanctions to assess punitive damages).

Finally, A review of similar cases demonstrates how excessive this punitive damages award to be. In *Shuford v. Cardoza*, this Court found that a punitive damages aware of $500,000 against each defendant excessive as it exceeded the maximum fine under the federal civil rights statute. See *Shuford v. Cardoza*, 2023 WL 2706255, at *17 (E.D.N.Y. Mar. 30, 2023). In *Lee v. Edwards*, the jury awarded $200,000 punitive damages award against a rookie police officer who arrested and intoxicated plaintiff after Plaintiff allegedly assaulted the officer. See *Lee v. Edwards*, 101 F. 3d 805 (2d Cir. 1996). The officer was found liable for malicious prosecution. *Id*. at 806 – 807. The Second Circuit found the award to be excessive, remanding for a new trial on the issue unless

39

A-4559

plaintiff accepted a punitive damages award of $75,000.  Id. at 813.  In finding the award excessive, the Court noted that defendant's alleged conduct – making a false statement -was a class A misdemeanor with a fine of up to $2,000 which "gives little warning that the offense could entail a $200,000 civil award."  Id. at 811.

More recently, this Court decided the matter *McDevitt v. Suffolk County*.  In *McDevitt*, an officer was found liable for excessive force and malicious prosecution when he preemptively struck plaintiff in the face during an arrest and subsequently charged him, inter alia, with second degree assault upon an officer. *McDevitt v. Suffolk County*, 16-cv-4164 (GRB), 2024 WL 1270811 (E.D.N.Y. Mar. 26, 2024).  On a post-trial motion, Judge Gary Brown found the jury's $450,000 punitive damages award to be excessive, finding the Second Circuit's holding in Lee v. Edwards to provide "an important benchmark."  *McDevitt*, 2024 WL at *10. The Court found that Lee and the totality of the Gore factors favored a revised punitive damages award of $155,400, which it noted was at the "high end" of what would be considered appropriate.  Id.

"As a threshold matter, the Second Circuit has indicated in police misconduct cases that a punitive damages award against an individual officer in the range of $125,000 to $175,000 would be "substantial," and the Court has implicitly considered such an award to be a rough upper range for punitive damages against any one defendant officer." *Martinez v. City of New York*, No. 16-cv-79 (NRM), 2023 WL 4627739, at *18 (E.D.N.Y. July 19, 2023) (citing *Payne*, 711 F.3d at 105.)

The jury's award of $800,000 is an aberration compared to other awards in this Circuit for similar or even more reprehensible conduct. See *Payne*, 711 F.3d at 85 (excessive punitive damages award of $300,000 against a police officer for excessive force and battery reduced to $100,000); *DiSorbo v. Hoy*, 343 F.3d 172 (2d Cir. 2003) (lowering a $1.2 million punitive damages

40

A-4560

award on claims of excessive force, battery, and abuse of process to $75,000); *King v. Macri*, 993 F.2d 294 (2d Cir. 1993) (lowering a $175,000 punitive damages award to $100,000 where a plaintiff prevailed on excessive force, malicious prosecution, and false arrest after claiming officers punched him after being handcuffed, strip-searched him, and stayed in Rikers Island pre-detention for two months before all charges were dismissed); *Cardoza v. City of New York*, 139 A.D.3d 151, 1st Dept. (2016) (reducing a jury's punitive damages award against an officer who was found to have knowingly provided false information to the District Attorney from $750,000 to $75,000).

For all these reasons, the punitive awards against Defendants Panuthos, Massaro, Iannucci, and O'Brien should be set aside in their entirety or, at a minimum, substantially reduced to amounts that reflect the actual evidence and constitutional constraints.

**CONCLUSION**

For all the foregoing reasons, Defendants respectfully request that the Court grant the aforementioned motions and any such further relief as this Court deems just and proper.

DATED:     August 1, 2025
            Mineola, New York

**Sokoloff Stern LLP**
*Attorneys for Defendant Massaro*

By:   *Leo Dorfman*
      Leo Dorfman
      179 Westbury Avenue
      Carle Place, New York 11514
      (516) 334-4500

Thomas A. Adams
Nassau County Attorney

By:   John Carnevale

41

A-4561

*Attorneys for Panuthos, O'Brien and Nassau*
1 West Street
Mineola, New York 11501
(516) 388-3045


Cuomo LLC
*Attorneys for Defendant Ianucci*

*Matthew Cuomo*

By:   Matthew A. Cuomo
200 Old County Road, Suite 2 South Wing
Mineola, New York 11501
(516) 741-3223

A-4562

# EXHIBIT A

Case 2:16-cv-00518-NRM-PCG    Document 164-2    Filed 08/01/25    Page 2 of 54 PageID #: 2813

*Opening Statement - Mr. Brewington*                55

I want to let you know that this is the beginning of what I consider a two-part process.  The judge is going to tell you about liability as she did yesterday and damages.  And the liability part dealing with who did what and who's responsible?  As we go through this process, I am going to ask you, no, I'm going to implore you to pay attention to the details.  Pay attention to what is presented to you in testimony that comes from that stand, from documents that may be placed up or that you may actually see.  And from those details that make you the persons that you are to tell the difference between when someone is not giving it to you straight.

This is an opening; it is not the trial.  It is our opportunity to give you kind of like what might be called the "coming attractions."  Those things which you can anticipate will come.  It is anticipatory.  It is our obligation to prove this case and the judge is going to give you the legal standard to prove this case and we believe that we will.  Why?  Because since November 3rd of 2014, Brian Pfail has been waiting for the opportunity to tell somebody what he went through.

November 3rd of 2014 isn't where we start, though, the judge just read you a stipulation.  It does start with Brian Pfail, in the year 2007, when he did sustain a traumatic brain injury and you'll hear from him about that.

Anthony D. Frisolone, FAPR, RDR, CRR, CRI, CSR
Official Court Reporter

Case 2:16-cv-00518-NRM-PCG    Document 164-2    Filed 08/01/25    Page 3 of 54 PageID #: 2814

*Opening Statement - Mr. Brewington*                56

And at that time -- who is Brian Pfail?  A young man who attended and graduated Chaminade High School in Nassau County.  A young man who grew up in the Garden City community.  Active participant in activities in school and community.  A young man who was raised in a Catholic tradition and you'll learn that his faith is important to him.

But you're also going to learn that in 2007, he did suffer an injury and from 2007 to 2014 it was a climb to get to a place where he could try to socialize again and be out in the community.

You're also going to learn that this young man Brian Pfail is capable.  He's capable of a lot of things.  But you're also going to learn that he also has a further injury.  A further injury that created for him an abyss, if you will, that took him from here and opened wide and put him down to a place where he should not have been.

And when did that happen?  It happened on November 3, 2014.  And it happened not because of what he did but what they did, the four individuals from Ms. O'Brien across.  Those individuals who were police officers of the County of Nassau.  You're going to learn and you're going to hear evidence that will show you that Brian Pfail, on November 3, 2014, was at a Buffalo Wild Wings out on a social event with a friend.  One of his first social outings

Case 2:16-cv-00518-NRM-PCG    Document 164-2    Filed 08/01/25    Page 4 of 54 PageID #: 2815

*Opening Statement - Mr. Brewington*                    57

going back out.  And when he went, he ordered a drink.  And you're also going to learn that on that day, his hands tremored.  His speech was not complete yet but he was working toward that in terms of especially when he got frustrated or scared.  You're going to learn that Brian Pfail spilled some of his drink and that immediately the wait staff cut him off, said you're drunk, and he couldn't articulate what was going on.  And then they made it very public.  They made statements about him, he got embarrassed, he got up, he left.  And as he left, you'll learn that he pushed the door and hit it hard and the door broke, glass on the door broke, a broken window.

You're also going to learn that Brian Pfail then left the Buffalo Wild Wings concerned about what just had happened, everything that had happened, and the evidence is going to show that Brian Pfail went to a nearby parking lot where there is a Fairway Supermarket and went into the supermarket.  And while in the supermarket, he called his fiancé, spoke with her, and they worked it out so that he was going to go back, apologize, and see if he could pay for the window.  That's what he was planning to do.

As he was coming out of the Fairway, you're going to learn that his brother called him on the phone.  And he was speaking to his brother in the parking lot of Fairway.  It was nighttime and as he talked and paced and spoke,

Case 2:16-cv-00518-NRM-PCG    Document 164-2    Filed 08/01/25    Page 5 of 54 PageID #: 2816

*Opening Statement - Mr. Brewington*                58

individuals in a Jeep Grand Cherokee pulled up, kind of, some of you may be old enough, "Starsky and Hutch" style. Kind of pulled in on an angle in a parking lot as he had his back turned and you're going to learn that Brian Pfail turned around to three men in plain clothes running at him. He'll tell you what he experienced in 2007 but in this situation, you're going to see, why, because there's video.

You're going to see that Brian Pfail as he was on the phone was rushed by the officers from their car. And, by the way, you're going to learn, broken window, but that's what where we were at that time, a broken window. And, ladies and gentlemen, you're going to hear testimony and you're going to see evidence that these individuals not only came out as though they were gangbusters, but you're going to hear and learn and see that these individuals came running at Brian Pfail and that defendant Iannucci made contact with Brian Pfail when Brian Pfail was both retreating and had no place to go. And that his contact wasn't grabbing him or trying to come up and talk to him. That his contact was a kick into Brian's hand knocking his wind out. And you'll hear from him and that then Iannucci, defendant Panuthos, and defendant Massaro who were in the Jeep Cherokee. Those three tackled Brian Pfail to the ground and into the vestibule of Fairway.

Doesn't stop there. Because you're going to learn

Case 2:16-cv-00518-NRM-PCG    Document 164-2    Filed 08/01/25    Page 6 of 54 PageID #: 2817

*Opening Statement - Mr. Brewington*          59

that Brian Pfail, not knowing who these individuals were, and we're going to get into the evidence of that, but you're going to hear and see that these individuals continued to then put their bodies on Brian Pfail, punch him, and cause him injury.

Ladies and gentlemen, you're going to see video of that because there was a camera in the vestibule, too. You're going to see and hear testimony about what they did to Brian Pfail as he was on the ground trying to figure out what was going on, who these individuals were, and what they said to him and what they did to him. And you're going to see evidence of a skull head injury that shows that he had a major opening in his head in the front lobe area. So much so that he had to get staples in them to close the wound.

What's going to show you that? Photos. Photos that were taken of Brian Pfail on the day of his injury by those officers, first, the scar. Who took the photos? They did because they took a mugshot and you'll see in that mugshot photo that Brian Pfail's head was severely injured. Then you'll see that after he was taken to the hospital and came back, that they put stitches, excuse me, staples in his head.

Ladies and gentlemen, this evidence in this case will also show that Brian Pfail not only didn't know who these individuals were but that a bystander watching what

*Opening Statement - Mr. Brewington*                62

then charge Brian Pfail, put the window to the side for a second, right?  There's a broken window.  Put the window to the side.  What they do is they charge Brian Pfail with assault on all of the officers, that he assaulted them, which is a felony charge against him, that caused him to have to go through years of litigation.

You'll learn that he went to trial and, ladies and gentlemen, he was found guilty of breaking the window.  The window that he wanted to go back and pay for which he was sorry.

But with regard to assault on O'Brien, Panuthos, Massaro, Iannucci, you'll learn that in a criminal trial he was found not guilty of those.  And why is that important?  Because all along Brian simply wanted someone to understand that he was victimized.  The evidence in this case is going to support that.  The evidence in this case where we are now is going to support that Brian Pfail was injured by individuals who should have just simply talked to him instead of escalating a situation and putting a size 10 or 11 or 12 foot in his gut and knocking the ever-loving stuff out of him.  That's what the evidence is going to show.

And, ladies and gentlemen, you're going to hear evidence about the officers and what they claim, what they deny.  But one of the things is that when they wrote this up and charged him, I don't think they even know there was

Case 2:16-cv-00518-NRM-PCG   Document 164-2   Filed 08/01/25   Page 8 of 54 PageID #: 2819

*Opening Statement - Mr. Brewington*            63

video.  They got caught.  And the evidence is going to support that.  Brian Pfail didn't get a chance to go back and really apologize the way that he wanted to.  But even during the case, he and his dad did go back and try to pay for the window.  But you'll learn that they wouldn't take the money at that point because of the criminal charges.

This is not an overly complicated case, dear jurors.  This is not necessarily the most complex fact scenario, ladies and gentlemen.  However, this is an important case.  Because a young man who was trying to get his life really back on track and was just about there got his entire life derailed by litigation, by a trial, and by another traumatic brain injury that set him backwards.

At the end of the liability portion, we're going to ask you to make a finding, a finding against the officers and we're going to ask you to make a finding that they used excessive force.  That they were prosecuting Mr. Pfail maliciously, malicious prosecution.  That they abused a process because they knew that if word got around or proof got around, or he was able to show that they did what they did, that they could get in trouble which they did.  You'll hear about that, too.  But that they were trying to make sure that they covered up enough so that they marked him up without any responsibility to them and that they assaulted and battered this man.

Case 2:16-cv-00518-NRM-PCG   Document 164-2   Filed 08/01/25   Page 9 of 54 PageID #: 2820

Massaro - direct - Brewington                 111

A    Yes.

Q    And then to the left would have been the area going towards the entrance of the store, correct?  Fairway?

A    No.  If his back was to the store, that's where the entry to the store would have been.

Q    That's what I asked you.

A    I thought you said to the left.  I'm sorry.

Q    If his back was to the store, the carts would have been to the right?

A    Correct.

Q    To his left would have been the entrance to the store; right?

A    Behind him to the left.

Q    Okay.  And, sir, would it be accurate also to say that the first officer who first reached Mr. Pfail was Panuthos?

A    Yes.

Q    And, sir, you say that when Mr. Panuthos reached Mr. Pfail, Mr. Pfail punched him, correct?

A    Correct.

Q    And you watched the video, correct?

A    Correct.

Q    Isn't it true, sir, that when the first contact of anybody with anybody was officer -- or Mr. Panuthos's foot to Mr. Pfail, yes or no?

A    Based on my vantage point that night or... the video?

Case 2:16-cv-00518-NRM-PCG    Document 164-2    Filed 08/01/25    Page 10 of 54 PageID #: 2821

*Massaro - Direct - Brewington*                                    127

officers, correct?

A    Yes.

Q    And the three officers were you and your two partners, right?

A    Yes.

Q    So, Mr. Pfail didn't punch anybody, did he?

     Did you see a punch?

A    Absolutely.

Q    You saw a punch in this photo?

A    Absolutely -- in this photo?  No, but in this video.

Q    In this video?

A    Yes.

Q    You saw a punch?

A    Yes.

Q    Before the kick?

A    I also saw a punch that night from the vantage point I had.

Q    Sir, my question is did you see a punch before a kick, yes or no?

     MR. DORFMAN:  Objection.

     THE COURT:  Overruled.

A    I never saw a kick.

     I saw a punch.

Q    And, sir, Mr. Pfail was then tackled, wasn't he?

A    Yes.

*Linda A. Marino, Official Court Reporter*

A-4572

Case 2:16-cv-00518-NRM-PCG    Document 164-2    Filed 08/01/25    Page 11 of 54 PageID #: 2822

*Massaro - Direct - Brewington*                129

yes.

Q    Sir, when you were on top of him, you were actually on top of him with your belly at or about his head, correct?

Yes or no?

A    At the time of the tackle?  I believe so, yes.

Q    And sir, it's your testimony that prior to Officer or Mr. Panuthos raising his leg that Mr. Pfail swung at the open air, correct?

A    Yes.

Q    And did you see that in the video?

A    Yes, I did.

Q    Sir, did you see Mr. Pfail put a hand out saying "What's going on?"  or just -- withdrawn.

Holding his hand out?

A    If you freeze the video, his hand is out.  If you play the video, he swings his arm.

Q    And just demonstrate for the jury, if you wouldn't mind, how you say he swung his arm before we play it back.

A    Sure.  He swung it wildly and loosely with his left arm.

Q    Indicating with arm stretched out to the side coming to the front full extension; is that right?

A    I don't know if it was full extension.

Q    You say that that's in the video?

A    Yes.

MR. BREWINGTON:  Can we go back, please?

*Linda A. Marino, Official Court Reporter*

Case 2:16-cv-00518-NRM-PCG    Document 164-2    Filed 08/01/25    Page 12 of 54 PageID #: 2823

*Massaro - Direct - Brewington*                    138

vestibule, you're talking about the punch that you say happened outside; is that correct?

A    I didn't know when you were referring to.

Q    So let me be clear.  My error.

A    Okay.

Q    When you were in the vestibule, you never saw Mr. Pfail punch anybody, did you?

A    I don't recall seeing him punch anyone.

Q    And that includes yourself, correct?

A    Correct.

Q    And sir, you claim that you had a bloody nose, correct?

A    Correct.

Q    But you don't know what manner that you received that bloody nose, do you?

A    Correct.

Q    And you don't know if it was an elbow from one of your colleagues or somebody else, correct?

A    Correct.

Q    And you claim that Mr. Pfail bit you, correct?

A    Correct.

Q    Where do you claim he bit you?

A    On my left tricep.

Q    Just point to that so the jury knows.

      Indicating the back part of your left arm; is that correct?

*Linda A. Marino, Official Court Reporter*

Case 2:16-cv-00518-NRM-PCG    Document 164-2    Filed 08/01/25    Page 13 of 54 PageID #: 2824

*Massaro - Direct - Brewington*                          146

that your testimony?

Do you want me to rephrase it?

A    It was that you said would be and then could be.

Q    I'll deal with would be.  Let's do would be first.

A    Not necessarily.

MR. DORFMAN:  Objection.

A    Blood-stained clothing can absolutely be evidentiary.

Q    In a claim when someone is stating that they were bleeding and utilizing that in the prosecution of someone, wouldn't you agree with me that the blood-stained clothing would be important evidence, yes or no?

MR. DORFMAN:  Objection.

THE COURT:  Sustained.

Would you rephrase that, please?

MR. BREWINGTON:  Sure.

Q    Would you agree that in this case, the blood on that sweatshirt would be important evidence?

A    No.

Q    Whose blood was it, sir?

A    I saw my blood dripping onto my sweatshirt.

Q    Not my question.

Whose blood was it on that sweatshirt; do you know?

A    My blood was on that sweatshirt.

Q    Was Mr. Pfail's blood on that sweatshirt?

A    I do not know.

J. Massaro - Direct/Mr. Dorfman                208

Q    Okay.  And once you've done that, what do you do next?

A    As I'm walking out, at a certain point while walking around the car, I say, Police we got to talk to you.  And nearly at the same time, Detective Panuthos is saying the same thing.  Mr. Pfail turns like he's going to run, at which point I believe all three of us take a step as if we're about to get into a pursuit, a foot pursuit.  And then he turns and, as described earlier, he swings, sorry, before that, he says, I'm not talking to you fucking police.  But then after he jukes us, all three of us went this way, we all fell for it, we all went like that.  After that, he turned back.  He said, Come at me motherfuckers and he made a fighting stance.

Q    I'm going to pause you right there and then get the video going and we'll take you through it, okay?

A    Okay.

THE COURT:  We can take a break before the video. It's a good time.

Ladies and gentlemen, we'll taking our afternoon break which is also 15 minutes like the morning break so we'll see you back here at 3:40 p.m.  Thank you all very much.  Remember don't discuss the case, you are free to leave your notepads here if you'd like.

(Jury exits courtroom at 3:26 p.m.)

THE COURT:  Have a seat, everyone.  Previously

Case 2:16-cv-00518-NRM-PCG    Document 164-2    Filed 08/01/25    Page 15 of 54 PageID #: 2826

*Massaro - Cross - Dorfman*                    238

THE COURT:  Overruled.

Don't say what anyone said, but you can say what you observed.

A    I just observed a bunch of officers.  I don't recall exactly what I observed at that point.

MR. DORFMAN:  I'm going to show you what's been previously marked as DIIIII, quintuple I.  I apologize for the marking.  Let me see if I can get that up on the screen.

(Exhibit published to the jury.)

Q    What do you see in this image?

A    That's a picture of me, my nose and my face that night.

Q    And when did you take this picture?

A    I took it that night outside the Fairway Market.

Q    I'm going to point to part of the photo --

MR. BREWINGTON:  I'm assuming it's received into evidence.

THE COURT:  Yes, the ones that we previously have not had objections to or I otherwise resolved are in evidence. So, this is IIIII in evidence.

MR. DORFMAN:  Thank you, Judge.

(Exhibit published to the jury.)

Q    Using my pointer, what is this here on your nose?

A    It's a small cut.

Q    The blood that we see here under the nose, around your mouth --

*Linda A. Marino, Official Court Reporter*

A-4577

Case 2:16-cv-00518-NRM-PCG    Document 164-2    Filed 08/01/25    Page 16 of 54 PageID #: 2827

*Massaro - Cross - Dorfman*                                      239

MR. BREWINGTON:  Objection.

THE COURT:  Sustained.

Q    What do we see here on the image under your nose?

A    There's blood around my nostrils and on my upper lip.

Q    And how about on your lower lip?

A    It's red -- yes, it's red, it's swollen and it appears to be blood there too.

Q    The blood that we see in this image, is that coming from the cut on your nose or somewhere else?

A    It was not coming from the cut on my nose, it was coming from inside my nostrils.

THE COURT:  Just one clarifying question for the record.

Did you take the photo yourself with your own phone, sort of selfie style?

THE WITNESS:  I did.

There was no mirror.  I tried to self-assess.

THE COURT:  Thank you.

Q    I'm going to now show you what's been previously marked and I believe accepted as into evidence as CCCCC.

(Exhibit published to the jury.)

Q    What is this a photo of?

A    Another flattering photo of myself, with a cut on my nose, dry blood around the inside of my nostrils, some dried blood around -- on the picture, I'm seeing the left side of my

*Linda A. Marino, Official Court Reporter*

A-4578

*Massaro - Cross - Dorfman*                    240

face off of my left nostril, and dried blood on whatever this part is called of your nose, underneath your nose.

Q     When was this picture taken?

A     It was taken the early morning hours of November 4, a few hours after the event.  Crime scene detectives responded to the station house after I was discharged from the hospital.

MR. DORFMAN:  Taking this one down.

Q     Showing you what's been marked and placed into evidence as Exhibit DDDDD, which is quintuple D.

What do we see in this photo?

A     I'm shirtless.  I have a circle with my initials on my left arm by my tricep.  And inside that circle is the location where Mr. Pfail bit me and it is --

Sorry, I didn't mean to do that.

MR. DORFMAN:  That was me.  I zoomed in a little bit.

A     I think I might have touched the screen and created an arrow.

(Pause in proceedings.)

Q     Sorry, Officer, what do we see inside the circle?

A     There's another circle in a mouth shape where Mr. Pfail bit me.

Q     And I'm going to show you --

MR. DORFMAN:  Judge, maybe I should show this to the witness first, before we publish it?

*Linda A. Marino, Official Court Reporter*

Massaro - cross - Dorfman                    245

Detective Panuthos.

Q    Was Mr. Pfail charged with anything other than criminal mischief for breaking the window and assaulting police officers?

A    There was one other assault charge for the police officers and that was for Sergeant Iannucci, who suffered pain.  Also.  His hand was injured.

Q    Were there any other charges besides those two that I just mentioned?

A    I believe resisting arrest, also.

Q    And what did Mr. Pfail, the plaintiff, do that night that in your mind qualified as resisting arrest?

A    When we approached him -- traditionally, when you approach someone who may be the subject of a criminal mischief, you don't necessarily just put them right in handcuffs.

         Myself, my partners, we've conducted hundreds of investigations, thousands of investigations.

         MR. BREWINGTON:  Objection.

         THE COURT:  Let me stop you there.  Don't talk about other investigations.  Just talk about the answer to the question --

         THE WITNESS:  Yes, your Honor.

         THE COURT:    -- which is what did Mr. Pfail do that night that in your mind qualified as resisting arrest?

Case 2:16-cv-00518-NRM-PCG    Document 164-2    Filed 08/01/25    Page 19 of 54 PageID #: 2830

Massaro - cross - Dorfman                    246

A    When we began our investigation, instead of cooperating with the investigation, he turned.  We thought he was going to run away.

In fact, he didn't.  He swung his arm violently in the air, then took a fighting stance, pulled his arm back, punched Detective Panuthos in the face.

Once he was in the vestibule, he refused to cooperate.  He didn't put his hands behind his back.  He was kicking his legs up.  He was pushing us off of him.  You could see throughout the video that I keep getting stood up because Mr. Pfail was standing me up.

I had no way of controlling Mr. Pfail.  His strength was outrageous and he was standing up and you could see my legs start to straighten out because that's how elevated I was.

That is resisting arrest instead of cooperating and allowing us to handcuff you.

Q    Mr. Brewington asked you earlier about a felony complaint.  Did you draft that complaint?

A    I did not.

Q    Do you know who drafted the complaint?

A    I believe it was Detective Ramos.

Q    And did you have input into him drafting the complaint?

A    I spoke to Detective Ramos before signing off duty that night, but I wasn't at the stationhouse at the time the

Case 2:16-cv-00518-NRM-PCG     Document 164-2     Filed 08/01/25     Page 20 of 54 PageID #: 2831

Massaro - cross - Dorfman                    247

processing was completed.

Q    Did you ever testify at a hearing --

MR. BREWINGTON:  Objection, Judge.  I'm not quite sure that question was answered.

THE COURT:  I'm sorry.  Let me hear that objection again.

MR. BREWINGTON:  It was unresponsive.

THE COURT:  Oh, to the last answer?

MR. BREWINGTON:  Yes.

THE COURT:  I'm going to overrule the objection on the question and answer about drafting the complaint.  I think it's fairly responsive.

Next question was about testimony at the hearing?

MR. DORFMAN:  Yes.

THE COURT:  Okay.

Q    Did you ever testify at a criminal hearing that Mr. Pfail punched you in the face?

A    I don't recall testifying that he punched me in the face.

Q    Did you ever testify at trial that Mr. Pfail punched you in the face?

A    No.

Q    Going into the criminal process for Mr. Pfail's prosecution, what did you believe caused your bloody nose?

A    I believe that while I was tackling Mr. Pfail to the ground, at a certain point, he struck me through that struggle

Massaro - cross - Dorfman                    248

process.

Q     And why --  withdrawn.

      Why did you believe that?

A     Because prior to approaching Mr. Pfail, my nose was fine, as fine as could be, and upon getting bit, I looked down and I saw the blood dripping from my nose.  I knew it was at a certain point between the tackling of Mr. Pfail and the bite to my arm that I was struck.

      I know that none of my partners that I recall punched me in the face or struck me in the face.  And I was under the belief that it was Mr. Pfail while I was tackling him to the ground.

Q     We heard some testimony about a 911 call before -- well, withdrawn.

      We heard actually, all of us, a 911 call before.  I think I heard some mention of a knife.

      Was there any knife involved in any portion of this incident?

A     No.

Q     Was there --

      MR. BREWINGTON:  Objection to the characterization, Judge.

      THE COURT:  The last question and answer is withdrawn.

      Without saying what you heard, you can ask a

A-4583

Massaro - cross - Dorfman                          250

A     Absolutely not.

Q     How is it that it took so many people and two minutes to get the plaintiff under control?

MR. BREWINGTON:  Objection.

THE COURT:  Sustained as to form.

Q     Do you know why it took two minutes to get plaintiff into handcuffs?

MR. BREWINGTON:  Objection.

THE COURT:  He can give his assessment going to his belief and the reasonableness of his actions, so I will allow it for that purpose.

A     We couldn't do it any quicker.  We tried.  It was the struggle of my career.

MR. BREWINGTON:  Objection, Judge.

THE COURT:  Let him finish the answer, and then I will address it.

A     It took two minutes and myself, my partners and the security guard because it was that difficult to control him, to restrain him, to get him to have his hands behind his back. It was a lot of movement, a lot of flailing, a lot of -- as you can see, myself moving around just trying to find a vantage point, just to try to figure out a way to control him.

MR. BREWINGTON:  Objection.

THE COURT:  Okay.  The objection is overruled.

Q     Do you believe that the amount of force you used was

Case 2:16-cv-00518-NRM-PCG    Document 164-2    Filed 08/01/25    Page 23 of 54 PageID #: 2834

Massaro - cross - Dorfman                    251

reasonable under the circumstances?

MR. BREWINGTON:  Objection.

THE COURT:  Sustained.

Q    How did you decide how much force to use during those two minutes to get Mr. Pfail into handcuffs?

A    I used the absolute minimal amount of force required to control and restrain him.

Q    What makes you say that?

A    That's our policy, that's how we are trained.  We use the minimal amount of force to control a subject.

Q    Well, is there more force that you could have used?

MR. BREWINGTON:  Objection.

THE COURT:  Sustained.

Q    What additional force could you have used that you didn't use?

MR. BREWINGTON:  Objection.

THE COURT:  Sustained.

Q    Other than using your hands in that situation, what else could you have done?

MR. BREWINGTON:  Objection.

THE COURT:  Sustained.

This is outside the scope of what the jury's going to be asked to decide.  I can hear you outside the presence of the jury on that at the close of today.

Q    You had your handgun on you that night?

Case 2:16-cv-00518-NRM-PCG    Document 164-2    Filed 08/01/25    Page 24 of 54 PageID #: 2835

*Massaro - Redirect - Mr. Brewington*                    365

MR. DORFMAN:  Can I have just a moment, please?

Objection.

THE COURT:  Sorry, that was 54?

MR. BREWINGTON:  Of the deposition, line 4 going to line 7.

THE COURT:  The binder I have isn't indexed, so it's going to take me a minute.

MR. BREWINGTON:  I'm sorry, Judge.

THE COURT:  That's okay.

Let me ask one question.  I am going to reserve on the objection.

Sitting here today do you have any recollection as to how your nose got bloody?

THE WITNESS:  I've only been able to refresh my memory.

THE COURT:  Stay with the microphone.

THE WITNESS:  I have only been able to refresh my memory through the video and all I do is try to just keep watching video to see what had happened.  So knowing what I told the detective that night is the best way I could say and it's one of those things when I was speaking with Mr. Brewington in the past, that little unknown allowed me to say I don't know, but I believe and I have always believed that it was during the takedown that I was struck by Mr. Pfail.

Jamie Ann Stanton, RMR, CRR, RPR
Official Court Reporter

A-4586

Case 2:16-cv-00518-NRM-PCG   Document 164-2   Filed 08/01/25   Page 25 of 54 PageID #: 2836

*Panuthos - Direct - Brewington*                    435

A    Correct.

Q    And that was part of the felony complaint against Mr. Pfail, correct?

A    Correct.

Q    And that was part of a sworn statement given to the courts, correct?

A    Correct.

Q    And is it your testimony that Mr. Pfail hit you in the left eye?

A    In the left eye, no.

Q    And, sir, you saw this felony complaint a number of times; didn't you?

A    I'm sure I saw it when we went to court.

Q    Right.  And you also saw it -- when you say you went to court, went to the Criminal Court?

A    Correct.

Q    And did you ever tell anybody that he didn't hit you in the left eye?

A    I don't know if I said that or not.

Q    Tell us about the swelling to the eye that you had.

A    So the direct impact was between my eye and my ear --

Q    Not my question.

A    And the swelling, you know, extended on the left side of my face.

Q    On the cheek, right?

Case 2:16-cv-00518-NRM-PCG    Document 164-2    Filed 08/01/25    Page 26 of 54 PageID #: 2837

*Panuthos - Direct - Brewington*                                                    436

A    It was my cheek and a little bit above.

Q    Well, sir, you never had swelling on your eye; did you?

A    On my eye?

Q    Yes.

A    I don't know for -- I -- I don't recall that.

Q    Well, sir, that was part of the sworn allegations against Mr. Pfail, right, that you had swelling to the eye.

A    Okay.

Q    That didn't happen; did it?

A    I had swelling to the side of my face.  I don't recall if it specifically reached -- what are we talking about, the orbital area, specifically?  I'm not sure.  I had swelling to the left side of my face.  It was between my left eye and my left ear.  I don't know if it extended into what we would probably consider the orbital area, you know, at this point, but it was -- that was the general area of where I had swelling.

Q    And, sir, would it be accurate to say with regard to that general area that you say you had swelling, that came from your having run toward Mr. Pfail and closing the gap to where he was and then you claim at some point there was contact, right?

A    Correct.

Q    So in actuality, as you ran toward him, you caused the contact; didn't you?

Jamie Ann Stanton, RMR, CRR, RPR
Official Court Reporter

Case 2:16-cv-00518-NRM-PCG    Document 164-2    Filed 08/01/25    Page 27 of 54 PageID #: 2838

Panuthos - Cross - Carnevale                465

going to run.  Turning on the police lights from a great distance would have indicated that here come the police and may have given him the opportunity to go further away from the original scene.

Q    And although your windows were up, were you still able to hear Mr. Pfail speaking?

A    Yes.

Q    Was he speaking loudly?

A    He was yelling.

        MR. CARNEVALE:  I'm going to hit play again.

        (Video plays; video stops.)

Q    At the moment you stepped out of the car, did you say anything?

A    I immediately said something to the effect of, "Police. We just want to talk to you."  Something like that.  That was the very first thing I said.  I don't know if that's my words verbatim, but it was something friendly like that.  I might have used the word "buddy."  I say that to almost everybody, just in a disarming way.

Q    And were you wearing a police uniform; no, right?

A    I was not.

Q    Did you have anything on you that identified you as a police officer?

A    Yes, I had my shield on a lanyard around my neck, like a necklace.

Linda A. Marino, Official Court Reporter

Case 2:16-cv-00518-NRM-PCG    Document 164-2    Filed 08/01/25    Page 28 of 54 PageID #: 2839

Panuthos - cross - Carnevale                     472

Q    So from 13 seconds until 16 seconds, what happens after the 6-second mark?

A    So at this point, we went to the ground in the vestibule.

Q    And did a struggle ensue?

A    Yes.

Q    Did you or any of your partners issue any commands to Mr. Pfail at this point?

A    I think all of us at some point said numerous times put your hands behind your back, put your hands behind your back. And our objective at this point was to handcuff him.

        MR. BREWINGTON:  Objection.

A    My objective.

        THE COURT:  Okay.  Do you still wish me to address that, Mr. Brewington?

        MR. BREWINGTON:  No, Judge.

        THE COURT:  You may proceed.

        MR. BREWINGTON:  Thank you.

        MR. CARNEVALE:  One moment.  I'm going to pull up the video from inside the vestibule.  Going from 16 seconds of what's marked?

        MR. DORFMAN:  I'm sorry, counsel.

        MR. CARNEVALE:  Yes.  Just give me a second here to work with the computer.

        THE COURT:  Are we moving to a different exhibit, a different view?

Case 2:16-cv-00518-NRM-PCG    Document 164-2    Filed 08/01/25    Page 29 of 54 PageID #: 2840

Panuthos - cross - Carnevale                477

THE COURT:  Can you just say the timestamp, Mr. Carnevale.

MR. CARNEVALE:  Yes.  For the record, the video has stopped at the two-minute and 15-second mark.

Q    At this point in the video, Detective, you're the individual with the maroon-colored sweatshirt?

A    Correct.

Q    What were you doing at this point?

A    So I was kneeling on what would be his butt down to the back of his thighs.  He had started saying I'm sorry and indicated that he -- you know, I'm sorry, I'm not going to do anything.

So, just to be safe, I still maintained my body weight, you know, on the back of his butt and on the back of his legs.

Q    At that point, did you know that there was a camera right there filming this?

A    No.

Q    Even without knowing you were on camera, did you strike Mr. Pfail?

A    No.

Q    Once he was restrained, did you or any of your partners strike Mr. Pfail?

A    No.

Q    Did you continue to apply any force after he was

A-4591

Panuthos - cross - Carnevale                478

compliant and handcuffed?

A     No.

Q     At what point did he begin to cry and apologize?

A     As soon as the second handcuff went on his arm, so his hands were behind his back, he had one cuff.

The second the second cuff went on, he immediately was compliant, upset and apologetic.

Q     Did other officers arrive to assist?

A     Yes.

Q     And this is all after you were punched in the face; correct?

A     Correct.

MR. BREWINGTON:  Objection.

THE COURT:  Sustained.

MR. BREWINGTON:  Move to strike, Judge.

THE COURT:  The jury will disregard that remark, meaning the question and the answer.

Q     Officer, during this whole encountered, was any of the force you used on Mr. Pfail retaliatory?

MR. BREWINGTON:  Objection.

THE COURT:  Overruled.  Withdrawn or do you want that noted for the record?

MR. BREWINGTON:  No.  I will take your ruling, Judge.  Thank you.

THE COURT:  Okay.

Case 2:16-cv-00518-NRM-PCG   Document 164-2   Filed 08/01/25   Page 31 of 54 PageID #: 2842

O'Brien - Direct - Powell                    537

(Audio plays; audio stops.)

MR. POWELL:  Stopping the audio at 54 seconds.

Q    Now, ma'am, you just heard the audio from 49 seconds to 54 seconds?

A    Yes, sir.

Q    Did you hear the individual on the call say, "This guy's head is bloody"?

A    I heard him as you played the recording, yes.

Q    Now, on November 3, 2014, based on your recollection, do you recall anyone's head being bloody?

A    Yes, sir.

Q    Was your head bloody?

A    No, sir.

Q    Was Sergeant Iannucci's head bloody?

A    No, sir.

Q    Was Officer Panuthos' head bloody?

A    No.

Q    Was Officer Massaro's head bloody?

A    Yes.

Q    And when you say that his head was bloody, do you mean his nose?

A    Yes, sir.  His face.

Q    His face or his nose?

A    His face, which is his nose, going down his face, down his lip.  The blood was dripping down.

Linda A. Marino, Official Court Reporter

*O'Brien - Direct - Powell*                    549

THE COURT:  I'll send reinforcements from my side.

Go ahead, Freddie.  You can go help.  Thanks.

(Pause in proceedings.)

MR. POWELL:  Placing 74C back on the screen at 3 minutes and 27 seconds, playing the exhibit.

(Video plays; video stops.)

MR. POWELL:  Stopping the exhibit.

Q    At some point in time, ma'am, you placed rubber gloves on your hands, correct?

A    Yes, sir.

MR. POWELL:  And placing 74C back on the screen at 3 minutes and 39 seconds.

Q    At this still shot, do you see a stain on the middle of the vestibule floor?

A    Yes, sir.

Q    And after Mr. Pfail was turned from facedown to faceup, at some point you, along with Officer Colon, helped him up, correct?

A    Yes, sir.

Q    And you walked Mr. Pfail out of the vestibule, right?

A    Yes, sir.

Q    And you were on his side, meaning at the side of Mr. Pfail?

A    Yes, sir.

Q    And you claim that at some point Mr. Pfail kicked you,

*Linda A. Marino, Official Court Reporter*

Case 2:16-cv-00518-NRM-PCG    Document 164-2    Filed 08/01/25    Page 33 of 54 PageID #: 2844

O'Brien - Direct - Powell                              550

correct?

A    Yes, sir, he did.

Q    In fact, you claim he bent over and kicked you three times, didn't you?

A    Yes, sir.

Q    And you were never behind Mr. Pfail, were you?

A    No, sir, I was to the side of him.

Q    And you said he kicked back and hit you in the stomach?

A    He did a donkey kick.  He brought his knee forward, and, as he brought his knee forward, his foot came back into my abdomen.  And once his foot was in my stomach, he continued to keep kicking where it was three times total; the initial kick, and then the two because his foot was already there.

Q    And now ma'am, you testified about this matter at the criminal trial, correct?

A    Yes, sir.

Q    And you testified about this matter at the criminal hearing, correct?

A    Yes, sir.

Q    And you testified about this matter at the grand jury indictment?

A    Yes, sir.

Q    And in any of those prior testimonies, did you ever say Mr. Pfail did a donkey kick?

A    I said that he brought his knee forward and then kicked

O'Brien - Cross - Carnevale                    559

CROSS-EXAMINATION

BY MR. CARNEVALE:

Q   Officer, I know you just answered a lot of questions from Mr. Powell.  I'm going to ask you a few more questions to clarify a few things.

Could you explain for us what happened immediately after you arrived at the Fairway Market on November 3 of 2014?

MR. POWELL:  Objection.

THE COURT:  Overruled.

A   When I saw the unmarked vehicle with the door open and none of the officers there, I immediately jumped out of my vehicle, out of the RMP, and ran over to the entrance to the Fairway supermarket.

Q   What did you see at the entrance of the Fairway Market?

A   At that time, Inspector Massaro looked up at me and I noticed blood pouring from his nose, going straight down on him.

Sergeant Iannucci at that time had said to me, "We need your help."

And then I immediately went in between Officer Panuthos and Sergeant Iannucci to assist with placing the Defendant under arrest.

(Continued on the following page.)

Linda A. Marino, Official Court Reporter

A-4596

O'Bried - cross - Carnevale                    560

BY MR. CARNEVALE: (Continuing.)

Q    And how would you describe the demeanor of your fellow officers at that point?

A    They all -- when I got down by -- onto the ground, I saw the side of Officer Panuthos' face already swollen.  All three look3e like they just got their asses kicked.  That was my first impression.  I knew these guys for a long time.  And Sergeant Ianucci --

        MR. POWELL:  Objection.

        THE COURT:  Sustained as to the last portion.

        The jury will disregard that comment.

        Just answer the question about what you observed at that time.

        THE WITNESS:  Yes, Your Honor.

BY MR. CARNEVALE:

Q    What did you observe about their demeanor as they were interacting with Mr. Pfail?

A    The officers were yelling at Mr. Pfail to stop resisting, to give us your hand.  They had one cuff on the defendant's hand which was being held so the cuff would not swing at the rest of us while they were attempting to pull out his other arm and to place the handcuffs and restrain him.

Q    And at some point was that one handcuff able to be placed around Mr. Pfail's other wrist?

A    Yes, I was able to do that.

Sophie Nolan, RPR, NYRCR - Official Court Reporter

A-4597

```
                 Iannucci - Direct - Brewington              618
```

Q    And I'm talking about the leg that was up.

The left leg that was up, that made contact with Mr. Pfail, didn't it?

A    While it was up?

Q    Well --

A    You're asking if the leg makes contact?  It does.  His whole body makes contact.

If you're asking the leg at that point in time and in which position, you'd have to be more specific.

Q    Well, sir, you're the one that witnessed it, correct?

A    Yes, sir.

Q    Now, sir, after Officer Panuthos collided with Mr. Pfail, would it be accurate to say that you and your partners dragged Mr. Pfail to the ground or tackled him?

A    I think those are fair descriptions.

Q    And would it be accurate to say, sir, that you claimed injuries after Officer Panuthos collided with Mr. Pfail.

A    Yes, sir.

Q    And your injuries, you claim, were to an abrasion on your left hand; is that correct?

A    No, sir.  I believe the abrasion was on my forehead.

MR. BREWINGTON:  One second, Judge.

THE COURT:  Sure.

(Pause in proceedings.)

Q    I'm sorry, abrasion on your forehead and a scratch to

*Linda A. Marino, Official Court Reporter*

Case 2:16-cv-00518-NRM-PCG    Document 164-2    Filed 08/01/25    Page 37 of 54 PageID #: 2848

*Iannucci - Direct - Brewington*                    619

your left hand, correct?

A    A scratch?   My injury to my hand was more than a scratch.

Q    Tell us what your injury to your hand was.

A    There was substantial pain to my hand.

Q    I didn't ask what you felt, I asked what the injury was.

A    I'm sorry, I was led to believe that pain is an injury.

Q    Isn't pain the alleged result of an injury?

A    It's that too, but if we're talking about the charges --

Q    Withdrawn.

Tell us physically what you claim happened to your hand.

A    Physically?

Q    Yes.

A    You want me to go through the whole incident?

Q    No.  Withdrawn.

Tell us, sir, what type of damage you claim happened to your hand.

A    According to the ER doctor --

Q    I'm talking about you.  Explain it in your terms.

A    My terms is I hurt my left hand.

Q    And, so, with regard to your claim of hurting your left hand, that had been a hand that you had injured before, correct?

A    Yes, sir.

Q    At least one fracture.

Case 2:16-cv-00518-NRM-PCG    Document 164-2    Filed 08/01/25    Page 38 of 54 PageID #: 2849

Iannucci - cross - Cuomo                    707

say stop?

A    No.

Q    Why do you say that?

A    Because I have been in several altercations.  At that time, I was a 46-year-old man.  I've had a lot of experience in my personal life and outside -- in my professional.

Q    Not in your personal life, sir?

A    Okay.  In my professional life and I could -- I was closer to him than the video camera that captures it and I was at eye level with him and I know what a jab at the air is.

Q    And what did he do next?

A    He -- to me, he appeared he braced himself, cocked back his right arm.  He put up his jab arm, his -- it would be my weak arm -- in a fighter stance, and he threw a punch at Detective Panuthos.

Q    But you mentioned before he didn't run at you or Inspector Massaro or Detective Panuthos; correct?

A    He did not.

Q    He actually -- I think in the video --

THE COURT:  Let me just ask you to avoid the leading, please.

Q    So based upon what he did, what did you do next?

A    Well, as I previously mentioned, when he took that quick step to the left, which I interpreted he was going to flee, we or I began running at him.

A-4600

Iannucci - cross - Cuomo                          708

Q    Did you observe what officers Massaro and Panuthos did at that time?

A    They also began running.

Q    And were they still in front of you at that point?

A    Yes, sir.

Q    And who got to -- who came in closest proximity to Mr. Pfail first?

A    Detective Panuthos.

Q    And then who was next?

A    Inspector Massaro.

Q    Okay.  And did their momentum coming at him bring everybody to the ground?

A    That is what I observed to be, yes.

Q    What did you do after you went to the ground?

A    I positioned myself in between Detective Panuthos and Inspector Massaro and began assisting and trying to pin him down, Mr. Pfail down and attempting to grab one of his arms.

Q    Why were you doing that?

A    In order to put handcuffs on him and keep him at the scene.

Q    Just tell the jury why is it that you were going to handcuff this person.

A    Well, because he had, at first -- well, first of all, he had fled the scene of the criminal mischief, the broken window, and his first action was -- caused us to believe he

A-4601

Case 2:16-cv-00518-NRM-PCG    Document 164-2    Filed 08/01/25    Page 40 of 54 PageID #: 2851

Iannucci - cross - Cuomo                    709

was going to run, and then his second action was to openly challenge us in his actions and his words.

Q    Do you believe that you and your men that evening appropriately identified yourselves as police to Mr. Pfail?

A    Yes, sir.

Q    How did you do that again?

A    Well, other than our shields around our neck, Detective Panuthos indicated that we were the police and that we wanted to talk to him.

Q    During the course of trying to get control of Mr. Pfail, did you sustain an injury of any sort?

            MR. BREWINGTON:  Objection.

            THE COURT:  Sustained as to form.

Q    While apprehending Mr. Pfail, did you sustain an injury?

A    Yes.

Q    Where did you sustain that injury?

A    My left hand.

Q    Do you know exactly how you injured yourself that day?

A    Yes -- well, yes, I believe -- I believe there were multiple things that hurt my hand.

Q    What were those multiple things?

A    Initially, in the initial rolling around, my hand had struck the ground while trying to gain control of Mr. Pfail. And while my hand was hurt, it further hurt, whether it be aggravating the initial hurt or re-injuring that same hand, it

A-4602

Iannucci - cross - Cuomo                    710

got caught in the open cuff at one point when he was cuffed on his one hand.

So I had -- everyone knows what the handcuffs look like when they're closed.

So one is cuffed around his left wrist and the other one on the end of the chain is his -- it's closed.  It's not like open, and my thumb is in it.  I had to let go with my right hand of the handcuffs.  And during the struggle, he was able to pull that hand back and under him.  So this hand felt like it was overextended and caused pain.  And then it went under him with that metal cuff in my hand and under his body and that struggle between the ground, and it hurt more.  So, between those three things -- I'm not trying to give more weight to one or the other, it caused the pain to my hand.

Q    And that evening you sought medical treatment?

A    Yes.

Q    Did you undergo medical treatment after that?

A    Yes.

Q    What types of medical treatment did you undergo for that injury?

A    I have a hand doctor.  I had a previous injury.  I injured my other hand.  So I go see this doctor who is a hand specialist.  And he treated me in the next day or so.  I don't recall if I went the next day or a couple days after.

Q    Did that hand, that left hand that you injured that

Case 2:16-cv-00518-NRM-PCG    Document 164-2    Filed 08/01/25    Page 42 of 54 PageID #: 2853

Iannucci - cross - Cuomo                    712

a foundation.

Q    While this struggle to subdue Mr. Pfail was ongoing, did you hear at any time Inspector Massaro exclaim anything about what was happening to him?

A    Yes, sir.

Q    What did you hear?

A    He yelled he's biting me, he's biting me.

Q    In response to that, what did you do?

A    Okay.  Well, at that point, as I previously mentioned, we had just gotten the one handcuff on his left arm, and I was holding, as I said, the open cuff and pulling it so that his arm was in back of him, his lower back, to give him the least amount of leverage.  And my weight was on top of him.  My other hand was holding the cuff that was on his wrist.  And I was using a pain compliance technique, where the one that is locked on the wrist, you kind of press it against the bone.  It causes like a pain that generally has people cooperate with you, you know, or are more compliant.

When he started yelling -- that's what position I was in when I heard him say he's biting me, he's biting me. My weight was forced down on him to keep him from getting back up.

When he said that, I pivoted on to my left side.  I removed my right hand from what I was doing helping to hold that arm, and I began to cock back my hand to try and throw a

Case 2:16-cv-00518-NRM-PCG    Document 164-2    Filed 08/01/25    Page 43 of 54 PageID #: 2854

*Pfail - Direct - Brewington*                           780

A    They were running towards me, sir.

Q    And sir, at the time they were running towards you, what were you -- what were your feet physically doing?

A    I may have taken a step back.

Q    And when you said you were bracing yourself for impact, how did you do that, sir?

A    I put my left arm up.

Q    And could you show the jury how you put your left arm up, please?

A    (Indicating)

        MR. BREWINGTON:  Indicating an arm across with elbow bent at right angle, your Honor, with the forearm pointing outward, away from his chest.

        THE COURT:  So noted.

Q    Is that accurate, Mr. Pfail?

A    Yes, sir.

Q    And when you put that arm up, what did you do with your right hand?

A    I believe I got it up in a fighting position.

Q    Now, what had you had in your hand just prior to that?

A    My phone, sir.

Q    What happened to your phone?

A    I don't know, sir.

Q    Did you see your phone anymore that evening, that you recall?

*Linda A. Marino, Official Court Reporter*

Case 2:16-cv-00518-NRM-PCG    Document 164-2    Filed 08/01/25    Page 44 of 54 PageID #: 2855

*Pfail - Cross - Dorfman*                          861

THE COURT:  Okay.

MR. DORFMAN:  Would it be okay if I read that out loud, Judge?

THE COURT:  Let me look at it first.

MR. BREWINGTON:  Judge, I have an objection to it being read out loud.

THE COURT:  Yes, I'm going to sustain that objection.

You can ask now that he's looked at it if it refreshes his recollection.

Q   Now that you have looked at page 34 of your deposition transcript, does that refresh your recollection that you heard somebody yelling at you and then they started running towards you?

A   Yes, I believe so.

Q   So first the yelling, then the running, correct?

A   Yes, I believe so.

Q   And you don't know -- whoever that was that was yelling, you don't know what they were yelling, right?

A   That is correct.

Q   You don't know what words they were saying?

A   That's correct.

Q   You don't remember as you sit here today them saying that they were police, right?

A   No, I don't.

*Linda A. Marino, Official Court Reporter*

A-4606

*Pfail - Cross - Dorfman*                              864

A    No, I didn't start to run.

Q    And then when those officers were moving towards you, you don't know if at first you had tried to run or not, right?

A    No, I just answered that.  I know I didn't run.

Q    So, today you know that you didn't run.

        Do I have that right?

A    Yes.

Q    Okay.  Did you move as though you were about to run to the right?

A    I'm not sure.  I just remember stepping backwards.

        (Continued on the following page.)

*Linda A. Marino, Official Court Reporter*

Case 2:16-cv-00518-NRM-PCG    Document 164-2    Filed 08/01/25    Page 46 of 54 PageID #: 2857

PFAIL - CROSS - MR. DORFMAN                    865

BY MR. DORFMAN: (Continuing.)

Q    Well, I'll get to that in a moment, sir.

But did you move as though you were trying to run?

MR. BREWINGTON:  Objection.

THE COURT:  Sustained.  Were you trying to run to the right or to the left?

A    I don't think so.

Q    Well, can you testify definitively here that you didn't try to move as though you were trying to run left or right?

MR. BREWINGTON:  Objection.

THE COURT:  Sustained.

Q    Do you know whether you tried to run to the left or to the right?

MR. BREWINGTON:  Objection.

THE COURT:  Sustained.  I think we've gone over this.  Let's move on.

Q    Am I correct that you don't remember whether you swung at the officers?

A    No, I did not.

Q    It's your testimony today that you did not swing at the officers when you were outside the Fairway?

A    That's correct.

Q    At your deposition in 2020 on Page 36 starting on line 19, did you give this testimony -- were you asked this question and did you give this answer on that date:

AVERY N. ARMSTRONG, RPR, NYRCR
OFFICIAL COURT REPORTER

A-4608

PFAIL - CROSS - MR. DORFMAN                    866

Question:   Did you swing at any of them, at any of the men?

Answer:   I don't -- I don't remember.

Did you give that testimony in 2020?

A    Yes, I believe that's correct.

Q    Isn't it also true that you don't remember if you pulled an arm back to punch any of them?

A    That's also correct.

Q    In the vestibule, when you first went down to the ground, you went backwards, right?

A    I remember landing facedown.

Q    Well, sir, we all watched the video.

Did you see yourself in the video going backwards into the vestibule?

MR. BREWINGTON:  Objection.

THE COURT:  Sustained.

Q    So it's your testimony here that when you went into the vestibule, you went face-first?

A    I can't fully recall, but I just remember landing facedown.

Q    And it's your testimony here that your face was the first thing that hit the ground?

MR. BREWINGTON:  Objection.

THE COURT:  Sustained.

Q    Was your face the first part of your body that hit the

*AVERY N. ARMSTRONG, RPR, NYRCR*
*OFFICIAL COURT REPORTER*

PFAIL - CROSS - MR. DORFMAN                870

A     I was trying to protect my face and my head.

        MR. DORFMAN:  Judge, could we ask the witness to answer the question please.  It's a yes-or-no question.

        THE COURT:  While you say you were trying to protect your face and your hands, at any point, were you trying to free your hands?

        THE WITNESS:  Yes.  I was trying to use my hands.

Q     And you were moving your hands around, right?

A     What do you mean by, moving my hands around?

Q     Well, withdrawn.

        You were moving your arms around, right?

A     Yes, I believe so.

Q     Okay.  And while you were moving your arms and your hands around, they came into contact with some of the police officers, right?

A     Yes, I believe so.

Q     You don't remember if you were kicking your legs during that time, do you?

A     No, I don't.

Q     And you don't know whether you hit any of the officers while you were on the ground, right?

A     No.

Q     That's correct, right?

A     I said no.

Q     That's not correct?

Case 2:16-cv-00518-NRM-PCG    Document 164-2    Filed 08/01/25    Page 49 of 54 PageID #: 2860

PFAIL - CROSS - MR. DORFMAN                871

A    That's not correct.

Q    So you do know that you hit some of the officers?

A    I did not hit these officers.

Q    It's your testimony now definitively that you did not hit any of the officers, right?

A    Yes, sir.

Q    That's -- okay.

Well, at your deposition on Page 39, 2020 testimony, Page 39, starting at line 19 and ending on line 23.

THE COURT:  Okay.

Question:  While you were on the ground, did you hit any of the police officers?

Answer:  I -- I don't know.  I mean, I was trying to defend myself, but I don't know --

MR. BREWINGTON:  Objection.  Misreading.

MR. DORFMAN:  I apologize.  I'll start over.

Question:  While you were on the ground, did you hit any of the police officers?

Answer:  I -- I don't remember.  I mean, I was trying to defend myself, but I -- I don't -- I don't know.

Q    Did you give that testimony in your deposition?

A    Yes, I did, sir.

Q    Sir, it's a fact, isn't it, that you don't remember a great deal of what you experienced that night?

MR. BREWINGTON:  Objection.

*AVERY N. ARMSTRONG, RPR, NYRCR*
*OFFICIAL COURT REPORTER*

Case 2:16-cv-00518-NRM-PCG     Document 164-2     Filed 08/01/25     Page 50 of 54 PageID #: 2861

PFAIL - CROSS - MR. DORFMAN                    875

A     That's correct.

Q     And you don't remember walking out of the Fairway, right?

A     No, I remember walking out.

Q     So as you sit here today, you recall walking out?

A     Yes, I remember walking out.

Q     You recall walking out with your hands behind your back?

A     I -- I'm a little lost where you are in the events.

Q     That's my fault.  I apologize.

      After officers stood you -- withdrawn.

      Do you remember officers standing you up with your hands behind your back?

A     No, I don't remember that.

Q     Do you remember after you stood up, walking out through the doorway of Fairway?

A     No, I do not.

Q     You don't remember that part, right?

A     That's correct.

Q     And you don't remember anything that happened between when you first walked outside and when you were put on a stretcher, right?

A     That's correct.

Q     But you do remember being put on the stretcher, right?

A     No, I do not.

Q     As you sit here today, you don't remember that either?

A     Yes.

*AVERY N. ARMSTRONG, RPR, NYRCR*
*OFFICIAL COURT REPORTER*

A-4612

PFAIL - CROSS - MR. DORFMAN                876

Q    You don't remember anything that happened between when you were walking out -- when you first walked out of Fairway and when you were put in the ambulance; is that your testimony?

A    I remember being in the ambulance, but I don't remember before then.

Q    After you were put in the ambulance, you were driven to the hospital, right?

A    Yes, sir.

Q    And you don't remember who was in the ambulance with you, correct, sir?

A    There was one paramedic.

Q    So today you remember that there was one paramedic?

A    I just recall one being there.

Q    But you didn't recall that in 2020 when you testified in your deposition, right?

        MR. BREWINGTON:  Objection.

        THE COURT:  Sustained.

Q    And you don't recall today whether you spoke to anyone in the ambulance, right?

A    That's correct.

Q    And you don't recall how long that ride to the hospital was?

A    That's correct.

Q    Sir, Mr. Carnevale, when he was asking you questions

*AVERY N. ARMSTRONG, RPR, NYRCR*
*OFFICIAL COURT REPORTER*

A-4613

PFAIL - CROSS - MR. DORFMAN                881

The question is, while on the vestibule floor and you were moving around and you were moving your arms around and you were moving your hands around, were you also trying to lift your head up off the floor?

MR. BREWINGTON:  Objection.

THE COURT:  Sustained.

Q    While you were in the vestibule and you were engaged with the officers who were in there with you, were you trying to left your head up off the floor?

A    I believe so, sir.

Q    You testified earlier that when you saw the people moving towards you, you didn't know they were police officers, right?

A    Yes, that's correct.

Q    And when you were down on the ground, you also didn't know they were police officers, right?

A    Yes.  That's correct.

Q    You thought you were just being attacked?

A    I didn't know what to think.

Q    Well, you were trying to defend yourself, weren't you, sir?

A    Yes.  But I just didn't understand what was going on.

Q    You didn't understand and you were trying to defend yourself, right?

A    Yes.

Q    And, in fact, you thought your life was in danger, right?

Case 2:16-cv-00518-NRM-PCG    Document 164-2    Filed 08/01/25    Page 53 of 54 PageID #: 2864

PFAIL - CROSS - MR. DORFMAN                 888

Q    When you experienced that day what you called an all out assault, did you do your best to fend off that all out assault?

A    I don't know if I could have.

Q    Did you try?

A    Yes, I did.

MR. DORFMAN:  No further questions.  Thank you.

THE COURT:  Sure.  All right.  Mr. Cuomo.

Sorry, just a moment, before while Mr. Cuomo is getting set up, while you were at lunch, jurors, the parties worked out stipulations on a couple of issues.  So I'm going to read these to you.  Remember, stipulated facts are evidence, just as if someone testified to it.  So there are two I'm going to read to you.

The first one is this:  Plaintiff's Exhibit 12, in evidence, consists of phone records regarding plaintiff's cell phone for the period of time in early November 2014.  The timing of the calls is reflected in Coordinated Universal Time, commonly referred to as UTC. UTC is a worldwide timekeeping standard.  Moving forward, I'm instructing you that November 3rd, 2014 was a Monday and that here in New York, we were observing Eastern Standard Time.  I'm also instructing you that as a result, New York's Eastern Standard Time was five hours behind UTC.  By way of example, if the time was 3:00 a.m. or 300 hours on November 4th, 2014 UTC,

*AVERY N. ARMSTRONG, RPR, NYRCR*
*OFFICIAL COURT REPORTER*

A-4615

# EXHIBIT B

A-4616

STATE OF NEW YORK : NASSAU COUNTY
SUPREME COURT      : PART 45
------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,       :

                                           :

     - against -                           :

BRIAN PFAIL,                               :

                           Defendant.      :
------------------------------------x
INDICTMENT #:  402A-15

                              February 27, 2018
                              262 Old Country Road
                              Mineola, New York

Before:

          THE HONORABLE TERENCE P. MURPHY
          Acting Supreme Court Justice


          HON. MADELINE SINGAS
          Nassau County District Attorney
               262 Old Country Road
               Mineola, New York  11501
          BY:  MATTHEW PERRY, ESQ.
               CARYN STEPNER, ESQ.
               Assistant District Attorneys


          FREDERICK K. BREWINGTON, ESQ.
               Attorney for the Defendant
               556 Peninsula Boulevard
               Hempstead, New York  11550

                         oOo
                        TRIAL
                         oOo


               GIGI WRIGHT, RPR
          Official Court Reporter

607
Case 2:16-cv-00518-NRM-PCG   Document 164-3   Filed 08/01/25   Page 3 of 11 PageID #: 2868

Dr. Berrill - Direct - Brewington

reasonable degree of clinical psychological and forensic neuropsychological certainty, about individuals that are suffering from the type of frontal lobe injury that Mr. Pfail had to strike out impulsively?

MR. PERRY:  Objection.

THE COURT:  Overruled.  You can answer the question.

A    Yes.  No, it wouldn't come as a surprise or shock because it would be consistent with the kind of description of his behavioral problems that existed in all of the reports.  If you were frustrated or anxious or angry, that it would not be surprising.  In fact, it would be consistent with his condition that there would be this impulsive, perhaps, angry acting out that, you know, almost might describe it as reflective.  It is not thought through.  It is a consequence of not having that filter or that stop/start mechanism that we all rely on to help us with our lives.

Q    How usual is it for a person, Doctor, suffering from what Mr. Pfail is suffering from to simply just hit whatever is near him?

MR. PERRY:  Objection.

THE COURT:  Sustained.

Q    Is there any aspect of your evaluation that would give us insight about persons suffering from a frontal

Dr. Berrill - Direct - Brewington

lobe injury, as Mr. Pfail, about their physicality with regard to items when they get frustrated?

MR. PERRY:  Objection, your Honor.

THE COURT:  Sustained.

Q   Are people with frontal lobe injuries, such as Mr. Pfail, known to just punch stuff?

MR. PERRY:  Objection, your Honor.

THE COURT:  Sustained.

Q   Doctor, I would like you to assume that Mr. Pfail was --

THE COURT:  Mr. Brewington, I'm going to interrupt.  I apologize for interrupting.

I'm going to give you a break, okay.  We'll call you right back.  Remember my admonitions.

(Whereupon, the jury exited the courtroom.)

THE COURT:  Doctor, I am going to give you a break, as well.  Step outside.  Take a seat in the hallway.  We'll call you right back.

(Whereupon, the witness is excused.)

THE COURT:  Mr. Brewington, I apologize for interrupting your examination, but I got the sense that this was going to be a controversial area of inquiry.  I'm going to ask you, based on the People's multiple objections, I'm going to ask you where is this leading to?

Case 2:16-cv-00518-NRM-PCG   Document 164-3   Filed 08/01/25   Page 5 of 11 PageID #: 2870

Dr. Berrill - Direct - Brewington

MR. BREWINGTON: With regard?

THE COURT: Well, with regard to the line of questioning: You know, does the defendant or people with the defendant's injury just strike out.

MR. BREWINGTON: That was tailored after having the other objections sustained. I'm willing to ask it directly concerning the defendant based on his evaluation. But I was tailoring that question because I was receiving objections before that.

THE COURT: If you are going to reflexive movements, almost like an uncontrollable body movement, I'm not going to allow that line of questioning. I think it is outside the scope of what we are dealing with here. I sustained the People's objections for that reason.

So, the jury needed a break anyway, I thought it was an appropriate time to give them a break. I'm just letting you know if we are going to go into those hypotheticals about impulsive and reflexive body movements, I'm not going to allow that line of questioning.

MR. BREWINGTON: Judge, just so we are not wasting anybody's time, my intent was to ask with regard to the frustration and the impulse concerns that he phrased, if there is a way they normally

A-4620

Dr. Berrill - Direct - Brewington

manifest themselves.

THE COURT:  People, I'll obviously wait for your objection.  That might put it in context rather than a general striking out.  Let's take a five-minute break, give everybody an opportunity for a break.

(Whereupon, a brief recess was held.)

THE CLERK:  Continued case on trial, People versus Brian Pfail.  All parties, including Mr. Pfail are present.  The jury is not.

MR. BREWINGTON:  I was asking questions regarding the video because I was going to use that to pose my questions.  Are you saying I should not do that?  I just want to know.  I don't want to go into areas that I shouldn't, otherwise I will pose hypotheticals, which I can pose.

THE COURT:  People, do you want to be heard?

MR. PERRY:  Your Honor, the People would oppose using the video in that fashion.  I don't believe that would be an appropriate use of the video or line of questioning for this witness.

MR. BREWINGTON:  I don't plan on showing the video, Judge.  He has seen them.

THE COURT:  But my understanding of the extent of his testimony is he is going to talk about

A-4621

Dr. Berrill - Direct - Brewington

the conditions and diseases or symptoms of those conditions or diseases. I don't see how you can utilize the video, because that goes to the specific date in question.

Are you going to ask him look at this video and say, is that an impulsive reaction? I don't know what your thinking is, if you will.

MR. BREWINGTON: Well, my thinking was just from the standpoint of what the video shows and what his observations may be. I can deal with it differently.

THE COURT: I think those points are left to the jury to decide.

MR. BREWINGTON: Understood.

THE COURT: Not for an expert witness.

Put the witness back on the stand.

(Whereupon, the witness resumes the witness stand.)

COURT OFFICER: Jury entering.

(Whereupon, the jury entered the courtroom and upon taking their respective seats, the following occurred:)

THE CLERK: Let the record reflect the presence of the jury and all parties.

Doctor, you are reminded you are still under

A-4622

Dr. Berrill - Direct - Brewington

oath.

THE WITNESS:  Yes.

CONTINUED DIRECT EXAMINATION

BY MR. BREWINGTON:

Q    Doctor, in what way does frustration and impulse control issues, that we spoke about, manifest themselves in persons that have frontal lobe traumatic brain injury?

A    Well, there is several different ways.  Sometimes people will become overly emotional for reasons that other people would think, you know, are foolish or they don't get.  They might yell or they might hit.  They might hit someone or hit a wall or hit themselves, depending on how impulsive they are.  It is not unheard of.

Q    Doctor, is the difference between -- withdrawn.

Was that consistent with Mr. Pfail's evaluations based on your review?

MR. PERRY:  Objection, your Honor.

THE COURT:  Overruled.

A    Yes.  There was discussion throughout the neuropsychs of this poor impulse control and anger management difficulties when he was frustrated and feeling overwhelmed.

Q    Doctor, can you just explain that a little bit more?  Are those things that happened are they spontaneous or otherwise?

Dr. Berrill - Direct - Brewington

A    No, it is a spontaneous -- I used the word before -- reflexive.  It is not like it is thought through.  It is when one experiences frustration and before you know it you punched the wall, or you are in a fight with someone or you are saying stuff that you would rather not say.  It is not thought through at all.  It is very spontaneous.

Q    Doctor, I think you referred to the flashpoint or triggering of Mr. Pfail's previous injury was a beating in 2007; is that correct?

A    That's correct.

Q    Based upon your evaluation and knowledge in the two areas that you are qualified, when a person is faced with similar circumstances, that has a traumatic brain injury, is there a typical way of responding?

MR. PERRY:  Objection, your Honor.

THE COURT:  Overruled.

A    Yeah.  I mean, I think I talked a little bit about post-traumatic stress before.  If one is confronted with stimulus or conditions or circumstances that are reminiscent or reminds one of the original trauma or injuries, yeah, that would activate.  The would be very upsetting, very frightening and result in a lot of, perhaps, irrational behavior or would result in frightened behavior.  I mean, yeah.

A-4624

Case 2:16-cv-00518-NRM-PCG    Document 164-3    Filed 08/01/25    Page 106 of 141 PageID #: 2875

Dr. Berrill - Direct - Brewington

Q    In your line of work how does fear figure into the issues of both traumatic brain injury and PTSD?

MR. PERRY:  Objection, your Honor.

THE COURT:  Overruled.

A    Well, with traumatic brain injury it is sometimes very difficult, quickly, to apprehend what is going on. In other words, to organize.  There are things happening or coming at me quickly, I have to kind of sort that out quickly and rapidly and make sense, and that's difficult.

If those things that are occurring to me, I guess, or the experience I'm having now is reminiscent of a prior trauma, in other words, it kind of looks like, feels like and seems like a prior trauma that would be incredibly frightening and incredibly stressful and incredibly difficult to manage.

Q    And, Doctor, based on your review of the records and evaluation of the documents that you reviewed, on November 3rd 2014 was Mr. Pfail still suffering from a post-traumatic stress disorder?

A    Yes.

Q    And within a reasonable degree of certainty in your fields, on November 3rd 2014 was Mr. Pfail suffering from a traumatic brain injury?

A    Yes.

Q    And can you just tell us was he suffering from

A-4625

                    Dr. Berrill - Cross - Perry

depression at that time?

A   He was, yes.

Q   With regard to anxiety disorder was he suffering from that as well?

A   Yes.

Q   Any other conditions based on your review and evaluation of the records, within a reasonable degree of certainty in your fields, that Mr. Pfail was suffering from on November 3rd of 2014, the date of this incident?

A   No.  It is really the combination of those things.  The traumatic brain injury and the results, post-traumatic stress disorder, depression, anxiety, all of those are operating simultaneously in him on the date that you mentioned.

Q   With regard to his functioning, with regard to his impulse control and frustration were those affected on that day?

A   Yes, definitely.

          MR. BREWINGTON:  Judge, I have no further questions for this witness at this time.

          THE COURT:  Thank you, Mr. Brewington.

          MR. PERRY:  May I inquire, your Honor?

          THE COURT:  Yes, you may, Mr. Perry.

          MR. PERRY:  Thank you.

CROSS-EXAMINATION

A-4626

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

BRIAN PFAIL,

                            Plaintiff,

      -against-

COUNTY OF NASSAU, et al.,

                            Defendants.

Docket No. 16-cv-00518
              (NRM)(CLP)

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS

SOKOLOFF STERN LLP
*Attorneys for Defendant*
*Police Officer Joseph Massaro*
179 Westbury Avenue
Carle Place, NY 11514
(516) 334-4500
File No. 220017

*of Counsel:*
    Leo Dorfman

A-4627

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES............................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................1

PROCEDURAL HISTORY................................................................................................2

STANDARD OF REVIEW ................................................................................................3

ARGUMENT ......................................................................................................................5

   I. The Court Should Defer Ruling on Plaintiff Counsel's Fee Application Until After The Merits of this Matter are Fully Decided ................................................5

   II. Plaintiff Counsel's Award is Excessive as Many of His Firm's Billing Submissions are Vague, Duplicative, or Unnecessary ..............................................6

      A. Vague Descriptions..........................................................................................6

      B. Duplicative Time, Effort, and Entries..............................................................7

      C. Unnecessary Time............................................................................................8

   III. Plaintiff's Application Impermissibly Seeks Recovery for Fees or Costs Which are Non-Compensable ..............................................................................9

      A. Conversations with the Media .........................................................................9

      B. Non-Prevailing Claims...................................................................................10

      C. Costs of Expert Witness Retention ...............................................................11

   IV. Plaintiff Counsel's Hourly Rate is Excessive .................................................12

      A. Attorney Scott Korenbaum ............................................................................12

      B. Attorney Fred Brewington .............................................................................12

CONCLUSION.................................................................................................................14

A-4628

## TABLE OF AUTHORITIES

Cases                                                                                   Page(s)

*Am. Freedom Def. Initiative v. Metro. Transp. Auth.*,
   889 F. Supp. 2d 606 (S.D.N.Y. 2012) ................................................................... 5

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany & Albany Cty. Bd. of Elections*,
   522 F.3d 182 (2d Cir. 2008) ................................................................................. 3

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany & Albany Cty. Bd. of Elections*,
   493 F.3d 110 (2d Cir. 2007) ............................................................................ 3, 4

*Asseng v. Beisel*,
   2024 WL 669871 (E.D.N.Y. Feb. 19, 2024) ........................................................ 6

*Clark v. Phillips*,
   965 F.Supp. 331 (N.D.N.Y.1997) ....................................................................... 9

*Claud v. Brown Harris Stevens of Hamptons, LLC*,
   2024 WL 245261 (E.D.N.Y. Jan. 23, 2024) ...................................................... 12

*Connor v. Ulrich*,
   153 F.Supp.2d 199 (E.D.N.Y.2001) .................................................................. 11

*Daiwa Special Asset Corp. v. Desnick*,
   2002 WL 31767817 (S.D.N.Y. Dec. 3, 2002) ................................................... 13

*Davis v. City of New Rochelle*,
   156 F.R.D. 549 (S.D.N.Y.1994) .......................................................................... 9

*Days Inn Worldwide, Inc. v. Amar Hotels, Inc.*,
   2008 WL 2485407 (S.D.N.Y. June 18, 2008) ................................................... 13

*DeCarlo v. Perales*,
   963 F.Supp. 181 (N.D.N.Y.1997) ....................................................................... 9

*Farbotko v. Clinton County*,
   433 F.3d 204 (2d Cir. 2005) ................................................................................. 3

*Flores v. J & B Club House Tavern, Inc.*,
   2012 WL 4891888 (S.D.N.Y. Oct. 16, 2012) ...................................................... 6

*Grant v. City of Syracuse*,
   357 F. Supp. 3d 180 (N.D.N.Y. 2019) ............................................................... 12

*Guilemard-Ginorio v. Contreras*,
   603 F. Supp. 2d 301 (D. Puerto Rico, 2009) ................................................................ 10

*Harty v. Par Builders, Inc.*,
   2016 WL 616397 (S.D.N.Y. Feb. 16, 2016) .................................................................. 6

*Hensley v. Eckerhart*,
   462 U.S. 424 (1983) ...................................................................... 3, 6, 10, 11

*In Re Agent Orange Prod. Liab. Litig.*,
   611 F.Supp. 1296 (E.D.N.Y.1985) ............................................................... 9

*Johnson v. Ga. Highway Express, Inc.*,
    488 F.2d 714 (5th Cir. 1974) .................................................................... 3, 4

*LaBarbera v. J.E.T. Res., Inc.*,
   396 F.Supp.2d 346 (E.D.N.Y.2005) ............................................................ 13

*LeBlanc–Sternberg v. Fletcher*,
   143 F.3d 748 (2d Cir. 1998) ..................................................................... 10

*Leibovitz v. Paramount Pictures Corp.*,
   1997 WL 542560 (S.D.N.Y. Sept. 3, 1997) ................................................... 5

*Local 32B–32J, Serv. Employees Int'l Union v. Port Auth. of New York and New Jersey*,
    180 F.R.D. 251 (S.D.N.Y. 1998) ................................................................. 6

*Loper v. New York City Police Dep't*,
   853 F.Supp. 716 (S.D.N.Y.1994) ............................................................... 9

*Luessenhop v. Clinton Cnty., N.Y.*,
   558 F. Supp. 2d 247 (N.D.N.Y. 2008) ......................................................... 8

*McLaughlin by McLaughlin v. Boston School Committee*,
   976 F.Supp. 53 (D. Mass. 1997) ................................................................ 9

*Mhany Mgmt. Inc. v. Inc. Vill. of Garden City*,
   44 F. Supp. 3d 283 (E.D.N.Y. 2014) ........................................................... 5

*Millea v. Metro-N. R. Co.*,
   658 F.3d 154 (2d Cir. 2011) ...................................................................... 3

*Miroglio S.P.A. v. Conway Stores, Inc.*,
   629 F. Supp. 2d 307 (S.D.N.Y. 2009) .......................................................... 7

*Quarantino v. Tiffany & Co.*,
   166 F.3d 422 (2d Cir. 1999) ........................................................................................ 6

*Rosario v. City of New York*,
   2023 WL 2908655 (S.D.N.Y Jan 27, 2023) ............................................................ 13

*Rozell v. Ross-Holt*,
   576 F.3d 527, 536-37 (S.D.N.Y. 2008) ................................................................... 4

*U.S. v. City of Buffalo*,
   770 F. Supp. 108 (W.D.N.Y. 1991) ......................................................................... 9

*United States ex rel. Miks v. Straus*,
   274 F.3d 687 (2d Cir. 2002) ..................................................................................... 3

*Vilkhu v. City of New York*,
   2009 WL 1851019 (E.D.N.Y. June 26, 2009) ...................................................... 13

*W. Virginia Univ. Hospitals, Inc. v. Casey*,
   499 U.S. 83 (1991) ................................................................................................. 11

*Walker v. City of New York*,
   2015 WL 4568305 (E.D.N.Y. Jul. 28, 2015) ........................................................ 11

*Wilder v. Bernstein*,
   975 F. Supp. 276 (S.D.N.Y.1997) ........................................................................... 9

*Williamsburg Fair Hous. Comm. v. Ross-Rodney Hous. Corp.*,
   599 F. Supp. 509 (S.D.N.Y. 1984) .......................................................................... 6

*Wise v. Kelly*,
   620 F. Supp. 2d 435 (S.D.N.Y. 2008) .................................................................... 13

Statutes

42 U.S.C. § 1988(b) ...................................................................................................... 1

42 U.S.C § 1983 ............................................................................................................. 2

Rules

Rule 54(d) of the Federal Rules of Civil Procedure ...................................................... 1

A-4631

## PRELIMINARY STATEMENT

On behalf of all Defendants, we oppose Plaintiff counsel's application for fees and costs ("Plaintiff's Application") made pursuant to Rule 54(d) of the Federal Rules of Civil Procedure ("Federal Rules") and 42 U.S.C. § 1988(b). The Application is excessive and should not be granted. First, a decision on Plaintiff's Application should be deferred until this Court rules on the merits of Defendants' post-trial motions and the United States Court of Appeals for the Second Circuit ("Second Circuit") rules on any subsequent appeals. Alternatively, should the Court decide Plaintiff's Application, the amount of fees and costs requested should be reduced by at least forty (40) percent. Plaintiff's billing records lack the detail and specificity necessary to warrant payment, and the billing records are mired with double-billing and excessive hours. Further, many of the fees and costs are not appropriate for reimbursement. Among these items are fees for media relations and costs for the retention of Plaintiff's expert witness, N.G. Berrill, PhD. Lastly, Plaintiff's requested billing rate of $600.00 per hour is excessive despite his experience in the field. When evaluating these deficiencies together, a forty (40) percent reduction of the total fee and cost package is warranted.

1

A-4632

## PROCEDURAL HISTORY

Plaintiff Brian Pfail initiated this action pursuant to 42 U.S.C § 1983 and New York state law asserting numerous claims, including false arrest, excessive force, assault, battery, malicious prosecution, and abuse of process arising from his arrest on November 3, 2014.

Trial commenced before the Honorable Nina R. Morrison on May 12, 2025. The liability portion of the trial concluded on May 23, 2025, and the damages portion concluded on May 29, 2025. For the liability portion, the jury returned a verdict and found: Defendants Massaro, Panuthos, and Iannucci liable for excessive force (federal) and abuse of process (federal); Defendants Massaro, Panuthos, and Iannucci, and O'Brien liable for malicious prosecution; and that an officer employed with the Nassau County Police Department had committed a battery and abuse of process. *See* ECF Dkt. No. 150, Verdict Sheet. The jury rejected Plaintiff's claim of assault and found Defendant O'Brien did not use excessive force or abuse process. *Id.*

Plaintiff's counsel filed a motion for attorneys' fees on July 23, 2025. ECF Dkt. No. 163. In his Declaration in Support, Plaintiff's counsel seeks compensation for attorneys' fees of $359,355.00 and costs of $22,048.93. *See* ECF Dkt. No. 163-1, Brewington Declaration. And Attorney Scott A. Korenbaum seeks fees in the amount of $16,005. The total amount of costs and fees together that Plaintiff's counsel seeks is $397,408.93. *Id.* For the reasons stated below, this amount is excessive and should be reduced by at least forty (40) percent.

2

A-4633

## STANDARD OF REVIEW

To determine an attorneys' reasonable fees, a court calculates each attorney's "presumptively reasonable fee," or the "lodestar." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany & Albany Cty. Bd. of Elections*, 522 F.3d 182, 189-90 (2d Cir. 2008). This is "the product of a reasonable hourly rate and the reasonable number of hours required by the case…." *Millea v. Metro-N. R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011).

The party seeking fees must establish both the reasonable rate, *Farbotko v. Clinton County*, 433 F.3d 204, 209 (2d Cir. 2005), and the reasonable number of hours claimed, by submitting contemporaneous time records showing "the date the work was done, the hours spent, and the nature of the work performed." *United States ex rel. Miks v. Straus*, 274 F.3d 687, 706 (2d Cir. 2002). The district court has broad discretion in granting a fee award and assessing its reasonableness. *Hensley v. Eckerhart*, 462 U.S. 424, 437 (1983). A court may exercise that discretion by applying an across-the-board percentage reduction to the number of hours billed as a practical means of trimming the fat from a fee application. *Patrolmen's Benevolent Ass'n of New York, Inc. v. City of New York*, 97-cv-7895 (SAS), 2003 U.S. Dist. LEXIS 13472, at *7 (S.D.N.Y. July 31, 2003).

The Second Circuit has held, in determining the appropriate hourly rate, district courts should determine "the rate a paying client would be willing to pay." *Arbor Hill*, 493 F.3d at 117. A reasonable "paying client wishes to spend the minimum necessary to litigate the case effectively." *Id.* at 118. In *Arbor Hill*, the Second Circuit instructed courts in this district, when assessing the appropriate hourly rate, to apply the twelve factors listed by the Fifth Circuit in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87, 92-93, 96 (1989). The twelve *Johnson* factors are:

3

A-4634

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Arbor Hill*, 493 F.3d at 117-118 (*citing Johnson*, 488 F.2d at 717-19); *see also Rozell v. Ross-Holt*, 576 F.3d 527, 536-37 (S.D.N.Y. 2008); *Lavely v. Redheads, Inc.*, 03 Civ. 7752 (RMB) (KNF), 2007 U.S. Dist. LEXIS 77109, at *18-19 (S.D.N.Y. Oct. 12, 2007). Courts should also apply other "case-specific variables" that may be "relevant to the reasonableness of attorney's fees." *Arbor Hill*, 493 F.3d at 117. The Second Circuit instructed courts to "bear in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively." *Id*. at 118. Under these standards, Plaintiff does not seek "presumptively reasonable" attorneys' fees.

4

A-4635

## ARGUMENT

**I.    THE COURT SHOULD DEFER RULING ON PLAINTIFF COUNSEL'S FEE APPLICATION UNTIL AFTER THE MERITS OF THIS MATTER ARE FULLY DECIDED.**

As an initial matter, this Court should defer ruling on Plaintiff's Application until the merits of this case are fully resolved. While a jury rendered a verdict in this case, Defendants have sought post-trial relief from this Court in the form of a Rule 50/59 motion. (ECF Dkt. Nos. 164.) Defendants also filed a Notice of Appeal and withdrew it pending decision on post-trial motions, confirming their intent to seek relief from the Second Circuit if necessary. ECF Dkt. No. 159, 160. Were the Second Circuit to rule in favor of Defendants, it could greatly modify the amount of fees Plaintiff could recover or even render moot his entire application. *See Mhany Mgmt. Inc. v. Inc. Vill. of Garden City*, 44 F. Supp. 3d 283, 285 (E.D.N.Y. 2014) (deferring ruling on plaintiff's motion for attorneys' fees until after Second Circuit had chance to hear appeal); *see also*, *Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 889 F. Supp. 2d 606, 613 (S.D.N.Y. 2012) (deferring ruling on fee application until resolution of appeal); *Leibovitz v. Paramount Pictures Corp.*, No. 94–cv–9144 (LAP), 1997 WL 542560, at *1 (S.D.N.Y. Sept. 3, 1997). As this matter is still live and ongoing, the fees associated with litigating this matter should not yet be resolved. Judicial efficiency favors a stay until the substantive litigation has concluded and there is certainty as to the final disposition of the case.

A-4636

## II.   PLAINTIFF COUNSEL'S AWARD IS EXCESSIVE AS MANY OF HIS FIRM'S BILLING SUBMISSIONS ARE VAGUE, DUPLICATIVE, OR UNNECESSARY.

In the alternative, should this Court rule on Plaintiff's Application prior to the Second Circuit adjudicating this matter, the award should be greatly reduced as Plaintiff's billing records are vague, duplicative, or exceedingly lengthy for the associated task.

In determining whether time entries are reasonable, "the critical inquiry is whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures." *Flores v. J & B Club House Tavern, Inc.*, No. 10-CIV-4332 GAY, 2012 WL 4891888, at *5 (S.D.N.Y. Oct. 16, 2012) "The number of hours should be reduced for excessive, redundant, or otherwise unnecessary hours." *Id.* (citing *Quarantino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1999)); *see also Harty v. Par Builders, Inc.*, No. 12-CV-2246 (CS), 2016 WL 616397, at *2 (S.D.N.Y. Feb. 16, 2016) (court may reduce or disallow wasteful and duplicative time). "If two or more attorneys have duplicated each other's work, then the number of hours submitted should be reduced, since some of the work was unnecessary and the time claimed would therefore be unreasonable." *Williamsburg Fair Hous. Comm. v. Ross-Rodney Hous. Corp.*, 599 F. Supp. 509, 518 (S.D.N.Y. 1984).

### A.  Vague Descriptions

Many of Plaintiff counsel's submissions of this work are too vague to warrant recovery. "Where hours are not properly documented, the court may reduce the fee 'accordingly.' *Asseng v. Beisel*, 14-cv-5275 (AYS), 2024 WL 669871, at *4–5 (E.D.N.Y. Feb. 19, 2024) (under appeal) (citing *Hensley*, 461 U.S. at 435); *Local 32B–32J, Serv. Employees Int'l Union* v. *Port Auth. of New York and New Jersey*, 180 F.R.D. 251 (S.D.N.Y. 1998) (reducing the requested attorney's fees by 20% due to vague descriptions in the time records, such as "research and draft papers" and "phone and meetings"). Moreover, several of these vague submissions are in quantities of more

6

A-4637

than two hours, which "have a tendency to obfuscate the amount of time expended on distinct tasks and introduces an element of vagueness into a fee application, making it difficult to determine if the reported hours are duplicative or unnecessary." *Miroglio S.P.A. v. Conway Stores, Inc.*, 629 F. Supp. 2d 307, 313 (S.D.N.Y. 2009) (internal quotations omitted).

The vagueness of Plaintiff's submissions is not confined to one biller. Examples of impermissibly vague billing practices include:

1. Draft Letter to Court: 1/10/19, 7/16/19, 3/17/20, 2/14/22, Five entries on 2/15/22, 4/5/23, two entries on 9/25/23, 2/11/24, two entries on 12/23/24, 2/11/25, 2/19/25, 3/21/25, 5/8/25

2. Review of Documents received from County: 7/29/18, 10/9/19

3. File Review: 8/26/20, 10/26/22, 5/10/23, 6/27/23, 12/23/24, 3/17/25, 3/18/25, 4/8/25, 4/11/25, 4/18/25, 5/5/25, 5/8/25

4. Legal Research: 8/5/22

5. Review medical records: 12/21/23, 5/7/25, 5/22/25

6. Non-specific trial Preparation: two entries on 4/10/25, 4/28/25, 5/2/25, 5/3/25, two entries on 5/5/25, 5/6/25, 5/7/25, 5/9/25, 5/10/25, 5/11/25, 5/13/25, two entries on 5/14/25, two entries on 5/18/25, 5/20/25

### B. Duplicative Time, Effort, and Entries

Plaintiff's counsel also seems to double-bill numerous tasks throughout their representation, including:

1. Review Order From Court (Opposing counsel seems to review Court Orders from the Court on "Status" multiple times): 4/13/16, 6/15/16, 7/13/17, 6/6/18, 12/3/18, 12/20/18

2. Draft letter to Court (Opposing counsel seems to bill letter to Court on "Status" multiple times): 7/26/17, 6/6/18, 12/4/18, 1/10/19, five entries 11/17/23

3. Multiple entries for Emails to Brewington regarding posting on same day: Twice on 3/20/19

4. Multiple entries for Scanning Discovery Documents: 4/16/19, Twice on 4/17/19

5. Multiple entries for Sign/Scanning/Emailing Stipulation: 4/22/19, 4/24/19, 5/1/19

6. Multiple entries for reviewing files for purposes of redacting documents: 4/29/19, 4/30/19

7

A-4638

7. Drafting interrogatories and responses to interrogatories/document demands: 4/19/19, 5/3/19, 5/13/19, 5/22/19, 5/23/19, 9/17/19

8. Drafting legal document relating to Rule 26 Disclosure: 5/15/19, 5/16/19, 5/21/19

9. Three entries for call to opposing counsel on same day: 3 times on 5/23/19

10. Multiple entries for call to L. Van Ommeren on same day: Twice on 6/6/19

11. Prepare for deposition of Panuthos: 3/3/20, 3/4/20

12. Preparation for oral argument: Twice on 5/18/20, 5/19/20

13. Multiple entries for meeting with P. Lockett on same day: 4/2/24

14. Multiple entries for email to adversary on same day: 10/16/24

15. Multiple entries for email to email to Dr. Berill on same day: 11/8/24

16. Draft Jury Instructions: 3/17/25, twice on 3/20/25, 3/21/25, 5/18/25

17. Drafting opposition to motion in limine: 4/3/25, multiple entries on 4/4/25

18. Multiple entries for meeting with Rosemarie Walker on same day: 5/6/25

19. Preparing trial exhibits: 4/28/25, 4/29/25, two entries on 4/30/25, 5/1/25

20. Two entries for call with Dr. Berill on 5/5/25

These duplicative entries are only a sample of work that appears to be double-billed in Plaintiff's Application, thereby warranting a percentage reduction of Plaintiff's fees.

### C.  Unnecessary Time

Attorney Scott Korenbaum seeks payment for a separate bill of fees for his work on this matter in the months of October and November 2024. *See* ECF Dkt. No. 163-11, Korenbaum Decl., p. 16. In fact, 11.2 hours ($6,160) for which Mr. Korenbaum seeks payment are for the instant motion for fees and costs. ECF Dkt. No. 163-11, p. 16. This is an impermissible amount of hours dedicated strictly to obtaining payment for fees. *See e.g.*, *Luessenhop v. Clinton Cnty., N.Y.*, 558 F. Supp. 2d 247, 270 (N.D.N.Y. 2008), aff'd, 324 F. App'x 125 (2d Cir. 2009).

8

#### D. Excessive Fees Related to Travel Time

Plaintiff seeks reimbursement based on his full hourly rate for time spent travelling to appointments associated with this case. This includes time on: 8/7/19, twice on 2/26/20, 8/1/24, three entries on 5/6/25, three entries on 5/12/25, two entries on 5/13/25, four entries on 5/14/25, four entries on 5/15/25, four entries on 5/16/25, three entries on 5/20/25, three entries on 5/21/25, five entries on 5/22/25, two entries on 5/23/25, 5/24/25, two entries on 5/27/25, two entries on 5/28/25, two entries on 5/29/25. Plaintiff also seeks travel Expenses 8/7/19, 8/1/24, 3/20/25, 4/30/25, 5/5/25, 5/11/25, 5/14/25, 5/15/25, 5/16/25, 5/20/25, 5/22/25, 5/26/25 (Hotel Lodging?), 5/27/25, 5/30/25. That is impermissible, as courts in the Second Circuit customarily reimburse attorneys for travel time at fifty percent of their hourly rate. *See*, *e.g.*, *Wilder v. Bernstein*, 975 F. Supp. 276, 283 (S.D.N.Y.1997); *Clark v. Phillips*, 965 F.Supp. 331, 336 (N.D.N.Y.1997); *DeCarlo v. Perales*, 963 F.Supp. 181, 184 (N.D.N.Y.1997); *Davis v. City of New Rochelle*, 156 F.R.D. 549, 559 (S.D.N.Y.1994); *Loper v. New York City Police Dep't*, 853 F.Supp. 716, 720 (S.D.N.Y.1994); *In Re Agent Orange Prod. Liab. Litig.*, 611 F.Supp. 1296, 1321–22, 1349 (E.D.N.Y.1985), *aff'd in part, rev'd in part*, 818 F.2d 226 (2d Cir.1987). Plaintiff's fees should be reduced accordingly.

### III. PLAINTIFF'S APPLICATION IMPERMISSIBLY SEEKS RECOVERY FOR FEES OR COSTS WHICH ARE NON-COMPENSABLE.

Several of the submissions in Plaintiff's application seek fees for tasks which are not compensable.

#### A. Conversations with the Media

Plaintiff may not recover fees associated with media relations. *See U.S. v. City of Buffalo*, 770 F. Supp. 108, 115 (W.D.N.Y. 1991) ("an award should not be made for time spent in conversation with newspaper reporters"); *McLaughlin by McLaughlin v. Boston School*

9

*Committee*, 976 F.Supp. 53, 72 (D. Mass. 1997) ("[r]eported federal cases are unanimous in denying awards of Attorneys' fees for media-related time to individual civil rights plaintiffs"). *Guilemard-Ginorio v. Contreras*, 603 F. Supp. 2d 301, 321 (D. Puerto Rico, 2009). Plaintiff's Application provides several bills which seem to principally based on discussing Plaintiff's case with the media, internal discussions about media strategy, and writing press releases. These include:

1. 1/30/2019 - 0.3 hours for "Review email from C.Harris-Marchesi about press contact; 0.4 hours for "Draft email back to C. Harris Marchesi about Press contact," both at $600 per hour;

2. 2/15/2019 - 0.4 hours for "Telephone call with client about working on articles," at $600 per hour;

3. 3/18/2019 - 0.5 hours for "Telephone call from client regardingF. K. Brewington putting Pfail decision up," and 0.2 hours for "Discussion with F. K. Brewington regarding posting," at $350 per hour;

4. 3/19/2018 – 0.2 hours for "returned telephone call to client regarding media," at $350/hour;

5. 3/20/2019 - 0.3 hours for "Email to F. K. Brewington, P. Lockett and R. Walker regarding posting," and 0.2 hours for "Emailto F. K. Brewington regarding posting," at $350 per hour;

6. 3/22/2019 – 0.4 hours for "Telephone call from Mrs.P fail about webpage," at $600 per hour;

7. 6/1/2025 – 0.8 hours for "Draft factual synopsis & follow up;" and 0.7 hours for "Public information and press conduct," at $600 per hour; and

8. 6/2/2025 - 0.4 hours for "Telephone on correct facts;" 0.3 hours to "Look at connections on correct facts," and .3 hours to "Send copy of correct facts, at $600 per hour.

None of these fees are compensable, and Plaintiff's award should be reduced accordingly.

## B. Non-Prevailing Claims

Plaintiff cannot recover fees associated with non-prevailing claims if those claims are severable from the prevailing claims. *See generally*, *Hensley v. Eckerhart*, 461 U.S. 424 (1983);

10

A-4641

*see also*, *LeBlanc–Sternberg v. Fletcher*, 143 F.3d 748, 762 (2d Cir. 1998) ("[w]hen a plaintiff has ... prevailed on fewer than all of his claims, the most important question in determining a reasonable fee is whether the failed claim was intertwined with the claims on which he succeeded").

In this case, Plaintiff asserted, litigated, but then withdrew before trial claims for disability discrimination claims under Title II of the Americans with Disabilities Act (ADA) and Section 4 of the Rehabilitation Act; false imprisonment; false arrest; intentional infliction of emotional distress; and negligence. These are all "non-prevailing claims" for the purposes of Plaintiff's Application. Because these non-prevailing claims have separate elements and rely on different evidence than those claims which prevailed at trial, they are severable from the prevailing claims. While Plaintiff does not specifically delineate his work by claim, it should not stop this Court from making an appropriate reduction based on the fact seven of Plaintiff's claims were non-prevailing. *See Hensley*, 461 U.S. at 436-37 ("the district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success"). Accordingly, reducing the award in Plaintiff's Application is appropriate in consideration of those dismissed, withdrawn, or otherwise non-prevailing claims that were part of Plaintiff's Complaint.

### C. Costs of Expert Witness Retention

Among Plaintiff's costs is a charge associated with Plaintiff's expert, Dr. Berrill, PhD., billed on May 15, 2020 for $4,000 as a "medical evaluation. *See* ECF Doc. No. 163-10, p. 75. This cost is not recoverable, as "§ 1988 does not allow the shifting of expert witness fees in § 1983 actions." *Walker v. City of New York*, 11–cv–314 (CBA), 2015 WL 4568305, at *12 (E.D.N.Y. Jul. 28, 2015) (citing *W. Virginia Univ. Hospitals, Inc. v. Casey*, 499 U.S. 83, 102 (1991)); *see also*, *Connor v. Ulrich*, 153 F.Supp.2d 199, 204 (E.D.N.Y.2001) ("Section 1988 does not convey

11

A-4642

the authority to shift expert fees to the losing party"). Plaintiff Counsel's recoverable costs should be reduced accordingly.

## IV.     PLAINTIFF COUNSEL'S HOURLY RATE IS EXCESSIVE.

The hourly rates submitted by attorneys Scott Korenbaum and Fred Brewington are excessive and should be lowered.

### A.  Attorney Scott Korenbaum

Attorney Scott Korenbaum seeks payment for a separate bill of fees for his work on this matter in the months of October and November 2024. *See* ECF Doc. No. 163-11, Korenbaum Decl., pp. 1 – 17. Attorney Korenbaum seeks fees at a rate of $550 per hour, based largely on his experience as a solo attorney practicing in the area of civil rights litigation. *Id.* As indicated above, however, Mr. Korenbaum's billing records suggest he was retained mostly to assist Mr. Brewington with Plaintiff's Application. *See* ECF Dkt. No. 63-11, p. 16. While a § 1988 fee application may be aided with the esoteric knowledge of a seasoned attorney like Mr. Korenbaum, his role in this case was similar to that of a senior associate or trial consultant, not a partner or the principal of his own firm. *See Claud v. Brown Harris Stevens of Hamptons, LLC*, 18-cv-01390, 2024 WL 245261, at *5 (E.D.N.Y. Jan. 23, 2024) (reducing fees of partner based on the "relatively limited nature of [his] work in this matter").

### B.  Attorney Fred Brewington

Attorney Fred Brewington seeks payment for his fees at a rate of $600 per hour. *See* Brewington Decl., pp. 1, 51. While Mr. Brewington's Declaration demonstrates years of experience with several marquee victories in the field of civil rights, $600 per hour is excessive. First, and as indicated above, the verdict rendered by the jury in this matter was not a complete victory for Plaintiff, as the jury rejected claims of assault and found Defendant O'Brien did not use excessive force or abuse process. ECF Dkt. No. 150, Verdict Sheet. Next, while this case surely

12

A-4643

required hours of work, it cannot be identified as uniquely complex or difficult, a fact bolstered by the relatively short duration of trial. *See Grant v. City of Syracuse*, 357 F. Supp. 3d 180, 204 (N.D.N.Y. 2019) (holding the trial court has "significant discretion" when determining the reasonableness of a plaintiff's attorney's purported expended hours "based on the scope and complexity of a case"). Moreover, courts in this Circuit have recognized that when reviewing fee applications, smaller civil rights firms are not "comparable to large Manhattan firms employing hundreds of lawyers." *Rosario v. City of New York*, 2023 WL 2908655, at *6 (S.D.N.Y Jan 27, 2023) (citing *Vilkhu v. City of New York*, 06-cv-02095 (CPS), 2009 WL 1851019, at *4 (E.D.N.Y. June 26, 2009); *see also*, *Wise v. Kelly*, 620 F. Supp. 2d 435, 446 (S.D.N.Y. 2008) ("[a]s different as (plaintiff's firm) is from a one to three-person firm or nonprofit entity, so, too, is it different from a firm like Skadden"). Based on the factors above, a rate of $500 per hour for Mr. Brewington is more reasonable for purposes of Plaintiff's Application.

Instead of reducing each of Mr. Brewington's bills by this rate, a more appropriate method for reducing the bills in Plaintiff's Application is with an "across the board" reduction, by a significant percentage in the range of 50%. S*ee, e.g., Daiwa Special Asset Corp. v. Desnick,* 00-cv-3856, 2002 WL 31767817, at *5 (S.D.N.Y. Dec. 3, 2002) (reducing fee award by 50% due to excessive billing); *LaBarbera v. J.E.T. Res., Inc.*, 396 F.Supp.2d 346, 352 (E.D.N.Y.2005) (hours reduced by fifty percent); *Days Inn Worldwide, Inc. v. Amar Hotels, Inc.*, 05 Civ. 10100 (KMW) (KNF), 2008 WL 2485407 at *10 (S.D.N.Y. June 18, 2008) (reducing excessive fees by 75%).

13

A-4644

**CONCLUSION**

For all the foregoing reasons, Defendants respectfully request that the Court defer ruling on the Plaintiff's application for fees and costs associated with prosecution of this matter. In the alternative, Defendants respectfully request that the Court reduce by forty (40) percent the total fees and costs requested by Plaintiff, for a maximum total of $238,445.36.

Dated: Carle Place, New York
September 4, 2025

**Sokoloff Stern LLP**
*Attorneys for Defendant Massaro*

By:    Leo Dorfman
179 Westbury Avenue
Carle Place, NY 11514
(516) 334-4500
File No.: 220017

To: All counsel by ECF

14

A-4645

**WORD COUNT CERTIFICATION**

This Memorandum of Law in Opposition to Plaintiff's Motion for Cost and Reasonable Attorneys' Fees is 3,715 words, exclusive of the caption and signature block, and therefore complies with the word count limit set forth in Local Rule 7.1(c) of the Joint Local Rules of S.D.N.Y. and E.D.N.Y.

Dated:  September 4, 2025
         Carle Place, New York

                                          SOKOLOFF STERN LLP

                                          _____
                                          Leo Dorfman

1

Case 2:16-cv-00518-NRM-PCG   Document 170   Filed 09/04/25   Page 1 of 48 PageID #: 3420

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------------- X

BRIAN PFAIL,                                                       DOCKET NO.: CV-16-518

                              Plaintiff,                                      (NRM)

              -against-

COUNTY OF NASSAU, NASSAU COUNTY
POLICE DEPARTMENT, POLICE OFFICER
JOSEPH MASSARO, in his individual and official
capacity POLICE OFFICER JONATHAN PANUTHOS,
in his individual and official capacity, POLICE OFFICER
KAREN C. O'BRIEN, in her individual and
official capacity, SERGEANT THOMAS IANNUCCI
in his individual and official capacity, and JOHN DOES
1-10 in their individual and official capacities,

                              Defendants.

-----------------------------------------------------------------------X

# PLAINTIFF'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS'
## MOTIONS FOR JUDGMENT AS A MATTER OF LAW,
## A NEW TRIAL OR REMITTITUR, PURSUANT TO
## FEDERAL RULE 50 AND 59

**LAW OFFICES OF**
**FREDERICK K. BREWINGTON**
**556 Peninsula Boulevard**
**Hempstead, New York 11550**
**(516) 489-6959**

**SCOTT A. KORENBAUM, ESQ.**
**14 Wall Street, Suite 1603**
**New York, NY 10005**
**(212) 587-0018**

**Attorneys for Plaintiff**

A-4647

## TABLE OF CONTENTS

**PAGE NO.**

**TABLE OF AUTHORITIES.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **iv**

**PRELIMINARY STATEMENT.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

**STATEMENT OF FACTS.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

**ARGUMENT.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

**POINT I**

THE EVIDENTIARY RULINGS CHALLENGED BY THE
DEFENDANTS REPRESENT APPROPRIATE EXERCISES
OF THE COURT'S DISCRETION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

    **A.**    THE COURT APPROPRIATELY EXERCISED ITS
DISCRETION IN PRECLUDING DEFENDANTS FROM
INTRODUCING DR. BERRILL'S CRIMINAL TRIAL
TESTIMONY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

    **B.**    THE COURT PROPERLY ALLOWED MR. PFAIL
TO QUESTION IANNUCCI AND PANUTHOS
ABOUT THE 911 CALLER'S VIDEO AND
MASSARO ABOUT HIS DESTRUCTION OF HIS
BLOODIED SWEATSHIRT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**

    **C.**    THE COURT APPROPRIATELY DENIED
DEFENDANTS' MOTION TO PRECLUDE DR.
BERRILL FROM TESTIFYING. . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**

    **D.**    THE COURT DID NOT ABUSE ITS DISCRETION IN
PRECLUDING THE DEFENDANTS FROM
UTILIZING THOSE RECORDS OF DR. GRIX'S
THEY PRODUCED ON THE EVE OF TRIAL. . . . . . . . . . . . . . . . . . **8**

**POINT II**

AMPLE EVIDENCE SUPPORTED THE JURY'S VERDICT
AND THE DEFENDANTS ARE NOT ENTITLED TO
QUALIFIED IMMUNITY WITH RESPECT TO ANY OF
MR. PFAIL'S CLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**

    **A.**    THE STANDARDS GOVERNING DEFENDANTS'
MOTIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**

B.      THE RELEVANT LEGAL PRINCIPLES GOVERNING MR. PFAIL'S MALICIOUS PROSECUTION CLAIM.................13

C.      AMPLE EVIDENCE EXISTED TO THE SUPPORT THE JURY'S FINDINGS OF LIABILITY REGARDING MR. PFAIL'S MALICIOUS PROSECUTION CLAIM...................................14

D.      THE LAW WAS CLEARLY ESTABLISHED AS OF NOVEMBER 3, 2014, THAT A POLICE OFFICER COULD NOT FALSIFY EVIDENCE IN AN EFFORT TO PROSECUTE A PERSON FOR CRIMES HE DID NOT COMMIT. .........................................16

E.      MR. PFAIL EASILY OVERCAME THE PRESUMPTION OF PROBABLE CAUSE ARISING FROM THE GRAND JURY INDICTMENT. ...................19

F.      AMPLE EVIDENCE EXISTED TO THE SUPPORT THE JURY'S FINDINGS OF LIABILITY REGARDING MR. PFAIL'S MALICIOUS ABUSE OF PROCESS CLAIM AND THE DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY. ................20

G.      AMPLE EVIDENCE SUPPORTS THE JURY'S VERDICT ON MR. PFAIL'S EXCESSIVE FORCE AND BATTERY CLAIMS AND THE DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY.............21

POINT III

        AMPLE EVIDENCE EXISTED OF PHYSICAL INJURIES AND LONG-TERM DETERIORATION OF MENTAL HEALTH TO SUSTAIN THE JURY'S COMPENSATORY DAMAGES AWARD.........................................23

POINT IV

        THE JURY'S AWARD OF PUNITIVE DAMAGES REFLECTED ITS RECOGNITION THAT IANNUCCI, MASSARO AND PANUTHOS RUTHLESSLY ATTACKED MR. PFAIL AND THEN, WITH THE ASSISTANCE OF O'BRIEN, ATTEMPTED TO COVER THEIR TRACKS BY FRAMING MR. PFAIL FOR CRIMES HE DID NOT COMMIT. ....................................................26

A-4649

A.      The standards governing remittitur. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

      1.      Reprehensibility. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

      2.      The ratio of punitive damages to
           compensatory damages.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

      3.      Comparable civil or criminal penalties.. . . . . . . . . . . . . . . . . . . 33

      4.      Relevant case law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34


CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

**TABLE OF AUTHORITIES**

CASE NAME                                                           PAGE NO.

*Adedeji v. Hoder,*
**935 F. Supp. 2d 557 (E.D.N.Y. 2013)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

*Alla v. Verkay,*
**979 F. Supp.2d 349 (E.D.N.Y. 2013)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **29, 35**

*Amnesty America v. Town of W. Hartford,*
**361 F.3d 113 (2d Cir. 2004)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **23**

*Amorgianos v. Amtrak,*
**303 F.3d 256 (2d Cir. 2002)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**

*Besedin v. County of Nassau,*
**18-cv-819, 2024 U.S. Dist. LEXIS 168488 (E.D.N.Y. Sept. 18, 2024)** . . . . . . . . . . . . . . . . . . **21**

*BMW of North America, Inc. v. Gore,*
**517 U.S. 559 (1996)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

*Bogle v. McClure,*
**332 F.3d 1347 (11th Cir. 2003)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **31, 36, 37**

*Breen v. Garrison,*
**169 F.3d 152 (2d Cir. 1999)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **23**

*Bridgeview Health Care Ctr. v. Clark,*
**09 C 5601, 2012 U.S. Dist. LEXIS 184089 (E.D. Ill. Sep. 28, 2012)** . . . . . . . . . . . . . . . . . . . **31**

*Cameron v. City of New York,*
**598 F.3d 50 (2d Cir. 2010)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13, 15**

*Cook v. Sheldon,*
**41 F.3d 73 (2d Cir. 1994)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**

*DiSorbo v. Hoy,*
**343 F.3d 172 (2d Cir. 2003)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **28**

*Drayton v. City of New York,*
**17-cv-7091, 2022 U.S. Dist. LEXIS 207165 (E.D.N.Y. Dec. 2, 2022)** . . . . . . . . . . . . . . . . . . **19**

*Edrei v. Maguire,*
**892 F.3d 525 (2d Cir. 2018)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**

*Fresh v. Entm't U.S.A., Inc.,*
**340 F. Supp. 2d 851 (W.D.Tenn. 2003).** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **31, 35**

*Gagnon v. Ball,*
**696 F.2d 17 (2d Cir. 1982).**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

*Garnett v. Undercover Officer C0039,*
**838 F.3d 265 (2d Cir. 2016).**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **29**

*Greenaway v. County of Nassau,*
**327 F. Supp. 2d 552 (E.D.N.Y. 2018).** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **26**

*Hope v. Pelzer,*
**536 U.S. 730 (2002).**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**

*Ismail v. Cohen,*
**899 F.2d 183 (2d Cir. 1990).**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **34**

*Jennings v. Yurkiw,*
**18 F.4th 383 (2d Cir. 2021).** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27, 28, 29, 31, 32, 33, 34**

*Kee v. City of New York,*
**12 F.4th 150 (2d Cir. 2021).**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **14**

*King v. New York City Bd. of Educ.,*
**CV 96-2730, 2000 U.S. Dist. LEXIS 18709 (E.D.N.Y. Dec. 19, 2000).** . . . . . . . . . . . . . . . . . . . . **2**

*Kyles v. Whitley,*
**514 U.S. 419 (1995).**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**

*Lee v. Edwards,*
**101 F.3d 805 (2d Cir. 1996).**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **26, 27, 28, 29, 32**

*Lore v. City of Syracuse,*
**670 F.3d 127 (2d Cir. 2012).**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13**

*Manganiello v. City of New York,*
**612 F.3d 149 (2d Cir. 2010).**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6, 17, 20**

*Manganiello v. Agostini,*
**07 Civ. 3644, 2008 U.S. Dist. LEXIS 99181 (S.D.N.Y. Dec. 9, 2008).** . . . . . . . . . . . . . . . . . . **19**

*Marshall v. Port Auth.,*
**19 Civ. 2168, 2022 U.S. Dist. LEXIS 219372 (S.D.N.Y. Dec. 5, 2022).** . . . . . . . . . . . . . . . . . . **6**

*Martinez v. Port Auth.*,
01 Civ. 721, 2005 U.S. Dist. LEXIS 19141 (S.D.N.Y. Sep. 2, 2005).. . . . . . . . . . . . . . . . . . . . . . 26

*McClellan v. Smith*,
439 F.3d 137 (2d Cir. 2006).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Morse v. Fusto*,
804 F.3d 538 (2d Cir. 2015).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Mullenix v. Luna*,
577 U.S. 7 (2015).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Patterson v. Balsamico*,
440 F.3d 104 (2d Cir. 2006).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Payne v. Jones*,
711 F.3d 85 (2d Cir. 2012).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 27, 32

*Perry v. Ethan Allen, Inc.*,
115 F.3d 143 (2d Cir. 1997).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Provost v. City of Newburgh*,
262 F.3d 146 (2d Cir. 2001).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133 (2000).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Robertson v. Sullivan*,
07-cv-1416, 2010 U.S. Dist. LEXIS 46691 (E.D.N.Y. May 12, 2010). . . . . . . . . . . . . . . . . . . 18

*Robinson v. Via*,
821 F.2d 913 (2d Cir. 1987).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Rosario v. City of New York*,
18 Civ. 4023, 2021 U.S. Dist. LEXIS 91675 (S.D.N.Y. May 13, 2021). . . . . . . . . . . . . . . . . . 25

*Russo v. Tuttnauer USA Co. Ltd.*,
21 CV 1720 , 2025 U.S. Dist. LEXIS 108048 (E.D.N.Y. Jun. 6, 2025).. . . . . . . . . . . . . . . . . 26

*Savino v. City of New York*,
331 F.3d 63 (2d Cir. 2003).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Servs. v. Town of Cromwell*,
12 F.4th 93 (2d Cir. 2024). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

*Singer v. Fulton Co. Sheriff*,
**63 F.3d 110 (2d Cir. 1995)**.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13**

*Smith v. Wade*,
**461 U.S. 30 (1983)**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27, 37**

*Toporoff Engineers, P.C. v. Fireman's Fund Ins. Co.*,
**371 F.3d 105 (2d Cir. 2004)**.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13**

*Tracy v. Freshwater*,
**623 F.3d 90 (2d Cir. 2010)**.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **23**

*Triolo v. Nassau Cnty.*,
**24 F.4th 98 (2d Cir. 2022)**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **23**

*United States v. Maxwell*,
**20-CR-330, 2021 U.S. Dist. LEXIS 220399 (S.D.N.Y. Nov. 11, 2021)**.. . . . . . . . . . . . . . . . **7, 8**

*United States v. Finley*,
**301 F.3d 1000 (9ᵗʰ Cir. 2002)**.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**

*Zellner v. Summerlin*,
**494 F.3d 344 (2d Cir. 2007)**.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**

**STATUTES**

**18 U.S.C. § 3571(b)(3)**.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**18 U.S.C. § 1623**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**18 U.S.C. § 242**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**18 U.S.C. § 3571(b)(3)**.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**18 U.S.C. §1621**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**42 U.S.C. § 1983**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**N.Y. Penal L. § 120.05**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**N.Y. Penal L. § 210.15**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**N.Y. Penal L. § 175.10.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**N.Y. Penal L. § 70.00.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

**Preliminary Statement**

The jury's verdicts reflected the defendants' brutal assault of Brian Pfail on the evening of November 3, 2014, and subsequent cover up designed to conceal their unconstitutional acts. The defendants' unjustified use of force left Mr. Pfail with a traumatic brain injury ("TBI"), which severely exacerbated his pre-existing depression and post-traumatic stress disorder. The cover up included withholding video evidence that the jury readily found put the lie to the defendants' claims of justifiable force, and destroying evidence that would have disproved the defendants' claim that Mr. Pfail caused their injuries. It also included Massaro's false claim that Mr. Pfail bit him. The jury's awards of $1,860,000 in compensatory damages and $1,024,290 in punitive damages were supported by substantial evidence of harm, fault, and reprehensibility.

Mr. Pfail submits this memorandum of law in opposition to the defendants' motion for judgment as a matter of law, a new trial, or a reduction of the jury's award of compensatory and punitive damages. Having presided over the trial, Mr. Pfail is confident the Court appreciates that ample evidence existed to support the jury's verdicts. In arguing to the contrary, defendants improperly view the evidence most favorably to them. And their arguments for a new trial on liability or damages based upon the Court's alleged evidentiary errors are wrong.

Defendants' sole argument regarding the need to remit the jury's compensatory damages award rests on their claim that the defendants' assault did not exacerbate Mr. Pfail's psychological injuries. The jury heard the defendants' arguments and rejected them. Their arguments regarding the jury's award of punitive damages awards ignore Mr. Pfail's evidence and the depravity of their actions.

**Statement of Facts**

Because the Court presided over the trial, Mr. Pfail presumes its familiarity with the

A-4656

proceedings.  He refers to the Declaration of Frederick K. Brewington ("Brewington Dec."), dated September 4, 2025, and Exhs. 1-8, to support his arguments.

**Argument**

**Point I**

**The evidentiary rulings challenged by the defendants represent appropriate exercises of the Court's discretion**

Defendants seek a new trial on liability for two reasons.  They claim the Court erred in precluding them from introducing testimony provided by Dr. Berrill during Mr. Pfail's criminal trial that Mr. Pfail's preexisting TBI rendered him unable to control himself.  They also claim that the Court erred in permitting Mr. Pfail to cross-examine defendants Iannucci and Panuthos about their failure to preserve video recorded by the Fairway employee who had called 911 to report how the defendants "just jumped out of this car and started beating on this guy. . . [,]" and Massaro about his destruction of his bloodied sweatshirt. Mr. Pfail demonstrates below that the defendants' arguments are meritless.

Defendants seek a new trial on damages for two reasons.  They claim the Court erred in permitting Dr. Berrill to testify about the damages Mr. Pfail sustained at the defendants' hands.  They also claim the Court erred in precluding them from utilizing 900 pages of materials from Dr. Grix that they produced to Mr. Pfail's counsel on the eve of trial.  These arguments are likewise meritless.

Rule 59 of the Federal Rules of Civil Procedure authorizes the grant of a new trial if a trial court's evidentiary errors represent substantial prejudice.  *King v. New York City Bd. of Educ.*, CV 96-2730, 2000 U.S. Dist. LEXIS 18709, *20 (E.D.N.Y. Dec. 19, 2000) (citing Fed. R. Civ. Proc. 61).  To establish an entitlement to a new trial for evidentiary errors, the moving party

-2-

shoulders a heavy burden.  The movant must demonstrate that the evidentiary errors swayed the factfinder's judgment in some material respect, and that the absence of relief would be inconsistent with substantial justice.  *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 150 (2d Cir. 1997).

**A.    The Court appropriately exercised its discretion in precluding defendants from introducing Dr. Berrill's criminal trial testimony**

Defendants claim the Court erred in precluding them from introducing testimony Dr. Berrill gave at Mr. Pfail's criminal trial.  Distilled to its essence, their argument is that Dr. Berrill's testimony, which was designed "to avoid the intent elements of various crimes charged against [Mr. Pfail]" (Defs. Memo at 4), supported their claims that Mr. Pfail was the aggressor. Defs. Memo at 4-8.

Pre-trial, defendants sought reconsideration of the Court's denial of their motion.  They contended, as they do here, that "the jury must be made aware of Dr. Berrill's testimony that Plaintiff's preexisting injury negated intent and excused Mr. Pfail from complying as this testimony also tends to support the officers' claim that Mr. Pfail was given a reasonable opportunity to comply and he did not. This evidence, from Plaintiff's own expert, supports the officers' claim that the amount of force used was proper, that probable cause for the assault and resisting charges never dissipated and that their actions supporting the prosecution were not malicious." Brewington Dec. at Exh. 6, p. 2.

Following jury selection on May 12, 2025, the Court denied the defendants' motion on the record.  Defendants do not provide a copy of the Court's oral ruling; Mr. Pfail incorporates the Court's May 12th ruling herein.  Brewington Dec. at ¶ 8.  He also notes that Dr. Berrill's proposed testimony did not prove what defendants sought.  Mr. Pfail's intent was not an issue

for the jury.  The jury was asked to determine whether probable cause existed to arrest and prosecute Mr. Pfail for assault and resisting arrest based upon what the defendants knew at the moment they decided to arrest him.  Whether Mr. Pfail had the requisite intent to comply with the officers' requests had no relevance to what the officer saw, heard and otherwise knew at the relevant times. If Mr. Pfail behaved as the officers claim, why he did so was irrelevant.

Relatedly, defendants' argument ignores that the jury saw video of the initial encounter between Mr. Pfail, Panuthos, Iannucci and Massaro.  The video left little doubt that Panuthos kicked Mr. Pfail immediately after Mr. Pfail placed his left hand up in an effort to make them stop.  That conclusion was bolstered by Iannucci's testimony.  Iannucci testified that as Panuthos ran towards Mr. Pfail, Mr. Pfail never ran, never advanced towards any of the defendants, and never advanced to attack them.  (Tr. 613-14.)  Similarly, Iannucci testified that Panuthos put up his leg as he approached Mr. Pfail, that Mr. Pfail was stationary as that occurred, and that after Panuthos made contact with Mr. Pfail these three defendants dragged Mr. Pfail to the ground or tackled him.  (Tr. 616-18.)  Because Dr. Berrill's testimony did not shed light on what Mr. Pfail did or did not do, the Court appropriately exercised its discretion in excluding it under Rule 403 of the Federal Rules of Evidence.

**B.    The Court properly allowed Mr. Pfail to question Iannucci and Panuthos about the 911 caller's video and Massaro about his destruction of his bloodied sweatshirt**

Defendants contend that the Court erred in denying their motion to preclude Mr. Pfail from questioning Iannucci and Panuthos about their failure to secure from the 911 caller the video he took, which they viewed, and questioning Massaro about the destruction of his sweatshirt, which was covered with blood.  They claim they had no duty to preserve this evidence and, as a result, their failure to maintain it rendered it immaterial.  Defs. Memo at 8-12.

-4-

A-4659

Defendants contentions are legally and factually wrong, and ignore the purpose for which the Court allowed questioning.

We start with Massaro's destruction of his sweatshirt, which bore directly on his credibility. As the Court noted, Mr. Brewington "has easily cleared the low bar of relevancy and I don't see that there's any unfair prejudice to Mr. Massaro. I think credibility is always relevant to a party in the case and I think there's a fair ground for Mr. Brewington to argue that the reason that Mr. Massaro destroyed the sweatshirt was he did not want it to be available as evidence and that does it is relevant in this trial to the jury's resolution of the factual disputes of which there are many as I understand it on the excessive force claim including, but not limited to the extent to which Mr. Pfail was bleeding at the time and the comparative extent, potentially, as to whether the defendant suffered those injuries." (Tr. 37-38.) Or as the Court succinctly noted after hearing further argument, "I think what he did with the item of clothing that he was wearing that by his own admission had blood on it, particularly after he, himself, pursued a claim of felony assault against Mr. Pfail in which he, himself, claims that he was bloodied is highly relevant. There may be some prejudice to Mr. Massaro, but it is not unfair prejudice in any way. It is a legitimate area of inquiry as to his good faith, his credibility, which is relevant to all of the claims." (Tr. 161-62.)

The same holds true for Iannucci's and Panuthos' failure to secure and produce the video created by the 911 caller. Again, the Court correctly noted their failure to obtain the video and produce it to the DA's Office bore directly on their credibility. (Tr. 45-47.) And defendants' focus on the video ignores the gravity of their actions. Iannucci's testimony made clear that he did nothing to preserve the identity of the 911 caller, who the parties labeled the "cart wrangler." (Tr. 639.) He did not take any notes of his interview with him, did not jot down his name or

-5-

A-4660

address and did not request a business card.  Iannucci let this person walk out without taking his information "because he didn't witness anything that was valuable to us." (Tr. 649-50.) Iannucci admitted that the 911 caller saw something, and the video captured something, but it was his opinion that this evidence had no value.  (Tr. 652-53.)  But it was the district attorney's obligation, and not Iannucci's, to assess the value of such evidence, particularly when it captured some or all of the events underlying Mr. Pfail's arrest and criminal prosecution.  *Kyles v. Whitley*, 514 U.S. 419, 437-38 (1995).  *See Manganiello v. City of New York*, 612 F.3d 149, 162-63 (2d Cir. 2010) (recognizing that a police officer must turn over exculpatory evidence to the prosecution for assessment of the strengths and weaknesses of a potential prosecution).  For these reasons alone, defendants' argument that they had no duty to preserve these materials is irrelevant – and wrong.  Defs. Memo at 8-10.

Defendants have no meaningful answer to the Court's rulings.  Their arguments about the lack of relevancy of the evidence rests upon their say so.  Defs. Memo at 11.  But the jury heard the cart wrangler's 911 call, who described how "these three guys just jumped out of this car and started beating on this guy. . . ."  From this testimony alone the jury could have concluded that the video captured relevant information.

For these reasons, the case law cited by defendants is inapplicable.  Defs. Memo at 10-11.  Neither *Savino v. City of New York*, 331 F.3d 63 (2d Cir. 2003), nor *Marshall v. Port Auth.*, 19 Civ. 2168, 2022 U.S. Dist. LEXIS  219372, *25-28 (S.D.N.Y. Dec. 5, 2022), involved the destruction of evidence or failure to turn over evidence that bore directly on the events at issue by the individual defendants.  And the remaining two cases cited by defendants merely cite the legal principles governing spoliation of evidence.

**C.    The Court appropriately denied defendants' motion to preclude Dr. Berrill from testifying**

Defendants contend they are entitled to a new trial on damages because the Court should not have permitted Plaintiff's expert, Dr. N.G. Berrill, PhD, to testify that "there had been an exacerbation of or a new TBI sustained by Plaintiff in the subject encounter." Defs. Memo at 12. A review of their arguments reflect a rehashing of many of the same arguments in their pretrial motion *in limine*, and Mr. Pfail refers the Court to its prior ruling denying the defendants' motion for the myriad reasons why the Court's ruling remains correct. Brewington Dec. at Exh. 5. Mr. Pfail addresses below some additional flaws in the defendants' arguments.

Defendants' chief argument is that Dr. Berrill merely parroted Mr. Pfail's claim that his TBI and PTSD were exacerbated. Defs. Memo at 14-15. Not so. Discussing the well-documented phenomenon of complex trauma, Dr. Berrill described how "the cumulative effect of additional traumas only adds to the problems and the difficulties the individual suffering from these disorders have because they ratchet up the symptoms and make the symptoms worse." (Tr. 1652.) And as the Court correctly recognized, psychologists "necessarily must rely and evaluate the reporting they may receive from the patient or party." Brewington Dec. at Exh. 5, p. 11. *See United States v. Maxwell*, 20-CR-330, 2021 U.S. Dist. LEXIS 220399, *9-10 (S.D.N.Y. Nov. 11, 2021). As the Ninth Circuit recognized in *United States v. Finley*, 301 F.3d 1000, 1009 (9th Cir. 2002), proper psychological methodology and reasoning include relying upon patient narratives and observing their behavior.

Relatedly, defendants complain that "the Court allowed Dr. Berrill to opine that there was a second TBI" without objective data. Defs. Memo at 15. Defendants ignore that Dr. Berrill testified that his review of the records reflected that Mr. Pfail suffered a concussion or a

second TBI on November 3, 2014, and that a concussion is a form of TBI. (Tr. 1643-49.) Defendants also ignore that the jury saw a photograph of Mr. Pfail (Plaintiff's Exh. 78) reflecting the wound to his head that doctors used staples to close (Tr. 795-96), which corroborated Dr. Berrill's conclusion.

Defendants' challenge to Dr. Berrill's testimony amounts to nothing more than a disagreement with his opinions. But a trial court's job is not to assess whether it agrees or disagrees with the expert's opinions; it is to analyze the soundness of the principles and methodologies employed by an expert in reaching his or her conclusions. *Amorgianos v. Amtrak*, 303 F.3d 256, 266 (2d Cir. 2002) (citation omitted). Here, Dr. Berrill considered Mr. Pfail's medical history, including his prior TBI, depression and anxiety, and incorporated them into his opinion that the TBI Mr. Pfail suffered on November 3, 2014, negatively impacted his ability to function. The Court correctly recognized that the defendants' arguments to the contrary went to the weight of Dr. Berrill's testimony, and not to its admissibility. *Maxwell*, 2021 U.S. Dist. LEXIS 220399 at *10 ("the Defense is of course free to cross-examine Dr. Rocchio about how she evaluates her patients.").

At bottom, defendants' argument wreaks of buyer's remorse. They could have presented the expert testimony of Dr. Gordon, who they had identified as their expert witness, to challenge the opinions of Dr. Berrill. They chose not to – or to offer any other evidence in their affirmative case. That choice was theirs to make and is now theirs to deal with following the jury's verdict.

**D.    The Court did not abuse its discretion in precluding the defendants from utilizing those records of Dr. Grix's they produced on the eve of trial**

Defendants also seek a new trial on damages because the Court allegedly abused its

-8-

discretion in precluding them from using certain of Dr. Grix's medical records to impeach Mr. Pfail's or Dr. Berrill's testimony, or to question Dr. Grix at trial. Defs. Memo at 17-24. But that is not what the Court ruled. Rather, the Court ruled that the defendants could not use the approximate 900 pages, which defendants represented were approximately 130 pages of substantive records (Tr. 1230), that it "dumped" upon Mr. Pfail's counsel on the eve of trial. The Court made clear, as discussed below, that defendants remained free to utilize whatever records it had previously obtained to question any witness. In reaching its conclusion, the Court analyzed the relevant factors articulated by the Second Circuit in *Patterson v. Balsamico*, 440 F.3d 104 (2d Cir. 2006), and recognized that allowing defendants to use these records would unduly prejudice Mr. Pfail's counsel. (Tr. 1225-43.) Mr. Pfail refers the Court to its May 22, 2025 ruling granting Mr. Pfail's motion to preclude for the reasons why the Court's ruling remains correct. *See* Brewington Dec. at Exh. 7. Mr. Pfail addresses below some additional flaws in the defendants' arguments.

Defendants go to great lengths to argue a lack of prejudice to Mr. Pfail because Dr. Grix was not a surprise witness. Defs. Memo at 21-22. But the identify of Dr. Grix was not the issue. It was defendants' failure to produce the newly obtained records until the eve of trial that prejudiced Mr. Pfail. And while defendants went to great lengths to establish their diligent efforts (Brewington Dec. at Exh. 7), the Court correctly rejected that post-hoc explanation in favor of defense counsel's earlier admission that they screwed up in not getting the records sooner. Brewington Dec. at Exh. 5, p. 15 ("Court: You're not putting the fault on Dr. Griggs, you're saying that someone on defense counsel's team who was supposed to get the full set of records did not request them prior to some recent time? Mr. Dorfman: That's right.").

Defendants contend that the Court "failed to require a demonstration by Plaintiff that he

A-4664

would somehow be unfairly prejudiced by these records." Defs. Memo at 23. They are wrong. During the May 6th conference, Brewington detailed the prejudice he anticipated if the Court did not grant the motion to preclude. Brewington Dec. at Exh. 5, pp. 25-27. And after inviting submissions from the parties, the Court agreed. As the Court noted, "It's also prejudicial to plaintiff's counsel and plaintiff's overall case, as it takes a significant amount of time away from preparing for other as aspects of trial. That's particularly so since I bifurcated the trial just prior to its commencement and counsel appropriately triaged their witness preparation to focus on the liability phase initially. We now have a jury deliberating over those claims and will start the damages case immediately after they conclude, if needed. Second, the late production of these documents does not only affect trial preparation, it also affects the many decisions plaintiff's counsel made during the years-long course of this litigation leading up to trial." (Tr. 1236-37.)

The Court also appreciated the element of gamesmanship underlying defendants' arguments. Defendants argued, as they do here, the lack of prejudice to Mr. Pfail because he listed Dr. Grix on the Joint Pretrial Order – as noted, that was beside the point. They did not obtain the disputed records, however, until Mr. Pfail's counsel told them he would not be calling Dr. Grix as a witness. But as the Court noted in response to counsel's representation that that lit the fire underneath them, "Why did that put [you] on [the] horse to get the records if she was on plaintiff's witness list and you were going to cross her and she was his treating psychologist for all those years? Why were you suddenly like, oh, maybe we should get her records. I think[] that's been conceded that you should have gotten them earlier." Brewington Dec. at Exh. 5, p. 20.

Contrary to defendants' suggestion, the Court did not preclude defendants from utilizing any of Dr. Grix's records. The Court made clear that the defendants could question Mr. Pfail,

-10-

A-4665

Dr. Berrill and Dr. Grix (if they chose to call her) about anything contained in Dr. Grix's records that they had obtained independent of the challenged records. (Tr. 1244-50.)  Defendants did not call Dr. Grix or Dr. Gordon, their designated expert witness; however, defense counsel had only themselves to blame because they were unable to separate the newly received documents from those they had already obtained.  Once again, the trial strategy employed by Defendants was not to call Dr. Grix. That, like deciding not to call their expert, was a decision of their own making.

Finally, defendants' claim of prejudice is overstated.  Defendants' closing argument (Tr. 1906-35) highlighted potential weaknesses in Dr. Berrill's testimony.  In fact, defendants highlighted their failure to call any mental health professionals because "Dr. Berrill [was] effectively our expert." (Tr. 1909.)  Among other things, defendants stressed how Dr. Berrill never treated Mr. Pfail, Mr. Pfail's failure to call any of the mental health professionals he saw over the years, and the medical records Dr. Berrill did not review.  (Tr. 1912-14.)  Concerning Dr. Grix, defendants highlighted the failure of Mr. Pfail to call her as a witness even though she had treated him for more than 10 years, and Dr. Berrill's failure to review her medical records (Tr. 1914-15.)  They also highlighted how, in their opinion, Dr. Berrill did nothing more than rely upon Mr. Pfail's self-reports.  (Tr. 1917.)  Last, but not least, defendants argued strenuously, as they do here (see Point III, below), that Dr. Berrill's testimony was unreliable because he failed to consider the Garden City case, which they strenuously argued undermined Dr. Berrill's testimony regarding causation.  (Tr. 1921-26.)

A-4666

## Point II

**Ample evidence supported the jury's verdict and the defendants are not entitled to qualified immunity with respect to any of Mr. Pfail's claims**

Defendants claim they are entitled to judgment as a matter of law on all of Mr. Pfail's claims. In advancing their arguments, defendants view the evidence most favorably to them and cherry pick Mr. Pfail's testimony in disregard of the rules governing the Court's review. The Court should deny their motion in its entirety.

**A. The standards governing defendants' motions**.[1]

"In entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record." That review

> must draw all reasonable inferences in favor of the nonmoving party . . . Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. . . . That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses.

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000) (citations and quotations omitted),

The Court cannot grant a motion for lack of sufficient evidence unless there is "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, []or . . . the evidence in favor of defendants so overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against

---

[1] While defendants articulate the standards governing a motion for a new trial, they do not advance any such arguments. Accordingly, Mr. Pfail only addresses the arguments relating to their Rule 50(b) motion.

-12-

A-4667

[them]."  *Toporoff Engineers, P.C. v. Fireman's Fund Ins. Co.*, 371 F.3d 105, 108 (2d Cir. 2004) (quotation marks and citations omitted).  In reaching its verdict, the jury was free to select the evidence it chose to rely on.  *See Lore v. City of Syracuse*, 670 F.3d 127, 150 (2d Cir. 2012).

**B.      The relevant legal principles governing Mr. Pfail's malicious prosecution claim.**

The elements of a malicious prosecution claim are well-known.  "Malicious prosecution occurs when (1) the defendant initiated a prosecution against plaintiff, (2) without probable cause to believe the proceeding can succeed, (3) the proceeding was begun with malice and, (4) the matter terminated in plaintiff's favor."  *Cameron v. City of New York*, 598 F.3d 50, 63 (2d Cir. 2010).  Mr. Pfail also had to establish that he suffered a post-arraignment deprivation of liberty.  *Singer v. Fulton Co. Sheriff*, 63 F.3d 110, 116 (2d Cir. 1995).  At trial, it was undisputed that Mr. Pfail's criminal prosecution terminated in his favor and that he suffered a post-arraignment deprivation of liberty.  (Tr. 1178).

Defendants claim that probable cause existed to prosecute Mr. Pfail for Resisting Arrest and Assault in the Second Degree.  The Court instructed the jury, without objection from the defendants, as follows:

> Probable cause to prosecute exists when the facts and
> circumstances within an officer's knowledge at the time he or she
> takes steps to proceed with a prosecution are sufficient for an officer of reasonable prudence to believe that the person being charged was guilty of the crimes charged. Even if the defendant personally believed that the plaintiff was guilty, that belief is not enough if a reasonably prudent person would not have believed that to be so. On the other hand, the fact that the plaintiff was ultimately acquitted of a criminal charge does not mean that a defendant lacked probable cause at the time the prosecution was initiated. Whether probable cause existed depends upon the reasonable conclusions to be drawn from the facts known to the Defendants at the time of the arrest and prosecution of the Plaintiff.

> You're not to determine whether the plaintiff was, in fact, innocent
> or guilty of the offenses for which he was prosecuted. You're only
> to determine whether, based on the facts as they reasonably
> appeared to the defendants, a reasonably prudent officer would

-13-

A-4668

> have believed that the plaintiff was guilty of all of the crimes with which he was charged. If you find the defendant lacked probable cause as to any one of the charged offenses, the plaintiff has met his burden of proof as to this element.

(Tr. 1180-81.)  The instructions regarding probable cause accurately reflect the law, which requires a plaintiff to establish only that probable cause was lacking for any of the charged offenses.  *See Kee v. City of New York*, 12 F.4th 150, 166 (2d Cir. 2021) (citations omitted).

**C.    Ample evidence existed to the support the jury's findings of liability regarding Mr. Pfail's malicious prosecution claim.**

Defendants' arguments regarding probable cause are easily disposed of.  Mr. Pfail only had to establish that probable cause was lacking for Resisting Arrest and Assault in the Second Degree.  *Kee*, 12 F.4th at 166 ("Although probable cause to prosecute is a complete defense to a claim of malicious prosecution, . . . such probable cause must be shown as to each crime charged in the underlying criminal action. . . .") (citations omitted).  Here, the jury easily found that defendants lacked probable cause to arrest and prosecute him for Resisting Arrest and Assault in the Second Degree.

Regarding Assault in the Second Degree, the Court instructed the jury in relevant part as follows: "a person is guilty of assault in the secretary [sic] degree when, with intent to prevent a police officer from performing a lawful duty, he causes physical injury to such person.  Intent means that the person had a conscious purpose or objective. Physical injury means impairment of physical condition or substantial pain."  (Tr. 1181.)  Regarding Resisting Arrest, the Court instructed the jury in relevant part as follows: "a person is guilty of resisting arrest when he intentionally prevents or attempts to prevent a police officer from effecting an authorized arrest of himself.  Intent means that the person had a conscious objective or purpose."  (Tr. 1182.)

Defendants contend that the undisputed evidence shows that Mr. Pfail resisted their

-14-

efforts to arrest him both outside and inside the Fairway, giving them probable cause to arrest him for Resisting Arrest.  They claim, citing their testimony, "they had their badges around their necks."  They claim, citing their testimony, that Mr. Pfail swung his fist in their direction. . . . He then turned back and took a fighting stance."  And they claim, citing their testimony, that Mr. Pfail violently resisted their efforts to arrest him by kicking his legs up, pushing us off of him, and by refusing to allow himself to be handcuffed.  They also contend that the video of the events outside the Fairway (Plaintiff's Exh. 74-B) support their claim.  Defs. Memo at 26-27.

Defendants' arguments fail because they ignore or skew Mr. Pfail's testimony.  Starting with video, it was for the jury to determine who did what outside the Fairway.  *Cameron*, 598 F.3d at 60-61 (judgment as a matter of law unwarranted because the time-lapse photographs of plaintiff's arrest did not definitively establish that probable cause was lacking for her arrest). The jury easily concluded that Mr. Pfail did not swing his fist at Panuthos, or any of the defendants, which was consistent with Mr. Pfail's testimony.  (Tr. 780, 802, 911-13.)  Nor did the jury have to accept defendants' testimony that they had identified themselves as police officers because their shields were visible to Mr. Pfail.  (Tr. 861-62, 865.)

Equally unavailing is defendants' contention that Mr. Pfail violently resisted their efforts to arrest him.  The Court should reject defendants' claim that Mr. Pfail admitted "physically struggling with the officers, trying to fend them off, trying to free his hands, pick up his head up off the floor, and 'defend' himself" (Defs. Memo at 27) because it distorts Mr. Pfail's testimony. Mr. Pfail's testimony made clear that he did not strike any of the officers while they attempted to handcuff him and whatever physical movements he made were to protect himself from the beating being administered by the defendants.  (Tr. 869-71.)

Defendants' arguments regarding probable cause to arrest Mr. Pfail for Assault in the

-15-

A-4670

Second Degree rely upon the above arguments and introduce the physical injury element of the offense. They claim that "all four suffered physical injuries in their efforts to place the Plaintiff under arrest." Defs. Memo at 27. They argue either that Mr. Pfail physically injured Massaro, Panuthos or O'Brien, or that Massaro and Iannucci injured themselves while effectuating Mr. Pfail's arrest. Defs. Memo at 27-28. Both arguments fail. Mr. Pfail denied punching or biting Massaro (Tr. 802, 887); Massaro admitted he did not know how he suffered a bloody nose, which could have occurred from an elbow of his co-defendants. (Tr. 138.) Mr. Pfail also denied punching Panuthos (Tr. 802) or kicking O'Brien (Tr. 790, 802.)

Regarding their assertion that Massaro and Iannucci injured themselves while arresting Mr. Pfail, they cite no case law to support this proposition. And this argument necessarily fails because, for the reasons discussed above, the jury readily concluded that Mr. Pfail did nothing more than protect himself against the defendants' unjustifiable use of force, which meant defendants knew that Mr. Pfail did not intend to injure them and that they, and not Mr. Pfail, were the cause of their injuries. Where an officer knows that an element of an offense is missing, probable cause to arrest is absent. *Provost v. City of Newburgh*, 262 F.3d 146, 157-58 (2d Cir. 2001).

**D.     The law was clearly established as of November 3, 2014, that a police officer could not falsify evidence in an effort to prosecute a person for crimes he did not commit**

Nor are defendants entitled to qualified immunity. "Qualified immunity protects public officials performing discretionary functions from personal liability in a civil suit for damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. . . . Whether qualified immunity applies turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were

-16-

A-4671

clearly established at the time it was taken. . . . [A] right is clearly established if it would be clear to a reasonable [public official] that his conduct was unlawful in the situation he confronted." *Morse v. Fusto*, 804 F.3d 538, 546 (2d Cir. 2015).

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (citation omitted). A case on all fours is not required to place officers on notice. Cases with fundamentally or materially similar facts are not required so long as the officer had "fair warning" that the conduct in which (s)he engaged was unconstitutional. The law can be clearly established even when "the very action in question" has not "previously been held unlawful" so long as the unlawfulness of the actions was "apparent" "in light of pre-existing law." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citations omitted). *See Edrei v. Maguire*, 892 F.3d 525, 541-43 (2d Cir. 2018) (citation omitted).

The Court must view the evidence most favorably to Mr. Pfail when considering defendants' claim of qualified immunity because they never requested that the jury answer special interrogatories. *Zellner v. Summerlin*, 494 F.3d 344 (2d Cir. 2007). As of November 3, 2014, it was clearly established that subjecting a person to a criminal prosecution based upon false charges violated the Fourth Amendment. *See Manganiello*, 612 F.3d at 164.

In a conclusory argument relying upon their arguments regarding probable cause, defendants contend "there is nothing in the record reasonably suggesting that officers would uniformly agree that Plaintiff did *not* resist arrest or commit an assault as defined above." Defs. Memo at 30. But drawing all inferences in Mr. Pfail's favor, for the reasons described above, the jury had ample evidence to conclude that the defendants subjected him to a baseless prosecution for the charges of Resisting Arrest and Assault in the Second Degree. As the Court

-17-

noted in the context of whether Mr. Pfail adduced sufficient evidence to overcome the grand jury presumption,

> But I understand the plaintiff's argument on malicious prosecution and abuse of process to be that the presumption of probable cause from the indictment was overcome here by some combination of fraud, perjury, suppression of evidence, or other bad faith police conduct in obtaining the indictment.  Namely, the disconnect that he has attempted to highlight between the charging instrument and the facts that he alleged occurred in the plaintiff's testimony, the destruction of the sweatshirt, the failure to preserve the 9-1-1 caller's video, which raises factual issues for the jury to resolve, and if they were to find those facts in his favor, that a jury could find that each of the officers, number one, lied to the Grand Jury and/or the District Attorney, and number two, engaged in other bad-faith conduct.

(Tr. 952.)  Mr. Pfail concurs.  And he demonstrates below that the jury could find those facts.

The jury's finding of malicious prosecution and its punitive damages award also militate against a finding of qualified immunity.  These findings meant that the jury had explicitly rejected defendants' contentions, thus foreclosing any entitlement to qualified immunity.[2]  As Judge Gleeson noted in *Robertson v. Sullivan*, 07-cv-1416, 2010 U.S. Dist. LEXIS 46691 (E.D.N.Y. May 12, 2010),

> with respect to the qualified immunity issue, the jury's award of punitive damages makes the defendants' claims seem especially hollow. The jury exercised its authority to award not only compensatory damages but punitive damages as well -- on each defendant. It could do so only upon a finding that each defendant acted "maliciously or wantonly, that is, if [the defendant] was prompted by ill will or spite toward the plaintiff or [acted with] a reckless or reckless or callous disregard or indifference to the plaintiffs' rights." Tr. 555 (jury charge)[.] The jury having found that each defendant deserved to be punished for engaging in such behavior, it is difficult to fathom the defendants' post-verdict claim

---

[2] The jury's note during deliberations regarding the malicious abuse of process claim (Brewington Dec. at Exh. 8) buttresses this conclusion.  (Tr. 1276.)

-18-

A-4673

> that I should find them immune on the ground that [*sic?*] acted in
> an objectively reasonable manner.

*Id.* at , *13-14.  *See Drayton v. City of New York*, 17-cv-7091, 2022 U.S. Dist. LEXIS 207165,

*10 (E.D.N.Y. Dec. 2, 2022) (Cogan, J.) (same); *Adedeji v. Hoder*, 935 F. Supp. 2d 557, 570-71

(E.D.N.Y. 2013) (Amon, J.) (same).

**E.    Mr. Pfail easily overcame the presumption of probable cause arising from the grand jury indictment**

Finally, defendants argue they are entitled to relief because Mr. Pfail did not overcome

the presumption of probable cause arising from the grand jury's indictment.  Relying upon the

argument advanced at trial that only perjury in front of the grand jury can overcome the

presumption (Tr. 970-71), they contend "there was no evidence the grand jury heard fraudulent

or perjurious testimony, nor that it was influenced by the suppression of evidence or other police

misconduct undertaken in bad faith."  Defs. Memo at 30.

The Court correctly questioned the accuracy of counsel's contention (Tr. 978) because it

is wrong.  *See McClellan v. Smith*, 439 F.3d 137 (2d Cir. 2006) ("the [grand jury] presumption . .

. may be overcome by evidence establishing that the police witnesses have not made a complete

and full statement of facts . . . that they have misrepresented or falsified evidence . . . or

otherwise acted in bad faith."  *Id.* at 146 (quotations and citation omitted).  *See Manganiello v.*

*Agostini*, 07 Civ. 3644, 2008 U.S. Dist. LEXIS 99181, *15 (S.D.N.Y. Dec. 9, 2008) ("[w]here

the defendant is a police officer . . . the plaintiff's avenue for rebuttal is not limited to proof of

misconduct in the grand jury alone.  Rather, the plaintiff may [also] show that the officer

misrepresented the fact to the District Attorney or otherwise acted in bad faith in a way that led

to the indictment"), *aff'd*, 612 F.3d 149 (2d Cir. 2010).  Here, as detailed above, the allegations

contained in the Felony Complaint made clear that the defendants lied to the DA's Office.

-19-

Similarly, the jury readily found that Iannucci and Panuthos withheld video captured by the 911 caller from the DA's Office, which the jury could have concluded supported Mr. Pfail's claims given the content of the 911 call itself, and even withheld the identity of the 911 caller. The jury also readily found that Massaro destroyed his sweatshirt that was covered with Mr. Pfail's blood. Such evidence easily overcame the grand jury presumption. *Manganiello*, 612 F.3d at 162-63.

**F.   Ample evidence existed to the support the jury's findings of liability regarding Mr. Pfail's malicious abuse of process claim and the defendants are not entitled to qualified immunity.**

Defendants advance two arguments in seeking judgment as a matter of law with respect to the jury's verdict on Mr. Pfail's malicious abuse of process claim.[3] First, they contend that probable cause existed for his criminal prosecution. Defs. Memo at 31-32. Next, they contend "the evidence presented at trial failed to demonstrate that Defendants sought to obtain a collateral objective outside the legitimate ends of the process." Defs. Memo at 32. Mr. Pfail demonstrates above that probable cause was lacking for the criminal prosecution. He demonstrates below that the evidence at trial permitted the jury to find that he established a collateral objective.

Similar to a malicious prosecution claim, courts borrow the elements of a malicious abuse of process claim from New York law. "In New York, a malicious abuse of process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994) (citations omitted). In *Besedin v. County of Nassau*, 18-

---

[3] The jury did not find O'Brien liable on the abuse of process claims.

-20-

A-4675

cv-819, 2024 U.S. Dist. LEXIS 168488, *42-43 (E.D.N.Y. Sept. 18, 2024) (citations omitted), this Court identified a number of circumstances that satisfied the collateral objective element of the claim. Those included "procuring a search warrant to steal someone's property, issuing a criminal process to avoid personal liability, and fabricating an assault charge to save one's employment." The Court similarly instructed the jury in this case. (Tr. 1185 ("Examples of collateral objectives that may satisfy this element of an abuse of process claim may include, but are not limited to, a Defendant's intent to avoid personal liability or adverse employment consequences.").)

Ample evidence existed to support the jury's conclusion that the defendants acted for a collateral objective. Again, based on the video evidence and Mr. Pfail's testimony, the jury readily found that the defendants fabricated the serious charges to protect themselves from criminal prosecution, personal civil liability or losing their jobs. The jury's verdict is also supported by the fact that the defendants pressed a claim of wrongdoing at trial despite the clear video evidence to the contrary. In sum, they wanted to avoid their own personal exposure.

Finally, defendants claim they are entitled to qualified immunity with respect to Mr. Pfail's malicious abuse of process claim. But the law has been clearly established since *Cook*, *supra*, that one cannot employ process maliciously and for an improper purpose.

**G.    Ample evidence supports the jury's verdict on Mr. Pfail's excessive force and battery claims and the defendants are not entitled to qualified immunity.**

Defendants do not challenge the jury's verdict that Iannucci, Massaro and Panuthos used excessive force. Defs. Memo at 33-35. But in an argument as stunning as it is meritless, they

-21-

A-4676

claim they are entitled to qualified immunity.[4]

Defendants contend "[t]hey identified themselves, approached to speak to him, and the videos show the rest: the officers moved to pursue him when it seemed he made a move to run. Then, they took him down to the ground and worked to place him in handcuffs. It took the efforts of three, then four, then five people, over the course of several minutes, to get Plaintiff into handcuffs. . . .  In the process, the officers used nothing more than their hands, and their legs for leverage."  Defs. Memo at 34-35.

Defendants' argument ignores Mr. Pfail's testimony, who testified that Panuthos kicked him in the stomach with such force that Mr. Pfail felt like the air had been kicked out of him. (Tr. 782.)  Mr. Pfail continued: "when I hit the ground, I felt like the wind was knocked out of me and I was having a hard time breathing because I could feel that these men were on top of me and I felt the punching, I felt something very blunt hit me in the back of the head numerous times, and I felt someone taking my head and slamming it into the floor of the vestibule and. . . ."  (Tr. 783.)  As noted, Mr. Pfail testified that he did nothing to warrant this use of force.

Defendants' argument also ignores the 911 call (Plaintiff's Exh. 85) that was played for the jury.  The 911 caller described how "these three guys just jumped out of this car and started beating on this guy. . . ."  And defendants' argument ignores their own testimony, which included Massaro's testimony that he saw Iannucci punch Mr. Pfail in the head (Tr. 139), his testimony at the criminal trial that Panuthos kicked Mr. Pfail before Mr. Pfail had done anything (Tr. 179-80), and Panuthos' testimony that he punched Mr. Pfail in the back of the leg. (Tr. 444.)

---

[4] Because the elements of the excessive force and battery claims are virtually identical (Tr. 2251), Mr. Pfail discusses them together.  The jury returned a verdict in O'Brien's favor on the use of force claim and in favor of all defendants on the assault claim.

-22-

Defendants admit that the law was clearly established as of November 3, 2014, that a police officer's use of entirely gratuitous force against an unresisting arrestee is unreasonable and therefore excessive within the meaning of the Fourth Amendment.  Defs. Memo at 34. Because the jury had ample evidence to conclude that the defendants did exactly that, they are not entitled to qualified immunity on Mr. Pfail's excessive force claim.  *See*, *e.g.*, *Tracy v. Freshwater*, 623 F.3d 90, 99 & n.5 (2d Cir. 2010); *Amnesty America v. Town of W. Hartford*, 361 F.3d 113, 123-24 (2d Cir. 2004); *Breen v. Garrison*, 169 F.3d 152, 153 (2d Cir. 1999); *Robinson v. Via*, 821 F.2d 913, 923-24 (2d Cir. 1987).

Defendants do not challenge the jury's verdict of excessive force.  Defs. Memo at 33-35. Thus, even if the Court finds the defendants are entitled to qualified immunity, the jury's award of damages on the state law battery claim survives against the County.  *Triolo v. Nassau Cnty.*, 24 F.4th 98, 110-13 (2d Cir. 2022) (recognizing that a municipality is liable for common law torts under the doctrine of *respondeat superior* where a police officer falsely arrests the plaintiff but is otherwise entitled to qualified immunity).  But the Court need not reach this issue because defendants are not entitled to qualified immunity.

### Point III

**Ample evidence existed of physical injuries and long-term deterioration of mental health to sustain the jury's compensatory damages award**

Defendants seek *remittitur* of the jury's compensatory damages award of $1,860,000. They do not raise an independent challenge to the jury's award of damages for malicious prosecution, abuse of process or excessive force.  Nor do they cite any relevant case law in support of what they contend an appropriate amount of damages should be.  Instead, resurrecting similar arguments regarding Dr. Berrill, they solely contend "[t]he jury's award is premised on a

-23-

A-4678

falsity: that Plaintiff's traumatic brain injury (TBI), and his resulting psychological symptoms, were proximately caused by the November 2014 incident involving Nassau County. In reality, Plaintiff's damages stem in large part from a separate and unconnected incident that occurred over a year earlier." Defs. Memo at 35-36 (referring to the "Garden City Case" (Tr. 1551).) But the jury heard this testimony during the defendants' examinations of Mr. Pfail and Dr. Berrill and rejected it. The Court should do the same.

Defendants cross-examined Mr. Pfail extensively about the Garden City case. The jury heard how Mr. Pfail made similar allegations in the Garden City case Complaint to those presented at trial. (Tr. 1548-71.) Defendants also questioned Dr. Berrill about the Garden City case:

> Q. You don't have in your report any details of Mr. Pfail's 2013 Garden City encounter with police, right?
> A No, not 2013, no.
> Q And you don't -- you didn't consider in your evaluation the fact that he was charged and prosecuted in relation to that incident?
> A Well, I don't have information about that incident so I can't tell you much about it.
> Q He didn't tell you about that arrest, right?
> A He did not.
> Q And you didn't review any records about it, right?
> A I don't think that I did review records about it. . . .
> Q You didn't review it as part of the evaluation for your report, right?
> A That's right.
> Q You didn't have it available when you did either of your reports, right?
> A Correct.

(Tr. 1800-01.) Notwithstanding these questions and answers, defendants did not ask Dr. Berrill about the impact of the Garden City case on Mr. Pfail and, how, if at all, it would change his opinion, or anything else relating to the conclusion the defendants ask the Court to reach.

Despite the weight they place on the Garden City case, defendants introduced no medical

-24-

records reflecting plaintiff's injuries. And Dr. Berrill's testimony went unrebutted by any mental health professional even though the defendants had retained Dr. Gordon as an expert witness, and despite having the opportunity to call Dr. Grix. (Tr. 1750-51.) Because the cause of Mr. Pfail's injuries were a fundamental issue for the jury, defendants' argument fail. *Rosario v. City of New York*, 18 Civ. 4023, 2021 U.S. Dist. LEXIS 91675, *10-12 (S.D.N.Y. May 13, 2021).

As noted, the defendants do not raise any additional challenge to the jury's award of compensatory damages. Mr. Pfail notes that any such challenge would be meritless. Viewing the evidence in a light most favorable to Mr. Pfail, *Payne v. Jones*, 711 F.3d 85, 98-99 n.10 (2d Cir. 2012), the jury heard from Mr. Pfail, his mother and Dr. Berrill how the defendants' use of force and baseless criminal prosecution exacerbated his depression and PTSD, among other things. Dr. Berrill diagnosed Mr. Pfail with "cognitive disorder secondary to head injury following an arrest by Nassau County police, November of 2014. Post-traumatic stress disorder, major depression, mild to moderate, recurrent without psychotic features and adjustment disorder with anxiety." While Mr. Pfail had suffered these disorders since his 2007 TBI, Dr. Berrill noted that the events of November 3, 2014, "exacerbated his impairment and only made things worse for him. That his experience with the arrest was notably traumatic, set him back with respect to any progress he was making, and essentially, in my estimation, solidified what I just described would be, unfortunately for him, a permanent situation where he would from now to whenever in the future, be struggling with trying to find some sense of stability in terms of his mood." (Tr. 1656-57.) Perhaps most troubling, Dr. Berrill shared with the jury that Mr. Pfail's prognosis for the future was grim (Tr. 1657 (Mr. Pfail is "unable to lead a normal life. And it's not because he doesn't want to lead a normal life, he definitely does. He would love to lead a

-25-

normal life but his symptoms are making it virtually impossible for him to do so.").)

In light of this evidence, the jury's compensatory damages award does not shock the conscience. *See Greenaway v. County of Nassau*, 327 F. Supp. 2d 552, 569-70 (E.D.N.Y. 2018) (remitting $7,500,000 compensatory damages award for excessive force to $2,500,000 – $3,223,000 in today's dollars – where the plaintiff had been tased four times and suffered similar psychological harm); *Martinez v. Port Auth.*, 01 Civ. 721, 2005 U.S. Dist. LEXIS 19141, *58-66 (S.D.N.Y. Sep. 2, 2005) (remitting a $1,000,000 award for false arrest to $360,000 – $585,000 in today's dollars – and declining to remit a $100,000 award for malicious prosecution – $162,500 in today's dollars). *See also Russo v. Tuttnauer USA Co. Ltd.*, 21 CV 1720 , 2025 U.S. Dist. LEXIS 108048, *22-29 (E.D.N.Y. Jun. 6, 2025) (remitting $2,500,000 compensatory damages award to $1,000,000 where the plaintiff suffered egregious emotion harm as a result of prolonged sexual harassment).

### Point IV

**The jury's award of punitive damages reflected its recognition that Iannucci, Massaro and Panuthos ruthlessly attacked Mr. Pfail and then, with the assistance of O'Brien, attempted to cover their tracks by framing Mr. Pfail for crimes he did not commit**

In an ostrich-like submission, defendants ignore the significance of the jury's findings. The jury easily concluded that they sought to cover their tracks by attempting to frame Mr. Pfail for crimes he did not commit, withheld and destroyed evidence, and then lied to everyone at every step of the way, including the jury.

**A. The standards governing remittitur.**

In *Lee v. Edwards*, 101 F.3d 805 (2d Cir. 1996), the Second Circuit articulated the criteria governing a review of an award of punitive damages:

-26-

> Punitive damages are available in a § 1983 action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). Although a jury has wide discretion, a district court may refuse to uphold a punitive damage award when the amount is "so high as to shock the judicial conscience and constitute a denial of justice." . . . .
>
> * * *
>
> [T]he Supreme Court [has] erected three guideposts that should assist us in the application of our standard, by which we deem excessive a punitive damage award that "shocks our judicial conscience," *Hughes*, 850 F.2d at 883. These guideposts include: (1) the degree of reprehensibility of the tortious conduct; (2) the ratio of punitive damages to compensatory damages; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases. *Gore*, [517 U.S. at 575]. . . .

*Lee*, 101 F.3d at 808-09.

When considering a motion for *remittitur*, the Court must view the evidence in a light most favorable to Mr. Pfail. *Payne*, 711 F.3d at 98-99 n.10. "[T]he ultimate question is whether the award 'shock[s] the judicial conscience' or amounts to a miscarriage of justice." *Jennings v. Yurkiw*, 18 F.4th 383, 389 (2d Cir. 2021) (quotation omitted). As the *Jennings* Court noted, "determining the amount of damages is a quintessential responsibility of juries." *Id*. at 390.

The jury appropriately assessed punitive damages against each defendant. *Gagnon v. Ball*, 696 F.2d 17, 19 n.2 (2d Cir. 1982). The jury did not simply award punitive damages based upon a single act. It considered the officers' conduct as a whole and awarded punitive damages, as instructed, for the officers' callous disregard for Mr. Pfail's constitutional rights and well-being. (JA 1967-68.) Each of the "guideposts" identified in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), supported the jury's punitive damages award.

-27-

A-4682

**1. Reprehensibility**.

"Reprehensibility" is often the most critical factor in weighing a punitive damages award. *Gore*, 517 U.S. at 575. *See DiSorbo v. Hoy*, 343 F.3d 172, 187-88 (2d Cir. 2003) (recognizing the second and third *Gore* factors frequently supply little guidance to the reviewing court); *Lee*, 101 F.3d at 810-11 (same). Reprehensibility is best assessed by focusing on the following non-exclusive aggravating factors: "(1) whether a defendant's conduct was marked by violence or presented a threat of violence; (2) whether a defendant's conduct evidenced trickery or deceit as opposed to mere negligence, and (3) whether the record supports a finding of intentional malice." *Jennings*, 18 F.4th at 390 (citation omitted). Here, the defendants' actions were violent (they repeatedly punched Mr. Pfail and slammed his head onto the floor), intentional (they withheld and destroyed evidence) and deceitful (they repeatedly lied about Pfail's actions to justify their unconstitutional use of force).

Defendants claim that "the jury heard no evidence that any officer used racial slurs, brandished a weapon, or sought to humiliate or target Plaintiff based on personal animus. The incident, though serious, was not prolonged, was not repeated, and did not involve any element of sadism or cruelty." Defs. Memo at 38. This argument ignores that Panuthos rushed out of his car and kicked Mr. Pfail in the stomach with such force that it felt like the air had been kicked out of him. (Tr. 782.) It also ignores that these defendants repeatedly punched Mr. Pfail as he lay on the ground, and that one of the defendants, most likely Iannucci, struck him in the back of the head with his flashlight, and that another of the defendants slammed his head into the floor of the vestibule ("when I hit the ground, I felt like the wind was knocked out of me and I was having a hard time breathing because I could feel that these men were on top of me and I felt the punching, I felt something very blunt hit me in the back of the head numerous times, and I felt

-28-

someone taking my head and slamming it into the floor of the vestibule and. . . ." (Tr. 783).) The use of gratuitous violence on a non-resisting person warrants the imposition of a significant award of punitive damages. *Jennings*, 18 F.4th at 390-91; *Alla v. Verkay*, 979 F. Supp.2d 349, 378 (E.D.N.Y. 2013).

The jury's punitive damages awards also reflected the deceitful nature of the defendants' actions. The jurors credited Mr. Pfail's testimony that he did not resist arrest or assault any defendant. Yet the defendants charged him with Assault in the Second Degree and Resisting Arrest. Assault in the Second Degree is a class D felony. N.Y. Penal L. § 120.05. Mr. Pfail faced seven years in prison. N.Y. Penal L. § 70.00.

In advancing their arguments, defendants ignore that the jurors heard from the defendants and witnessed with their eyes the calculating efforts of Panuthos, Iannucci, Massaro and O'Brien, which included their lies to the DA's Office and their efforts to withhold or destroy evidence. Each defendant falsely accused Mr. Pfail of resisting arrest or assault, and each defendant supported the other defendants' lies. Falsely accusing a citizen of a crime is "egregious and reprehensible." *Lee*, 101 F.3d at 810. *See Garnett v. Undercover Officer C0039*, 838 F.3d 265, 275 (2d Cir. 2016) (quotation omitted). The defendants' falsely accusing Mr. Pfail of violent behavior necessitating their use of force culminated in the commencement of a baseless criminal prosecution that exposed Mr. Pfail to up to seven years in prison.

Defendants' arguments also ignore the steps the defendants took to conceal their wrongdoing. Defendants wrongly contend that the Court should not have allowed Mr. Pfail to question them about their failure to preserve the 911 caller's video and Massaro's sweatshirt (see Point I.B, above), and the jury fully appreciated the heinous nature of their actions. The 911 caller made clear that Iannucci, Massaro and Panuthos attacked Mr. Pfail. The jury agreed. It

-29-

was undisputed that Iannucci met with the 911 caller, and that he and Panuthos viewed the video of the assault on the 911 caller's phone.  The jury readily found that his video was consistent with his 911 call, yet Iannucci and Panuthos failed to preserve it after viewing it because, as Iannucci testified, the video "didn't catch anything that [he] evaluated to be important."  (Tr. 644.)  In fact, the jury readily concluded that Iannucci and Panuthos acted to conceal the identity of the video.  They did not record their interview with the 911 caller, did not preserve the video, did not ask the 911 caller to preserve it, and did not even take down his name.  (Tr. 639-46.)

The same holds true for Massaro and his sweatshirt.  Massaro testified that when he went to the substation after his interaction with Mr. Pfail he took the sweatshirt that had blood on it, put it in a trash bag and threw it in the garbage in the bathroom of the substation. (Tr. 163-164). This sweatshirt represented material evidence that was never tested for either Massaro's blood, or, more likely, Mr. Pfail's blood. As to the photographs of the bloody sweatshirt, Assistant District Attorney Matthew Perry, the ADA assigned to the prosecution of Mr. Pfail, informed Mr. Pfail's counsel that he had asked Defendants for all of the evidence, including photographs, they had in their possession. For Massaro to all of sudden remember that he had a photograph of the bloody sweatshirt, the weekend before trial, that was always in his possession but never previously disclosed, permitted the conclusion that Massaro was attempting to hide the sweatshirt throughout the entire criminal and civil litigation processes.

The jury also concluded that Massaro lied about plaintiff punching him in the nose and biting him.  In the Felony Complaint, Massaro claimed that Mr. Pfail punched him in the nose. But Massaro admitted he did not know if this were so.  (Tr. 138; 185-89.)  Massaro also claimed that Mr. Pfail bit him.  But there was no broken skin, no tetanus shot and no stitches.  (Tr. 138-39.)  And Mr. Pfail denied it.  (Tr. 802, 887.)

-30-

A-4685

Additional factors supported the jury's punitive damages awards. As President Nixon learned the hard way, the cover up can be worse than the crime. *Bridgeview Health Care Ctr. v. Clark*, 09 C 5601, 2012 U.S. Dist. LEXIS 184089, at *13-14 n.5 (E.D. Ill. Sep. 28, 2012). Time and again courts have recognized that a defendants' efforts to hide his or her acts of misconduct weigh heavily in the reprehensible calculus. *Jennings*, 18 F.4th at 391 ("The reprehensible nature of the officers' conduct is underscored by the elaborate steps they took to cover up their misconduct."); *Bogle v. McClure*, 332 F.3d 1347, 1359, 1362 (11th Cir. 2003) (recognizing that the defendants' reprehensible racial discrimination was accompanied by post-discrimination conduct covering up their wrongful intent warranted punitive damage awards of $1,900,000 to each of seven plaintiffs and imposed on the board of trustees for a public library system and its director); *Fresh v. Entm't U.S.A., Inc.,* 340 F. Supp. 2d 851, 858-59 (W.D.Tenn. 2003) (in an action alleging claims of assault, battery and false imprisonment, the trial court found the company's cover up of intentional wrongdoing relevant to a finding of reprehensibility, and remitted the punitive damages award to $717,610.36).

The jury appropriately considered the falsehoods the defendants told at every step of the way. The jury watched the video multiple times, heard the language in the Felony Complaint and concluded that Mr. Pfail neither resisted arrest nor assaulted any of them. The jury heard that Massaro alleged in the Felony Complaint that Mr. Pfail punched him in the nose. At trial, he admitted that did not happen. (Tr. 138; 181-82). The jury heard that Panuthos alleged in the Felony Complaint that Mr. Pfail punched him in the left side of the face and that Mr. Pfail had already punched him before he kicked Mr. Pfail. (Tr. 434-35, 470). The outside video put the lie to Panuthos' testimony. The jury heard O'Brien testify that Mr. Pfail kicked her three times in the stomach (Tr. 549-50) even though the Felony Complaint did not contain this allegation.

-31-

(Tr. 557-58.)  Whether O'Brien alleged that Mr. Pfail kicked her once or three times, the jury concluded both were lies.  Finally, the jury heard that Iannucci alleged in the Felony Complaint that Mr. Pfail brought about injuries to his left hand and face, which he admitted at trial did not occur.  (Tr. 660-61.)  Given these falsehoods, the jury necessarily concluded that the defendants were only concerned with protecting themselves.  *Jennings*, 18 F.4th at 391 ("The jury heard and was entitled to consider a record that included falsified charging documents, false accounts of the beating, faked or exaggerated injury, and perjured trial testimony.").

> **2.      The ratio of punitive damages to compensatory damages**.

In order to determine if there is a permissible ratio of punitive damages to compensatory damages, "the proper inquiry is whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually occurred."  *Gore*, 517 U.S. at 581 (quotation marks and citations omitted).  The Second Circuit has emphasized that this factor weighs little in its analysis.  *Payne*, 711 F.3d at 103.  *See Lee*, 101 F.3d at 811.  While the damages awards are high, there is nothing about a slightly less than 1:2 ratio that raises eyebrows.  As the *Jennings* Court recognized,

> Even where compensatory damages are substantial, punitive damages awards that are a multiple higher may be warranted because of the deterrent function of punitive damages. The purpose of § 1983 is not only to provide compensation to the victims of past abuses, but to serve as a deterrent against future constitutional deprivations, as well. . . .  Because of this deterrent function, extra-compensatory damages are warranted where the misconduct was designed to escape detection. . . .  Where the injurer makes active efforts to conceal the harm, [underdeterrence] is of course exacerbated. . . .  Given the extensive misconduct directed at escaping liability, the deterrent capacity of the 1:4 ratio presented here passes muster.

*Jennings*, 18 F.4th at 392 (citation, quotations and footnotes omitted).

Defendants advance no meaningful analysis of this factor other than to assert the "ratio of punitive to compensatory damages is also problematic." Defs. Memo at 39. Their perfunctory argument rests upon their claim that the compensatory damages award is too high. *Id.*

**3.      Comparable civil or criminal penalties.**

District courts may also compare punitive damages awards to civil or criminal penalties for similar conduct to insure that defendants had adequate notice of the severity with which society views their actions. *Gore*, 517 U.S. at 583-84. The defendants claim that "there are no civil or criminal penalties that remotely approach the size of the punitive damages assessed here." Defs. Memo at 39. Not so. Pursuant to 18 U.S.C. § 242, if convicted, each defendant faced ten years in jail (*id.*) and a fine of $250,000. 18 U.S.C. § 3571(b)(3). *Jennings*, 18 F.4th at 392-93. Defendants also ignore that their lies at trial subjected them to prosecution under 18 U.S.C. §§1621, 1623, for which they faced up to five years imprisonment (*id.*) and a fine of $250,000. 18 U.S.C. § 3571(b)(3). Under New York law, Perjury in the first degree, § 210.15, is a class D felony that carries a sentence of up to 7 years, a probation term of 5 years, and payment of a substantial fine. Defendants could also be subjected to Penal Law § 175.10, Falsifying business records in the first degree, also a class D Felony. These offenses demonstrate the serious ramifications of which the Defendants had notice.

Defendants also claim that "[n]o officer was internally disciplined, nor was any referred for criminal prosecution." Defs. Memo at 39. That no officer was disciplined by the Department or prosecuted criminally supports the need for large punitive damages awards in order to insure that such conduct will not recur. As the Court instructed the jury, "Punitive damages are awarded in the discretion of the jury to punish a defendant for extreme or outrageous conduct or to deter or prevent a defendant and others like him or her from

committing such acts in the future." (Tr. 1967.)  That none of the defendants, each of whom were interviewed by Internal Affairs, was disciplined shows that the system is broken.  As O'Brien and Panuthos acknowledged, Internal Affairs never asked them how Mr. Pfail became bloodied.  (Tr. 451-52; 544.)

> 4.      **Relevant case law**.

Relying on case law that ignores the import of *Jennings*, among other relevant decisions, defendants suggest a realm of punitive damages awards in cases that ignore the gravity of their conduct.  Defs. Memo at 39-41.  *Jennings* makes clear that the Court's "task is not to balance the number of high and low awards and reject the verdict . . . if the number of lower awards is greater."  *Jennings*, 18 F.4th at 393.  Because the Court must assess the jury's award against each defendant separately, Mr. Pfail addresses the $293,580 awards against Iannucci, Panuthos and Massaro before turning to the $143,550 award against O'Brien.

Regarding Iannucci, Panuthos and Massaro, the Court need look no further than *Jennings* to affirm the punitive damage awards against them.  In *Jennings*, the Second Circuit affirmed an award of $250,000 against defendant Yurkiw, whose assault left Jennings with a broken nose.  The jury's award of $250,000 translates to $290,565 in today's dollars, which is virtually identical to the jury's award.[5]  *See Ismail v. Cohen*, 899 F.2d 183, 187 (2d Cir. 1990) (upholding a $150,000 punitive damages award, which translates to $376,513 in today's dollars).

*Jennings* made clear that the $250,000 award against Yurkiw was not a ceiling.  *Id.* at 393-94 ("This is true even if we were to ignore that Yurkiw and the other officers took steps to

---

[5] When comparing awards from years ago, courts must make adjustments for inflation.  Courts frequently use the Bureau of Labor Statistics Consumer Price Index Inflation Calculator located at https://www.bls.gov/data/inflation_calculator.htm to adjust awards from the date of entry of the verdict or conclusion of the appeal.  *Jennings*, 18 F.4th at 393 & n.7.

-34-

A-4689

conceal their use of excessive force. Taking the officers' deliberate concealment of evidence into account only heightens the degree of malice associated with their excessive force and further confirms that the punitive damages were supported by the record evidence.") (footnote omitted). In *Alla*, *supra*, Judge Block upheld a total punitive damages award of $300,000 against defendant Verkay for false arrest ($150,000) and excessive force ($150,000). *Alla*, 979 F. Supp. 2d at 373-75, 378-79. That translates into more than $415,000 in today's dollars. Verkay's use of force involved a single-blow to Gad Alla's head, which caused a break of his zygomatic arch. *Id.* at 357-58, 364. While Verkay falsely arrested Gad Alla, he did not falsify charges against him, and, as such, Gad Alla never faced jail time as did Mr. Pfail.

In *Fresh, supra*, the jury found that the defendants had committed the torts of assault, battery and false imprisonment. As relevant here, the jury awarded "$4,402.59 in medical expenses, $175,000.00 in compensatory damages, and $ 2,161,540.00 in punitive damages." *Fresh*, 340 F. Supp. 2d at 855. The district court found the punitive damages award violated the Due Process Clause, and remitted the punitive damages award to $717,610.36, which translates to $1,258,000 in today's dollars. Critical to its finding was the company's cover up of intentional wrongdoing. *Id.* at 858-60.

The jury's award of $143,550 against O'Brien also does not shock the conscience. While the jury found that she did not use excessive force against Mr. Pfail, the jury's finding of malicious prosecution was well-founded. As detailed above, O'Brien not only supported her co-defendants' lies, but lied without concern for Mr. Pfail's well-being. In *Alla*, Judge Block upheld an award of $150,000 in punitive damages against defendant Dorson who was found liable for false arrest and who, together with Verkay, "fabricated their version of events in an attempt to justify Verkay's punch." *Alla*, 979 F.Supp.2d at 374. The jury's award of $150,000

translates to $207,485 in today's dollars.

Also instructive are the Second Circuit's recent decision in *Gilead Cmty. Servs. v. Town of Cromwell*, 12 F.4th 93 (2d Cir. 2024), and the Eleventh Circuit's decision in *Bogle v. McClure*, 332 F.3d 1347 (11th Cir. 2003). In *Gilead Cmty. Servs.*, the plaintiff brought suit pursuant to, among other things, the Fair Housing Act. "A jury found the town of Cromwell, Connecticut liable for a campaign of discriminatory conduct meant to keep a group home for individuals with mental health disabilities from opening in the town, in violation of the Fair Housing Act (FHA) and Americans with Disabilities Act." *Id.* at 95. In reducing the jury's punitive damages award of $5,000,000 to $2,000,000, the Court noted the following:

> there was ample evidence of highly reprehensible conduct by the town of Cromwell. The town engaged in a deliberate and sustained campaign of discrimination and retaliation, reflecting repeated actions rather than an isolated incident and resulting from intentional malice rather than "mere accident. . . . The town also evinced an indifference to or reckless disregard of the health or safety of others, when its police officers leaked sensitive medical information about a Gilead resident to the public and failed to investigate an episode of vandalism of Gilead's group home. . . . And the ultimate targets of the town's conduct, the residents with disabilities who relied on Gilead's housing, had financial vulnerability. Finally, it bears remembering that Cromwell officials not only violated the FHA but also publicly celebrated when their discriminatory efforts succeeded in keeping Gilead's residents out of town. This is a case where further sanctions beyond compensatory damages are warranted to achieve punishment [and] deterrence.

*Id.* at 106.

In *Bogle*, the Eleventh Circuit upheld punitive damage awards of $1,900,000 to each of seven plaintiffs and imposed on the board of trustees for a public library system and its director. In so doing, the *Bogle* Court recognized that the defendants' reprehensible racial discrimination was accompanied by post-discrimination conduct covering up their wrongful intent warranted.

-36-

A-4691

*Bogle*, 332 F.3d at 1359, 1362.

*Gilead Cmty. Servs.* and *Bogle* involved claims of employment and housing discrimination.  Without minimizing the scourge of unlawful discrimination and the harm it wreaks, police misconduct is different in kind.  Here, Iannucci, Massaro and Panuthos viciously assaulted Mr. Pfail and then, together with O'Brien, actively lied to police and prosecutorial personnel.  If successful, Mr. Pfail could have spent seven years in jail for crimes he did not commit.  Punitive damages are awarded in the jury's discretion to punish a defendant for outrageous conduct, and to deter him or her, and others in the same position, from engaging in similar conduct in the future.  *Smith v. Wade*, 461 U.S. 30, 49 (1983).  The jury's award of punitive damages are designed to achieve these goals.

A-4692

**Conclusion**

For the reasons outlined above, defendants' motions should be denied in all respects, together with such other and further relief as is just and proper.

Dated: New York, New York
         September 4, 2025

                              Respectfully submitted,


                              LAW OFFICES OF FREDERICK K. BREWINGTON
                              556 Peninsula Blvd.
                              Hempstead, NY 11550
                              (516) 489-6959


                              By: /S/ Frederick K. Brewington


                              SCOTT A. KORENBAUM, ESQ.
                              14 Wall Street, Suite 4C
                              New York, NY 10005
                              (212) 587-0018


                              Co-counsel for Plaintiffs



                              By: _____/s_____
                                      Scott A. Korenbaum

FREDERICK K. BREWINGTON, ESQ.,
COBIA POWELL, ESQ.
SCOTT A. KORENBAUM, ESQ.,
         of Counsel

-38-

A-4693

# United States District Court
# Eastern District Of New York

-------------------------------------------------------------------------- X

BRIAN PFAIL

        Plaintiff,

   -*against*-

COUNTY OF NASSAU,
NASSAU COUNTY POLICE DEPARTMENT,
POLICE OFFICER JOSEPH MASSARO,
in his individual and official capacity,
POLICE OFFICER JONATHAN PANUTHOS,
in his individual and official capacity,
POLICE OFFICER KAREN C. O'BRIEN,
in her individual and official capacity,
SERGEANT THOMAS IANNUCCI,
in his individual and official capacity, and
JOHN DOES 1-10, in their individual and official capacities,

        Defendants.

-------------------------------------------------------------------------- X

2:16-cv-00518

**DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO RULE 50 AND
FOR A NEW TRIAL OR REMITTITUR PURSUANT TO RULE 59**

A-4694

# Table of Contents

*PRELIMINARY STATEMENT*.................................................................................*1*

I.     **FOUR OF THE COURT'S EVIDENTIARY RULINGS CAUSED A SERIOUSLY ERRONEOUS RESULT AND A MISCARRIAGE OF JUSTICE** ..................................... 1

    A.    **The officers should have been able to elicit testimony from Dr. Berrill about his criminal trial testimony**..................................................................................2

    B.    **Plaintiff's opposition does not rebut the Officers' demonstration that the jury was improperly influenced by the improperly admitted testimony about the sweatshirt and the witness video.** ...............3

    C.    **Plaintiff's opposition fails to rebut the demonstration that Dr. Berrill's testimony should have been stricken.** ...............................................................................4

    D.    **Plaintiff's opposition does not rebut Defendant's demonstration that the Court's discovery sanction regarding the Grix records was improper**..................................................7

II.     **DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S MALICIOUS PROSECUTION CLAIM, OR THE VERDICT SHOULD BE SET ASIDE** ...............................................................................................9

    A.    **Probable Cause for Resisting Arrest** ....................................................9

    B.    **Probable Cause for Second Degree Assault** ........................................10

    C.    **Because Defendants Had at Least Arguable Probable Cause to Charge, They are Entitled to Qualified Immunity**.................................................................11

    D.  **Plaintiff Has Failed to Rebut the Presumption of Probable Cause the Accompanies a Grand Jury Indictment** ..............................................................................12

III.     **DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S ABUSE OF PROCESS CLAIM, OR THE VERDICT SHOULD BE SET ASIDE**..................................................................................................13

IV.     **DEFENDANTS SHOULD BE GRANTED JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S EXCESSIVE FORCE CLAIMS, ASSAULT, AND BATTERY CLAIMS, OR THEY SHOULD BE SET ASIDE FOR QUALIFIED IMMUNITY** .........................................13

V.     **PLAINTIFF'S OPPOSITION DOES NOT REHABILITATE THE COMPENSATORY DAMAGES AWARD** ...............................................................................16

VI.     **PLAINTIFF'S OPPOSITION DOES NOT JUSTIFY THE EXCESSIVE PUNITIVE DAMAGES AWARD** ...............................................................................17

*CONCLUSION*.............................................................................................*19*

# Table of Authorities

**Cases**

*Anderson Group, LLC v. City of Saratoga Springs*, 805 F.3d 34, 51 (2d Cir. 2015) ................... 17

*BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996) ....................................................... 19

*DiSorbo v. Hoy*, 343 F.3d 172 (2003)....................................................................... 20

*Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016) .................................................... 12

*Fujitsu Ltd. v. Fed'l Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001)............................ 3

*G.E. v. Joiner*, 522 U.S. ........................................................................................ 7

*Gibeau v. Nellis*, 18 F.3d 107, 110 (2d Cir. 1994)...................................................... 17

*Haas v. Del. & Hudson Ry. Co.*, 282 Fed. Appx. 84, 86 (2d Cir. 2008) ......................... 7

*Johnson v. United States*, No. 21-CV-2851, 2024 WL 1246503 (E.D.N.Y. Jan. 16, 2024)............ 6

*Lee v. Edwards*, 101 F.3d 805, 813 (2d Cir. 1996)...................................................... 20

*Mazurkiewicz v. N.Y.C. Transit Auth.*, 810 F. Supp. 563, 570 (S.D.N.Y. 1993).......................... 10

*McDevitt v. Suffolk County,* 2024 WL 1270811, at *10 (E.D.N.Y. Mar. 26, 2024)...................... 20

*N. Am. Soccer League, LLC v. United States Soccer Fed'n,, Inc.* 2025 U.S. Dist. LEXIS 86428,
  *29-30 .................................................................................................... 1

*Payne v. Jones*, 711 F.3d 85, 105 (2d Cir. 2012)......................................................... 20

*People v. Cotton*, 143 A.D.2d 680, 532 N.Y.S.2d 911 (2d Dep't 1988) ..................................... 10

*People v. Sekoll*, 254 A.D.2d 797, 797 (4th Dep't 1998.................................................. 11

*Pinter v. City of New York*, 976 F. Supp. 2d 539, 570 (S.D.N.Y. 2013) ..................................... 14

*Schloerb v. Nat'l R.R. Passenger Corp.*, 2025 U.S. Dist. LEXIS 4231......................................... 8

*Smith v. City of New York*, No. 1:18-CV-05079-MKV, 2021 WL 4267525, at *11 (S.D.N.Y.
  Sept. 20, 2021) ......................................................................................... 13

A-4696

*Smith v. City of New York*, No. 1:18-CV-05079-MKV, 2021 WL 4267525, at *12 (S.D.N.Y. Sept. 20, 2021) ................................................................................................ 10

*Smith v. Wade*, 461 U.S. 30 (1983),.............................................................................. 19

*State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408 (2003)............................... 19

*Tang Cap. Partners, LP v. BRC Inc.,* 2025 U.S. Dist. LEXIS 122831, *12 (S.D.N.Y. 2025)....... 2

*United States v. Rodriguez,* 2025 U.S. App. LEXIS 12455, *5 (2d Cir. 2025).............................. 2

*Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007)............................................... 12

A-4697

## PRELIMINARY STATEMENT

The arguments advanced in Plaintiff's opposition do not remedy the fundamental flaws in the jury's verdict. The liability findings rest on legally insufficient evidence, and the damages awards are excessive, speculative, and unsupported by the record. Plaintiff's effort to reframe the evidence does not overcome the fact that his expert's testimony was incomplete and unreliable, nor does it reconcile the duplicative nature of his damages claims. Equally unavailing is Plaintiff's defense of the punitive damages award, which disregards the constitutional guideposts and comparative authority that compel substantial reduction.

For the reasons set forth in Defendants' motion and reinforced herein, the verdict cannot stand. The Court should enter judgment as a matter of law or, at a minimum, grant a new trial or substantial remittitur.

I. **FOUR OF THE COURT'S EVIDENTIARY RULINGS CAUSED A SERIOUSLY ERRONEOUS RESULT AND A MISCARRIAGE OF JUSTICE**

Plaintiff's opposition to the motion for a new trial on liability and damages sets forth the correct standard as it relates to the Officers' burden and then fails rebut the Officer's demonstration that they carried that heavy burden on each of the four erroneous evidentiary rulings they challenge. Each of the erroneous rulings affected the Officers' substantial rights, as each, even on its own, likely swayed the jury's judgment against the Officers in a material fashion. *N. Am. Soccer League, LLC v. United States Soccer Fed'n,, Inc.* 2025 U.S. Dist. LEXIS 86428, *29-30, quoting *Restivo v. Hessemann*, 846 F.3d 547, 573 (2d Cir. 2017). Plaintiff's opposition does not place the Court in a position to "conclude with fair assurance that the evidence did not substantially influence the jury.'" *United States v. Rodriguez,* 2025 U.S. App. LEXIS 12455, *5 (2d Cir. 2025) quoting *United States v. Cummings,* 858 F.3d 763, 774 (2d Cir. 2017).

1

**A. The officers should have been able to elicit testimony from Dr. Berrill about his criminal trial testimony**.

Plaintiff's opposition simply ignores the Court's error with respect to Rule 404. Rule 404(b) does not apply because the Defendants were not seeking to use prior bad acts but were simply seeking to use, in the same way Plaintiff had in his criminal trial, Dr. Berrill's opinion testimony that Plaintiff's actions that night were reflexive and could not be controlled. Plaintiff's opposition fails to address this controlling point in any meaningful way. Rule 404(a)(1) cannot be read as prohibiting Defendants from producing evidence that Plaintiff's TBI caused him to act a certain way when he had previously presented that very same evidence in his own defense at the criminal trial. Indeed, the Officers have found no case law and Plaintiff presents no case law suggesting that Rule 404(a)(1) would apply to bar the proposed testimony from Dr. Berrill in the liability trial.

Next, even viewing Plaintiff's pre-existing TBI symptoms as a character trait such "evidence is, however, admissible for challenging witness credibility." *Tang Cap. Partners, LP v. BRC Inc.,* 2025 U.S. Dist. LEXIS 122831, *12 (S.D.N.Y. 2025) (Fed. R. Evid. 404(a)(3), 607). Dr. Berrill's testimony, which presumably would have been in accord with his criminal trial testimony, was offered for a proper purpose – challenging Plaintiff's credibility in the civil trial and giving the jury additional evidence to use when weighing the accounts given by the Officers and Plaintiff. This testimony from Dr. Berrill's was directly relevant in the civil matter. If the jury had heard Plaintiff's expert testify that Plaintiff simply could not help himself the jury would likely have been swayed to arrive at a different determination as to excessive force which likely would have led to different determinations as to malicious prosecution and abuse of process. Finally, the probative value substantially outweighed the prejudicial effect. Plaintiff cannot reasonably argue, and in fact he does not even try, that the substance of Dr. Berrill's criminal trial testimony was unfairly prejudicial to the Plaintiff in view of the fact that Plaintiff had used that very same

2

testimony in defense of the criminal charges against him. Even when addressed as a Rule 404 issue the Court's ruling on Dr. Berrill's testimony was erroneous and kept vital information, from the jury, that likely would have swayed the jury in the Officers' favor.

Plaintiff's opposition does not seriously contest the erroneous nature of the Court's ruling. It does not address the demonstration that a Rule 404 analysis should have resulted in the Officers being able to call Dr. Berrill during the liability trial. It does not address that Rule 404 simply does not apply in this instance. On this issue, the Court cannot be fairly assured that the lack of testimony from Dr. Berrill during the liability trial did not substantially and, as it relates to the Officers, adversely influence the jury. The Officers are entitled to a new liability trial.

**B. Plaintiff's opposition does not rebut the Officers' demonstration that the jury was improperly influenced by the improperly admitted testimony about the sweatshirt and the witness video.**

Plaintiff's opposition leaves unchallenged the fact that the Court erred when allowing Plaintiff to adduce evidence about the cart wrangler's video and the sweatshirt. The "duty to preserve evidence arises when the party has notice that the evidence is relevant to litigation or should have known that the evidence may be relevant to future litigation." *Fujitsu Ltd. v. Fed'l Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001). The Court admitted, when denying Plaintiff's spoliation motion that it was unaware of "any clear authority saying that an obligation to preserve in a criminal case even if it existed necessarily, permitted, or required a spoliation instruction or establish the duty to preserve for civil litigation purposes. So the question then is, whether the obligation to preserve in the civil case had attached to these individuals at the time it was destroyed." (Trial transcript May 21, 2025 at page 1015, lines 17-23).

After correctly determining that there was no duty to preserve the video and sweatshirt the Court then improperly allowed Plaintiff to present evidence and argue to the jury that the Officers

3

had failed to preserve evidence – which they had no duty to preserve. The Court allowed Plaintiff to make arguments to the jury about the Officers' duties and obligations even though the law did not place those duties and obligations on the Officers. This is a textbook demonstration of prejudice outweighing any possible probative value. Plaintiff's opposition does its level best to ignore this problem and suggests that this is merely a discretion issue as opposed to an error of law.  Further, Plaintiff's opposition does not seriously contest that the improperly admitted evidence about the video and sweatshirt significantly prejudiced the Officers. Plaintiff should have been precluded from presenting evidence about the video and sweatshirt to the jury.

On this issue, the Court cannot be fairly assured that the improperly admitted video and sweatshirt evidence did not substantially and, as it relates to the Officers, adversely influence the jury. The Officers are entitled to a new liability trial.

**C. Plaintiff's opposition fails to rebut the demonstration that Dr. Berrill's testimony should have been stricken.**

Plaintiff's opposition misses the point when arguing that "defendants complain that" The court allowed Dr. Berrill to give an opinion that Plaintiff suffered a second TBI (Plaintiff's opposition memo at p.7) as if that were the entirety of the objection to Dr. Berrill's testimony. Plaintiff argues that because Dr. Berrill opined that he suffered a mild concussion, a form of TBI, that there was no error when allowing the jury to hear the testimony.  The dispute on this motion is not whether Dr. Berrill testified about a new TBI or exacerbation of an old TBI. The error is that he was allowed to testify at all when he had no basis for his opinions.

Initially,  Dr. Berrill's report did not contain any opinion about a new TBI, exacerbation of existing an TBI or mild concussion. Although Dr. Berrill's report referred to records that suggested a mild concussion his trial testimony did not identify the specific care providers who made these "diagnoses." Instead, Dr. Berrill's diagnostic impression included "Cognitive Disorder, secondary

4

to head trauma" which was not specified as a new condition or an exacerbation of Plaintiff's pre-existing cognitive disorder. Similarly, the remainder of the diagnostic impressions in the report fail to specify any new condition or exacerbation of a pre-existing condition. The conclusions and recommendations in his report spoke about a "head injury" having occurred on November 3, 2014, but not a concussion. Significantly, there is no dispute that Plaintiff sustained a cut on his head on November 3, 2014 – a head injury. But a cut on the head is not equal to a concussion. Yet the Court allowed this new opinion offered at trial for the first time. Plaintiff's opposition attempts to gloss over this issue – but it is at the heart of the dispute. Dr. Berrill's report avoided any diagnostic opinion of a new TBI, exacerbation of a pre-existing TBI or PTSD. Plaintiff's opposition provides absolutely no legal basis to support the Court's decision to allow Dr. Berrill to testify.

The data he possessed was merely subjective and was insufficient to support his new opinion, to a reasonable degree of certainty in his fields, that there had been an exacerbation of or a new TBI sustained by Plaintiff in the subject encounter. Likewise, the missing Grix records rendered Dr. Berrill's opinion, that there was PTSD directly related to the subject encounter as opposed to all of the other violent episodes involving Plaintiff, without any connection to objective data. Dr. Berrill's trial testimony, was nothing more than an opinion that Plaintiff's "new" concussion or his pre-existing TBI and PTSD were exacerbated because Plaintiff said so (See *Shambreskis v. Bridgeport & Port Jefferson Steamboat Co.*, 2008 WL 2001877 (E.D.N.Y. May 8, 2008) ("It is apparent that the doctors' attribution of Plaintiff's maladies to the ... accident are based solely upon plaintiff's claim that these symptoms began after, and were caused by, the ferry incident."). A doctor's opinion on causation is speculative and conjectural when based solely on a plaintiff's inaccurate subjective reports of his history (see *Johnson v. United States*, No. 21-CV-2851, 2024 WL 1246503 (E.D.N.Y. Jan. 16, 2024) (citation omitted)).

5

A-4702

Dr. Berrill's testimony was predicated on cherry picked data and Plaintiff's erroneous, or misleading, history given to the doctor. Plaintiff never told Dr. Berrill about the incident in March 2013 where Plaintiff punched a wall in his home and broke his hand. Plaintiff never told Dr. Berrill about the incident involving his mother and the police encounter at Dr. Grix's office in July 2013. Likewise, Dr. Berrill was unaware of the alleged assault by Plaintiff against his brother in December 2014. Finally, Plaintiff's counsel did not provide Dr. Berrill with records that would have alerted Dr. Berrill to these other incidents. Without this crucial information Dr. Berrill's opinions on PTSD and TBI were rendered speculative and conjectural. Further, the Court need not assess whether this failure to provide information to Dr. Berrill was purposeful or innocent – the mere fact that he did not have the information undermined the basis for his opinions. And Plaintiff's retort is not to demonstrate that Dr. Berrill had sufficient objective data to render his opinions but is to instead argue that the Officers could have called their own expert. But whether Defendants should have called Dr. Gordon to testify is not at all relevant to whether there was any basis for Dr. Berrill's opinions.

Dr. Berrill's testimony should have been stricken as there was "simply too great an analytical gap between the data and the opinion proffered." *G.E. v. Joiner*, 522 U.S. at 146. On this issue, the Court cannot be fairly assured that the improperly admitted expert testimony by Dr. Berrill did not substantially and, as it relates to the Officers, adversely influence the jury. The Officers are entitled to a new damages trial.

6

**D. Plaintiff's opposition does not rebut Defendant's demonstration that the Court's discovery sanction regarding the Grix records was improper.**

Initially, Plaintiff misstates the details of the Court's ruling on the Grix records. The court ruled that Defendants could not cross-examine Dr. Berrill on any of Dr. Grix's records that he did not have and consult in preparing his report. A review of Berrill's May 19, 2020 report suggests that he had two letters from Dr. Grix's file – one dated July 21, 2015 and one dated February 26, 2013. Similarly, as it relates to questioning Dr. Grix about her treatment of Plaintiff the Court's ruling precluded Defendants from using Dr. Grix's records to refresh her recollection about her treatment of Plaintiff. Simply, the Court's improper discovery sanction rendered the overwhelming majority of the Grix records unusable at trial.

The purpose of the disclosure rule "is to prevent the practice of 'sandbagging' an opposing party with new evidence." *Haas v. Del. & Hudson Ry. Co.*, 282 Fed. Appx. 84, 86 (2d Cir. 2008) quoting *Ebewo v. Martinez*, 309 F. Supp. 2d 600, 607 (S.D.N.Y. 2004)" *Haas V. Del. & Hudson Ry. Co.*, 282 Fed. Appx. 84, 86. These were Plaintiff's own treating psychologist's records. Plaintiff's counsel sent an authorization to Dr. Grix in April 2019 to obtain the records. Plaintiff was the proponent of the preclusion motion. Even though Defendants may have been the proponents of the evidence the Court was obligated to explore whether the proponent of the motion to preclude, Plaintiff, was actually surprised or prejudiced by the content of his own treating psychologist's records. In this matter, the Court failed to develop a record which demonstrated that sandbagging had occurred. Contrarily, the cases relied upon by the Court in fashioning the sanction all contained actual surprise and the element of sandbagging.

Plaintiff's opposition provides no case law to the contrary. The opposition continues to baldly suggest that Plaintiff would have been prejudiced had his own treating psychologist's records been admitted into evidence. And Plaintiff's opposition is still silent as to whether Dr.

7

A-4704

Grix's records, at least through April 2019 when Plaintiff's counsel sent an authorization to Dr. Grix seeking the records, were in counsel's possession. If the Grix records were obtained by counsel then counsel would have known the scope of Dr. Grix's knowledge well before trial rendering the purported late disclosure of Plaintiff's own treating psychologist's records harmless (*Schloerb v. Nat'l R.R. Passenger Corp.*, 2025 U.S. Dist. LEXIS 4231, *36-37 (citation omitted)). The Court failed to develop a record which supported its disclosure sanction and Plaintiff's opposition does nothing to address the gaping hole in the analytical basis for the sanction.

Further, Plaintiff's opposition fails to contest the probative value of the Grix records. The records clearly undermine Berrill's opinions and Plaintiff's claims as to causation of any new TBI and exacerbation of the pre-existing TBI and PTSD. Dr. Grix's office notes from January 2, 2013 to February 2, 2017 demonstrate no evidence of a new TBI or exacerbation of a TBI. Further, there is scant evidence from Dr. Grix, the treating psychologist for 10 years, that Plaintiff's PTSD symptoms were worsened specifically as a result of his encounter with the Officers in November 2014 as opposed to, for example, the March 2013 incident where Plaintiff punched a wall in his home and broke his hand, the July incident involving his mother and the police encounter at Dr. Grix's office and the alleged assault by Plaintiff against his brother in December 2014. The only prejudice to Plaintiff would have been that the jury would have heard and seen probative evidence, of which Plaintiff was aware, regarding his damages claims.

On this issue, the Court cannot be fairly assured that the improperly excluded Grix records did not substantially and, as it relates to the Officers, adversely influence the jury. The Officers are entitled to a new damages trial.

8

A-4705

**II.    DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S MALICIOUS PROSECUTION CLAIM, OR THE VERDICT SHOULD BE SET ASIDE**

**A.  Probable Cause for Resisting Arrest**

Plaintiff tries to dismiss as "unavailing" the fact that "Pfail violently resisted [officers'] efforts to arrest him," but this is incontrovertibly true. It is plain as day from video inside the Fairway vestibule and from Plaintiff's own testimony, where he acknowledges Plaintiff acknowledged physically struggling with the officers, trying to fend them off, trying to free his hands, pick his head up off the floor, and "defend" himself. Ex. A, pp. 870-71, 881, 888.

Whether Pfail *subjectively* thought he was resisting arrest or "trying to protect himself" is irrelevant to the probable cause analysis, which focuses on the objective information available to the officers at the time of the arrest. And *objectively* Plaintiff was unquestionably resistant to Defendants' efforts to place him in handcuffs. For almost three minutes, Plaintiff struggled against three, four, and then five individuals' efforts to get him under control. If these actions do not create probable cause for resisting arrest, it is hard to imagine what would. *See Smith v. City of New York*, No. 1:18-CV-05079-MKV, 2021 WL 4267525, at *12 (S.D.N.Y. Sept. 20, 2021) (probable cause for resisting arrest where, "Defendants present evidence that when they attempted to make the arrest, Plaintiff, inter alia, flailed and tensed his arms and resisted to be placed in handcuffs… Plaintiff concedes that he tensed up.") (cleaned up); *People v. Cotton*, 143 A.D.2d 680, 532 N.Y.S.2d 911 (2d Dep't 1988) (affirming second-degree assault conviction and resisting arrest where officer "sustained physical injury" when defendant attempted to evade arrest by struggling as officers attempted to handcuff him); *Mazurkiewicz v. N.Y.C. Transit Auth.*, 810 F. Supp. 563, 570 (S.D.N.Y. 1993) ("Since there was an altercation between the parties, the officers could not have been acting maliciously in charging plaintiff with assault, given the police officers' defense of qualified immunity.").

9

**B.  Probable Cause for Second Degree Assault**

Officer O'Brien—kicked by Plaintiff as she walked him, handcuffed, outside the Fairway—had probable cause to charge Plaintiff with second degree assault. Plaintiff might have denied kicking O'Brien *inside* Fairway, but he could not have—and did no—deny kicking her *outside* Fairway. Plaintiff insisted that he could not recall *anything* that happened outside Fairway, before he was placed in an ambulance. Uncontroverted evidence established that Plaintiff kicked O'Brien outside Fairway, and the video—though admittedly from some distance—fully corroborates witness accounts.

Officers Massaro, Iannucci, and Panuthos similarly had ample probable cause for their respective charges against Plaintiff because all three undisputedly suffered injuries to their bodies during the course of the arrest—Massaro, a bloody nose; Iannucci, an injured hand; and Panuthos, swelling to the face. Plaintiff denies punching and kicking them, but he does not and cannot deny struggling with them during the course of a lawful arrest.

Plaintiff argues the officers could not identify the precise mechanism of their injury during this struggle, but that is not necessary for a conviction on Second-Degree Assault, much less for the much lower bar of probable cause, or the even lower bar of *arguable* probable cause for qualified immunity. For example, in *People v. Sekoll*, 254 A.D.2d 797, 797 (4th Dep't 1998), the appellate court found sufficient evidence that defendant "caused injury" and sustained a conviction where, "the State Trooper testified that, after struggling and wrestling with defendant for 3 to 5 minutes, he felt pain in his left arm as defendant pulled away from him, that the pain in his left arm and shoulder worsened and that he sought treatment at the hospital." Similarly, in *People v. Soto*, 184 A.D.2d 673, 673 (2d Dep't 1992), the court upheld a Second-Degree Assault charge where "the evidence adduced at trial established, that, as a result of their struggle with the defendant, two court officers suffered "physical injury." *See also People v. Cotton*, 143 A.D.2d

10

A-4707

680 (affirming second-degree assault conviction where officer "sustained physical injury" when defendant attempted to evade arrest by struggling as officers attempted to handcuff him).

Plaintiff's argument that he did not *intend* to injury the Defendants is one for his criminal jury trial; it has no bearing on the probable cause analysis here. First, the Second-Degree Assault does not require intent to *injure*, only intent to prevent a police officer from performing a lawful duty. NYPL §§ 120.05(3). And here, as set forth above, the officers had ample cause to believe Plaintiff was resisting arrest. Second, the probable cause analysis focuses only on the objective facts known to officers at the time. *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007). And the objective facts known to the officers at the time of *this* arrest and charging were that Plaintiff had likely broken a window at Buffalo Wild Wings, that he was, therefore, arrestable, that Plaintiff resisted the arrest, and that they were injured while trying to effectuate the arrest.

"[A]n arresting officer will find protection under the defense of qualified immunity unless 'no reasonably competent officer' could have concluded, based on the facts known at the time of arrest, that probable cause existed." *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016). Because reasonable officers *could* conclude, on these facts, that Defendants had probable cause to charge, they are entitled to qualified immunity.

### C. Because Defendants Had at Least Arguable Probable Cause to Charge, They are Entitled to Qualified Immunity

The question for qualified immunity here is not—as Plaintiff would have it—whether the officers' actions overall were reasonable in light of clearly established law. "A police officer is entitled to qualified immunity on a malicious prosecution claim if there was arguable probable cause to support prosecution." *Smith v. City of New York*, No. 1:18-CV-05079-MKV, 2021 WL 4267525, at *11 (S.D.N.Y. Sept. 20, 2021). That a jury might have found the officers' conduct generally unreasonable or warranting punitive damages has no bearing on the question of

A-4708

"arguable probable cause" because this is purely a legal question, for the Court to decide based on the objective, undisputed facts available to the officers at the time of the arrest. It is not a question of the jury. Moreover, as argued more fully on the evidentiary issues, it is more than likely the jury was unduly and improperly prejudiced by Plaintiff's repeated references to, and argument about, pieces of "evidence" the Defendant officers had no legal duty to preserve.

Ultimately, "even if there was not probable cause, there was at least arguable probable cause, which would entitle the police officers to qualified immunity on Plaintiff's malicious prosecution claim." *Smith v. City of New York*, No. 1:18-CV-05079-MKV, 2021 WL 4267525, at *14 (S.D.N.Y. Sept. 20, 2021) *citing Mazurkiewicz v. N.Y.C. Transit Auth.*, 810 F. Supp. 563, 570 (S.D.N.Y. 1993) ("Since there was an altercation between the parties, the officers could not have been acting maliciously in charging plaintiff with assault, given the police officers' defense of qualified immunity.").

**D. Plaintiff Has Failed to Rebut the Presumption of Probable Cause the Accompanies a Grand Jury Indictment**

Plaintiff did not present any evidence that Massaro, Iannucci, Panuthos, or O'Brien "misrepresented" any "fact to the District Attorney or otherwise acted in bad faith in a way that led to the indictment." Plaintiff's indictment were fully supported by probable cause, and Plaintiff failed to present any evidence—and he cites none here—that any Defendant lied to either the prosecutors or the grand jury. Further, Defendants had no obligation to produce the 911 caller's alleged video, identity, or Massaro's sweatshirt to the prosecution. And there is no reason to think that the production of any of these items would have undermined or eliminated probable cause for the charges of resisting arrest and assault. As such, Plaintiff fails to rebut the presumption of probable cause.

12

A-4709

**III.   DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S ABUSE OF PROCESS CLAIM, OR THE VERDICT SHOULD BE SET ASIDE**

Plaintiffs' abuse of process claim must fail for the same reason the malicious prosecution claim must fail – because probable cause existed for Plaintiff's prosecution. For the reasons discussed above, Defendants had probable cause, or at the very least, arguable probable cause to arrest and charge Plaintiff. Thus, his abuse of process claim fails. See *Pinter v. City of New York*, 976 F. Supp. 2d 539, 570 (S.D.N.Y. 2013) ("the Second Circuit's conclusion that the individual defendants had arguable probable cause forecloses [the] abuse of process claims against them").

Additionally, Plaintiff has failed to set forth any evidence of a "collateral objective" to support a due process claim. Plaintiff makes the conclusory claim, "Ample evidence existed to support the jury's conclusion that the defendants acted for a collateral objective." Pl. Brief, p. 21. But Plaintiff does not cite *any* evidence that would support the notion that Defendants had any reason to be concerned about "personal exposure," much less that they took any action.

**IV.   DEFENDANTS SHOULD BE GRANTED JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S EXCESSIVE FORCE CLAIMS, ASSAULT, AND BATTERY CLAIMS, OR THEY SHOULD BE SET ASIDE FOR QUALIFIED IMMUNITY**

Plaintiff argues that "Defendants do not challenge the jury's verdict that Iannucci, Massaro and Panuthos used excessive force," but this flatly incorrect. In a section entitled, "DEFENDANTS SHOULD BE GRANTED JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S EXCESSIVE FORCE CLAIMS, ASSAULT, AND BATTERY CLAIMS, OR THEY SHOULD BE SET ASIDE FOR QUALIFIED IMMUNITY," Defendants argued—and still maintain—that the Defendant Officers used no more force than was reasonably necessary under the circumstances. Def. Brief, p. 35 ("the officers used nothing more than their hands, and their legs for leverage… Courts have held much more force than that to be reasonable under similar circumstances.") This

13

A-4710

is an argument for dismissal of Plaintiff's federal excessive force claim and his state law battery claim alike; if granted, no claim should survive against the individual officers of the County.

In opposing Defendants' arguments for dismissal and qualified immunity, Plaintiff cites "entirely gratuitous force against an unresisting arrestee," but the video and testimonial evidence supports neither the notion that there was "gratuitous force" used, nor that Plaintiff was "an unresisting arrestee." Indeed, the objectively supports the officers' on the scene perception: when they confronted him, he made a sudden move to the left, as though ready to run. And when once on the ground, he struggled for several minutes before the officers were able to get him under control and in handcuffs. There is no "unresisting arrestee" in this case.

Nor is there any evidence of "entirely gratuitous force," either initially outside the Fairway, or inside. The law does not prohibit officers from using force, including punching, kicking, and grappling, to place a suspect under arrest. And the force used here was no more than was reasonable under the circumstances.

No officer used gratuitous or excessive force against Plaintiff outside the Fairway. Officer Panuthos denies kicking Plaintiff, and Officer Massaro testified consistently with respect to Officer Panuthos that, "there was no kick." But even if there was, it was reasonable in light of Plaintiff's motion to flee and fighting stance. And there is no clearly established law—and Plaintiffs cite none—that would prohibit an officer from using a kick to the abdomen to stop a fleeing suspect. Nor to take down a suspect that, as Plaintiff can be clearly seen doing in the video, takes a fighting stance against an arrest. Notably, Plaintiff makes no argument—and there can be none—that Officers Massaro or Iannucci used excessive force outside the Fairway. They merely followed behind Panuthos in approaching Plaintiff and then went down with him to the ground.

Once the Plaintiff and Officers were struggling on the ground, all the force they used to—

14

A-4711

including the one or two punches Plaintiff cites—was deployed in an effort to get Plaintiff under the control. The video, which shows the entirety of the encounter inside Fairway, shows Plaintiff coming down to the ground and shows the entire interaction that follows. It *does not* show any gratuitous or unnecessary force deployed by the officers. It is a testament to the Officers' restraint under the circumstances that it took the help of two more people to get Plaintiff restrained and that Plaintiff suffered little more than a bruised cheek and a cut to the forehead in the encounter.

Qualified immunity must be analyzed officer by officer, and here, the evidence—both video and testimonial—shows that Panuthos, Iannucci, Massaro, all used no more force than to bring Plaintiff under control. Given that it ultimately took five people to get Plaintiff in handcuffs, there is simply no evidence from which a jury could reasonably have concluded that Panuthos, Iannucci, or Massaro used more force than was necessary under the circumstances. Tellingly, for Iannucci, Plaintiff does not point to anything other than one punch he claims was excessive (a punch Massaro believes was delivered to stop Plaintiff biting Massaro). For Massaro, Plaintiff does not identify *any* use of force that was unreasonable, much less gratuitous or that violated clearly established law. Notably, Plaintiff does not cite any cases that would have put the officers on notice that their particular use of force, under these circumstances, was unreasonable.

As the Court instructed the jury, "The nature of reasonableness must allow for the fact that police officers are often forced to make split-second judgments—under circumstances that are tense, uncertain and rapidly evolving—about the amount of force that is necessary in a particular situation." Here, the Officers made a series of split-second judgments, under tense, uncertain circumstances. Their actions were reasonable, did not violate any clearly established law, and they should have the benefit of the doubt enshrined in the concept of qualified immunity.

A-4712

### V.   PLAINTIFF'S OPPOSITION DOES NOT REHABILITATE THE COMPENSATORY DAMAGES AWARD

Plaintiff's opposition does not resolve the fundamental defect in the jury's compensatory damages award. Plaintiff's damages case rested on an expert opinion concededly uninformed about a prior head trauma litigated in a separate federal case. Dr. Berrill testified that he did not know about the 2013 Garden City incident, did not receive any information from Mr. Pfail about it, and did not review any records concerning it. (Tr. 1800–01.) On that record, his conclusion that the 2014 Nassau County incident caused or exacerbated Plaintiff's long-term decline is speculative and incomplete. An award of nearly two million dollars cannot stand on that foundation. See *Gibeau v. Nellis*, 18 F.3d 107, 110 (2d Cir. 1994) (damages must be proximately caused by the violation); *Anderson Group, LLC v. City of Saratoga Springs*, 805 F.3d 34, 51 (2d Cir. 2015) (damages may not be speculative).

Plaintiff argues that the jury heard about the Garden City case and nonetheless credited his expert but the jury's general prerogative does not cure an expert's omission of critical facts. Without any medical testimony distinguishing between the effects of the 2013 incident and the 2014 incident, the jury lacked a reliable evidentiary basis for attributing Plaintiff's claimed cognitive and psychological sequelae to the latter. Plaintiff further contends that Defendants should have asked of Dr. Berrill on cross examination to speculate on how knowledge of the Garden City case might have affected his views, or called their own expert to testify at trial. However, this position overlooks that it was Plaintiff's burden to provide competent, non-speculative proof of causation and that he did not do so.

The risk of duplicative recovery underscores the problem. The Garden City and Nassau County complaints, both drafted by the same counsel within months of each other, alleged nearly identical injuries—memory loss, headaches, confusion, emotional distress—yet omitted reference

16

A-4713

to one another. Plaintiff now insists that the compensatory award should be upheld notwithstanding these overlapping claims and the lack of any expert testimony apportioning causation. That is precisely the type of speculative verdict the law forbids. See *Anderson Group,* 805 F.3d at 51.

Plaintiff's citations to cases sustaining or remitting other damages awards (*Payne v. Jones, Greenaway, Martinez, Russo*) do not bridge this evidentiary gap. Those cases did not involve an expert whose entire analysis failed to account for an undisputed, earlier head trauma and separate lawsuit. On this record, the $1.86 million compensatory award rests on conjecture, not proof. It should be vacated or substantially reduced.

### VI.     PLAINTIFF'S OPPOSITION DOES NOT JUSTIFY THE EXCESSIVE PUNITIVE DAMAGES AWARD

Plaintiff's opposition likewise fails to justify the jury's punitive damages verdict. While invoking language such as "ruthlessly attacked" and "cover-up," Plaintiff does not grapple with the constitutional limits that govern punitive damages under *Smith v. Wade*, 461 U.S. 30 (1983), *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996), and *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408 (2003).

Plaintiff's opposition portrays the punitive awards as a fitting response to alleged deceit and concealment but ignores the principle that punitive damages must be grounded in evidence that each defendant acted with the requisite state of mind. Here, the jury imposed nearly identical awards of $293,580 against three officers and $143,550 against a fourth, without any differentiation among their roles or culpability. That uniformity reflects a reflexive approach rather than the individualized assessment required to sustain such an award. The problem is especially acute for Officer O'Brien where the jury did not find her liable for excessive force, yet Plaintiff still defends a six-figure punitive award against her based on derivative allegations of malicious prosecution.

17

A-4714

Nor does the ratio of punitive to compensatory damages salvage the award. Plaintiff emphasizes that the ratio is less than two to one, but ratio is not dispositive. *Gore* makes clear that a low ratio cannot save an award lacking in the requisite reprehensibility or individualized analysis. Here the compensatory figure itself is excessive and overstated, as explained above. Anchoring punitive damages to that inflated number compounds the problem rather than curing it.

Plaintiff also leans on statutory maximums under federal and state criminal laws to suggest that the awards were within the realm of possible sanctions. However, those provisions identify theoretical maxima, not comparable penalties for the conduct tried here. The undisputed fact is that none of the officers were disciplined internally or referred for prosecution. Under *Gore*, that absence of comparable sanctions underscores, rather than excuses, the disproportionality of the jury's verdict.

Finally, the case law establishes a consistent benchmark far below what the jury awarded. The Second Circuit has made clear that punitive damages against police officers in the range of $125,000 to $175,000 are already "substantial." *Payne v. Jones*, 711 F.3d 85, 105 (2d Cir. 2012). Courts in this Circuit have repeatedly reduced higher awards to that range or lower. See *Lee v. Edwards*, 101 F.3d 805, 813 (2d Cir. 1996) ($200,000 reduced to $75,000); *DiSorbo v. Hoy*, 343 F.3d 172 (2003) ($1.2 million reduced to $75,000); *McDevitt v. Suffolk County,* 2024 WL 1270811, at *10 (E.D.N.Y. Mar. 26, 2024) ($450,000 reduced to $155,400). Plaintiff's reliance on *Jennings v. Yurkiw* and other cases does not alter that landscape. *Jennings* involved a single officer and a fact-specific record that is not comparable here. Nothing in *Jennings* or the other authorities cited in Plaintiff's opposition supports nearly $300,000 award per officer across the board, particularly where the jury's awards were mechanically uniform and untethered to individualized proof.

A-4715

In sum, Plaintiff's effort to defend the punitive damages award relies on rhetoric and inapposite comparisons, not on the record or governing law. The Court should vacate the punitive awards in their entirety, or, at minimum, remit them to levels consistent with the benchmarks established in *Lee, DiSorbo, Payne, and McDevitt*. Any punitive award against Officer O'Brien should be reduced further in light of the absence of an excessive-force finding.

## CONCLUSION

For the reasons set forth in Defendants' moving papers and reinforced herein, the jury's verdict cannot stand. Defendants respectfully request that the Court grant judgment as a matter of law pursuant to Rule 50, or, in the alternative, a new trial or substantial remittitur pursuant to Rule 59, together with such other and further relief as the Court deems just and proper.

DATED:    September 17, 2025
          New York, New York

**Sokoloff Stern LLP**
*Attorneys for Defendant Massaro*

By:    *LDorfman*
       Leo Dorfman
       179 Westbury Avenue
       Carle Place, New York 11514
       (516) 334-4500

**Thomas A. Adams**
Nassau County Attorney
*Attorneys for Panuthos, O'Brien and Nassau*

By:    *JCarnevale*
       John Carnevale
       1 West Street
       Mineola, New York 11501
       (516) 388-3045

19

A-4716

**Cuomo LLC**
*Attorneys for Defendant Ianucci*

By:    Matthew A. Cuomo
200 Old County Road, Suite 2 South Wing
Mineola, New York 11501
(516) 741-3223

20

A-4717

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

BRIAN PFAIL,

                             Plaintiff,

        -against-

COUNTY OF NASSAU, NASSAU COUNTY
POLICE DEPARTMENT, POLICE OFFICER
JOSEPH MASSARO, in his individual and
official capacity, POLICE OFFICER
JONATHAN PANUTHOS, in his individual and
official capacity, POLICE OFFICER KARN C.
O'BRIEN, in her individual and official capacity,
SERGEANT THOMAS IANNUCCI, in his
individual and official capacity, and JOHN
DOES 1-10, in their individual and official
capacities,

                          Defendants.

-------------------------------------------------------------------x

**MEMORANDUM AND ORDER**
16-CV-518 (NRM)

NINA R. MORRISON, United States District Judge:

Defendants move the Court to set aside the verdict and order a new trial in this matter under Federal Rules of Civil Procedure 50 and 59. Defendants also move for remittitur of the jury's compensatory and punitive damages. For the reasons outlined below, Defendants' motions are denied in their entirety.

## BACKGROUND

Because the parties are familiar with the background of this case, the Court only briefly recounts the facts necessary for the disposition of the instant motions.

A-4718

This case arises from an incident on November 3, 2014 at the Fairway Supermarket in Westbury, New York, during which Plaintiff Brain Pfail ("Pfail" or "Plaintiff") was forcibly restrained by four officers from the Nassau County Police Department ("NCPD") and then placed under arrest. Plaintiff brought this action alleging, *inter alia,* that police officers Joseph Massaro ("Massaro"), Jonathan Panuthos ("Panuthos"), Karen O'Brien ("O'Brien"), Sergeant Thomas Iannucci ("Iannucci"), and the NCPD (collectively, "Defendants") violated both federal and state law by engaging in excessive force, malicious prosecution, abuse of process, and battery against him.

Several of the Court's pretrial rulings are pertinent here. First, the Court received briefing and held argument on May 6, 2025, on whether Plaintiff's expert, Dr. N.G. Berrill, should be permitted to testify as to certain damages that he concluded Pfail suffered from the incident. This Court ultimately denied Defendants' *Daubert* motion to preclude Dr. Berrill's testimony. Relatedly, Defendants sought to call Dr. Berrill as a witness during the liability stage of the trial so that they could question him on certain aspects of his earlier testimony from Pfail's criminal trial in 2018. The Court similarly denied that motion. Finally, Defendants moved to preclude questioning about the officers' conduct with respect to their failure to preserve certain pieces of evidence — a sweater, and a video of the incident allegedly recorded by a bystander. The Court also denied that motion.

A jury trial lasting ten days was conducted between May 14 and May 28. During the liability stage of the trial, all four officers testified as to the events of the

A-4719

night in question, claiming that they identified themselves as police officers, and that Pfail resisted their lawful actions to restrain and arrest him. *See* Trial Tr. at 82–175, 402–53, 528–58, 592–662. Pfail testified that he was not aware that the officers were indeed officers, and that at the time he believed that unknown persons had jumped out of a car and attacked him, unprovoked. *See id.* at 769–806. The jury was shown two videos of the incident, one taken from the parking lot, and another from the internal vestibule of the supermarket. *See* Pl. Ex. 74A, 81. The jury also viewed stills from that video, as well as photos of Pfail and the officers following the incident. *See* Pl. Ex 86, Def. Ex. BBBBB, CCCCC, DDDDD.

At the close of the liability phase of the trial, the jury found Defendants liable on all counts. Defendants moved for a judgment as a matter of law under Rule 50, which this Court denied. *See* Trial Tr. at 948–80.

Trial then proceeded to the damages phase, where both Pfail and his mother, Eileen, testified about how the event had negatively impacted him and affected his daily functioning. *See id.* at 1375–99, 1416–41. Dr. Berrill also testified regarding a pre-existing traumatic brain injury and other injuries that Pfail had sustained from an unrelated incident in 2007, and how, in Dr. Berrill's assessment, those pre-existing injuries were exacerbated by Pfail's 2014 encounter with the officers. *See id.* at 1616–63. The jury awarded Plaintiff $1,860,000 in compensatory damages. The jury also awarded $293,580 each in punitive damages against Officers Panuthos and Massaro and Sergeant Iannucci, and $143,550 against Officer O'Brien, for a total of $1,024,290.

3

A-4720

Defendants now move under Federal Rules of Civil Procedure 50 and 59 to set aside the verdict and jury awards.

<u>**DISCUSSION**</u>

### I.  Rule 59

Rule 59(a)(1)(A) allows the Court to grant a new trial if, "after a jury trial, for any reason for which a new trial has heretofore been granted in in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). The rule permits the Court to grant a new trial if the verdict is against the weight of the evidence, which can happen "if and only if the verdict is (1) seriously erroneous or (2) a miscarriage of justice." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 417–18 (2d Cir. 2012) (internal quotation omitted). This is a high bar, and a request for a new trial under Rule 59 "ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Medforms, Inc. v. Healthcare Mgmt. Sols., Inc.*, 290 F.3d 98, 106 (2d Cir. 2002) (quoting *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 623–24 (2d Cir. 2001)).

The standard applied in reviewing a Rule 59 motion "depends on whether that party objected contemporaneously to the purported errors." If a party objects contemporaneously, a new trial is warranted only if "the district court committed errors that were a 'clear abuse of discretion' that were 'clearly prejudicial to the outcome of the trial.'" *Marcic v. Reinaurer Transp. Cos.*, 397 F.3d 120, 124 (2d Cir. 2005) (quoting *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 17 (2d Cir.

4

A-4721

1996)).  If the claimed errors were not preserved, "a new trial will be granted only for error that was 'so serious and flagrant that it goes to the very integrity of the trial.'"  *Id.* (quoting *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 51 (2d Cir. 1998)).

Defendants challenge four of this Court's rulings under Rule 59.  The Court addresses each in turn.

A.  Dr. Berrill's Criminal Trial Testimony

Defendants first argue that the Court erred in not allowing them to impeach Dr. Berrill with certain statements from his testimony at Pfail's criminal trial in 2018.  According to Defendants, Dr. Berrill testified at the prior criminal trial that one effect of Pfail's prior traumatic brain injury ("TBI") from 2007 is that "Plaintiff would strike out impulsively."  Def. Mem. at 11.[1]

This issue was argued extensively prior to trial, and this Court stated its reasons for denying Defendants' request on the record on May 12.  As expressed in that ruling, the Court does not agree that Dr. Berrill's criminal trial testimony supports the inference that Pfail was likely to strike out impulsively during his encounter with Defendants in 2014.  Rather, Dr. Berrill testified that people with Pfail's condition may demonstrate poor impulse control, that they might "become overly emotional" and respond with "irrational behavior" when faced with circumstances similar to the original trauma, Def. Ex. B at 8–9, and that Pfail's

---

[1] The Court refers to the page numbers assigned by the Electronic Case Filing System ("ECF").

A-4722

impulse control and emotional regulation were so affected on the night of this incident, *id.* at 11.

Moreover, even if the criminal trial testimony were construed to suggest that Pfail had some general tendency to lash out or strike out because of his earlier brain injury, it was properly excluded under Rule 404(a)(1) and Rule 403.[2]  Defendants now argue that even if this is character evidence, it was admissible for the purpose of "challenging witness credibility," not to show that Pfail acted in accordance with that character trait. *Tang Cap. Partners, LP v. BRC Inc.*, No. 22-CV-3476 (RWL), 2025 WL 1785245, at *4 (S.D.N.Y. June 27, 2025).  As Defendants state in their post-trial memorandum of law, the officers "testified that Plaintiff verbally challenged their authority and indicated that he would not comply with their lawful order.  Conversely, Plaintiff . . . denied challenging them." Def. Mem. at 15.  Defendants conclude that this evidence would undermine Pfail's testimony as it may have "swung the balance in favor of the Officers as Dr. Berrill's testimony lends credence to the Officers' version of the initial interaction with Plaintiff." *Id.*

What Defendants describe is still Rule 404(a)(1) evidence.  While Defendants purport to merely impeach Pfail's credibility, they do so only by arguing that Pfail has a trait which made it more likely that it was the officers who were telling the truth about his actions, and not Pfail.  That is precisely what is prohibited by Rule 404(a)'s bar on the introduction of character evidence. *See Micone v. Sarene Servs.*

---

[2] Defendants also argue that this evidence was improperly excluded under Rule 404(b).  The Court does not address this argument, as it did not exclude the evidence based on Rule 404(b).

*Inc.*, No. 2:20-CV-3273 (NJC), 2025 WL 736638, at *45 n.25 (E.D.N.Y. Mar. 8, 2025) (noting that evidence that a person acted in accordance with a character trait "tends to distract the trier of fact from the main question of what actually happened on the particular occasion at issue in the trial" (internal quotation omitted)).  Indeed, to allow any evidence that supports one side's account over another under the guise of "credibility" would be to completely vitiate Rule 404(a)(1), as it would allow a party to introduce character evidence simply because a witness testified that he or she acted in a manner that is inconsistent with that alleged character.

The very case Defendants cite on this point, *Tang Capital*, recognizes this distinction.  *Tang Capital* allowed the admission of character evidence to challenge the credibility of a claim that a party was "difficult, angry, and impersonal," but only for the limited purpose of allowing the jury to "properly weigh testimony from [other] witnesses who may be influenced by their employment relationship with him." *Tang Capital*, 2025 WL 1785245, at *4.  In other words, it was not introduced to show that Tang acted in accordance with his alleged character on a particular occasion, as Defendants try to argue here, but rather to show that other testifying witnesses may have been intimidated by Tang's reputation, which would go to *their* credibility.

Lastly, Defendants argue that because the testimony was allowed in the previous criminal trial under Rule 404(a)(1), it is by definition admissible in this civil trial.  Def. Mem. at 13–14.  However, Defendants point to no caselaw — nor is the Court aware of any — suggesting that an evidentiary ruling in a criminal case

7

in a different jurisdiction, involving different claims and different burdens of proof, binds a federal court in a subsequent civil case brought by one of those parties.

Finally, this Court reaffirms its previously articulated reasons for excluding this evidence under Rule 403. *See* Pl. Ex. 6.

B. Sweatshirt and the "Cart Wrangler"

Defendants next argue that the Court erroneously allowed Plaintiff to present evidence that Officer Massaro disposed of his bloody sweatshirt immediately after the incident, and that the officers did not preserve any video from the eyewitness who called 911 about the incident, who was referred to at trial as the "cart wrangler." This issue, too, was argued extensively prior to trial, and this Court denied Defendants' oral motion to preclude inquiry about the sweatshirt and the cart wrangler's video.

Defendants' argument largely rests on a body of caselaw concerning spoliation, arguing that there was no duty to preserve the evidence for future use in a civil case. *See* Def. Mem. at 16–17 (citing *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001); *Chepilko v. Henry*, 722 F. Supp. 3d 329, 337 (S.D.N.Y. Mar. 21, 2024)). However, whether or not there was a duty to preserve the evidence for civil litigation is a completely separate question from whether or not the officers' actions in failing to preserve the evidence were relevant to the factual disputes before the jury on Plaintiff's malicious prosecution claims, as well as to the officers' overall credibility. Defendants essentially claim that any action a police officer

8

takes is irrelevant to the jury's inquiry in a civil rights trial unless that action was contrary to some other legal duty.  None of their cited cases hold as much.

For example, *Marshal v. Port Authority of New York & New Jersey* concerned spoliation sanctions, but its discussion of the relevance of the unpreserved video does not apply to the case at hand.  No. 19-CV-2168 (LJL), 2022 WL 17491006, at *8 (S.D.N.Y. Dec. 5, 2022).  In *Marshal*, the Court found that the unpreserved video would not be relevant to the civil case because the operative question in the civil case was whether or not the plaintiff was verbally asked to present a ticket, and the unpreserved video tape would not have had audio.  *Id.  Savino v. City of New York* is similarly inapposite, as it does not involve the destruction or spoliation of evidence.  *See* 331 F.3d 63 (2d Cir. 2003).

Defendants argue that the evidence here was not relevant because the "cell phone video . . . did not capture the incident" and the sweatshirt was "not shown to contain exculpatory material content."  Def. Mem. at 18.  However, the only testimony that the eyewitness's video did not capture the incident came from the officers themselves.  Given that the officers nonetheless failed to preserve the video, and evidence was presented that the cart wrangler had told them that it *did* capture the incident, it was perfectly permissible for the jury to draw an adverse inference about the officers' decision not to preserve the video, as well as Massaro's intentional disposal of the sweatshirt.

9

A-4726

For these reasons, this Court finds no error or an abuse of discretion in allowing this evidence to be presented, nor in declining to give a curative instruction.

C. Dr. Berrill's Testimony

Defendants next claim that the Court abused its discretion in denying their motion to preclude Dr. Berrill's testimony at this trial and declining to strike the testimony after it was given. Defendants largely make the same arguments they made in their original *Daubert* motion to exclude Dr. Berrill's testimony. *See* ECF No. 103. That motion was denied in an oral ruling on May 6, 2025, *see* Pl. Opp. Ex. 5, and nothing in Defendants' Rule 59 motion now warrants reconsideration. *See* Pl. Opp. Ex. 5. The Court will not restate that lengthy ruling here, but will explain why, in light of the actual testimony given, it was not an abuse of discretion to allow Dr. Berrill to testify and decline to strike his testimony.

Defendants' primary complaint with Dr. Berrill's testimony, as in their original motion, appears to be that Dr. Berrill had no "objective data" to determine that Defendants' actions caused Pfail to sustain a second TBI and additional damages. Def. Mem. at 22. It is unclear what Defendants mean by "objective data," especially in the field of neuropsychology. As explained in the oral ruling on May 6, *Daubert* does not preclude Dr. Berrill from relying on Pfail's self-reporting in lengthy clinical interviews, in combination with pre-2014 medical records, to form his opinion. Defendants' newly cited cases do not change this analysis.

10

*Shabreskis v. Bridgeport & Port Jefferson Steamboat Co.*, No. 02-CV-2692 (DRH), 2008 WL 2001877 (E.D.N.Y. May 8, 2008), did not concern a *Daubert* challenge, and dealt with medical records, not expert testimony. And in *Shabreskis*, the doctors appeared to rely only on the plaintiff's self-reporting, without reference to any other evidence of the plaintiff's condition. Similarly, in *Johnson v. United States*, the court excluded expert opinion on causation of injury because the purported medical expert—who only analyzed the plaintiff post-accident—testified that he had not reviewed any medical records besides his own. No. 21-CV-2851 (MKB), 2024 WL 1246503, at *5 (E.D.N.Y. Jan. 16, 2024) ("It is undisputed that [the expert] was not aware of Plaintiff's pre-Accident history . . . ."). In addition, *Johnson* did not involve a neurological injury.

By contrast, Dr. Berrill told the jury that in reaching the conclusion that the 2014 incident exacerbated Pfail's condition, he relied not only on Pfail's self-reporting, but also on Pfail's past medical records. *See* Trial Tr. at 1632; 1677. Dr. Berrill explained that included in these medical records were reports that Pfail's 2014 injury was "either a concussion in some cases or a second TBI." *Id.* at 1648. Defendants cite no caselaw that indicates an expert must rely on anything more, let alone "objective testing," before the expert can offer a neuroscientific opinion that a plaintiff suffered from a TBI.

Defendants were also free to cross-examine Dr. Berrill on the fact that he did not have the benefit of so-called "objective testing" from before the 2014 incident, and they did, extensively. Dr. Berrill responded that Defendants' questions were

presuming those tests measured something that "those tests aren't designed to do." *Id.* at 1699. He stated that there is "no objective psychological testing you could [do] that could help you make that differential." *Id.* at 1706. Defendants also had the option to call their own retained expert — who had also reviewed these records and interviewed Pfail — to refute Dr. Berrill's methodology and opinion, but they chose not to do so.

Finally, to the extent that Defendants argue that Dr. Berrill's testimony is unreliable because he did not know about the 2013 incident with the Garden City police and he did not review *all* of Pfail's medical records, this is a classic topic for cross examination, not a basis to exclude or strike his testimony. *See Protostorm, LLC v. Antonelli, Terry, Stout & Kraus, LLP*, No. 08-CV-0931 (PKC), 2014 WL 12788845, at *6 (E.D.N.Y. Mar. 31, 2014) ("Any failure to take a given piece of evidence into account in [the expert's] analysis would affect only the weight of his testimony, not its admissibility."); *Simpson v. New Prime, Inc.*, No. 15-CV-5392 (VMS), 2022 WL 17961213, at *2 (E.D.N.Y. Dec. 27, 2022) ("The alleged failure to examine certain medical records also does not make the experts' opinion inadmissible."). This Court gave Defendants ample opportunity to vigorously cross-examine Dr. Berrill on this issue — which, again, they did. *See, e.g.,* Trial Tr. at 1800 ("Q: [Y]ou didn't review any records about [the Garden City arrest], right? A: I don't think that I did review records about it."). In short, for the same reasons originally outlined in the May 6 ruling, and with the additional benefit of Dr.

12

A-4729

Berrill's trial testimony, this Court finds no abuse of discretion or error in allowing Dr. Berrill to testify.

D. <u>Dr. Grix's Records</u>

Lastly, Defendants argue that the Court abused its discretion and violated Rule 37(c)(1) by precluding them from offering 900 pages of records by Plaintiff's former therapist, Dr. Grix, after they were produced on the eve of trial in this nine-year-old case. On May 22, this Court issued a lengthy decision on the matter after written submissions and oral argument from the parties. The Court will not retread its earlier application of the *Patterson* balancing test, *see Patterson v. Balsamico*, 440 F.3d 104 (2d Cir. 2006), but will now address a few of the arguments Defendants raise in their Rule 59(e) papers.

First, Defendants take issue with this Court's reliance on *Klonski v. Mahlab*, 156 F.3d 255 (1st Cir. 1998), and *Haas v. Delaware & Hudson Railway Co.*, 282 F. App'x 84 (2d Cir. 2008), because the prejudice in those cases was not the same as here. *See* Def. Mem. at 27–28. However, this Court relied on those cases in analyzing the "explanation for the discovery violation" prong of the *Patterson* test, not the prejudice prong. *See* Trial Tr. at 1233–35.

Defendants also argue that unlike here, the cases cited in the Court's prior ruling, like *Lujan v. Cabana Management, Inc.*, 284 F.R.D. 50 (E.D.N.Y. 2012), dealt with "actual" surprise. *See* Def. Mem. at 28. But as already explained, this was actual surprise, just in a different form. This is because while Plaintiff may have been aware of the *existence* of Dr. Grix as a witness, the 900 pages of

13

documents from her file were not produced by Defendants nor identified as potential trial evidence until long after the close of both lay and expert discovery, and approximately three weeks before trial. *See Lujan*, 284 F.R.D. at 71 (finding prejudice where documents that defendants intended to rely upon were newly produced, "depriving plaintiffs of the ability to challenge" them); *Jablonski v. Special Counsel, Inc.*, No. 16-CV-5243 (AT), 2025 WL 315884, at *4 (S.D.N.Y. Jan. 27, 2025) ("Plaintiff's late production is not harmless because it prevents Defendant from inquiring at a deposition or otherwise investigating the evidence offered by [the opposing party], and therefore prejudices Defendant." (internal quotation omitted)). Thus, Defendants' argument that admitting the records would have been "harmless" is baseless.

Defendants then argue that the Court failed in its obligation to "require a demonstration by Plaintiff that he would somehow be unfairly prejudiced by these records." Def Mem. at 30. They even go so far as to claim that the Court "*did its best to avoid an assessment* of how Plaintiff might be prejudiced." *Id.* (emphasis added). This Court has reviewed the trial record once more, and finds no reason to conclude that it did not fairly consider whether and how Plaintiff might actually be prejudiced by allowing Defendants to cherry-pick from 900 pages of newly disclosed exhibits from Plaintiff's former therapist and use them at trial at the eleventh hour. Such potential prejudice included, but was not limited to, what could result from allowing Defendants to cross examine Plaintiff about statements or events

14

attributed to him in therapy notes from a decade earlier that were never raised in discovery or prior motion practice.

In addition, *Patterson*'s third prong requires the Court to consider "the prejudice suffered by the opposing party as a result of having *to prepare to meet the new testimony*." 440 F.3d at 117 (emphasis added). Plaintiff's counsel sufficiently outlined the prejudice to trial preparation and otherwise that would result from receiving 900 pages of documents that Defendants sought to use at trial just three weeks before jury selection in this nearly decade-old case. *See* Pl. Ex. 5 at 26–27.

The Court thus re-affirms its prior ruling that the failure to timely disclose these documents was not "harmless." It finds no error in its decision precluding these exhibits.

## II.    Rule 50

The Court now turns to Defendants' claims under Federal Rule of Procedure 50 — their renewed motion for judgment as a matter of law under Rule 50(b). This motion is denied for the same reason it was denied at the close of evidence. As this Court stated at the beginning of that prior ruling, "[t]his case is at its heart a contest of credibility," Trial Tr. at 974, and the jury was permitted to credit as much or as little of the officers' or Pfail's testimony as it saw fit.

"Under Rule 50(b), if a jury returns a verdict for which there is not a legally sufficient evidentiary basis, the Court may either order a new trial or direct the entry of judgment as a matter of law." *Protostorm, LLC v. Antonelli, Terry, Stout & Krauss, LLP*, No. 08-CV-931 (PKC), 2015 WL 3605143, at *2 (E.D.N.Y. June 5,

15

2015).  A Rule 50 motion "may only be granted if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been a result of sheer surmise and conjecture, or the evidence in favor of the movant[s] is so overwhelming that reasonable and fair-minded [persons] could not arrive at a verdict against [them]." *Kinneary v. City of New York*, 601 F.3d 151, 155 (2d Cir. 2010) (quoting *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 133 (2d Cir. 2008)).

In deciding a Rule 50 motion, a court "must give deference to all credibility determinations and reasonable inferences of the jury." *Caruolo v. John Crane, Inc.*, 226 F.3d 46, 51 (2d Cir. 2000) (quoting *Galdieri-Ambrosini v. National Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998)).  As such, it must "consider the evidence in the light most favorable to the [non-moving] party and . . . give that party the benefit of all reasonable inferences that the jury might have drawn in [its] favor from the evidence." *Concerned Area Residents for the Env't v. Southview Farm*, 34 F.3d 114, 117 (2d Cir. 1994) (quoting *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 367 (2d Cir. 1988)).  The Supreme Court has explained that "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000).

One legal rule that provides important context for Defendants' Rule 50(b) claims is that "the court must bear in mind that the jury is free to believe part and disbelieve part of *any* witness's testimony." *Zellner v. Summerlin*, 494 F.3d 344,

16

371 (2d Cir. 2007) (emphasis added).  Much of Defendants' Rule 50(b) motion revolves around excerpts from the trial in which the officers testified to their version of what occurred at a specific moment during the parties' encounter, while Pfail could not remember some or all of what transpired at that exact moment. Defendants argue that the officers' testimony in such cases established an uncontroverted fact that the jury was compelled to credit.  *See* Def. Mem. at 33. This is simply not the law.

The jury heard from each of the officers and observed their demeanor on the stand.  The jury also did not hear that testimony in a vacuum.  It weighed the officers' testimony alongside other evidence — including the videos, the 911 call, and photographs — and compared their testimony to Pfail's entire testimony.  The jury was completely within its right to make credibility determinations as to each officer, and credit all, some, or none of their testimony, whether or not a specific thing the officer said was directly controverted by Pfail's testimony on that same fact.  *See United States v. Paddy*, 725 F.3d 147, 152 (2d Cir. 2013) ("The jury is free to believe part, and to disbelieve part, of any given witness's testimony."); *Salters v. New York City Transit Authority*, 12-cv-4836 (OEM) (JRC), 2025 WL 1504122, at *10 (E.D.N.Y. May 27, 2025) (finding that the jury "was free to credit some or all of [the witness's] respective testimony," and that "[t]he jury was also not required to believe either side").

The Court now turns to the individual claims on which Defendants seek judgment as a matter of law under Rule 50.

17

A. <u>Malicious Prosecution</u>

Defendants argue that they are entitled to judgment as a matter of law on the malicious prosecution claim because no reasonable jury could have found that they lacked probable cause to arrest Pfail for resisting arrest and assault in the second degree.

It is true that "the existence of probable cause is a complete defense to the claim of malicious prosecution in New York." *Stansbury v. Wertman*, 721 F.3d 84, 94–95 (2d Cir. 2013) (quoting *Manganiello v. City of New York*, 612 F.3d 149, 161–62 (2d Cir. 2010)).  However, the jury was so instructed, and it reasonably found that the officers did not have probable cause to arrest Pfail on either charge. Defendants' claim relies entirely on an interpretation of the facts most favorable to them, as opposed to drawing all reasonable inferences in favor of the non-moving party.

Defendants emphasize that probable cause is an objective test of what the officers knew at the time, not Pfail's subjective understanding of what happened. *See Zellner*, 494 F.3d at 369.  But that did not require the jury to accept everything that the officers testified to as true, nor to accept the officers' subjective interpretations of objective facts.  *See id.* ("An arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." (internal quotation omitted)).

1. <u>Resisting Arrest</u>

A-4735

The jury was instructed that "a person is guilty of resisting arrest when he intentionally prevents or attempts to prevent a police officer from effecting an authorized arrest of himself. Intent means that the person had a conscious objective or purpose." Trial Tr. at 1182; N.Y. Penal Law § 205.30. Defendants' argument that the officers had probable cause to arrest Pfail for resisting arrest as a matter of law improperly relies entirely on an interpretation of the trial evidence most favorable to them.

The officers testified that they identified themselves as police officers and said they wanted to speak with Pfail, and additionally, that they had their badges around their necks. *See* Trial Tr. at 208, 465, 709, and 861. They stated that Pfail swung his arm at them as they approached him, *id.* at 129, and took a "quick step to the left, which [was] interpreted [as] he was going to flee," *id.* at 707. The officers then testified that after Pfail was on the ground, he "didn't put his hands behind his back. He was kicking his legs up . . . [he was] resisting arrest instead of cooperating." *Id.* at 246.

But whether the defendants actually identified themselves as police officers was very much a fact in dispute. Pfail testified that a car pulled up, and three men came out — three men whose identities he did not know. *Id.* at 779. Though he heard the men yelling, *id.* at 860, he did not know what was being said, *id.* at 861. Pfail testified that the three men ran towards him and he "braced for impact." *Id.* He stated that he did not make any contact with the men, and then the foot of one of the men struck him in the abdomen. *Id.* at 782.

Pfail then testified that in the vestibule of the Fairway Market, he "hit the ground, [he] felt like the wind was knocked out of [him,] and [he] was having a hard time breathing because [he] could feel that these men were on top of [him] and [he] felt the punching, [he] felt something very blunt hit [him] in the back of the head numerous times, and [he] felt someone taking [his] head and slamming it into the floor of the vestibule." *Id.* at 783. Pfail then heard a woman yell "break his leg," and felt a man bend his leg backwards as he begged them to stop. *Id.* at 783–84. And as he was on the floor, he remembered the "pounding on [his] head" and not being sure "what was going to happen if it didn't stop and [that he] was afraid [he] was going to die." *Id.* at 784. The jury was free to credit Pfail's testimony regarding these events and discredit the officers' testimony.

The jury also watched the video of the incident from outside of the Fairway. *See* Pl. Ex. 74B. In that video, there are approximately five seconds from the moment Officer Panuthos comes around the back of the vehicle to the moment the officers make contact with Pfail and eventually tackle him into the vestibule of the Fairway. *Id.* at 00:08–00:13. Additionally, the officers are in plainclothes, and the vehicle is an unmarked black SUV. *Id.* The video, combined with Pfail's testimony that he could only hear yelling, taken in the light most favorable to Pfail, is surely enough to for a reasonable jury to infer that no reasonable officer in Defendants' position would have believed that the individual they approached and immediately tackled was aware they were police officers and thus had the conscious objective to resist arrest.

Case 2:16-cv-00518-NRM-PCG    Document 173    Filed 11/13/25    Page 21 of 44 PageID #: 3869

Moreover, the jury heard a 911 call from the so-called cart wrangler, a person who was witnessing the event contemporaneously, and who told the operator that *"these three guys just jumped out of this car and started beating this one guy."* Pl. Ex. 81 00:12–00:16 (emphasis added). It was a perfectly reasonable inference for the jury to make that, because the 911 caller also could not tell that the Defendants were police officers attempting to make an arrest, the officers did not reasonably identify themselves as such, and thus any "defensive" posture that Pfail may have had was a reasonable reaction to an unprovoked attack such that the officers could not have reasonably believed he was resisting a lawful arrest.

Not only that, even when uniformed officer O'Brien went to help the other officers, the 911 caller said that "the officer seems to be fighting these guys off right now, you might wanna — need another officer here right now. They keep beating — this officer's struggling — they need backup right now." *Id.* at 1:00–1:10. A reasonable jury could have inferred that the 911 caller at that moment *still* believed the plain-clothed officers were not in fact officers, and that they were themselves criminals fighting off Officer O'Brien as they attacked Pfail. That may not be the only reasonable interpretation of the evidence, but it is certainly one the jury could have made.

Defendants' argument that no reasonable jury could come to the conclusion the officers did not have probable cause to arrest Pfail for resisting arrest while inside the Fairway vestibule suffers from the same defects. Pfail testified that he was not resisting arrest, only attempting to defend himself from what he perceived

as an unprovoked attack.  The video inside the Fairway Market vestibule also shows the three officers putting their body weight on top of Pfail as he tries, unsuccessfully, to protect his body and move his arms and legs while pinned underneath them.  *See* Pl. Ex. 74A at 00:12.  A reasonable jury could certainly find that this video supported Pfail's version of the events.

Furthermore, an individual has the legal right to act in self-defense when faced with officers who are using unreasonable force against him.  As the New York Court of Appeals has stated, "[t]here can be no cavil with the proposition that a citizen may use reasonable force in self-defense where the force exerted by the police in effecting an arrest is excessive.  Nor can there be any doubt that force used by the police may reach such dimensions as to be illegal." *People v. Stevenson*, 31 N.Y.2d 108, 112 (1972) (internal citations omitted); *see also McLaurin v. Falcone*, No. 05-4849-cv, 2007 WL 247728, at *1 (2d Cir. Jan. 25, 2007) (summary order) ("[I]t is well-established that '[t]he purpose of [N.Y. Penal Law § 35.27] is merely to prevent combat arising out of a dispute over the validity of an arrest and does not prevent an individual from protecting himself from an unjustified beating.'" (quoting *People v. Sanza*, 323 N.Y.S.2d 632, 633 (N.Y. App. Div. 1971)).  A jury could have inferred that the video evidence, combined with Pfail's testimony and the 911 caller's statements, made clear that Pfail was not resisting arrest but rather protecting himself from the use of excessive force, and that no reasonable officer could have believed that he was simply resisting a lawful arrest.

Indeed, Defendants in their motion argue that "it took about three minutes and five people working together to get Plaintiff into handcuffs." Def. Mem. at 33. But by the two-minute nine-second mark in the video, Pfail appears to be completely motionless face down on the floor. *See* Pl. Ex. 74A at 2:09. And after he is cuffed, the video shows him being rolled over while appearing almost lifeless, with a large pool of blood on the floor where his head had been.

Probable cause is an objective analysis, not a subjective one. However, an element of the crime of resisting arrest is that the arrestee has an *intent* to resist arrest. Based on all the facts presented at trial, and drawing all reasonable inferences in favor of Pfail, it was reasonable for the jury to conclude that the officers did not have probable cause to believe that Pfail was acting with the intent to resist arrest.

### 2. Assault in the Second Degree

The jury was instructed that a person is guilty of assault in the second degree "when, with the intent to prevent a police officer from performing a lawful duty, he causes physical injury to such a person. Intent means that the person had a conscious purpose or objective. Physical injury means impairment of physical condition or substantial pain." Trial Tr. at 1181; *see* N.Y. Penal Law § 120.05. For largely the same reasons just outlined as to why a reasonable jury could have concluded the officers had no probable cause to believe Pfail was resisting arrest, a reasonable jury could have concluded the officers similarly lacked probable cause for second degree assault. Namely, a reasonable jury could have concluded that the

officers did not identify themselves, such that Pfail did not know they were police officers and therefore lacked the intent to stop any officer from performing a lawful duty.

Defendants argue simply that because the officers each testified as to sustaining injuries during the arrest, they necessarily had probable cause to arrest Pfail for assault in the second degree. *See* Def. Mem. 34–35. However, the jury was entitled not to credit the officers' testimony about how they actually sustained those injuries. Additionally, while it is true that Pfail acknowledged that at some point when he was on the ground he was "trying to defend himself," Trial Tr. at 871, that does not mean that the officers had probable cause to arrest him for assault in the second degree.

The jury could have reasonably found, for example, that the officers attacked Pfail without provocation and without properly identifying themselves, and that Pfail was lawfully attempting to defend himself from grievous physical injury. Further, the jury found Panuthos, Massaro, and Iannucci liable for use of excessive force and assault. And if the officers were using excessive force, their actions were no longer "lawful," *see Stevenson*, 31 N.Y.2d at 112, and any actions Pfail took to defend himself would not have been with the intent to stop the officers from performing a lawful duty.

Defendants highlight the fact that Pfail did not deny Officer O'Brien's allegation that he kicked her; as he explained, after sustaining a second TBI in 2014, he could not remember that portion of the incident one or way or another. *See*

24

A-4741

Trial Tr. at 550.  But the jury was free to make credibility determinations and to disbelieve all or part of Officer O'Brien's testimony, especially in light of other aspects of her testimony.  *See United States v. Miller*, 116 F.3d 641, 676 (2d Cir. 1997) ("[W]here there are conflicts in the testimony, we must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses.").  For example, Officer O'Brien claimed that, upon arriving at the scene, Panuthos, Massaro, and Iannucci all looked "like they just got their asses kicked."  Trial Tr. at 560.  On the other hand, she testified that Pfail looked to her like he had somehow managed, on his own, to physically dominate these three police officers.  *See* Trial Tr. at 570 (Q: "[I]t's your testimony that it looked like Mr. Pfail was doing the ass kicking? A: It looked like he did it before I arrived.").

However, the jury watched the video from inside the Fairway, which showed that when Officer O'Brien arrived, Pfail had already been on the ground under the three officers for approximately one minute.  *See* Pl. Ex. 74A at 1:25.  Then, after about two minutes, all the officers are standing while Pfail lies motionless on the ground, and Pfail is rolled over, leaving a large pool of blood where his head was. *See id.* at 3:05–3:22.  The jury also saw pictures of Pfail after the incident, showing a large gash on his head that had to be stapled shut, *see* Pl. Ex. 86, and could compare those to the photos of the officers taken, which showed only some light redness and mild swelling, *see* Def. Ex. BBBBB, CCCCC, DDDDD.

This evidence could have led a reasonable jury to agree with Plaintiff's counsel's argument in summation that Officer O'Brien's claims about how the

25

respective parties looked when she arrived were so incredible and biased that other aspects of her testimony, including her claim that she was kicked by Pfail, were not worthy of belief. *See* Trial Tr. at 1146 (arguing that O'Brien showed "her true stripes" on the witness stand when she falsely claimed that her fellow officers looked like they had been badly beaten by Pfail, rather than vice-versa); *id.* at 1150. Thus, there is no cause to disturb the jury's finding that Defendants lacked probable cause to arrest Pfail for assault in the second degree.

### 3.  Grand Jury Indictment

Defendants next argue that "indictment by a grand jury creates a presumption of probable cause," *Savino*, 331 F.3d at 72, which may only be rebutted by "establish[ing] that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith," *Rothstein v. Carriere*, 373 F.3d 275, 283 (2d Cir. 2004), and that Pfail did not rebut that presumption. However, the jury was instructed on this issue, and "juries are presumed to follow the court's instructions." *CSX Transp., Inc. v. Hensley*, 556 U.S. 838, 841 (2009). Defendants offer no new case law or argument since their original Rule 50(a) motion to show that no reasonable jury could have found that Pfail overcame the presumption of probable cause.

As in their Rule 59 motion, Defendants' entire argument is that the disposal of the sweatshirt and failure to preserve the cart wrangler's identity and cell phone video cannot overcome the presumption of probable cause because Defendants had no obligation to preserve this evidence. Again, Defendants confuse the question of

26

whether there is a legal obligation to preserve evidence in a civil case with whether the officer's failure to preserve that evidence is a relevant fact for the jury's determination of bad faith or the officers' credibility as witnesses.

The jury heard testimony that Officer Massaro had a bloody sweatshirt from the incident and that he took a picture of it, but that he deliberately threw out the sweatshirt that night. Trial Tr. at 145–46. He agreed that he did not know if Pfail's blood was on the sweatshirt, *id.* at 146, and that by destroying it, he made it unavailable for DNA testing by the prosecutors or by Pfail. *Id.* at 147.

The jury was also presented with evidence that the cart wrangler who made the 911 call — which indicated that he believed that he was witnessing three men assault Pfail — was taken back to the substation by Officer Panuthos and Sergeant Iannucci, and that he told them he had a video of the incident. *Id.* at 446–47; 639–42. Officer Panuthos did not recall telling anyone, including anyone in the DA's office, about even speaking with the witness. *Id.* at 448. He claimed that he "determined that there wasn't a video," *id.*, and he did nothing to document the identity of the witness, *id.* at 450. Given that this was the very witness whose 911 call seemed to corroborate Pfail's claim that this was an unprovoked attack or (in the caller's own words) a "beating," it was hardly unreasonable for a jury to infer that the caller's video and/or testimony would have benefited Pfail, and that the officers sent him home without recording his name or contact information for that reason, thus securing the indictment in bad faith.

A-4744

Relatedly, a jury could have reasonably inferred that if the sweatshirt did not have Pfail's blood or the cart wrangler's video did not actually depict the incident, as the officers now claim, the officers would have preserved those pieces of evidence precisely in order to dispel any inference that they buried or covered up unfavorable evidence — rather than asking the District Attorney's office or Pfail to simply take them at their word about what the evidence would or would not have shown.

Finally, with regards to Officer O'Brien, if the jury did not credit her testimony that Pfail kicked her — which it clearly did not — then it follows that they concluded that she acted in bad faith when she made those same false statements about Pfail's alleged assault on her in seeking his indictment.

Thus, a reasonable jury could have found the presumption of probable cause overcome by the evidence presented at trial.

### 4. Qualified Immunity as to Malicious Prosecution

Even if the officers did not have probable cause to arrest Pfail on the above charges, Defendants argue that the malicious prosecution verdict should be set aside under Rule 50(b) because there was no evidentiary basis for the jury to determine that the Defendants were not protected by qualified immunity. Def. Mem. at 35–37.

First, "because qualified immunity is an affirmative defense, it is incumbent upon the defendant to plead, and adequately develop, a qualified immunity defense during pretrial proceedings so that the trial court can determine . . . *which facts material to the qualified immunity defense must be presented to the jury to*

*determine its applicability once the case has gone to trial.*" *Blissett v. Coughlin*, 66 F.3d 531, 538 (2d Cir.1995) (emphasis added). Here, however, Defendants did not move for summary judgment on qualified immunity. Thus, when the claim was raised pre-trial, they asked this Court to make the determination without any corresponding factual record.

In the context of a Rule 50 motion, while qualified immunity is a legal defense, "[t]o the extent that a particular finding of fact is essential to a determination by the court that the defendant is entitled to qualified immunity, it is the responsibility of the defendant to request that the jury be asked the pertinent question. If the defendant does not make such a request, he is not entitled to have the court, in lieu of the jury, make the needed factual finding." *Zellner*, 494 F.3d at 368 (internal citation omitted). Defendants did not request any special interrogatory for the jury on qualified immunity, and thus this Court cannot make any factual findings in place of the jury's. The Court thus analyzes the issues based only on the facts adduced at trial, weighing all of the evidence in favor of Pfail.

For a claim of malicious prosecution, "qualified immunity protects an officer if he had arguable probable cause to arrest the plaintiff." *Myers v. Patterson*, 819 F.3d 625, 632 (2d Cir. 2016) (cleaned up). "Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Id.* at 633. Defendants simply argue that there was "nothing in the record reasonably suggesting that officers would uniformly agree

29

that Plaintiff did *not* resist arrest or commit an assault as defined above." Def. Mem. at 37.

The Court disagrees. Just as a reasonable jury could find no probable cause existed, it could also find no arguable probable cause existed. If the jury were to credit Pfail and not the officers, a reasonable interpretation of his testimony along with the video and the 911 caller's statements is that the three men in plainclothes exited out of an unmarked vehicle, kicked Pfail in the stomach, and immediately tackled him to the ground without identifying themselves or giving him a chance to comply with their commands. No reasonable officers could have believed they had probable cause to charge him with resisting arrest in this scenario.

Additionally, the jury also found that the officers used excessive force against Pfail, making the contact Pfail made with them — as shown on the video and otherwise described in his testimony — legally permissible to protect himself, and thus defeating even arguable probable cause. *See Stevenson*, 31 N.Y.2d at 112; *McLaurin*, 2007 WL 247728, at *1.

Thus, Defendants are not entitled to qualified immunity on the malicious prosecution claim.

B. Due Process

Defendants argue that the judgment against them for abuse of process must be set aside. To the extent that Defendants justify this claim based on the existence of probable cause or arguable probable cause to arrest Pfail, the argument is rejected for the reasons just discussed. Defendants next argue that no evidence was

presented from which a reasonable jury could infer that the prosecution was pursued for a collateral purpose.

To meet that standard, a plaintiff must show "not that defendant[s] acted with an improper motive, but rather an improper purpose—that is, 'he must claim that [the defendants] aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution.'" *Taylor v. City of New York*, No. 19-CV-6754 (KPF), 2022 WL 744037, at *20 (S.D.N.Y. Mar. 11, 2002) (emphasis removed) (quoting *Douglas v. City of New York*, 595 F. Supp. 2d 333, 344 (S.D.N.Y. 2009)).[3] Under New York law, this collateral objective can include "covering up an unconstitutional use of force, perhaps to forestall personal liability." *Gabilly v. City of New York*, No. 19-CV-11884 (RA), 2021 WL 3667981, at *4 (S.D.N.Y. Aug. 17, 2021). It can also include "[f]abricating assault charges to save one's job." *Douglas v. City of New York*, 595 F. Supp. 2d 333, 344 (S.D.N.Y. 2009).

It is true — and unsurprising — that none of the officers admitted on the stand that they pursued Pfail's criminal prosecution to save their jobs or avoid liability for violating his civil rights. However, the jury was entitled to draw such inferences after observing the officers' demeanor on the stand, hearing about their failure to preserve evidence potentially relevant to Pfail's prosecution, and watching

---

[3] The Second Circuit case on which Defendants rely for their rule statement and contention that the collateral purpose be the *primary* purpose, *see Doctor's Assocs., Inc. v. Weible*, 92 F.3d 108 (2d Cir. 1996), was specifically looking at an abuse of process claim under *Connecticut* law. Indeed, directly preceding the quote Defendants use in their memorandum at page 39, the Second Circuit clarifies that it is the "Connecticut law" elements for abuse of process it is defining. *See id.* at 114.

A-4748

the video of the incident.  Notably, the jury also knew that if Pfail *had* been found guilty of resisting arrest and assault in the second degree, the officers could not have been held liable in a future civil action. *See* Trial Tr. at 1177 (noting that the second element of a malicious prosecution claim is that the prosecution terminated in Plaintiff's favor).

Thus, the jury had a reasonable basis to find against the officers for abuse of process.

C.  Excessive Force, Assault, and Battery

Defendants next argue that the judgments for excessive force, assault, and battery must be overturned, both because the use of force was "reasonably necessary under the circumstances," Def. Reply at 13, and because they are protected by qualified immunity, Def. Mem. at 41–42.  Again, Defendants' claim relies on viewing the evidence in the light most favorable to them and crediting the officers' testimony over Pfail's.

Defendants argue that the officers "identified themselves, approached to speak to [Plaintiff], and the videos show the rest: the officers moved to pursue him when it seemed he made a move to run.  Then, they took him down to the ground and worked to place him in handcuffs.  It took the efforts of three, then four, then five people, over the course of several minutes, to get Plaintiff into handcuffs.  Why did it take so long to get Plaintiff into handcuffs? Massaro explained: 'we couldn't do it any quicker.'" *Id.* at 42.  In particular, Defendants repeatedly claim that the video "objectively supports the officers' on the scene perception: when they

32

A-4749

confronted [Pfail], he made a sudden move to the left, as though ready to run." Def. Reply at 14.

This is by no means the only reasonable interpretation of the video and the testimony given. The jury could have reasonably found that what the video actually showed was three men exiting an unmarked car in plainclothes and assaulting Pfail without identifying themselves or providing him a chance to comply with their commands. The jury also could have found that one officer kicked Pfail, tackled him to the ground, and continued to beat him for nearly two minutes while he was on the ground attempting to protect himself. Indeed, from the Court's own repeated viewing of the video, it was hardly unreasonable for the jury to find that it corroborated Pfail's account and not the officers'.

Similarly, though the jury could have credited Officer Massaro's testimony that it took so long to get Pfail in handcuffs because he was resisting so forcefully, they could also have watched the video and found that it showed three officers engaging in an unprovoked attack on Pfail, whose own movements were an effort to protect his head and body from the assault. The jury could have also credited Pfail's own testimony that as the officers came towards him from the vehicle, he braced himself for impact, Trial Tr. at 780, and that in the ensuing struggle, he heard a female officer tell the others to "break his leg" and bend his leg back as he was begging for them to stop, *id.* at 783–84. The evidence at trial thus supports the jury's determination, and accepting Defendants' preferred narrative would usurp the jury's role as fact finder.

33

A-4750

Defendants are also not entitled to qualified immunity on the excessive force and battery claims. As of 2010, it was clearly established in the Second Circuit "that it is a Fourth Amendment violation for a police officer to use significant force against an arrestee who is no longer resisting and poses no threat to the safety of officers or others." *Jones v. Treubig*, 963 F.3d 214, 225 (2d Cir. 2020). Here, a reasonable jury could conclude that Pfail did not resist arrest nor pose any threat, yet the officers used excessive force in kicking him, bringing him to the ground, telling one another to "break his leg," and continuing to beat him once he was on the ground, ultimately leaving him lying motionless in a pool of blood. Such conduct is certainly not protected by qualified immunity.

For the foregoing reasons, the Court denies Defendants' Rule 50 motion for a renewed judgment as a matter of law.

## III. Compensatory Damages

Defendants challenge the jury's award of $1,860,000 in compensatory damages as excessive. However, their reasoning is difficult to parse. Notably, Defendants do not argue that this amount "shocks the conscience" on this record. Rather, they appear to raise only one issue: that Pfail's physical injuries, specifically his brain injuries, were not proximately caused by Defendants' actions, but rather resulted from a "separate and unconnected incident that occurred over a year later." Def. Mem. at 43. This incident, referred to at trial as "the 2013 incident" or "the Garden City incident," is described in a 2016 complaint Pfail filed in a different civil rights lawsuit in this court at Docket No. 16-CV-3832.

First, to the extent that Defendants challenge Dr. Berrill's testimony as to Pfail's TBI because he did not consider the 2013 incident when he made his diagnosis, that is simply a re-litigation of the *Daubert* motion on which this Court has already ruled.

Otherwise, Defendants correctly note that the 2013 incident provided a basis for them to argue to the jury that at least some of Pfail's symptoms stemmed from that incident. That is precisely why this Court denied Plaintiff's motion to preclude that evidence and allowed defense counsel to cross both Pfail and Dr. Berrill at great length on the statements in the civil complaint about the 2013 incident and its impact on Pfail. *See* Tr. 1548–71; 1800–01. However, it does not follow that simply because Defendants have raised a possible alternative cause of Pfail's injury, the jury was required to accept their theory — namely, that Pfail sustained a TBI in 2013, but not during his arrest by Defendants in 2014.

This is especially so given that Defendants could have called their own expert to testify that Pfail's injuries stemmed from 2013 as opposed to 2014, but chose not to do so. Indeed, Defendants presented no affirmative evidence that the 2013 event caused a TBI. Rather, they asked the jury to infer that that was the case based on assertions by counsel that Pfail signed in a 2016 civil complaint. The jury was entitled to draw its own conclusions.

Defendants make no other discernible argument supporting their claim that the jury's award was excessive or improper. Indeed, Pfail and his mother Eileen presented substantial, detailed evidence to support this award of damages as

A-4752

specifically tied to the injuries he sustained during his encounter with Defendants in 2014. As this Court instructed the jury, compensatory damages can stem from pain, suffering, disability, disfigurement, mental anguish and/or loss of capacity for enjoyment of life. Trial Tr. at 1963; *see Bergerson v. New York State Off. of Mental Health*, 652 F.3d 277, 286 (2d Cir. 2011).

Eileen testified that on the day of the 2014 incident and just after, "[Pfail] was a mess . . . his whole face. He was all banged up." *Id.* at 1386. She said that "[h]e was very much out of it . . . he just seemed very confused and he couldn't hold a conversation. He just was not right." *Id.* 1389. Pfail himself testified about the pain he endured, describing that when he looked in the mirror following the incident, "it looked like [his] face was painted red." *Id.* at 1441.

Eileen also testified to Pfail's long-term emotional distress, saying that "[w]hen he would eventually sleep, [she] would hear screaming during the night because he was having night terrors and then he would get up and he would be soaking we from sweating so much." *Id.* at 1390. Notably, she specified that these night terrors were not happening before the 2014 incident. *Id.* She also testified that Pfail could no longer hear a siren without becoming anxious and upset. *Id.* at 1399. She further described how the 2014 incident affected Pfail's depression, saying that "before [the incident] he at least was going out, doing things . . ." but that after, "he would spend the day in bed. . . . He can't function." *Id.* at 1398–99, 1391.

36

Pfail and Eileen also testified as to the damage caused by the officers' malicious prosecution and abuse of process. For example, Eileen stated that the criminal trial depressed and frustrated Pfail, *id.* at 1393, that seeing his mugshot on television was distressing for him, *id.* at 1391, and that he could not stop crying. *Id.* at 1392. Pfail testified that there were social media posts on Facebook, Twitter, and LinkedIn regarding his arrest, and that his mugshot made him embarrassed and ashamed. *Id.* at 1432–33.

Thus, viewing the evidence presented in the light most favorable to Pfail, the Court cannot find that the compensatory damages award here "shock[s] the judicial conscience." *Pescatore*, 97 F.3d at 18 (quoting *Matthews v. CTI Container Transp. Int'l Inc.*, 871 F.2d 270, 278 (2d Cir. 1989)).

## IV.    Punitive Damages

Finally, Defendants ask this Court to set aside or substantially reduce the jury's award of punitive damages. The jury awarded punitive damages of $293,580 each against Officers Panuthos, Massaro, and Iannucci, and $143,550 against Officer O'Brien. Defendants' motion is denied.

As a preliminary matter, Defendants argue that since the amounts against all four Defendants were "nearly identical," the jury must have given the awards reflexively without consideration of each officer's state of mind. First, it should be noted that the award against Officer O'Brien was less than half of the other officers', reflecting the jury's assessment of her relative culpability. Moreover, it was perfectly reasonable for the jury to assign equivalent, higher punitive damages

against Panuthos, Massaro and Iannucci given that it found that those three officers engaged in the same conduct at the same time in assaulting and using excessive force against Pfail. In any case, Defendants again cite to no law authorizing a Court to find that a jury did not make an individualized assessment simply because it assigned the same punitive damages to three Defendants involved in the same conduct.

A jury has "wide discretion" to award punitive damages, and a district court "may refuse to uphold a punitive damages award" only when the amount is "so high as to shock the judicial conscience and constitute a denial of justice." *Lee v. Edwards*, 101 F.3d 805, 808 (2d Cir. 1996) (quoting *Hughes v. Patrolmen's Benevolent Ass'n of N.Y., Inc.*, 850 F.2d 876, 883 (2d Cir. 1988)). The "guideposts" for a court in deciding whether an award of punitive damages is excessive are: (1) the degree of reprehensibility of the tortious conduct; (2) the ratio of punitive damages to compensatory damages; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574–75 (1996) ("the Gore factors"). The Court considers each of these factors in turn.

A. Degree of Reprehensibility

The degree of reprehensibility is "perhaps the most important" factor. *Gore*, 517 U.S. at 575. The Second Circuit has instructed district courts to look at three factors with regard to each defendant: "(1) whether a defendant's conduct was marked by violence or presented a threat of violence, (2) whether a defendant's

conduct evinced trickery or deceit as opposed to mere negligence, and (3) whether the record supports a finding of intentional malice." *Jennings v. Yurkiw*, 18 F.4th 383, 390 (2d Cir. 2021).

Defendants first state that because they did not brandish weapons, use racial slurs, or seek to humiliate Pfail, their actions could not have involved "reckless or callous indifference" to Pfail's rights. Def. Mem. at 45 (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). However, they cite to no caselaw which requires these specific elements to be present to find that the conduct was reprehensible.

By contrast, the record is replete with evidence weighing against the Defendants on all three *Jennings* factors. The jury heard evidence from which it certainly could conclude that Massaro, Panuthos, and Iannucci used gratuitous violence against Pfail. This Court has already extensively discussed that evidence, and will here simply reiterate that Pfail testified that the first contact between him and the officers was a foot to his abdomen, at which point he fell face-first into the vestibule of the Fairway. Trial Tr. at 782–83. When he was on the ground, he testified that all the men were on top of him and he could feel the punching. He said that someone took his head and slammed it on the floor of the vestibule, and felt something blunt hitting him in the back of the head numerous times. *Id.* at 783. Video evidence, photographs, and the 911 caller's descriptions of a "beating" all corroborated his account of Defendants' use of violence.

The jury also concluded that the officers had no probable cause to believe Pfail assaulted them or resisted arrest, yet charged him with those felony crimes.

39

And as discussed, the jury was presented with evidence that the Officers acted with malice and deceit in pursuing Pfail's prosecution, including by making false statements about his conduct and by failing to preserve evidence, potentially with the intent to suppress exculpatory evidence.  The jury also saw all of the officers testify and apparently concluded that they were not being truthful in their claims that Pfail assaulted them and resisted arrest.

Presented with the above evidence of Defendants' gratuitous violence, deceit, and intentional malice, the jury certainly could have concluded that the officers' conduct was reprehensible.

B.  Ratio of Punitive Damages to Compensatory Damages

The second *Gore* factor is the ratio of punitive damages to the compensatory damages.  Notably, the Second Circuit in *Jennings* itself found "nothing untoward about the 1:4 ratio between compensatory and punitive damages." *Jennings*, 18 F.4th at 392.  The ratio here does not even approach that.

Defendants' argument is simply a re-litigation of their motion to remit compensatory damages, *see* Def Mem. at 46. ("Where the compensatory award is already excessive and likely overstated, any attempt to calibrate punitive damages to that award becomes equally flawed."), which the Court has already addressed.  Thus, the Court finds no basis to remit punitive damages on this basis.

C.  Difference with Comparable Cases

The final *Gore* factor instructs us to compare the punitive damages to potential civil and criminal sanctions or awards in other civil rights cases.  As a

preliminary matter, Defendants in their initial brief compare the total punitive damages here against all officers—over one million dollars—to the damages in other cases. But the cases they cite analyze amounts against each officer individually. The correct comparator is therefore the punitive damages against individual officers in this case, the highest of which is $293,580.

First, Defendants argue that because no officer was internally disciplined or referred for criminal prosecution, there was an absence of sanctions, and thus no comparative criminal or civil sanctions. This argument misreads *Gore*. *Gore* instructed the district court to look at "statutory fines *available in* [the State] or elsewhere for similar malfeasance." *Gore*, 517 U.S. at 584 (emphasis added). It decidedly did not instruct district courts to anchor punitive damages on any criminal or civil fines that were actually *imposed* on the defendants. Moreover, the Second Circuit has explicitly directed district courts to look to *federal* criminal law in § 1983 cases. *See Jennings*, 18 F.4th at 393 ("Where a jury imposes punitive damages for a violation for § 1983, the penalties imposed under federal criminal law offer a useful comparison."). And as Pfail points out, if the officers had been prosecuted for perjury under 18 U.S.C. § 1621, a federal felony, they each could have been fined up to $250,000.

Defendants next argue that this award is excessive compared to similar cases. The Court first cautions that while it is "helpful in deciding whether a particular punitive award is excessive to compare it to court rulings on the same question in other cases," *Payne v. Jones*, 711 F.3d 85, 104 (2d Cir. 2013), a court's

task is not to simply "balance the number of high and low awards and reject the verdict . . . if the number of lower awards is greater," *Ismail v. Cohen*, 899 F.2d 183, 187 (2d Cir. 1990).

Defendants cite to this Court's opinion in *Martinez v. City of New York*, No. 16-CV-79 (NRM), 2023 WL 4627739, at *18 (E.D.N.Y. July 19, 2023), for the proposition that the Second Circuit set $175,000 as the upper range of punitive awards against a single officer. *See* Def. Mem. at 47. This is decidedly not what *Martinez* states. For Defendants neglect to mention the sentence immediately following their quoted line, which reads: "However, since that time, the Second Circuit made clear in *Jennings* that courts must *adjust previous awards for inflation* before comparing those awards with the jury's award in the case before them." *Martinez*, 2023 WL 4627739, at *18 (emphasis added). And as the *Martinez* opinion went on to note, the Second Circuit in *Jennings* affirmed a $250,000 award against a single officer. *Id.* (citing *Jennings*, 18 F.4th at 393).

Furthermore, *Jennings* left ample room for an even higher award on facts such as these. In *Jennings*, the defendant police officers assaulted the plaintiff, then took steps to conceal that assault. Yet the Second Circuit stated that its award would be reasonable "even if [the court] were to ignore that [the Defendant] and the other officers took steps to conceal their use of excessive force." *Jennings*, 18 F.4th at 393–94. In other words, *Jennings* indicates that an award of punitive damages against a single officer in a case involving excessive force *and* an effort to conceal that excessive force could reasonably be *higher* than $250,000 in 2021 dollars.

42

The underlying damages trial in *Jennings* was held in April of 2019, *see Jennings v. Yurkiw*, 14-CV-6377 (SGG), 2019 WL 6253813, at *2 (E.D.N.Y. Nov. 22, 2019). In the instant trial, the jury delivered its verdict in May of 2025. Adjusted for inflation, $250,000 in May of 2019 has the same buying power as $313,817.89 in May of 2025. Bureau of Labor Statistics CPI Inflation Calculator, https://www.bls.gov/data/inflation_calculator.htm. Thus, the jury's punitive awards against each individual officer in this case, adjusted for inflation, is *less* than the amount that the Circuit in *Jennings* already found reasonable.

The Court has reviewed the other cases Defendants rely upon, and finds that they are similarly distinguishable.[4] As such, following the Second Circuit's direction in *Jennings* that $313,817.89 in today's dollars would not be excessive in a case that involved excessive force but did *not* involve deceit or cover-up, the punitive awards here are clearly not excessive in light of the multiple civil rights violations found by the jury and the nature of those violations.

---

[4] For example, Defendants cite to the recent case of *McDevitt v. Suffolk County*, No. 16-CV-4164 (GRB), 2024 WL 1270811, at *10 (E.D.N.Y. Mar. 26, 2024), where a punitive damages award was lowered from $450,000 to $100,000. *See* Def. Mem. at 47. However, while *McDevitt* involved claims of excessive force and malicious prosecution, the court specifically noted that the "punitive award relates solely to plaintiff's malicious prosecution claim, emanating from acts which, though highly reprehensible, were not marked by violence or a threat of violence." *McDevitt*, 2024 WL 1270811, at *8. The court in *McDevitt* also found the ratio to weigh against the plaintiff, as the compensatory award was only $150,000. *Id.* Thus, the facts are not comparable to the facts here, where the compensatory award was much higher, and there is nothing to indicate that the punitive damages were not also awarded for the excessive force claim.

43

A-4760

## CONCLUSION

For the foregoing reasons, Defendants' post-trial motions are denied in full.


_/s/ Nina R. Morrison_
NINA R. MORRISON
United States District Judge

Dated:     November 13, 2025
           Brooklyn, New York

A-4761

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRIAN PFAIL,<br><br>                    Plaintiffs,<br><br>          v.<br><br>COUNTY OF NASSAU, NASSAU COUNTY POLICE DEPARTMENT, POLICE OFFICER JOSEPH MASSARO, in his individual and official capacity, POLICE OFFICER JONATHAN PANUTHOS, in his individual and official capacity, POLICE OFFICER KARN C. O'BRIEN, in her individual and official capacity, SERGEANT THOMAS IANNUCCI, in his individual and official capacity, and JOHN DOES 1-10, in their individual and official capacities,<br><br>                    Defendants. | MEMORANDUM & ORDER<br>16-CV-518 (NRM) |

NINA R. MORRISON, United States District Judge:

A jury awarded Plaintiff Brian Pfail $1,860,000 in compensatory damages and $293,580 in punitive damages against four police officers of the Nassau County Police Department ("NCPD").  On November 13, 2025, this Court denied Defendants' post-trial motions to set aside the verdict or reduce the jury's damages award.  ECF No. 173.  Plaintiff's counsel now moves for attorney's fees as the prevailing party in the litigation under 42 U.S.C. § 1988.  For the reasons that follow, the Court grants Plaintiff's motion in full and awards attorney's fees as requested in Plaintiff's most recent supporting declarations.  *See* Reply Dec. of

1

A-4762

Korenbaum at 3; Reply Dec. of Brewington at 6.[1]

### DISCUSSION

Defendants primarily argue that a number of counsel's time entries in their billing submissions are duplicative and are therefore illegitimate.  Opp. at 11–13.  However, any purported duplication pointed out by Defendants can be explained by the fact that certain tasks may take — or indeed, require — multiple occasions to complete.  *See Pascuiti v. New York Yankees*, 108 F. Supp. 2d 258, 271 n.5 (S.D.N.Y. 2000) ("The Yankees include in this category allegedly duplicative entries . . . . But the examples cited by the Yankees are tasks that simply might have taken two occasions to complete, such as reviewing photos or preparing a file memo."); *Etna Prods. Co. Inc. v. Q Mktg. Grp., Ltd.*, No. 03-CV-3805 (SAS), 2005 WL 2254465, at *4 (S.D.N.Y. June 6, 2005) ("There also is no basis for the Defendants' contention that Etna should be denied fees in instances where an attorney performed the same task over the course of several days.").  In addition, while some of the descriptions for these entries may be vague, "when viewed in the context of other work performed around the same time, the ambiguity of many of the challenged entries disappears." *Rozell v. Ross-Holst*, 576 F. Supp. 2d 527, 540 (S.D.N.Y. 2008).

Defendants also claim that Plaintiff cannot recover fees for work associated with media relations.  Opp. at 14–15.  Courts indeed "generally require that [media relations] work be 'directly and intimately related to the successful representation

---

[1] All references to page numbers use the pagination provided by the Electronic Case Filing system.

2

of [the] client'" to be compensable as attorney's fees. *Small v. New York City Transit Auth.*, 2014 WL 1236619, at \*8 (E.D.N.Y. Mar. 25, 2014) (second alteration in original) (quoting *Davis v. City and Cnty. of San Francisco*, 976 F.2d 1536, 1545 (9th Cir. 1992)). "However, there is precedent for awarding fees for media work, as informing the public about court proceedings is often necessary to fully vindicate the public interest implicated by the case." *Rodriguez ex rel. Kelly v. McLoughlin*, 84 F. Supp. 2d 417, 425 n.7 (S.D.N.Y. 1999). For example, the court exercised its discretion to award such fees in *Rodriguez* after a jury awarded the plaintiff $50,002 against a foster care service who unlawfully removed a child from his foster mother's care. *Id.* at 419; *see Rodriguez v. McLoughlin*, 49 F. Supp. 2d 186, 189–92 (S.D.N.Y. 1999). Similar public interests are implicated here, where a jury found that four officers of the NCPD engaged in numerous violations of state and federal law, and Plaintiff alleged that he suffered serious physical and emotional injuries at the hands of these officers that may persist for the rest of his life. Further, Plaintiff's counsel's entries related to public relations pointed out by Defendants represents only 5.2 hours of work, Opp. at 15, out of a total of 840 hours in compensable attorney time spent on the litigation over nine years, Reply Ex. 3 at 87. The Court finds that "the comparatively few hours" spent on media relations are reasonable and compensable. *U.S. Football League v. Nat'l Football League*, 704 F. Supp. 474, 482 (S.D.N.Y. 1989), *aff'd*, 887 F.2d 408 (2d Cir. 1989).

Defendants also raise objections to Plaintiff's entries related to travel time and time spent on the retention of one of Plaintiff's experts, Opp. at 9, 11–12, but

3

A-4764

Plaintiff's counsel has already agreed to reduce his requested fees in accordance with those objections, Reply Dec. of Brewington at 5–6.

None of Defendants' remaining challenges have merit.  Accordingly, the Court grants Plaintiff's motion for attorney's fees, as revised in their Reply, in full. Plaintiff is awarded attorney's fees and discretionary costs in the total amount of $425,665.53 — $372,645.53 for the Law Offices of Frederick K. Brewington, and $53,020 for Scott A. Korenbaum.[2]

SO ORDERED.

/s/ Nina R. Morrison
NINA R. MORRISON
United States District Judge

Dated:      December 3, 2025
            Brooklyn, New York

---

[2] Plaintiff's Reply states that the total compensation amount is $425,555.53, rather than $425,665.53.  Reply at 15.  However, Plaintiff provides a breakdown of the individual amounts that make up that total, and those amounts add up to $425,665.53.  *Id.*; *see* Reply Dec. of Brewington at 6; Reply Dec. of Korenbaum at 3. The Court thus awards $425,665.53.

4

A-4765

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

BRIAN PFAIL,

                                  Plaintiff,

         -against-

COUNTY OF NASSAU, NASSAU COUNTY
POLICE DEPARTMENT, POLICE OFFICER
JOSEPH  MASSARO, in his individual and official
capacity, POLICE OFFICER JONATHAN
PANUTHOS, in his individual and official capacity,
POLICE OFFICER KAREN C. O'BRIEN, in her
individual and official  capacity, SERGEANT
THOMAS IANNUCCI, in his individual and official
capacity, and JOHN DOES 1-10, in their individual
and official capacities,

                                 Defendants.

---------------------------------------------------------------X

**NOTICE OF APPEAL**

16-cv-00518  (NRM) (CLP)

     **NOTICE IS HEREBY GIVEN** that Defendants, COUNTY OF NASSAU; NASSAU

COUNTY POLICE DEPARTMENT, P.O. JONATHAN PANUTHOS, in his individual and

official capacity, P.O. KAREN C. O'BRIEN, in her individual and official capacity, and JOHN

DOES 1-10, in their individual and official capacities, appeals to the United States Court of

Appeals for the Second Circuit from the final Judgment dated May 30, 2025 and from an order

of this Court denying the defendants' joint Rule 50(b), 59 and request for remittitur post-trial

motions.

Dated: Mineola, New York
       December 11, 2025

                                         Yours, etc.,

                                         HONORABLE THOMAS A. ADAMS
                                         Nassau County Attorney
                                         *Attorney for Defendants County of Nassau,*
                                         *Nassau County Police Department. P.O.*
                                         *Jonathan Panuthos, P.O. Karen C. O'Brien*
                                         *and John Does 1-10*

A-4766

By:  s/Robert F. Van der Waag
      Robert F. Van der Waag
      Deputy County Attorney
      One West Street
      Mineola, New York 11501
      (516) 571-3954

TO:    U.S. District Court, E.D.N.Y.

       All Counsel Via ACMS

A-4767

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X
BRIAN PFAIL,

                          Plaintiff,

   -against-

COUNTY OF NASSAU, NASSAU COUNTY
POLICE DEPARTMENT, POLICE OFFICER
JOSEPH MASSARO, in his individual and
official capacity, POLICE OFFICER JONATHAN
PANUTHOS, in his individual and official
capacity, POLICE OFFICER KAREN C.
O'BRIEN, in her individual and official capacity,
SERGEANT THOMAS IANNUCCI, in his
Individual and official capacity, and JOHN DOES
1-10 in their individual and official capacities,

                          Defendants.
-------------------------------------------------------------------------X

**NOTICE OF APPEAL**

16-cv-00518 (NRM)(CLP)

**NOTICE IS HEREBY GIVEN** that Defendant, Sergeant Thomas Iannucci, in his individual and official capacity, appeals to the United States Court of Appeals for the Second Circuit from the final Judgment dated May 30, 2025 and from an order of this Court denying the defendants' joint Rule 50(b), 59 and request for remittitur post-trial motions.

Dated: Mineola, New York
         December 11, 2025

                CUOMO LLC

                /s/ Matthew A. Cuomo /s/

BY:    MATTHEW A. CUOMO
        Attorneys for Defendant
        SERGEANT THOMAS IANNUCCI
        200 Old Country Road, Suite 2 South
        Mineola NY 11501
        (516)-741-3222

A-4768

TO:     *All Counsel Via ECF*

A-4769

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

BRIAN PFAIL,

      Plaintiff,

  -against-

COUNTY OF NASSAU, NASSAU COUNTY POLICE
DEPARTMENT, POLICE OFFICER JOSEPH
MASSARO, in his individual and official capacity
POLICE OFFICER JONATHAN PANUTHOS, in his
individual and official capacity, POLICE OFFICER
KARN C. O'BRIEN, in her individual and official
capacity, SERGEANT THOMAS IANNUCCI, in his
individual and official capacity, and JOHN DOES 1-10, in
their individual and official capacities,

      Defendants.

Docket No.
16-cv-00518 (NRM)(CLP)

**NOTICE OF APPEAL**

**NOTICE IS HEREBY GIVEN** that Defendant Police Officer Joseph Massaro, in his

individual and official capacity, appeals to the United States Court of Appeals for the Second

Circuit from a Judgment dated May 30, 2025 and from a November 13, 2025 Order of this Court

denying the Defendants' joint Rule 50(b), 59 and request for remittitur post-trial motions.

Dated: Carle Place, New York
   December 11, 2025

            SOKOLOFF STERN LLP
            *Attorneys for Defendant*
            *Police Officer Joseph Massaro*

            _____
            Leo Dorfman
            179 Westbury Avenue
            Carle Place, New York 11514
            (516) 334-4500
            File No. 220017

TO:  U.S. District Court, E.D.N.Y.
    All Counsel Via ACMS